# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JAVIER CARDENAS and KURT KIRTON, individually and on behalf of all others similarly situated, | Civil Action No._____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., and SOUTHEAST TOYOTA DISTRIBUTORS, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

The allegations contained in this Complaint are based on Plaintiffs' personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based on an investigation by Plaintiffs' Counsel:[1]

## I.    INTRODUCTION

1.    Plaintiffs Javier Cardenas and Kurt Kirton (collectively "Plaintiffs") bring this class action against Defendants Toyota Motor Corporation ("TMC"), Toyota Motor Sales, U.S.A., Inc. ("TMS"), and Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") (collectively the "Toyota Defendants" or "Toyota") and Southeast Toyota Distributors, LLC

---

[1] Counsel's investigation includes analysis of publicly available information, including consumer complaints to the National Highway Transportation Safety Administration ("NHTSA"), Technical Service Bulletins issued by Defendants, and additional analysis.  Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

("SET") (collectively with Toyota, the "Defendants") for Defendants' fraudulent activities, unfair trade practices, violation of the federal Racketeering Influenced and Corrupt Practices Organizations Act, 18 U.S.C. § 1962, and conspiracy to conceal a known defect in millions of 2012–2017 Toyota Camrys sold in the United States, and against the Toyota Defendants for breach of implied warranties, fraudulent activities.

2.      Plaintiffs bring their claims individually and on behalf of all persons or entities in the United States and/or Florida and Tennessee who purchased or leased a 2012–2017 Toyota Camry and/or Toyota Camry Hybrid (the "Class Vehicles").

3.      The Class Vehicles contain a defective Heating, Ventilation, and Air Conditioning System (the "Defective HVAC System") that fails to properly remove all humidity and water and emits foul, noxious, and/or toxic odors into the vehicles' passenger compartments when the Defective HVAC System is in use. Upon information and belief, in addition to the nuisance of being exposed to foul, noxious, and/or toxic odors, Plaintiffs and Class members (defined below) are exposed to a serious health and safety hazard because mold and other contaminants are emitted into the vehicle by the air circulated through the Defective HVAC System.

4.      The defect—*i.e.*, the above-described HVAC system's failure to remove all humidity and water, thereby emitting foul, noxious, and/or toxic odors into the vehicles and exposing vehicle occupants to a health and safety hazard (the "HVAC System Defect" or the "Defect")—has resulted in numerous complaints to NHTSA, distributors, and Toyota dealerships across the country, as well as directly to Defendants themselves. Toyota has issued numerous Technical Service Bulletins ("TSBs") to its exclusive network of distributors and dealerships acknowledging the foul, noxious, and/or toxic odors from the Defective HVAC Systems and collaborated with the Defective HVAC System supplier DENSO International, Inc. ("DENSO"),

2

distributor like SET and Gulf States Toyota, Inc. ("GST") (collectively the "Distributors"), and Toyota dealerships and other independent dealerships ("Dealers") to conceal the Defect in the Defective HVAC System, while passing on to consumers, including Plaintiffs and Class members, the costs to inspect, diagnose, and/or ameliorate the resultant foul, noxious, and/or toxic odors.

5.     Toyota and SET have long been aware of the HVAC System Defect but have concealed the Defect from Plaintiffs, Class members, and the public.  For example, based on the research and technical knowledge of TEMA, TMS published a course manual on air conditioning and climate control that TMC approved in which the Toyota Defendants admitted that Toyota HVAC system odors are "a common complaint among users" and that the odors are caused by, *inter alia*, "[m]icrobes [*i.e.*, mold] growing on the evaporator surface" including "small living bacteria . . . carried into the evaporator case [that] grow in the warm, moist environment."  SET also communicated with Toyota on multiple occasions regarding customer complaints as to the foul, noxious, and/or toxic odors from the Defective HVAC System.  Thus, consumers, including Plaintiffs and Class members, were knowingly sold vehicles that Defendants knew would accumulate mold and/or emit foul, noxious, and/or toxic-smelling odors.

6.     According to the World Health Organization ("WHO"), "[h]ealthy indoor air is recognized as a basic right," and exposure to mold can result in allergies, asthma, respiratory issues, upper respiratory problems, and immunological reactions.  Thus, Plaintiffs and Class members have been exposed to a real and serious health and safety hazard as a result of Defendants' wrongful conduct.

7.     Despite issuing several TSBs to its exclusive network of Distributors and Dealers, Toyota conspired with SET to keep information of the HVAC System Defect from consumers, including Plaintiffs and Class members, so that Toyota and SET could misrepresent the standard,

quality, and/or grade of the Class Vehicles and knowingly, actively, and affirmatively omit and conceal the existence of the Defective HVAC System to increase their profits by selling additional Class Vehicles and charging consumers for special filters, HVAC servicing, and other "repair" fees when consumers complained of the foul, noxious, and/or toxic odors.

8.      Knowledge and information regarding the Defective HVAC System and associated health and safety hazard the HVAC System Defect posed to vehicle occupants was in the exclusive and superior possession of Toyota, Distributors, and Dealers, and was not provided to Plaintiffs and Class members, who could not reasonably discover the Defect through due diligence.  Based on pre-production testing, design failure mode analysis, and/or consumer complaints to Toyota, Distributors, Dealers, and NHTSA, *inter alia*, Defendants were aware of the Defect in the Defective HVAC System and fraudulently failed to disclose such information about the Defect to Plaintiffs and Class members.

9.      Notwithstanding this knowledge, TEMA continued to design and manufacture Class Vehicles that contained the Defective HVAC System, TMS continued selling Class Vehicles with the Defective HVAC System, TMC continued to direct and or approve of continued production and sales of the defective Class Vehicles, SET continued to distribute Class Vehicles to Dealers, and Dealers continued to sell Class Vehicles with the Defective HVAC System to consumers, including Plaintiffs and Class members.  Indeed, the Toyota Defendants and SET conspired to conceal the knowledge of this Defect and failed to disclose the existence of the Defective HVAC System to Plaintiffs and Class members.  Additionally, Toyota has refused to issue a recall and has not remedied the Defect and/or compensated Plaintiffs or Class members for their damages resulting from the material Defect.  Rather, Defendants wrongfully and intentionally concealed information about the Defective HVAC System from Plaintiffs and Class members.

4

10.     No reasonable consumer expects to purchase or lease a vehicle that contains a Defective HVAC System that emits foul, noxious, and/or toxic odors into the vehicle's passenger compartment or emits mold and other contaminants into the vehicles, posing a health and safety hazard to vehicle occupants.  The Defect is material to Plaintiffs and Class members. When Plaintiffs and Class members purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from defects and would not emit foul, noxious, and/or toxic odors into the Class Vehicles' passenger compartments or pose a health and safety hazard to Class Vehicle occupants.

11.     Had Defendants disclosed that the Defective HVAC System was defective and would emit foul, noxious, and/or toxic odors into the Class Vehicles' passenger compartment or pose a health and safety hazard to Class Vehicle occupants, Plaintiffs and Class members would not have purchased or leased their Class Vehicles or would have paid significantly less for their Class Vehicles.

12.     As a result of the Defective HVAC System and Defendants' concealment thereof, Plaintiffs and Class members overpaid for their Class Vehicles, did not receive the benefit of their bargains, were exposed to foul, noxious, and/or toxic odors and a health and safety hazard, and were forced to incur additional expenses in an attempt to remedy the Defective HVAC System in their Class Vehicles.

13.     Upon information and belief, to the extent Defendants have offered or provided odor mitigation to the Class Vehicles based on consumer complaints, those mitigation attempts are not permanent repairs as Defendants knew and have admitted.  The odor mitigation instructions drafted by the Toyota Defendants were distributed to the participants of the Toyota RICO

Enterprise (defined below), who then passed the information along to Distributors and Dealers who spoke directly with consumers, including Plaintiffs and/or Class members.

14.     Plaintiffs and Class members assert claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), fraud, misrepresentations, breach of implied warranties, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, violation of the Florida Unfair & Deceptive Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"), and violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, against the Toyota Defendants and claims for fraud or fraudulent concealment and violation of the FDUPTA against SET and Toyota.

15.     As a direct result of Defendants' wrongful conduct, Plaintiffs and Class members have been harmed and have suffered actual damages, including overpayment for their Class Vehicle, loss of use of their Class Vehicle, costs and lost time associated with bringing in their Class Vehicle for diagnosis, repair, and replacement of components, and the actual costs of diagnosis, repair, and replacement components to address or repair the Defective HVAC System.

## II.     JURISDICTION AND VENUE

16.     This Court has original diversity jurisdiction, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA") because Plaintiffs and many members of the Class are citizens of states different from Defendants' home states and the aggregate amount in controversy in this action exceeds $5,000,000, exclusive of interests and costs, and there are more than 100 members in the proposed Class and Classes.

17.     Jurisdiction is also proper in this Court, pursuant to 28 U.S.C. § 1331, because Plaintiffs' RICO claims arise under federal law.  This Court also has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes §§ 48.193(1)(a)(1), (2), and (6), because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries, Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.  This Court also has personal jurisdiction over Defendants because they consented to jurisdiction by registering to do business in Florida.  This Court has pendant or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs.

19.     This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District, and supplemental or pendant jurisdiction over Defendants for Plaintiffs' state law claims.  Personal jurisdiction is conferred by 18 U.S.C § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

20.     Venue is proper in this District, under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

this District, Defendants have caused harm to Class members residing in this District, Defendants regularly conduct business in this District, and because Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

21.     Furthermore, Toyota has marketed, advertised, sold, and leased the Class Vehicles within this District, and SET is a Florida limited liability company that operates in this District and has its headquarters in Deerfield Beach, Florida. Accordingly, Defendants have sufficient contacts with this District to subject Defendants to personal jurisdiction and venue is proper. Also, venue is proper in this District pursuant to 18 U.S.C. § 1965.

22.     Moreover upon information and belief, given the high level of heat and humidity experienced in Florida, Class members from Florida are more adversely affected by the HVAC System Defect due to the HVAC system's need to remove increased humidity and water from the atmosphere and the Florida Class members' increased need to use the Defective HVAC System's air-conditioning, which aggravates the foul, noxious, and/or toxic odors emitted by the Defective HVAC System. These circumstances make venue particularly proper in this District.

## III.    PARTIES

### A.    Plaintiffs

#### i.    Javier Cardenas (Florida)

23.     Plaintiff Javier Cardenas is a citizen and resident of the state of Missouri and resides in St. Louis, Missouri. On or around August of 2014, while a resident of Florida, Plaintiff Cardenas purchased a new 2014 Toyota Camry from Kendall Toyota in Miami, Florida for personal, family, or household purposes. Kendall Toyota is a Toyota authorized Dealer of Toyota vehicles. Plaintiff Cardenas continues to own the 2014 Toyota Camry.

24.     When Plaintiff Cardenas purchased his Class Vehicle, he was unaware his Class Vehicle contained the Defective HVAC System, which exposes drivers and passengers to foul,

8

noxious, and/or toxic odors and emits air into the Class Vehicles' passenger compartment filled with mold and other contaminants, posing a health and safety hazard to vehicle occupants. Defendants never informed or warned Plaintiff Cardenas of the Defective HVAC System and corresponding health and safety hazard associated with his Class Vehicle. Had Plaintiff Cardenas known of the Defective HVAC System, he would not have purchased his Class Vehicle or would have paid significantly less for it.

25.     Given the Defect, Plaintiff Cardenas has been exposed to foul, noxious, and/or toxic odors emitted from the Defective HVAC System, including a "funky, horrid, old smell" when turning on the air conditioner. Plaintiff Cardenas first experienced the smell several months after he purchased the Class Vehicle. The cooler Plaintiff Cardenas sets the temperature, the worse the smell gets. Passengers in his car have complained to him about the foul smell as well. Even when Plaintiff Cardenas turns off the air recirculation feature, the smell persists.

26.     On June 9, 2015, Plaintiff Cardenas took his car to Lou Fusz Toyota, a Toyota authorized dealer in St. Louis, Missouri for routine maintenance. At that time, Plaintiff Cardenas complained about the smell coming from the air conditioner. An employee of the Dealer informed Plaintiff Cardenas that it was "just the humidity" and directed him to open the vents of the car. Dealer also represented to Plaintiff Cardenas that heat would kill the smell. Plaintiff Cardenas asked what he should do if those actions failed to remedy the problem, and the Toyota Dealer quoted him a price of $300 for the dealership to open the dashboard and inspect the vehicle.

27.     Plaintiff Cardenas followed Lou Fusz Toyota's instructions. Plaintiff Cardenas opened the vents of his car and occasionally blasted heat, but the smell persists despite all of Plaintiff Cardenas's efforts. When Plaintiff Cardenas turned on the air conditioner for the first

time this year in May 2018, he was again confronted with the disgusting smell.  Plaintiff Cardenas then called TMS directly to complain and spoke with an employee from TMS over the phone.

### ii.    Kurt Kirton (Tennessee)

28.    Plaintiff Kurt Kirton is a citizen and resident of the state of Tennessee and resides in Nashville, Tennessee.  On or around March of 2017, Plaintiff Kirton purchased a used 2015 Toyota Camry from a Wyatt Johnson Toyota dealership in Clarkesville, Tennessee for approximately $16,500 for personal, family, or household purposes.  Plaintiff Kirton still owns his 2015 Toyota Camry.

29.    When Plaintiff Kirton purchased his Class Vehicle, he was unaware his Class Vehicle contained the Defective HVAC System, which exposes drivers and passengers to foul, noxious, and/or toxic odors and emits air into the Class Vehicles' passenger compartment filled with mold and other contaminants, posing a health and safety hazard to vehicle occupants. Defendants never informed or warned Plaintiff Kirton of the Defective HVAC System and corresponding health and safety hazard associated with his Class Vehicle.  Had Plaintiff Kirton known of the Defective HVAC System, he would not have purchased his Class Vehicle or would have paid significantly less for it.

### iii.    Plaintiffs and Class Members generally

30.    None of the advertisements reviewed or representations received by Plaintiffs or Class members contained any mention or disclosure of the Defective HVAC System and its associated health and safety hazard.  Had Defendants disclosed that the Class Vehicles contained a Defective HVAC System and corresponding health and safety hazard, Plaintiffs and Class members would have not purchased or leased their Class Vehicles, or they would have paid significantly less for their respective vehicles.

31.     When Plaintiffs and Class members purchased or leased their Class Vehicles, they relied on the reasonable expectation that the Class Vehicles would be equipped with an HVAC system that was free from defects, safe to operate, and would not pose a threat to their health or safety.  In fact, Defendants have always emphasized the quality and reliability of the Class Vehicles, knowing that consumers, including Plaintiffs and Class members, rely upon such representations when purchasing or leasing vehicles.  Had Defendants disclosed that the Defective HVAC System in the Class Vehicles could lead to the emission of foul, noxious, and/or toxic odors and air filled with mold and other contaminants into the passenger compartment, posing a health and safety hazard to vehicle occupants, Plaintiffs and Class members would not have purchased or leased their Class Vehicles or would have paid significantly less for their respective vehicles.

32.     Plaintiffs and Class members operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used.  Plaintiffs and the Class members have suffered an ascertainable loss as a result of Defendants' unfair and deceptive conduct, breach of common law and statutory duties, and omission and/or misrepresentations associated with the Defective HVAC System and its associated health and safety hazard, including but not limited to, out-of-pocket losses and diminished value of their vehicles.

33.     Neither Defendants nor any of their agents, Distributors, Dealers, or other representatives informed Plaintiffs and Class members of the HVAC System Defect and its associated health and safety hazard prior to Plaintiffs' and the Class members' purchase or lease of the Class Vehicles.

### B.    Defendants

34.    Defendant TMC is the world's largest automaker and largest seller of automobiles in the United States. TMC is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

35.    Defendant TMS is a California corporation with its corporate headquarters located at 6565 Headquarters Drive, Plano, Texas 75024.  TMS also has offices in Jacksonville, Florida and manages and supports a Dealer network located throughout the state of Florida, including Kendall Toyota in Miami.

36.    TMS is the authorized importer and distributor of Toyota motor vehicles in the United States. TMS is responsible for advertising, marketing, and selling the Class Vehicles. It also distributes Toyota vehicles to the two independent distributors, which have licenses to distribute cars in certain states: SET, in Deerfield Beach, Florida and GST, in Houston, Texas. At all relevant times, TMS acted through its authorized employees, agents, and its Distributor and Dealer networks in performing activities, including but not limited to advertising, marketing, and selling Class Vehicles and providing warranties, disseminating technical information and mechanic training materials to Dealers, and monitoring the performance of Toyota vehicles in the United States, including but not limited to the Class Vehicles.

37.    Defendant TEMA is a Kentucky corporation with its corporate headquarters located at 6565 Headquarters Drive, Plano, Texas 75024.

38.    TEMA is the automobile engineering, manufacturing, research, and design concern in North America for Toyota motor vehicles.  TEMA designs, develops, tests, manufactures, assembles, and evaluates Toyota motor vehicles in the United States. TEMA also develops parts for North American Toyota vehicles.  TEMA runs factories which manufacture Toyota vehicles

and operates research and development facilities.  Upon information and belief, TEMA manufactured the Class Vehicles at TEMA's factory in Georgetown, Kentucky.

39.    Defendant SET is a Florida limited liability company with its headquarters located at 100 Jim Moran Boulevard, Deerfield Beach, Florida 33442.

40.    SET distributes Toyota vehicles, parts, and accessories to Dealers located in Florida, Georgia, Alabama, North Carolina, and South Carolina.  SET is the largest independent distributor of Toyotas in the United States. Vehicles manufactured by Toyota in North America and Japan are processed at SET's facilities in Jacksonville, Florida.  SET also supports Dealers through regional sales and marketing, customer service, accessory development, and sales.  In 2016, SET was number two in total dealer profits for Toyota vehicles and number one in the region in Toyota Certified Used Vehicle sales.  SET is also the leading distributor of Toyota parts and accessories in the United States.  Finally, SET hosts one of the largest automotive training and technical support facilities for Toyota Dealers in its region, and SET provides close to 100,000 hours of training on maintenance education and diagnostic assistance and advice to Toyota Dealers, including training and assistance on Toyota's Defective HVAC System.  At all relevant times, SET acted through its authorized agents and representatives in its Dealer network while performing activities associated with advertising, marketing, and selling Class Vehicles and providing warranties, warranty repairs, and dissemination of technical information and mechanic training materials.

41.    At all times relevant to this action, Defendants manufactured, distributed, sold, leased, and/or warranted the Class Vehicles under the Toyota brand name throughout the United States.

42.     Together, the Toyota Defendants developed and disseminated the owner's manuals, warranty booklets, maintenance schedules, advertisements, and other promotional and technical materials relating to the Class Vehicles to Distributors and Dealers.

**C.     Non-Party Participants in the Toyota RICO Enterprise**

43.     DENSO International America, Inc. has several offices in the United States and is headquartered in Southfield, Michigan.

44.     DENSO designs, tests, and manufactures the Defective HVAC Systems and sells them to Toyota to be included in the Class Vehicles.

45.     GST is a Texas corporation with its headquarters located at 1355 Enclave Parkway, Houston, Texas 77077.

46.     GST distributes Toyota vehicles, parts, and accessories to Dealers located in Texas, Oklahoma, Arkansas, Mississippi, and Louisiana.  At all relevant times, GST acted through its authorized agents and representatives in its Dealer networks while performing activities associated with advertising, marketing, and selling Class Vehicles and while providing warranties, warranty repairs, and dissemination of technical information and mechanic training materials.

**IV.     FACTUAL ALLEGATIONS**

      **A.     The Defective HVAC System**

47.     The Class Vehicles are equipped with the Defective HVAC System that emits foul, noxious, and/or toxic odors and mold and other contaminants into the passenger compartment of the vehicle.

48.     According to the Toyota Air Conditioning and Climate Control Course 752 and as shown in the illustration below, the basic air conditioning system "contains components to push refrigerants through a closed system to extract heat out of the vehicle interior and transfer that

14

heat to the outside air" during which process "the refrigerant changes from a liquid to a gas and then back to a liquid."



49.     As shown below, the Defective HVAC System in the Class Vehicles includes a component called the evaporator, which resides inside the HVAC system module.  The system has a high-pressure and a low-pressure side, which includes the expansion valve and the evaporator.  The expansion valve controls the flow and pressure of liquid refrigerant into the evaporator.  A blower draws air through the evaporator to cool and dehumidify the interior air.



50.     On information and belief, the Defective HVAC System fails to adequately remove water from the evaporator and surrounding enclosure.  The moist environment leads to the development of a foul, noxious, and/or toxic odor and mold and other contaminants, which are emitted into the passenger compartment of the Class Vehicles by the blower.

51.     On information and belief, the mold and contaminants emitted from the Defective HVAC System grow on the evaporator, which is located behind the vehicle's instrument panel. Below is an image of an evaporator from the Toyota Air Conditioning and Climate Control Course manual.



52.     As cold refrigerant passes through into the evaporator, it absorbs heat from the air and produces liquid water due to dehumidification of the air.  The collected water (condensation) is intended to drain from the Defective HVAC System through a rubber hose onto the ground. Moisture, pollen, and debris, *inter alia*, that enter into the Defective HVAC System create an environment susceptible to the growth of mold and other contaminants.  The Class Vehicles' failure to adequately drain condensed water from the Defective HVAC System results in trapped water, aggravating the tendency of the Defective HVAC System to generate mold and foul, noxious, and/or toxic odors.

53.     In 2004, the Institute of Medicine ("IOM") found there was sufficient evidence to link indoor exposure to mold: with upper respiratory tract symptoms, coughing, and wheezing in otherwise healthy people; with asthma symptoms in people with asthma; and with hypersensitivity pneumonitis in individuals susceptible to that immune-mediated condition.  The IOM also found limited or suggestive evidence linking indoor mold exposure and respiratory illness in otherwise healthy children.  Other studies have shown a potential link between mold exposure and the development of asthma in children.

54.     According to WHO's Guidelines for Indoor Air Quality: Dampness and Mould, "[m]icrobial pollution involves hundreds of species of bacteria and fungi that grow indoors when sufficient moisture is available" and "[e]xposure to microbial contaminants is clinically associated with respiratory symptoms, allergies, asthma and immunological reactions."

55.     No reasonable consumer expects to purchase or lease a vehicle with a HVAC System Defect that exposes them to foul, noxious, and/or toxic odors, mold, and other contaminants.  Further, Plaintiffs and Class members do not reasonably expect Defendants to conceal a defect in the Class Vehicles or conceal a known health and safety hazard.  Plaintiffs and

Class members had no reasonable way to know that Class Vehicles contained Defective HVAC Systems, which were defective in materials, workmanship, design, and/or manufacture and posed a serious and real health and safety hazard.

56.     As a result of Defendants' material misrepresentations and omissions, including Defendants' failure to disclose that the Class Vehicles contain a HVAC System Defect, Plaintiffs and Class members paid more for their Class Vehicles than they would have and suffered other actual damages, including but not limited to, out-of-pocket expenses, diminished value of their vehicles, and exposure to foul, noxious, and/or toxic odors and mold and other contaminants.

**B.     Defendants' Knowledge of the Defective HVAC System and Associated Health and Safety Hazard**

57.     Defendants have known since at least the late 1990s of the HVAC System Defect and the health and safety hazard posed by their Defective HVAC System that emits foul, noxious, and/or toxic odors and fills vehicle compartment air with mold and other contaminants.

58.     Toyota, Distributors, DENSO, SET, GST, and Dealers possessed exclusive and superior knowledge and information regarding the Defective HVAC System, but concealed the HVAC System Defect from Plaintiffs and Class members.  Based on pre-production testing, pre-production design failure mode analyses, production design failure mode analyses, early consumer complaints made to TMS's network of exclusive Dealers, aggregate warranty data compiled from those Dealers, repair order and parts data received from Dealers, consumer complaints to NHTSA, and testing performed by TEMA in response to consumer complaints, amongst other things, Defendants were aware of the HVAC System Defect in the Class Vehicles and fraudulently concealed the HVAC System Defect and its associated health and safety hazard from Plaintiffs and Class members.

59.     Defendants fraudulently and intentionally omitted and concealed from Plaintiffs and Class members the HVAC System Defect in the Class Vehicles, even though Defendants knew or should have known of the design and/or manufacturing defects in the Class Vehicles.

60.     Defendants knew or should have known that the HVAC System Defect and its associated health and safety hazard were material to owners and lessees of the Class Vehicles and that Plaintiffs and Class members did not know or could not reasonably discover the HVAC System Defect before they purchased or leased Class Vehicles or before the warranties on their Class Vehicles expired.

61.     Notwithstanding Defendants' exclusive and superior knowledge of the Defective HVAC System, Defendants failed to disclose the HVAC System Defect to consumers, including Plaintiffs and Class members, at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the same defect through the 2017 model year.  Defendants knowingly and intentionally concealed the HVAC System Defect and associated health and safety hazard and failed to provide any notice of the HVAC System Defect and associated health and safety hazard to Plaintiffs and Class members.  Toyota also failed to recall the Class Vehicles to remedy the HVAC System Defect.

62.     Indeed, at all relevant times, in advertisements, promotional materials, and other representations, Toyota and SET continuously maintained that the Class Vehicles were safe and reliable, while uniformly omitting any reference to the HVAC System Defect.  Plaintiffs, directly or indirectly, viewed or heard such advertisements, promotional materials, or representations prior to purchasing or leasing their Class Vehicles.  The misleading statements and omissions about the Class Vehicles' safety and reliability in Defendants' advertisements, promotional

materials, and representations were material to Plaintiffs' and Class members' decision to purchase or lease the Class Vehicles.

63.     Examples of Toyota's safety and reliability representations include the following:

a) In its Camry brochures and guides, Toyota touted the reliability and comfortable experience the Class Vehicles provided:

(i) Toyota, in its 2012 Camry brochure, claimed to "pore[] over every facet of the previous model's interior in search of even the subtlest ways to enhance what was *already a remarkable driving experience*." (emphasis added).  Toyota claimed to take these steps in order to "improve on a car of such legendary quality."

(ii) Toyota, in both its 2013 and 2014 Camry brochures, claimed to "offer high-end features" and make the interior of the car "a space that is *rewarding and enhances the driver experience*." (emphasis added).

(iii) Toyota, in its 2015 Camry brochure, claimed that the Camry was "*more than just comfort*." (emphasis added).

(iv) Toyota, in both its 2016 and 2017 Camry brochures, claimed to offer "*maximum comfort*" and "*make you feel right at home*." (emphasis added).

(v) Toyota, in its 2012, 2013, 2014, 2015, 2016, and 2017 Camry Warranty and Maintenance Guide, claimed: "At Toyota, *our top priority is always our customers*.  We know your Toyota is an important part of your life and something you depend on every

day.   That's why we're dedicated to building ***products of the highest quality and reliability***." (emphasis added).

b) In press releases, Toyota also touted the reliability of its brand and Class Vehicles:

(i)   In a 2011 or 2012 press release, Toyota's Group Vice President and General Manager remarked that the 2012 Camry included "best-in-class . . . safety features."   Toyota's Group Vice President and General Manager also stated that the 2012 Camry would be a "safety-focused and ***worry-free choice for American consumers***." (emphasis added).

(ii)   In a 2014 press release, Senior Vice President of Automotive Operations for TMS claimed that customers would appreciate "***the durability, quality, and value that the [2015] Camry represents***." (emphasis added).

(iii)   In a June 2016 press release, Toyota claimed that the 2017 Camry "continue[d] to offer ***the best combination of roominess, comfort, quality, safety[,] and performance*** in the midsize segment." (emphasis added).

(iv)   In a 2017 press release, Toyota North American Vehicle, Quality & Safety Engineering Group Vice President stated that "[a]t Toyota, we're committed to developing ***safe and reliable vehicles***." (emphasis added).

64.     SET also includes on its website the Toyota Camry brochures and additionally represents that "***the choice is clear***" when contemplating whether to purchase a Camry, and noted that the "[s]tyle, tech[,] and safety features set Camry apart." (emphasis added).   SET also advocated purchasing Toyota parts, claiming, despite its knowledge of the Defective HVAC System, that Toyota parts are "***[b]uilt to last***" and "there's no better way to care for your car than with Genuine Toyota Parts." (emphasis added).  In none of SET's advertisement or representations about the Toyota Camry does it mention the HVAC System Defect or the propensity of the Class Vehicles' Defective HVAC System to emit foul, noxious, and/or toxic odors and mold and other contaminants into the vehicle.

**1.      NHTSA Complaints**

65.     Consumers who purchased or leased Class Vehicles have filed numerous complaints with NHTSA, reporting and detailing the Defect in the HVAC system in the Class Vehicles.

66.     Federal law requires Toyota to monitor defects that can cause a safety issue and report them within five (5) days to NHTSA.  Toyota regularly monitors NHTSA complaints in order to meet reporting requirements under federal law and were, therefore, provided information and knowledge of the HVAC System Defect through these complaints, as well as by other means.

67.     The HVAC odor problem caused by the Defective HVAC System in the Class Vehicles has persisted for several years, as can be seen by a small sample of consumer complaints made to NHTSA:

> a) **Consumer Complaint with NHTSA ID Number: 763519**
> **1999 TOYOTA CAMRY**
> **Date Complaint Filed: 06/26/2002**
> **Date of Incident: 09/24/2000**
> **Component(s): EQUIPMENT, SUSPENSION, STEERING**

THERE IS A SQEAK [sic] COMING FROM THE FRONT END WHEN I GO OVER SMALL BUMPS/DIPS IN THE ROAD. TOYOTA RECOMMENDED THE REPLACEMENT OF TIE RODS, WHICH DID ABSOLUTELY NOTHING. THE NOISE CONTINUES AND HAS INCREASED IN SEVERITY. ***THE AIR CONDITIONER SMELLS WHEN USING IT. IT SMELLS LIKE MOLD. II [sic] HAVE TAKEN IT TO THE DEALER, BUT ALL THEY DO IS SPRAY IT WITH FRIGI-FRESH, WHICH ONLY MASKS THE SMELL FOR A SHORT WHILE.*** *AK

b) **Customer Complaint with NHTSA ID Number: 10091310**
   **2001 TOYOTA CAMRY**
   **Date Complaint Filed: 09/20/2004**
   **Date of Incident: 05/01/2001**
   **Component(s): EQUIPMENT**

   ***MY WIFE'S 2011 TOYOTA CMRY [sic] HAS AN AIR CONDITIONER ODOR. WE HAVE BEEN LEAD [sic] TO BELIEVE THAT IT MAY BE CAUSED BY THE A/C GETTING TOO COLD, FREEZING UP, AND ACTUALLY CAUSING MOLD IN THE A/C SYSTEM.*** SHE HAS DRIVEN THE CAR FOR 2 1/2 YEARS AND NOW HAS CANCER. WE HAVE BEEN UNABLE TO DO ANYTHING TO RID THE CAR OF THE ODOR. DOESN'T EXPOSURE TO MOLD, IF SO, CAUSE HEALTH PROBLEMS? WE SPENT A YEAR TRYING TO LOCATE AN ODOR IN THE CAR. REPLACED MATS, DETAILED THE UPHOLSTRY, ETC. *AK (emphasis added).

c) **Customer Complaint with NHTSA ID Number: 10182434**
   **2002 TOYOTA CAMRY**
   **Date Complaint Filed: 02/13/2007**
   **Date of Incident: 08/21/2003**
   **Component(s): EQUIPMENT**

   MY 2002 CAMRY HAS BEEN A GREAT CAR EXCEPT FOR THE FOUL ODOR COMING FROM THE AIR CONDITIONER. I HAVE CONTACTED THE DEALER AS WELL AS TOYOTA ABOUT THIS PROBLEM SEVERAL TIMES BUT NOTHING HAS BEEN FIXED. WE ARE STILL DEALING WITH THE ODOR FROM THE AIR CONDITIONER. *JB

d) **Customer Complaint with NHTSA ID Number: 10245997**
   **2000 TOYOTA CAMRY**
   **Date Complaint Filed: 10/18/2008**
   **Date of Incident: 05/26/2008**
   **Component(s): ENGINE AND ENGINE COOLING**

*I HAD A PASSENGER WHO REMARKED THAT THERE WAS A SULFUR SMELL IN PASSGENER [sic] COMPARTMENT OF CAR WHEN RECIRCULATION AIR IS SWITCHED ON.* I HAD NOTICED IT BEFORE BUT DIDN'T KNOW WHAT TO THINK ABOUT IT. *I'VE HAD LOTS OF MIGRAINE HEADACHES OVER THE PAST 5 MONTHS.* WHEN I MENTIONED TO A MECHANIC HE SAID IT WAS PROBABLY DUE TO THE SULFUR DIOXIDE POISONING ME. \*TR (emphasis added).

e) **Customer Complaint with NHTSA ID Number: 10544817**
**2010 TOYOTA CAMRY**
**Date Complaint Filed: 09/22/2013**
**Date of Incident: 9/22/2013**
**Component(s): UNKNOWN OR OTHER**

*WHEN I OPERATE MY HEAT OR AIR CONDITIONING IN MY 2010 TOYOTA CAMRY I GET A STRONG SMELL OF SULFUR IN THE PASSENGER COMPARTMENT OF MY CAR.* I OWNED MY CAR FOR 4 YEARS NOW AND THE PROBLEM STARTED ABOUT 3 YEARS AGO. NO ONE CAN TELL ME THE EXACT CAUSE OF THE PROBLEM. (emphasis added).

f) **Customer Complaint with NHTSA ID Number: 10566143**
**2013 TOYOTA CAMRY**
**Date Complaint Filed: 2/26/2014**
**Date of Incident: 6/30/2013**
**Component(s): EQUIPMENT, VISIBILITY**

2013 TOYOTA CAMRY. CONSUMER WRITES IN REGARDS [sic] TO HVAC ASSEMBLY AND AC SYSTEM ISSSUES. \*SMD THE CONSUMER STATED THE VEHICLE WAS TAKEN TO THE DEALER ON 4 SEPARATE OCCASSIONS, FOR THE ODOR ISSUE COMING FROM THE AC AND THE MILDEW AND FUNGUS GROWTH IN THE PADDING AND CARPET. \*JB

g) **Customer Complaint with NHTSA ID Number: 10592165**
**2012 TOYOTA CAMRY**
**Date Complaint Filed: 5/17/2014**
**Date of Incident: 4/7/2014**
**Component(s): EQUIPMENT**

*FOR THE PAST SEVERAL MONTHS MY 2012 CAMRY A/C UNIT RELEASES A FOUL MILDEW ORDER [sic]. IN-PASSENGER COMPARTMENT FILTER AS WELL AS OZONE DEPLETION SPRAY WAS COMPLETED TWICE OVER THE SPAN OF ONE WEEK AT CROWN TOYOTA, HOWEVER THE FOUL SMELL*

*SHORTLY REAPPEARS WHEN THE CAR IS TURNED ON. *JS* (emphasis added).

h)  **Customer Complaint with NHTSA ID Number: 10660319**
    **2014 TOYOTA CAMRY**
    **Date Complaint Filed: 11/23/2014**
    **Date of Incident: 9/15/2014**
    **Component(s): ENGINE AND ENGINE COOLING**

*WHEN STARTING VEHICLE AND TURNING ON A/C A VERY FOUL ODOR OF MILDEW AND MOLD COMES FROM THE VENTS. WE HAVE TAKEN IT BACK TO THE DEALERSHIP FOR A CLEANING AND REPLACED THE FILTER WITH A CARBON ONE AT THE DEALERSHIP AT OUR EXPENSE. THIS DID NOT FIX THE ISSUE.* WE FOLLOW INSTRUCTIONS OF FUNNING [sic] AC IN NON RECIRCULATING [sic] MODE TO NO AVAIL. TOYOTA DOES NOT SEEN [sic] TO WANT TO TAKE OWNERSHIP OF THE ISSUE. I AM CONCERNED OF [sic] OUR HEALTH FROM INHALING THESE MOLD SPORES AND BACTERIA. *TR (emphasis added).

i)  **Customer Complaint with NHTSA ID Number: 10808387**
    **2013 TOYOTA CAMRY**
    **Date Complaint Filed: 12/04/2015**
    **Date of Incident: 12/01/2015**
    **Component(s): UNKNOWN OR OTHER**

CAR HAS ONLY 17000 MILES. *TERRIBLE ODOR FROM THE A/C AND HEATING VENTS. DEALER RECOMMENDS A CLEANER AND FILTER CHANGE COSTING ME 140.00 DOLLARS.* WHY IS THIS SMELL HAPPENING? IS IT MOLD? VERY UNHEALTHY. (emphasis added).

j)  **Customer Complaint with NHTSA ID Number: 10811278**
    **2012 TOYOTA CAMRY HYBRID**
    **Date Complaint Filed: 12/19/2015**
    **Date of Incident: 11/17/2014**
    **Component(s): UNKNOWN OR OTHER**

STRONG MOLD SMELL FROM AIR VENTS. ESPECIALLY STRONG FOR FIRST 15 MINUTES OF DRIVING.

k)  **Customer Complaint with NHTSA ID Number: 10871416**
    **2014 TOYOTA CAMRY**
    **Date Complaint Filed: 05/30/2016**
    **Date of Incident: 07/28/2015**
    **Component(s): UNKNOWN OR OTHER**

*TOYOTA DEALER HAS FAILED ON 2 OCCASION [sic] TO FIX A MUSTY, MOLD ODOR COMING FROM THE HEAT/AC VENTS LEAVING ME WITH THE UNPLEASANT AND UNHEALTHFUL [sic] TASK OF BREATHING THIS TOXIC AIR EVERY DAY I DRIVER [sic] THE VEHICLE.* (emphasis added).

l) **Customer Complaint with NHTSA ID Number: 10873415**
**2014 TOYOTA CAMRY HYBRID**
**Date Complaint Filed: 06/09/2016**
**Date of Incident: 05/10/2016**
**Component(s): UNKNOWN OR OTHER**

I PURCHASED A 2014.5 [sic] TOYOTA CAMRY XLE HYBRID ON NOVEMBER 3, 2014. *RECENTLY, THE VEHICLE EMITS A FOUL ORDER [sic] WHEN THE AIR CONDITIONER IS TURNED ON. I TOOK IT TO A LOCAL DEALERSHIP WHO TRIED TO TELL ME THAT ALL CARS HAVE THIS PROBLEM.* I SEE THERE IS A CLASS ACTION LAWSUIT FOR 2012 MODEL YEAR VEHICLES, AND TOYOTA IS STILL PRODUCING VEHICLES WITH THIS PROBLEM. THE DEALERSHIP OFFERED TO DO A FORM CLEAN OF THE SYSTEM AND INSTALL A CHARCOAL FILTER FOR THE TUNE OF $150 WITHOUT ANY GUARANTEE THAT WHIS [sic] WOULD EVEN FIX THE PROBLEM. THE SMELL HAPPENS WHEN THE VEHICLE IS IN MOTION, AND WE ARE JUST NOT COMING IN TO WARM WEATHER IN MY PART OF THE US, SO THAT'S WHY I'M NOTICING THE SMELL AT THIS TIME. (emphasis added).

m) **Customer Complaint with NHTSA ID Number: 10892407**
**2014 TOYOTA CAMRY**
**Date Complaint Filed: 08/02/2016**
**Date of Incident: 06/10/2016**
**Component(s): UNKNOWN OR OTHER**

*MOLD SMELL IN AC VENTS ON SUMMER DAYS EVERYTIME [sic] I TURN ON CAR FOR AT LEAST 5 MINUTES. ITS [sic] UNHEALTHY AND EMBARASSING [sic] TO HAVE A 2 YEAR OLD CAR THAT SMELLS AWFUL WHEN TURNED ON.* I HAVE READ ON MANY FORUMS THIS IS A VERY COMMON ISSUE WITH CAMRYS. (emphasis added).

n) **Customer Complaint with NHTSA ID Number: 10918027**
**2014 TOYOTA CAMRY**
**Date Complaint Filed:  10/22/2016**
**Date of Incident: 06/01/2015**
**Component(s): UNKNOWN OR OTHER**

MUSTY SMELL FROM A/C. A/C PRODUCE [sic] AIR WITH MOLD SPORES

o) **Customer Complaint with NHTSA ID Number: 10936115**
   **2015 TOYOTA CAMRY**
   **Date Complaint Filed: 12/18/2016**
   **Date of Incident: 10/26/2016**
   **Component(s): ENGINE AND ENGINE COOLING**

   *AFTER MY 25,000 MILE MAINTENANCE CHECK I BEGAN NOTICING A FOUL ODOR UPON ENTERING THE CAR.* ODDLY ENOUGH, THIS ODOR IS MOST PRONOUNCED WHEN THE CAR HAS BEEN SITTING FOR A FEW HOURS. WHILE THE CAR IS RUNNING AND THE FANS ARE BLOWING, THE SMELL REDUCES IN STRENGTH. HOWEVER, ANYTIME THE CAR IS OFF, THE PASSENGER COMPARTMENT FILLS ONCE AGAIN WITH THIS HORRIBLE FOUL ODOR. *TO DESCRIBE THE SMELL I WOULD [sic] THAT IT'S SIMILAR TO A GYM LOCKER MIXED WITH GARBAGE.* THIS IS EXTREMELY DISAPPOINTING AS MY CAR IS UNDER 2 YEARS OLD AND IT IS SOLEY USED FOR COMMUTING. FOOD IS NOT CONSUMED IN THIS VEHICLE AND ONLY WATER IS DRANK. THE FACT THAT THE SMELL DISAPPEARS WHEN DRIVING WITH THE FANS ON LEADS ME TO BELIEVE THAT THERE IS NOT A DEAD ANIMAL PRESENT IN THE CHASSIS. THIS SEEMS LIKE A MECHANICAL ISSUE. *TR (emphasis added).

p) **Customer Complaint with NHTSA ID Number: 10958691**
   **2016 TOYOTA CAMRY**
   **Date Complaint Filed: 3/5/2017**
   **Date of Incident: 10/15/2016**
   **Component(s): UNKNOWN OR OTHER**

   SHORTLY AFTER GETTING THE VEHICLE THE AC WHEN ACTIVATED EMITS A MOLDY SMELL THROUGH THE VENTS. THE VEHICLE HOW [sic] HAS 8512 MILES. I FEEL THIS MIGHT BE A CONTRIBUTOR TO ALLERGIC SYMPTOMS.

q) **Customer Complaint with NHTSA ID Number: 10993952**
   **2015 TOYOTA CAMRY**
   **Date Complaint Filed: 6/8/2017**
   **Date of Incident: 5/2/2017**
   **Component(s): UNKNOWN OR OTHER**

   TERRIBLE SOUR SMELL COMING FROM AC VENTS

r)  **Customer Complaint with NHTSA ID Number: 100994268**
**2013 TOYOTA CAMRY**
**Date Complaint Filed: 6/10/2017**
**Date of Incident: 6/7/2017**
**Component(s): UNKNOWN OR OTHER**

***AIR CONDITION DEVELOPS MOLD IN THE EVAPORATOR COIL CAUSING THE SMELL OF MOLD TO BE CIRCULATED IN THE INTERIOR OF THE CAR. MYSELF AND PASSENGERS COUGH WHEN THE SMELL IS PRESENT*** [sic] (emphasis added).

s)  **Customer Complaint with NHTSA ID Number: 11006141**
**2014 TOYOTA CAMRY**
**Date Complaint Filed: 07/18/2017**
**Date of Incident: 06/05/2017**
**Component(s): AIR BAGS, ELECTRICAL SYSTEM, UNKNOWN OR OTHER**

AC CONDENSER UNIT PLUGS AND CREATES MOLD AND BAD SMELL FROM VENTS. MOLD CAUSES PEOPLE WITH ALLERGIES TO START HAVING REACTIONS. IN ADDITION, THERE IS CONCERN THAT THE ACCUMULATED WATER MAY THEN LEAK THROUGH A SEAM IN THE HOUSING ONTO THE AIR BAG CONTROL MODULE POTENTIALLY RESULTING IN A SHORT CIRCUIT OF THE MODULE. A SHORT CIRCUIT MAY CAUSE THE AIR BAGS TO BECOME DISABLED OR INADVERTENTLY DEPLOY. THIS IS SIMILAR TO 2013 CAMRY MODEL RECALL. NHTSA CAMPAIGN NUMBER: 13V442000. I THINK THE RECALL SHOULD EXTEND TO THE 2014 CAMRY MODEL AS WELL.

t)  **Customer Complaint with**
**2014 TOYOTA CAMRY**
**Date Complaint Filed: 12/11/2017**
**Date of Incident: 12/05/2017**
**Component(s): UNKNOWN OR OTHER**
**NHTSA ID Number: 11054069**

MUSTY MOLD SMELL COMING FROM AIR CONDITIONING AND HEATING VENTERS [sic] WHILE USING HEAT AND AIR CONDITIONING

**2.**    **Technical Service Bulletins**

68.     As a result of Toyota's exclusive and superior knowledge regarding the Defective HVAC System, Toyota released several TSBs describing the issue to its exclusive network of Distributors, including SET, and Dealers beginning in the late 1990s.

69.     On or around May 9, 1997, Toyota issued a TSB titled "Air Conditioning Evaporator Odor" for all Toyota Models to its exclusive network of Dealers.  TSB AC002-97 described the HVAC System Defect as follows:

> A musty odor may be emitted from the air conditioning system of some vehicles which are usually operated in areas with high temperature and humidity.  It is most noticeable when the air conditioner is first turned "ON" after the vehicle has been parked for several hours.  The odor could result from one or more of the following conditions:
>
> 1.   Blockage of the evaporator housing drain pipe, resulting in the build up of condensate.
>
> 2.  Microbial growth in the evaporator, arising from dampness in the evaporator housing where the cooling air flow is dehumidified.

70.     On or around August 6, 2009, Toyota issued another TSB related to HVAC odors for certain Camry and Prius models to SET, GST, and its exclusive network of Dealers.  The TSB stated that "[s]ome Camry, Camry HV, and Prius models may exhibit an intermittent HVAC system odor.  A newly designed evaporator sub-assembly has been made available to decrease the potential for HVAC odor."  T-SB-0261-09 further stated that "[t]his repair is covered under the Toyota Comprehensive Warranty. . . . in effect for 36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date."

71.     On or around November 29, 2011, Toyota issued a revision to the August 6, 2009 TSB to its Distributors and Dealers, updating production change information and again informing dealers that a newly designed evaporator sub-assembly had been made available to decrease the potential for HVAC odor.  T-SB-0261-09 Rev1 again stated that "[t]his repair is covered under

the Toyota Comprehensive Warranty. . . . in effect for 36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date." However, it also noted that "[w]arranty application is limited to occurrence of the specified condition described in this bulletin."

72.    On or around September 12, 2013, Toyota issued yet another TSB related to HVAC odors titled "HVAC Odor Maintenance" to its Distributors and Dealers, which attempted to explain the odors as "naturally occurring from the HVAC system and/or related environmental factors." T-SB-0142-13 informed Toyota Dealers that "there is ***no way to eliminate these odors***" and that bulletin procedures should be followed "to minimize the odors experienced."  (emphasis added).

73.    Toyota updated T-SB-0142-13 on April 9, 2015 to include 2015 model Toyota vehicles.   According to the updated version, the TSB applied to model year 2007-2015 Camry and Camry Hybrid vehicles.

74.    While Dealers and Distributors received copies of the above-described TSBs, Plaintiffs and Class members never received copies of or the information contained in the TSBs described above.  Upon information and belief, the TSBs were not directly communicated to consumers, including Plaintiffs and Class members.   Thus, despite Toyota's and SET's knowledge of the HVAC System Defect and associated health and safety hazard, which Defendants recognized was present in Class Vehicles, Defendants failed to disclose the HVAC System Defect to owners and lessees of the Class Vehicles, including Plaintiffs and Class members, and instead, intentionally concealed the HVAC System Defect.  Moreover, the Toyota Defendants have failed to provide an effective remedy for or replace the Defective HVAC System.

30

### 3. Distributor and Dealer Communications

75. In addition to NHSTA complaints and the TSBs, Toyota and SET also received multiple reports from Dealers complaining about the Defective HVAC Systems, the persistent HVAC odor in Class Vehicles, and Toyota's and its Distributors' and Dealers' inability to provide a solution to the HVAC System Defect.

76. Dealers began complaining of the Defective HVAC System in the Class Vehicles after customers complained of the HVAC System Defect and came in for repeated repairs.

77. In September of 2012, Toyota discussed complaints from SET. As described by Christopher Hitt, Product Engineer with TMS, "**AC has been one of the top issues for SET for the last few years. . . . SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida. SET** *started to tell customers the condition was normal*." (emphasis added).

78. TEMA employees, including JP Flaharty, General Manager, Vehicle Performance Development 2, knew the repeated repair attempts were especially troubling to Florida Toyota Dealers.

79. Even Toyota's own employees complained of the Defective HVAC System and the odor it produces *in their own* vehicles. Dwayne Kinsey ("Kinsey"), a Field Product Engineer for TMS, first brought in his 2012 Camry on April 12, 2012 to SET, complaining of HVAC odor. Kinsey brought in his vehicle again on December 4, 2012 with the same complaint. Finally, on April 2, 2013, after letting his vehicle sit with open vents for twelve hours, the odor was still detected, and the service technician recommended replacing the evaporator core.

80. At the same time that TMS engineer Kinsey was dealing with the HVAC System Defect in his own vehicle, he proposed an agenda for talking to various Toyota Dealers in Florida

regarding the HVAC odor, including meeting with SET about the impact of the Defective in the HVAC system on Dealers' business.

81.     Several employees at SET expressed concern about the unfair practices employed to conceal the HVAC System Defect from consumers and to pass along increased costs associated with the HVAC System Defect to consumers.  For example, on September 9, 2015, Shayne Carter, a Toyota pricing manager, emailed Ethan Leighton, the National Product Planning Manager for Toyota, stating he agreed with employees from SET and asking, "*if this is a known issue with a TSB for how to repair, why are we asking to charge customers. . . . it does seem challenging to explain why to get what a customer should expect as a standard condition for the air conditioner (no odor) we charge more?*"  (emphasis added).

82.     Together, the pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made to Dealers, Distributors, and NHTSA, aggregate warranty data compiled from those Dealers, repair orders, and parts complaints, clearly evidences that since at least the late 1990s, Toyota and SET knew about the Class Vehicles' HVAC System Defect and the health and safety hazard the Defect poses.  Further, Defendants learned of the HVAC System Defect through sources not available to Plaintiffs and Class members.

## V.     TOYOTA ENGAGED IN MAIL AND WIRE FRAUD.

83.     Toyota's illegitimate scheme to sell more Class Vehicles at inflated prices (by concealing the defect in the Class Vehicles' Defective HVAC Systems and making affirmative false representations about the quality and durability of the Class Vehicles), along with its scheme to sell additional components and services to Plaintiffs and Class members to mitigate the Defect

(which Defendants have to date admitted has no actual repair), constitute mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

84.     To further the scheme to defraud, Toyota repeatedly concealed the nature and scope of the Defective HVAC System.  To carry out or attempt to carry out its scheme to defraud, Toyota conducted or participated in the conduct of the affairs of the Toyota RICO Enterprise through patterns of racketeering activity that employed the use of the mail/or and wire facilities, as described below.

85.     The materials prepared by the Toyota Defendants for review by consumers, including owner manuals, warranty information, and maintenance schedules, failed to include any reference to the Defective HVAC System.  For example, the Warranty and Maintenance Guide for the 2014 Toyota Camry included a full description of the recommended maintenance for the vehicle up to 120,000 miles of service.  While an inspection of the radiator and condenser is listed for every 15,000 miles of service, there is no mention of any necessary service at all for the evaporator, which is at the center of the Defective HVAC System.  There also is no mention of the need to employ charcoal filters or any other specific service required for the Defective HVAC System.

86.     The same Toyota manual prominently displays Toyota's promise of quality in the Class Vehicles.  "[W]e're dedicated to building products of the highest quality and reliability. . . We're confident—as you should be—that your Toyota will provide you with many years of enjoyable driving."

87.     Indeed, the Toyota owner's manuals furnished with the Class Vehicles omit information about the existence of the Defective HVAC System that can pose a health and safety hazard to vehicle occupants and can mislead consumers, including Plaintiffs and Class members,

into believing that any odors detected in the Class Vehicles are caused by an accumulation of odors from other unrelated sources.   These manuals were drafted by the Toyota Defendants and distributed to Distributors and Dealers to give to consumers, including Plaintiffs and Class members.

88.    The press releases published by Toyota for each model year of Camry Class Vehicles also fail to mention the Defective HVAC System and the health and safety hazard associated with it.

89.    These public statements failed to disclose the material fact that Class Vehicles exposed consumers, including Plaintiffs and Class members, and their passengers to mold and other contaminants, that the Class Vehicles contained the Defective HVAC System, or that attempts by Toyota or Dealers to mitigate the resultant HVAC odors would not be effective or covered by the warranty, or if they were covered by a warranty, that warranty coverage would eventually expire despite the fact that the defect lacked a permanent solution.

90.    These statements are fraudulent in and of themselves and are also designed to lull consumers, including Plaintiffs and Class members, into believing that no fraudulent scheme is occurring and that their vehicles are not defective.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

91.     Defendants' knowing and active concealment of the Defective HVAC System and the misrepresentations and omissions alleged herein toll any applicable statute of limitations. Through no fault of their own or any lack of due diligence, Plaintiffs and Class members were deceived regarding the Defective HVAC System and could not reasonably discover the Defect or Defendants' deception with respect to the Defect.

92.     Plaintiffs and Class members did not discover and did not know of any of the facts that would have caused a reasonable person to suspect that Defendants were concealing a defect or that the Class Vehicles contained a Defective HVAC System and corresponding health and safety hazard.  As alleged herein, the existence of the Defective HVAC System and corresponding health and safety hazard were material to Plaintiffs and Class members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiffs and Class members could not have discovered through the exercise of reasonable due diligence that Defendants were concealing the Defect in the Defective HVAC System.

93.     At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and that the Defective HVAC System posed a serious and significant health and safety hazard.  Instead of disclosing the Defect, Defendants encouraged and permitted their agents and representatives to advise consumers, including Plaintiffs and Class members, that any odors caused by the Defective HVAC System were "normal" or resulting from conditions other than the Defective HVAC System.

94.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including the Defective HVAC System and its associated health and safety hazard. Plaintiffs and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

## VII.    CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and/or (b)(3), on behalf of the following Classes for the maximum time period allowable by law:

> **Nationwide Class:** All persons or entities who purchased or leased a Class Vehicle in the United States;
>
> **Florida Class:** All persons or entities who purchased or leased a Class Vehicle in Florida; and
>
> **Tennessee Class:** All persons or entities who purchased or leased a Class Vehicle in Tennessee.

The Nationwide Class, the Florida Class, and the Tennessee Class are referred to collectively as the "Classes."

96.    Plaintiffs reserve the right to revise the definition of the Classes based upon subsequently-discovered information and reserve the right to establish sub-classes where appropriate.

97.    The Classes exclude Defendants and any entity in which Defendants have a controlling interest, as well as their officers, directors, legal representatives, successors, and assigns.  The Classes also exclude government entities and judicial officers that have any role in adjudicating this matter.

98.    The Classes are each so numerous that joinder of all members is impracticable. Plaintiffs believe that there are least a million proposed members of the Classes throughout the United States.

99.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

100.    Plaintiffs' claims are typical of the claims of the Classes Plaintiffs seek to represent. As alleged herein, Plaintiffs and Class members sustained damages arising out of the same illegal actions and conduct by Defendants.

101. Common questions of law and fact exist to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

- Whether the Defective HVAC System installed in Class Vehicles contains a design defect and/or a defect in material, manufacturing, or workmanship;

- Whether the Defective HVAC System installed in the Class Vehicles presents a health and safety hazard;

- Whether Defendants knew or should have known that the Defective HVAC System installed in the Class Vehicles is defective and/or presents a health and safety hazard;

- Whether Defendants had a duty to disclose that the Defective HVAC System installed in the Class Vehicles is defective and/or presents a health and safety hazard;

- Whether Defendants intentionally and knowingly falsely represented, concealed, suppressed, and/or omitted material facts, including the fact that the Defective HVAC System installed in the Class Vehicles is defective and/or presents a health and safety hazard;

- Whether Defendants made material misrepresentations and omissions concerning the standard, quality, or grade of the Class Vehicles and the Defective HVAC System;

- Whether members of the Classes would have purchased or leased their Class Vehicle or paid less to purchase or lease their Class Vehicle, if Defendants, at the time of purchase or lease, had disclosed that the Defective HVAC System was defective and presents a health and safety hazard;

- Whether Defendants actively concealed material facts from Plaintiffs and members of the Classes in order to, amongst other things, sell more Class Vehicles, profit off of a scheme to sell more components and services to Plaintiffs and Class members, when they complained about HVAC odor caused by the Defective HVAC System in their Class Vehicles, and avoid incurring the cost, expenses, and bad publicity associated with recalling vehicles suffering from the HVAC System Defect;

- Whether Toyota conspired with SET in furtherance of the unlawful acts alleged herein;

- Whether the Toyota RICO Enterprise engaged in mail and/or wire fraud;

37

- Whether the Toyota RICO Enterprise engaged in a pattern of racketeering activity;

- Whether the scheme described among Toyota, DENSO, Distributors, and Dealers resulted in injury to Plaintiffs' and the Classes' business or property;

- Whether the scheme described between Toyota, DENSO, Distributors, and Dealers is an enterprise within the meaning of 18 U.S.C. § 1961(4);

- Whether Toyota conspired with SET and other unknown co-conspirators to violate 18 U.S.C. § 1962(c);

- Whether Toyota breached implied warranties to Plaintiffs and members of the Classes;

- Whether Toyota violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*; and

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

102.    Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all the obligations and material duties necessary.  Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have no interests adverse to or in conflict with the interests of any of the other members of the Classes.

103.    Plaintiffs' interests are co-extensive with and not antagonistic to those of absent members within the Classes.  Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

104.    Plaintiffs have engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

105.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

106.    The Classes may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

107.    The Classes may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants, would be dispositive of interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

108.    The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical.  The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

109.    The nature of notice to the proposed Classes is contemplated to be by direct mail upon certification of the Classes, or, if such notice is not practicable, by the best notice practicable under the circumstances including, amongst other things, email, publication in major newspapers, and the internet.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)
### On behalf of Plaintiffs and the Nationwide Class
### (Against the Toyota Defendants)

110. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

111. The Toyota Defendants are "persons," as that term is defined in 18 U.S.C. § 1961(3).

112. The Toyota Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Toyota RICO Enterprise through a pattern of racketeering activity.

113. Plaintiffs and members of the Nationwide Class are "person[s] injured in his or her business or property" by reason of the Toyota Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### The Toyota RICO Enterprise

114. The following persons and others presently unknown have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Toyota RICO Enterprise:

a) The Toyota Defendants, who designed, manufactured, and sold millions of vehicles equipped with the Defective HVAC System that they knew or were reckless in not knowing contained the Defect in the Defective HVAC System, the scope and nature of which they concealed from and misrepresented to Plaintiffs, Class members, the public, and regulators for more than a decade, while falsely and inaccurately representing that their vehicles were safe and reliable, thereby deceiving Plaintiffs and Class members.

40

b) The Toyota Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Toyota RICO Enterprise to deceive Plaintiffs and Class members into purchasing, leasing, and "repairing" dangerous and defective vehicles and actively concealing the defect in the Defective HVAC System and the health and safety hazard it poses to Plaintiffs and Class members.

c) Defendant SET, GST, and/or other Distributors, who distributed Class Vehicles and Class Vehicle parts and accessories to Toyota Dealers in certain states, including Florida, performed activities associated with the advertising, marketing, and selling of the Class Vehicles, provided warranties and warranty repairs, and disseminated technical information and mechanic training materials regarding the Class Vehicles they knew or should have known contained Defective HVAC Systems.

d) Defendant SET's, GST's, and/or other Distributors' Officers and Executives, who have collaborated and/or colluded with each other and with other associates-in-fact in the Toyota RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles and actively concealing the defect in the Defective HVAC System and the health and safety hazard it poses to Plaintiffs and Class members.

e) DENSO, who, with the Toyota Defendants' guidance and instructions, designed, manufactured, and sold millions of Defective HVAC Systems likely knowing that they contained the HVAC System Defect, the scope and nature of which it concealed from and misrepresented to the public and regulators for more than a decade.

f) The DENSO Officers, Executives, and Engineers, who have collaborated with each other and with other associates-in-fact in the Toyota RICO Enterprise to deceive Plaintiffs and Class members into purchasing or leasing dangerous and defective vehicles and

41

actively concealing the HVAC System Defect and the health and safety hazard it poses to Plaintiffs and Class members.

g)  Dealers, who sold, leased, and serviced the Class Vehicles containing the Defective HVAC System in their defective condition, when they knew or should have known the Class Vehicles contained the HVAC System Defect.  Dealers also misrepresented to Plaintiffs and Class members that the foul, noxious, and/or toxic odors caused by the HVAC System Defect was not caused by a defect and could be remedied or repaired, when they knew or should have known these representations were false and only induced consumers to spend more money to fix a defect that had no repair.

h)  Dealers' Officers and Executives, who have collaborated with each other and with other associates-in-fact in the Toyota RICO Enterprise to deceive Plaintiffs and Class members into purchasing, leasing, and "repairing" dangerous and defective vehicles and actively concealing the HVAC System Defect and the health and safety hazard it poses to Plaintiffs and Class members.

115.   The Toyota RICO Enterprise, which engaged in, and whose activities affected interstate commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4), and it consists of "persons" associated together for a common purpose.  The Toyota RICO Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities, and it directly engaged in the production and distribution of goods and services in interstate commerce.

116.   While the Toyota Defendants participated in the conduct of the Toyota RICO Enterprise, they each had an existence separate and distinct from the Toyota RICO Enterprise.

Further, the Toyota RICO Enterprise was separate and distinct from the pattern of racketeering in which the Toyota Defendants have engaged.

117.    At all relevant times, the Toyota Defendants primarily operated, controlled, or managed the Toyota RICO Enterprise, through a variety of actions. The Toyota Defendants' participation in the Toyota RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Toyota Defendants manufactured, marketed, leased, and sold Class Vehicles with the Defective HVAC System, concealed the nature and scope of the HVAC System Defect, and profited from such concealment.

118.    The members of the Toyota RICO Enterprise all served a common purpose: to sell as many Defective HVAC Systems and Class Vehicles containing the Defective HVAC Systems, as possible, and thereby maximize the revenue and profitability of the Toyota RICO Enterprise's members.   The members of the Toyota RICO Enterprise shared the profits generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.   Each member of the Toyota RICO Enterprise benefited from the common purpose: the Toyota Defendants sold or leased more Class Vehicles, and received more for those vehicles than they would have otherwise had the scope and nature of the HVAC System Defect not been concealed; DENSO sold more Defective HVAC Systems to the Toyota Defendants than they would have otherwise had the scope and nature of the HVAC System Defect not been concealed; Distributors distributed more Class Vehicles to Dealers; and Dealers sold, leased, and serviced more Class Vehicles, and leased or sold those vehicles at a much higher price as a result of the concealment of the scope and nature of the HVAC System Defect from Plaintiffs and Class members.

**The Pattern of Racketeering Activity**

119.    The Toyota Defendants each conducted and participated in the conduct of the affairs of the Toyota RICO Enterprise through a pattern of racketeering activity that has lasted over a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

120.    For all three of the Toyota Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the HVAC System Defect found in millions of Toyota Camrys in the United States in order to sell more Class Vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with recalling vehicles suffering from the HVAC System Defect.  By concealing the scope and nature of the HVAC System Defect contained in millions of vehicles, the Toyota Defendants also maintained and boosted consumer confidence in the Toyota brand, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped the Toyota Defendants sell more vehicles than they would have otherwise sold and at a much higher price or for a higher profit.

121.    As detailed in the factual allegations above, the Toyota Defendants were well aware that the HVAC System in the Class Vehicles was defective and expelled noxious, foul, and/or toxic odors that exposed Plaintiffs and Class members to a health and safety hazard caused by the presence of mold and other contaminants, but intentionally subjected Plaintiffs and Class members to those risks or consciously disregarded them in order to maximize their profits. Moreover, once they received several NHTSA complaints and consumer complaints, the Toyota Defendants discussed the further dangers associated with the HVAC System Defect and Toyota issued TSBs about the Defect, which they shared with Distributors and Dealers, but nevertheless Toyota

44

continued to conceal the nature and scope of the HVAC System Defect from Plaintiffs and Class members and continued to sell and lease or cause to sell and lease Class Vehicles to unsuspecting consumers, including Plaintiffs and Class members, that contained the Defect.

122.    To further the scheme to defraud, the Toyota Defendants concealed the nature and scope of the HVAC System Defect from federal regulators, enabling them to escape investigation and costs associated with recalls for more than a decade.

123.    To also further the scheme to defraud, the Toyota Defendants promoted and touted the safety, reliability, and quality of the Class Vehicles, while simultaneously concealing the nature and scope of the HVAC System Defect.

## The Predicate Acts of Mail and Wire Fraud

124.    To carry out or attempt to carry out the scheme to defraud, the Toyota Defendants have conducted or participated in the conduct of the affairs of the Toyota RICO Enterprise through the following pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a)   The Toyota Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet and transmitted or caused to be transmitted by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including through the Toyota website, communications with NHTSA, statements to the press, and/or communications with other members of the Toyota RICO Enterprise, as well as advertisements and other communications to Toyota customers, including Plaintiffs and Class members; and

b)   The Toyota Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.  From at least the late 1990s to the present, Toyota

regularly utilized the interstate and international mail and wires to ship and pay for the Defective HVAC Systems from DENSO's offices in Michigan and California, among others located in the United States.

125.    The Toyota Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes include but is not limited to the following:

a)    During the relevant time period, the Toyota Defendants transmitted or caused to be transmitted (which herein after also means that the Toyota Defendants acted with knowledge that the use of the interstate or foreign mails and/or wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and/or wire communication travelling in interstate or foreign commerce, between its offices in Japan, California, Florida, and Kentucky communications concerning the defective nature of the HVAC system, recognizing that the Defective HVAC System installed in Toyota's vehicles exposed vehicle occupants to foul, noxious, and/or toxic odors, which presented a serious health and safety hazard to Class Vehicle occupants.

b)    On or about May 9, 1997, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a TSB titled "Air Conditioning Evaporator Odor," which described the HVAC System Defect as "[a] musty odor" that was "emitted from the air conditioning system of some vehicles," including Toyota Camrys.  Toyota and the other members of the Toyota RICO Enterprise, however, continued to conceal the HVAC System Defect from consumers, including Plaintiffs and Class members, for over a decade, despite receiving copious complaints from consumers, choosing to instead increase their profits.

c) On or about August 6, 2009, Toyota again transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a TSB titled "HVAC Odor" affecting 2007-2010 Camrys and Camry HVs to address an "HVAC system odor." Toyota stated in this TSB that the issue was only covered by the Toyota Comprehensive Warranty, which expired after "36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date," which continued to falsely mislead consumers, including Plaintiffs and Class members, into believing the HVAC system was neither defective nor posed a health and safety hazard to its consumers and vehicle occupants.

d) In 2011, Toyota transmitted or caused to be transmitted its 2012 Camry brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Camry's "legendary quality" and "remarkable driving experience," despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiffs and Class members.

e) On or about November 29, 2011, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a revision to its August 6, 2009 TSB, informing Dealers that a "newly designed evaporator sub-assembly has been made available to decrease the potential for HVAC odors," but again stating that the issue was only covered by the Toyota Comprehensive Warranty, which expired after "36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service

date," which continued to falsely mislead consumers, including Plaintiffs and Class members, into believing the HVAC system was neither defective nor posed a health and safety hazard to its consumers and vehicle occupants.

f)   On or about March 14, 2012, Toyota transmitted or caused to be transmitted from its offices in Florida to its offices in Michigan by means of mail and/or wire communications travelling in interstate and/or foreign commerce an invitation to a meeting to discuss the impact of the HVAC odor in the Class Vehicles with SET and "comments by health care professionals," conceding that the fumes emitting the foul, noxious, and/or toxic odors could also have a negative health impact on vehicle occupants, yet Toyota and the other members of the Toyota RICO Enterprise never disclosed this to Plaintiffs, Class members, or the public.  Instead, Toyota and the other members of the Toyota RICO Enterprise concealed the HVAC System Defect to increase their profits and avoid the costs and bad publicity associated with a recall or lemon law suit.

g)  On or about September 19, 2012, Toyota transmitted or caused to be transmitted by means of mail and/or wire communications travelling in interstate and/or foreign commerce between in its offices in California to its offices in Texas, a summary of its communications with SET acknowledging that the "AC odor has been one of the top issues for SET for the last few years" but that "SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida," which "caused warranty claims and field reports to drop off," further concealing the Defect from Plaintiffs and Class members.

h) On or about January 23, 2013, Toyota transmitted or caused to be transmitted by means of mail and/or wire communications travelling from its offices in Michigan to its offices in Australia and Japan, explaining that Toyota and its Dealers are "hesitant" to attempt to repair the HVAC System Defect, because the odors come back and it would subject them to

Lemon Law liability, demonstrating that the Toyota Defendants, Distributors, and Dealers were aware the Defective HVAC System had no permanent repair and was defective, and yet failed to inform Plaintiffs, Class members, and the public of the Defect, instead choosing not to even address the problem in order to increase their profits and avoid the costs of a recall or lemon law suits.

       i)  On or about July 25, 2013, Toyota transmitted or caused to be transmitted by means of mail and/or wire communications travelling in interstate and/or foreign commerce between its offices in Kansas and SET's offices in Florida standard language to be provided to Toyota customers complaining of HVAC odor, which stated that the odor was not a defect but rather "an industry-wide condition" and encouraged customers "to contact [their] local Toyota dealership for a thorough evaluation of the condition," thereby working with SET to conceal the true nature and scope of the HVAC System Defect from consumers, including Plaintiffs and Class members, and to increase profits by sending consumers to Dealers where they would be charged inspection fees and "repair" charges.

       j)  On or about September 12, 2013, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a TSB titled "HVAC Odor Maintenance," which falsely described the odors as "naturally occurring from the HVAC system and/or related environmental factors" and "a normal characteristic of automotive A/C systems," thereby directing Dealers and other members of the Toyota RICO Enterprise to conceal the true nature and scope of the HVAC System Defect. Further, the TSB admitted that "there is no way to eliminate these odors" and the instructed general procedure "**will NOT eliminate the odors experienced, but it's provided to help reduce the**

**intensity of these odors**" (emphasis in original), but nevertheless, Toyota and the other members of the Toyota RICO Enterprise encouraged Plaintiffs and Class members to pay for remedies that would fail to completely repair the HVAC System Defect, to increase Defendants' and other members of the Toyota RICO Enterprise's profits.

k)   Also in 2013, Toyota transmitted or caused to be transmitted by means of wire communication travelling in interstate and/or foreign commerce its 2014 Camry brochure by placing or having the brochure posted on its website, which could be accessed all over the United States and worldwide.  The brochure stated that the interior of the 2014 Camry was "a space that is rewarding and enhances the driver experience," when Toyota knew that the 2014 Camry contained the HVAC System Defect that emitted toxic, noxious, and/or foul odors into the interior of the vehicle.

l)   On or about April 9, 2015, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, an update to the September 12, 2013 TSB titled "HVAC Odor Maintenance," which expanded the "condition" to cover 2007 to 2015 Toyota Camrys and again falsely described the odors as "naturally occurring from the HVAC system and/or related environmental factors" and "a normal characteristic of automotive A/C systems," thereby directing Dealers and other members of the Toyota RICO Enterprise to conceal the true nature and scope of the HVAC System Defect. Toyota also admitted that "there is no way to eliminate these odors" and the instructed general procedure "**will NOT eliminate the odors experienced, but it's provided to help reduce the intensity of these odors**" (emphasis in original), but nevertheless, Toyota and the other members of the Toyota RICO Enterprise encouraged Plaintiffs and Class members to pay for remedies that

would fail to completely repair the HVAC System Defect, to increase Defendants' and other members of the Toyota RICO Enterprise's profits.

m) On September 9, 2015, by means of mail and/or wire communications travelling in interstate and/or foreign commerce Toyota transmitted or caused to be transmitted from its offices in Texas to its offices in California, an email admitting that the Class Vehicles contained a Defective HVAC System, which was an engineering problem that affected "a basic requirement of the system" that should be replaced without charge.  Nevertheless, Toyota continued to conceal the Defect, charging its customers to "repair" the issue, and increasing its profits by selling more Class Vehicles, which Plaintiffs and Class members would not have purchased or leased or would have paid significantly less for had they been aware of the Defect.

n) In 2016, Toyota transmitted or caused to be transmitted by interstate and/or foreign commerce through mail and/or wire communications its 2017 Camry brochure, in which Toyota touted that the 2017 Camry's interior had "maximum comfort" that "is ready for your next road trip" and is "[c]ommitted to safety."  Toyota made these representations knowing that the 2017 Camry contained the HVAC System Defect and that these representations were likely to deceive consumers, including Plaintiffs and Class members, into believe the Camry was defect-free and would not emit foul, noxious, and/or toxic odors into the passenger compartment of the vehicle.

o) On June 9, 2016, by means of wire communications travelling in interstate and/or foreign commerce Toyota transmitted or caused to be transmitted from one of its offices to the rest of the United States by posting or have posted on its website its press release regarding the 2017 Toyota Camry representations that the "2017 Camry continues to offer the best combination of roominess, comfort, quality safety and performance," "upholds its well-earned reputation for

comfort," and comes with a "[p]eace of [m]ind [w]arranty [p]rotection," despite knowing the 2017 Camry contained the HVAC System Defect that emits foul, noxious, and/or toxic odors which posed a health and safety hazard to vehicle occupants, which are either not covered under Toyota's warranty or which Toyota claims are naturally occurring and ergo need no repair.

126.   The Toyota Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and Class members were directly harmed as result of the Toyota Defendants' intentional conduct.  Plaintiffs, Class members, and federal regulators, among others, relied on the Toyota Defendants' omissions or material misrepresentations.

127.   As described throughout this complaint, the Toyota Defendants engaged in a pattern of related and continuous predicate acts for over a decade.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and Class members and obtaining significant monies and revenues from them while providing Defective HVAC Systems and Class Vehicles worth significantly less than the purchase or lease price paid.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

128.   The predicate acts all had the purpose of generating significant revenue and profits for the Toyota Defendants and the Toyota RICO Enterprise at the expense of Plaintiffs and Class members.  The predicate acts were committed or caused to be committed by the Toyota Defendants through their participation in the Toyota RICO Enterprise and in furtherance of its fraudulent scheme.  The predicate acts were interrelated in that they involved obtaining Plaintiffs' and the Class members' funds and avoiding the expenses associated with recalling and remediating the HVAC System Defect.

**Injury to Plaintiffs and the Classes**

129.    By reason of and as a result of the conduct of the Toyota Defendants and their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a)  overpayment for leased or purchased Class Vehicles, in that Plaintiffs paid for vehicles with safe and functioning HVAC systems and instead obtained vehicles with anything but, and were deprived of the benefit of their bargain; and

b)  the value of the Class Vehicles has diminished, thus reducing their resale value.

130.    Had the Toyota Defendants been entirely forthcoming with Plaintiffs, Class members, NHTSA, and the public in a timely manner about the true nature and scope of the Defective HVAC System and the risks it poses to vehicle occupants, as was their duty, Plaintiffs and Class members would not have suffered these harms.  The Toyota Defendants' conduct and their pattern of racketeering activity were reasonably calculated to deceive persons of ordinary prudence and comprehension and were committed with reckless indifference to the truth if not outright intent to deceive.

131.    The Toyota Defendants' violations of 18 U.S.C. § 1962(c) were committed with the specific intent to defraud, thereby entitling Plaintiffs and Class members to treble damages under 18 U.S.C. § 1964(c).

132.    The Toyota Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as

injunctive/equitable relief and costs and reasonable attorneys' fees, pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

**COUNT TWO**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)**
**On behalf of Plaintiffs and the Nationwide Class**
**(Against All Defendants)**

133.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against the Toyota Defendants and SET.

134.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

135.    At all relevant times, the Toyota Defendants, SET, and other unknown co-conspirators were associated with the Toyota RICO Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate directly and indirectly in the conduct of the affairs of the Toyota RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).   The Toyota Defendants, SET, and other unknown co-conspirators also agreed to the objective of the conspiracy or to commit at least two racketeering predicate acts.

136.    Over the course of the past decade or more, the Toyota Defendants, SET, and other unknown co-conspirators: shared information about the Defective HVAC Systems' inherent flaws, their failure to perform as required, and the foul, noxious, and/or toxic fumes and odors emitted by the Defective HVAC System into the Class Vehicles; delayed and/or prevented the release of inculpatory information or information involving the Defect; and maintained a consistent public posture as to condition of the Defective HVAC System and the risk it posed. The Toyota Defendants', SET's, and other unknown co-conspirators' close cooperation on issues surrounding the HVAC System Defect, their concealment of the nature and scope of the Defective HVAC

System, and their joint participation in predicate acts described below is evidence of the conspiracy.

## Overt Acts

137.    Toyota committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof.  More specifically, the following conduct and overt acts demonstrate the ongoing conspiracy between Toyota, SET, and other unknown co-conspirators:

a)  Toyota, SET, and other unknown co-conspirators knew that the Defective HVAC System was emitting into the Class Vehicles foul, noxious, and/or toxic odors caused by mold spores.

b)  Toyota was aware of the Defective HVAC System installed in its vehicles, since at least the late 1990s, after receiving numerous customer complaints about the odors emitted into the vehicle through the Defective HVAC System, and Toyota issued several TSBs to its Distributors and Dealers. Yet, Toyota concealed the Defect from Plaintiffs and Class members, and instead falsely represented that the foul, noxious, and/or toxic odors were "natural" and normal, thereby deceiving consumers and the public.

c)  Toyota communicated to its Distributors and Dealers again in 2011, 2013, and 2015 via TSBs the fact that the Defective HVAC Systems contained in its Class Vehicles were defective, but Toyota misrepresented to consumers that the odor was natural and directed Distributors and Dealers to encourage consumers complaining about the foul, noxious, and/or toxic odors and moldy smell to bring their vehicles into Toyota Dealers, knowing there was no effective remedy for the Defect.

d) In 2012 and 2013, Toyota engaged in several discussions with SET regarding the Defective HVAC Systems and acknowledged the safety and health hazard for passengers exposed to the mold fumes and foul, noxious, and/or toxic odors emitted by the Defective HVAC System. Nevertheless, neither Toyota nor SET nor any other members of the Toyota RICO Enterprise alerted Plaintiffs, Class members, NHTSA, or the public about this health and safety hazard. Instead Toyota and SET conspired to conceal the nature and scope of the HVAC System Defect.

138. In addition, SET engaged in the following predicate acts in furtherance of the conspiracy:

a) In at least 1997, 2009, 2011, 2013, and 2015, SET and other Distributors and Dealers received from Toyota TSBs regarding the HVAC System Defect, but instead of disclosing the Defect to Plaintiff, Class members, and the public, SET conspired with Toyota to conceal the Defect, in order to maximize its profits and encouraged consumers complaining of the odors to go to their local Dealers to have their vehicles examined and "repaired" in order to charge customers additional labor fees and service parts, even though SET knew there was no effective repair and all remedies described in the TSBs would at best only temporarily minimize the odor.

b) In at least 2011 and 2012, SET refused to even address customer complaints regarding the Defective HVAC System in order to avoid legal costs and liability under Florida's Lemon Law. Instead of disclosing to consumers, including Plaintiffs and Class members, that the odors they complained of in their Class Vehicles were produced by a known Defect in the HVAC system, SET instead misrepresented that the condition was normal.

c) In or about September of 2015, SET acknowledged the HVAC System Defect should be covered under the warranty because it was an engineering defect, but nevertheless

conspired with Toyota to treat the odors and fumes caused by the HVAC System Defect as a normal condition and charge consumers for ineffective "repairs."

139.     Toyota's and SET's misrepresentations and acts also caused the Dealers to engage in the following predicate acts in furtherance of the Toyota RICO Enterprise:

      a)   Dealers continued to sell Class Vehicles to Class Members knowing they contained a Defective HVAC System and failed to disclose this Defect to Plaintiffs and Class members.

      b)   Dealers continued to charge customers for inspections of the Defective HVAC System and repair efforts to decrease the intensity of the odors caused by the Defective HVAC System.

140.     Toyota, SET, and other unknown co-conspirators agreed to and did conduct and participate in the conduct of the Toyota RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiffs and Class members, as more fully described in the prior Count and herein.

### Injury to Plaintiffs and the Classes

141.     As a direct result of Toyota's, SET's, and other unknown co-conspirators' conspiracy and violation of 18 U.S.C. § 1962(d), Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

      a)   overpayment for leased or purchased Class Vehicles, in that Plaintiffs and Class Members paid for vehicles with functioning HVAC systems and instead obtained vehicles with anything but, and have been deprived of the benefit of their bargain; and

      b)   the Class Vehicles' value has diminished, thus reducing their resale value.

142.     Had Toyota, SET, and other unknown co-conspirators been entirely forthcoming with Plaintiffs, Class members, NHTSA, and the public in a timely manner about the true nature

and scope of the Defective HVAC System and the risks it poses to vehicle occupants, as was their duty, Plaintiffs and Class members would not have suffered these harms. Toyota's, SET's, and other unknown co-conspirators' conspiracy to commit mail fraud and/or wire fraud was reasonably calculated to deceive persons of ordinary prudence and comprehension and was committed with reckless indifference to the truth if not outright intent to deceive.

143.    Toyota's, SET's, and other unknown co-conspirator's conspiracy to violate 18 U.S.C. § 1962(c) was committed with the specific intent to defraud, thereby entitling Plaintiffs and Class members to treble damages under 18 U.S.C. § 1964(c).

144.    The Toyota Defendants' and SET's violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees, pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT THREE
## FRAUD OR FRAUDULENT CONCEALMENT
### On behalf of the Nationwide Class or Alternatively
### the Florida Class and Tennessee Class
### (Against the Toyota Defendants)

145.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

146.    Plaintiffs bring this claim against the Toyota Defendants on behalf of themselves and the members of the Nationwide Class under the common law of fraud and fraudulent concealment, as there are no true conflicts (case-dispositive differences) amongst various states' laws for fraud or fraudulent concealment. In the alternative, Plaintiffs bring this claim against the

Toyota Defendants under the laws of the states where Plaintiffs and Class Members purchased or leased their Class Vehicles.

147.    Defendants intentionally and knowingly misrepresented, concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles with the intent that Plaintiffs and Class members rely on such misrepresentations and omissions. The Defective HVAC System installed in the Class Vehicles is defective and exposes drivers and occupants to foul, noxious, and/or toxic odors and a health and safety hazard from mold growth. As a direct result of the Toyota Defendants' fraudulent conduct, Class members have suffered actual damages.

148.    In connection with the purchase or lease of each of the Class Vehicles, Toyota provided warranty coverage for the Class Vehicles under one or more manufacturer's warranties. Specifically, Toyota provided a Toyota New Vehicle Limited Warranty for 36 months or 36,000 miles, which includes all components other than normal wear and maintenance items.  Under the warranties provided to Plaintiffs and Class members, Toyota promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Defective HVAC System, at no cost to owners and lessees of the Class Vehicles and within a reasonable time.

149.    At the time of sale or lease of the Class Vehicles, the Toyota Defendants informed Plaintiffs and members of the Classes in the Toyota Warranty and Maintenance Guides that Toyota's "excellent warranty coverage is evidence that we stand behind the quality of vehicles. We're confident—as you should be—that your Toyota will provide you with many years of enjoyable driving." *See infra.*  Further, Toyota knew that quality and reliability were two factors that Plaintiffs and Class members relied on when deciding to purchase or lease Class Vehicles,

stating "[w]e realize that your confidence in the quality and reliability of our produces was a key factor in your decision to buy a Toyota."

150.    Although Toyota informed Plaintiffs and Class members that it would stand behind the quality and reliability of the Class Vehicles, repairing or remedying any issues that arose during the warranty periods, Toyota knew (at the time of sale or lease and thereafter) that the Class Vehicles contained a Defective HVAC System, concealed the Defect, and never intended to repair or replace the Defective HVAC System during the warranty periods.  Toyota admitted in its TSBs that the recommended HVAC Odor Maintenance procedure "*will NOT eliminate the odors experienced*, but it's provided to help reduce the intensity of these odors[,]" and "*there is no way to eliminate these odors*." (emphasis added).  To date, the Toyota Defendants have not provided consumers or Class members with a repair or remedy that will eliminate the odors or the emission of mold and other contaminants, which pose a health and safety hazard to all vehicle occupants, and Toyota has not offered to replace the Defective HVAC Systems in the Class Vehicles.

151.    The Toyota Defendants owed a duty to disclose the Defective HVAC System and its corresponding health and safety hazard to Plaintiffs and Class members because the Toyota Defendants possessed superior and exclusive knowledge regarding the Defect and the hazard associated with the Defective HVAC System.  Rather than disclose the Defect, the Toyota Defendants intentionally and knowingly falsely represented, concealed, suppressed, and omitted material facts including the standard, quality, or grade of the Class Vehicles and the existence of the Defective HVAC System.

152.    The fact that the Defective HVAC Systems installed in the Class Vehicles are defective and expose drivers and occupants to foul, noxious, and/or toxic odors and a corresponding health and safety hazard is material because Plaintiffs and Class members had a

reasonable expectation that the vehicles would not suffer from a Defective HVAC System and would not expose them and other vehicle occupants to foul, noxious, and/or toxic odors and mold or other contaminants, which pose a health and safety hazard.  No reasonable consumer expects a vehicle to incorporate a Defective HVAC System that exposes drivers and other vehicle occupants to foul, noxious, and/or toxic odors and an associated health and safety hazard.

153.    Plaintiffs and Class members would not have purchased or leased the Class Vehicles or would have paid significantly less for the Class Vehicles but for the Toyota Defendants' omission and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Defective HVAC System.

154.    The Toyota Defendants knew their misrepresentations, concealment, and suppression of material facts were false and misleading and knew that the effect of misrepresenting and concealing those material facts would cause Plaintiffs and Class members to rely on the Toyota Defendants' misrepresentations and omissions to Plaintiffs' and Class members' detriment.  The Toyota Defendants knew their concealment and suppression of the Defective HVAC System would sell more Class Vehicles and would result in increased revenue and profits from the sale of the Class Vehicles, as well as the sale of services and components intended to mitigate the odors.

155.    Plaintiffs and Class members reasonably relied upon the Toyota Defendants' knowing, affirmative and active representations, concealment, and omissions.  As a direct proximate result of the Toyota Defendants' actions, Plaintiffs and Class members have suffered actual damages in an amount to be determined at trial.

156.    The Toyota Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard for Plaintiffs' and Class members' rights and well-being, and with the aim of enriching the Toyota Defendants by increasing their profits.  The Toyota

Defendants' conduct, exhibiting their complete disregard for the health and well-being of consumers, including Plaintiffs and Class members, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT FOUR**
**FRAUD OR FRAUDULENT CONCEALMENT**
**On behalf of Plaintiff Cardenas and the Florida Class**
**(Against SET)**

157.    Plaintiff Cardenas brings this claim against SET on behalf of himself and the Florida Class under the common law of fraud and/or fraudulent concealment.

158.    As described above, SET made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective HVAC Systems contained in them.

159.    SET concealed and suppressed material facts regarding the HVAC System Defect, including the propensity of the Defective HVAC System to emit foul, noxious, and/or toxic odors and mold and other contaminants into the passenger compartments of the Class Vehicles and the effects those odors and contaminants could have on vehicle occupants.

160.    SET took affirmative steps to ensure that its employees did not reveal the known HVAC System Defect to consumers, including but not limited to instructing its employees to tell consumers complaining of the Defective HVAC System that the condition was natural or normal and instructing Dealers to tell customers the same.

161.    Upon information and belief, SET has still not made full and adequate disclosure, continues to defraud Plaintiff and Class members, and continues to conceal material information regarding the Defective HVAC System.

162.    SET had a duty to disclose the Defective HVAC System because it:

a)  Had exclusive and/or far superior knowledge and access to the facts, and SET knew the facts were not known to or reasonably discoverable by Plaintiff and Class members;

b)  Intentionally concealed the foregoing from Plaintiff and Class members; and

c)  Made incomplete representations about the safety and reliability of the Defective HVAC Systems and Class Vehicles, while purposefully withholding material facts from Plaintiff and Class members that contradicted these representations.

163.   These omitted and concealed facts were material because they would be relied upon by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Class. Plaintiff and Class members trusted SET not to direct them to Dealers that would sell or lease them vehicles that were defective or recommend them to pay money for inspections and repairs that were caused by a defect and that would not remedy the Defect.

164.   SET concealed and suppressed these material facts to ensure more Class Vehicles were distributed, sold, and leased to protect its profits.

165.   SET also misrepresented the safety and reliability of the Defective HVAC System and Class Vehicles, because it either (a) knew but did not disclose the HVAC System Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

166.   SET actively concealed or suppressed these material facts, in whole or in part to maintain a market for the Class Vehicles it distributed, to protect its profits, and to avoid recalls that would hurt the Toyota brand it distributed and cost SET profits.  SET did so at the expense of Plaintiff and the Florida Class.

167.    Plaintiff and the Florida Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

168.    Had they been aware of the Defective HVAC Systems installed in the Class Vehicles, Plaintiff and the Florida Class would either not have paid as much for their Class Vehicles or would not have purchased or leased them at all.  Plaintiff and the Florida Class did not receive the benefit of their bargains as a result of SET's fraudulent concealment and misrepresentations.

169.    Because of SET's concealment and misrepresentations, Plaintiff and the Florida Class sustained damages because they own vehicles that diminished in value as a result of SET's concealment of and failure to timely disclose the Defective HVAC System in the Class Vehicles and serious health, safety, and quality issues posed by the Defect.

170.    The value of all Florida Class members' Class Vehicles has diminished as a result of SET's fraudulent concealment and misrepresentations of the Defective HVAC System because it has made any reasonable consumer reluctant to purchase any Class Vehicle, let alone pay what otherwise would have been a fair market value for the Class Vehicles.

171.    Accordingly, SET is liable to Plaintiff and the Florida Class for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase or lease, the diminished value of the Defective HVAC System and the Class Vehicles, and/or costs incurred in storing, maintaining, or otherwise disposing of the Defective HVAC System or Class Vehicle.

172.    SET's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard for Plaintiff's and the Florida Class's rights and well-being, and with the aim of enriching SET by increasing its profits and not damaging its business with Toyota.

SET's conduct, exhibiting its complete disregard for the health and well-being of consumers, including Plaintiff and Class members, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT FIVE**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**On behalf of Plaintiff Cardenas and the Florida Class**
**(Against the Toyota Defendants)**

173.    Plaintiff Cardenas hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

174.    Plaintiff  brings this count on behalf of himself and the Florida Class against the Toyota Defendants.

175.    Plaintiff and members of the Florida Class purchased or leased the Class Vehicles from Toyota by and through Toyota's authorized agents.  At all relevant times, the Toyota Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles. The Toyota Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

176.    The Toyota Defendants are and were at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code.

177.    With respect to leases, the Toyota Defendants are and were at all relevant times lessors of goods within the meaning of the Uniform Commercial Code.

178.    Toyota impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

179.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation.  The Class Vehicles contain an inherent Defect in the Defective HVAC

65

System (at the time of sale or lease and thereafter) and present an undisclosed health and safety hazard to drivers and occupants.  Thus, the Toyota Defendants breached the implied warranty of merchantability.

180.    The Toyota Defendants cannot disclaim their implied warranty as they knowingly sold or leased a defective product.

181.    The Toyota Defendants received notice of the HVAC System Defect by numerous consumer complaints made to Dealers and Distributors, complaints to NHTSA, and through its own testing and investigations.  Affording the Toyota Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because the Toyota Defendants knew of and concealed the Defective HVAC System, and, upon information and belief, refused to repair or replace the Defective HVAC System free of charge within a reasonable time.

182.    As a direct and proximate result of Toyota's breach of the implied warranty of merchantability, Plaintiff and members of the Florida Class have been damaged in an amount to be proven at trial.

183.    Any attempt by the Toyota Defendants to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, the Toyota Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers, including Plaintiff and Class members, about the Defect.   The time limits contained in the Toyota Defendants' warranty limitation are unconscionable and inadequate to protect Plaintiff and members of the Florida Class.  Among other things, Plaintiff and the members of the Florida Class did not determine these time limitations, the terms of which unreasonably favored Toyota, who knew of the Defective HVAC System and that Plaintiff and members of the Florida Class would not discover the Defect until

after the warranty period had expired.  A gross disparity in bargaining power and knowledge existed between Toyota and members of the Florida class.  Toyota knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Defective HVAC System posed a serious health and safety hazard.

184.    Plaintiff and members of the Florida Class have been excused from performance of any warranty obligations as a result of Toyota's misconduct described herein.

185.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule, fraudulent concealment, and the terms of the express warranty.

**COUNT SIX**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT ("MMWA")**
**15 U.S.C. § 2301 *et seq.***
**On behalf of Plaintiffs and the Florida and Tennessee Classes**
**(Against the Toyota Defendants)**

186.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if fully set forth herein.

187.    Plaintiffs bring this count on behalf of themselves and the Florida and Tennessee Classes against the Toyota Defendants.

188.    Plaintiffs satisfy the Magnuson-Moss Warranty Act ("MMWA") jurisdictional requirement, because Plaintiffs allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

189.    Plaintiffs and members of the Florida Class and Tennessee Class are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

190.    The Toyota Defendants are each a "supplier" and "warrantor" within the meaning of the MMWA, 15, U.S.C. §§ 2301(4)-(5).

191.    The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

192.    The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

193.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

194.    The Toyota Defendants breached these warranties by misrepresenting the standard, quality, or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Defective HVAC System.  Without limitation, the Class Vehicles share a common Defect in design, material, manufacturing, or workmanship that fails to operate as represented by the Toyota Defendants and presents a health and safety hazard to Plaintiffs, the Florida Class, the Tennessee Class, and all vehicle occupants.

195.    Any attempt by the Toyota Defendants to disclaim or limit their implied warranties is unconscionable and unenforceable.  Specifically, the Toyota Defendants' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers, including Plaintiffs and Class members, about the Defect.  The time limits contained in the Toyota Defendants' warranty periods are also unconscionable and inadequate to protect Plaintiffs and members of the Florida and Tennessee Classes.  Among other things, Plaintiffs and members of the Florida and Tennessee Classes did not determine these time limitations, the terms of which unreasonably favor the Toyota Defendants.  A gross disparity in bargaining power existed between the Toyota Defendants and members of the Florida and Tennessee Classes.  Toyota knew or should have known that the Class Vehicles were defective at the time of sale or lease, that they posed a health and safety hazard, and that the Defect would not necessarily be discoverable by Plaintiffs and Class members until after the warranty period the Toyota Defendants imposed had expired.

196. Affording Toyota a reasonable opportunity to cure its breach of warranties is unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Toyota knew or was reckless in not knowing of the material misrepresentations and omissions concerning the standard, quality, or grade of the Class Vehicles and the existence of the Defective HVAC System, but it failed to repair or replace the Defective HVAC System and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford the Toyota Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

197. Plaintiffs and members of the Florida and Tennessee Classes would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them to Defendants. Thus, Plaintiffs and members of the Florida and Tennessee Classes have not re-accepted their Class Vehicles by retaining them.

198. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

199. Plaintiffs, individually and on behalf of members of the Florida and Tennessee Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

**COUNT SEVEN**
**VIOLATION OF FLORIDA'S DECEPTIVE & UNFAIR TRADE**
**PRACTICES ACT, FLA. STAT. § 501.201** *et. seq.*
**On behalf of Plaintiff Cardenas and the Florida Class**
**(Against All Defendants)**

200.    Plaintiff Cardenas hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

201.    Plaintiff brings this claim on behalf of himself and the members of the Florida Class against Toyota and SET.

202.    Plaintiff and the members of the Florida Class are "consumers" within the meaning of the FDUTPA, Fla. Stat. § 501.203(7).

203.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

204.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive practices that violated the FDUTPA as described above.

205.    Defendants impliedly warranted that the Class Vehicles were in merchantable condition, fit for the ordinary purpose for which vehicles are used, and were of a standard, quality, or grade that the vehicles were not.

206.    Defendants breached these warranties by misrepresenting the standard, quality, or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Defective HVAC System.  Without limitation, the Class Vehicles share a common Defect in design, material, manufacturing, or workmanship that fails to operate as represented by Defendants

and presents an undisclosed health and safety hazard to Plaintiff, the Florida Class, and all vehicle occupants.

207.    Any attempt by Defendants to disclaim or limit their implied warranties is unconscionable and unenforceable.  Specifically, the Toyota Defendants' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers, including Plaintiff and Class members, about the Defect.

208.    In the course of their business, Defendants failed to disclose and actively concealed the Defective HVAC Systems contained in the Class Vehicles and the dangers and hazard posed by the Class Vehicles and the Defective HVAC Systems, as described above and otherwise engaged in activities with a tendency or capacity to deceive.

209.    In violation of the FDUTPA, Defendants employed unfair and deceptive acts or practices, fraud, false pretenses, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale and/or lease of Class Vehicles.  Defendants knowingly concealed, suppressed, and omitted material facts regarding the Defective HVAC System and associated health and safety hazard and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiff and the Florida Class.

210.    Defendants actively suppressed the fact that the Defective HVAC System in Class Vehicles is defective and presents a health and safety hazard because of materials, workmanship, design, and/or manufacturing defects.  Further, Defendants employed unfair and deceptive trade practices to deny repair or replacement of the Defective HVAC System within a reasonable time in violation of the FDUTPA.  Defendants also breached their warranties as alleged above in violation of the FDUTPA.

211.    As alleged above, Defendants have known of the Defect contained in the Class Vehicles HVAC System for over a decade.  Prior to installing the Defective HVAC Systems in the Class Vehicles, Toyota knew or should have known they emitted foul, noxious, and/or toxic odors that contained mold and other contaminants, which posed a health and safety hazard to vehicle occupants, because they had received numerous consumer complaints about the foul, noxious, and/or toxic odors and had drafted or sent TSBs explaining the HVAC System Defect.  SET also should have known of the Defect from discussions with Toyota and after receiving numerous complaints about the Defect from consumers and Dealers.  Defendants, nevertheless, failed to disclose and actively concealed the dangers and hazard posed by the Class Vehicles and the Defective HVAC Systems installed in them.

212.    By failing to disclose and by actively concealing the HVAC System Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as a reputable manufacturer or distributor for a reputable manufacture that values safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective HVAC System to emit foul, noxious, and/or toxic odors and mold and pose a health and safety hazard to vehicle occupants, to ensure that consumers, including Plaintiff and Class members, would purchase or lease the Class Vehicles and spend money on useless remedies and repairs.

213.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Defective HVAC System.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective HVAC Systems installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer or a reputable distributor for a reputable manufacturer that values safety.

214.    Defendants' unfair and deceptive trade practices were likely intended to deceive a reasonable consumer.  Plaintiff and members of the Florida Class had no reasonable way to know that the Class Vehicles contained Defective HVAC Systems, which were defective in materials, workmanship, design and/or manufacture and posed a serious and significant health and safety hazard.  Defendants possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Defective HVAC System and its associated health and safety hazard, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions, as Plaintiff and members of the Florida Class did.

215.    Defendants intentionally and knowingly misrepresented material facts and omitted material facts regarding the Class Vehicles and the Defective HVAC Systems installed in Class Vehicles with an intent to mislead Plaintiff and the Florida Class.

216.    Defendants knew or should have known that their conduct violated the FDUTPA.

217.    Defendants made material statements and/or omissions about the safety and reliability of the Class Vehicles and/or the Defective HVAC Systems installed in them that were either false or misleading. Defendants' misrepresentations, omissions, statements, and commentary have included selling and marketing Class Vehicles as safe and reliable, despite their knowledge of the Defective HVAC System.

218.    To protect their profits, avoid remediation costs and public relation problems, and increase their profits by having consumers pay for component parts and other useless repairs to remedy the HVAC System Defect, Defendants concealed the defective nature and the health and safety hazard  posed by the Class Vehicles and the Defective HVAC Systems installed in them. Defendants allowed unsuspecting new and used car purchasers and lessees to continue to buy or

lease the Class Vehicles and continue to drive them, despite the health and safety hazard they pose to vehicle occupants.

219.   Defendants owed Plaintiff and the Florida Class a duty to disclose the true safety and reliability of the Class Vehicles and the Defective HVAC System installed in them because Defendants:

> a)  Possessed exclusive knowledge of the Defect and its associated health and safety hazard;
>
> b)  Intentionally concealed the foregoing from Plaintiff and the Florida class; and/or
>
> c)  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and the Florida Class that contradicted these representations.

220.   Because Defendants fraudulently concealed the HVAC System Defect in the Class Vehicles and the Defective HVAC Systems installed in them, resulting in a raft of negative publicity once the HVAC System Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, the Class Vehicles are now worth significantly less than they otherwise would be.

221.   Defendants' failure to disclose and active concealment of the foul, noxious, and/or toxic odors produced by the Defective HVAC Systems installed in the Class Vehicles were material to Plaintiff and the Florida Class.  A vehicle made by an honest and reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a dishonest and disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly reports on and remedies them.

222.     Plaintiff and the Florida Class suffered ascertainable losses caused by Defendants' misrepresentations and their failure to disclose material information.  Had Plaintiff and the Florida Class members been aware of the Defective HVAC Systems that existed in the Class Vehicles and Defendants' complete disregard for the health and safety of their consumers, including Plaintiff and Class members, and vehicle occupants, Plaintiff and the Florida Class either would not have paid as much for their Class Vehicles or would not have purchased or leased them at all.  Plaintiff and the Florida Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

223.     Plaintiff and the Florida Class risk loss of use of their Class Vehicles and health issues as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiff, the Florida Class, and the public in general. Defendants' unlawful acts and practices complained of above affect the public interest.

224.     As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiff and the Florida Class have suffered injury-in-fact and/or actual damage.

225.     Plaintiff and the Florida Class are entitled to recover their actual damages, under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat § 501.2105(1).

226.     Plaintiff and the Florida Class also seek an order enjoining Defendants' unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**COUNT EIGHT**
**VIOLATION OF THE TENNESEE CONSUMER PROTECTION ACT,**
**TENN. CODE ANN. § 47-18-101 *et seq.***
**On behalf of Plaintiff Kirton and the Tennessee Class**
**(Against the Toyota Defendants)**

227.    This claim is brought only on behalf of the Tennessee Class against Toyota.

228.    Plaintiff Kirton and the Tennessee Class are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

229.    The Toyota Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2) (the "Act").

230.    The Toyota Defendants' conduct complained of herein affected "trade," "commerce," or "consumer transactions," within the meaning of Tenn. Code Ann. § 47-18-103(19).

231.    The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "[r]epresenting that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have . . . ;" "[r]epresenting that goods or services are of a particular standard, quality or grade . . . if they are of another;" and "[a]dvertising goods or services with intent not to sell them as advertised."  Tenn. Code Ann. § 47-18-104.  The Toyota Defendants violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Class Vehicles have characteristics or benefits that they did not have; representing that Class Vehicles are of a particular, standard, quality, or grade when they are of another; and advertising Class Vehicles with intent not to sell or lease them as advertised.

232.    In the course of their business, the Toyota Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and the Defective HVAC Systems

installed in them as described here and otherwise engaged in activities with a tendency or capacity to deceive. The Toyota Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective HVAC System installed in them.

233.    As alleged above, the Toyota Defendants have known of the HVAC System Defect in the Class Vehicles since at least the late 1990s, including through consumer complaints to them, NHTSA, and Dealers and as evidenced by their several TSBs issued to its Dealers and Distributors to address the Defect.  Prior to installing the Defective HVAC Systems in the Class Vehicles, the Toyota Defendants knew or should have known of the HVAC System Defect.

234.    By failing to disclose and by actively concealing the HVAC System Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufactures that value safety, the Toyota Defendants engaged in unfair or deceptive business practices in Violation of the Tennessee CPA. Defendants deliberately withheld the information about the propensity of the Defective HVAC System to emit foul, noxious, and/or toxic odors and mold and other contaminants into the Class Vehicles, in order to ensure consumers, including Plaintiffs and Class members, would purchase or lease the Class Vehicles and spend additional sums in useless repairs to help decrease the intensity of the foul, noxious, and/or toxic odors.

235.    In the course of the Toyota Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the health and safety hazard and serious Defect discussed above. The Toyota Defendants compounded the deception by repeatedly

asserting that the Class Vehicles and Defective HVAC Systems installed in them were safe, reliable, and of high quality and by claiming to be reputable manufacturers that value safety.

236.    The Toyota Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, including Plaintiff and the Tennessee Class, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and the Tennessee Class, about the true safety and reliability of the Class Vehicles and the Defective HVAC Systems installed in them, the quality of the Toyota Defendants' brands, and the true value of the Class Vehicles.

237.    The Toyota Defendants intentionally and knowing misrepresented material facts regarding the Class Vehicles and/or the Defective HVAC Systems installed in them with an intent to mislead Plaintiff and the Tennessee Class.

238.    The Toyota Defendants knew or should have known that their conduct violated the Tennessee CPA.

239.    As alleged above, the Toyota Defendants made material statements about the safety and reliability of the Class Vehicles and the Defective HVAC Systems installed in them that were either false or misleading.  The Toyota Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the HVAC System Defect.

240.    To protect their profits and avoid remediation costs and a public relations nightmare, the Toyota Defendants concealed the dangers and risks posed by the Class Vehicles and the Defective HVAC Systems installed in them and allowed unsuspecting new and used car purchasers or lessees to continue to buy/lease the Class Vehicles and continue driving them.

241.    The Toyota Defendants owed Plaintiff and the Tennessee Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective HVAC System installed in them because the Toyota Defendants:

a)  Possessed exclusive knowledge of the dangers and hazard posed by the foregoing;

b)  Intentionally concealed the foregoing from Plaintiff and the Tennessee Class; and

c)  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and the Tennessee Class that contradicted these representations.

242.    Because the Toyota Defendants fraudulently concealed the HVAC System Defect in Class Vehicles, resulting a raft of negative publicity once the HVAC System Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by the Toyota Defendants' conduct, they are now worth significantly less than they otherwise would.

243.    The Toyota Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective HVAC Systems in Class Vehicles were material to Plaintiff and the Tennessee Class.  A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe or unreliable vehicles that conceals a defect rather than promptly reports and remedies it.

244.    Plaintiff and the Tennessee Consumer Class suffered ascertainable loss caused by the Toyota Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the HVAC System Defect that existed in the Class Vehicles and/or the

Defective HVAC System installed in them and the Toyota Defendants' complete disregard for safety, Plaintiff and the Tennessee Class either would not have paid as much for their vehicles or would not have purchased or leased them at all.  Plaintiff and Tennessee Class members did not receive the benefit of their bargain as a result of the Toyota Defendants' misconduct.

245.    The Toyota Defendants' violations present a continuing risk to Plaintiff, the Tennessee Class, and the general public. The Toyota Defendants' unlawful acts and practices complained of here affect the public interest.

246.    As direct and proximate result of the Toyota Defendants' violation of the Tennessee CPA, Plaintiff and the Tennessee Class have suffered injury-in-fact and/or actual damage.

247.    Pursuant to Tenn. Code Ann. § 74-18-109(a), Plaintiff and the Tennessee Class seek monetary relief against the Toyota Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of the Toyota Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representative of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged above;

C.      An order awarding costs, restitution, disgorgement, punitive damages, statutory

damages, and exemplary damages under applicable law, and compensatory damages for economic

loss, diminished value, and out-of-pocket expenses in an amount to be determined at trial;

D.      An award of treble the amount of damages suffered by Plaintiffs and members of

the Classes as proven at trial, plus interest and attorneys' fees and expenses, pursuant to 18 U.S.C.

§§ 1962(c) and (d);

E.      An order requiring Defendants to pay both pre- and post-judgment interest on any

amounts awarded;

F.      An award of costs, expenses, and attorneys' fees as permitted by law; and

G.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Respectfully submitted,

Date:   July 12, 2018                          **PODHURST ORSECK, P.A.**

s/ Peter Prieto
Peter Prieto (FBN 501492)
pprieto@podhurst.com
John Gravante, III (FBN 617113)
jgravante@podhurst.com
Matthew Weinshall (FBN 84783)
mweinshall@podhurst.com
Alissa Del Riego (FBN 99742)
adelriego@podhurst.com
SunTrust International Center
One S.E. 3rd Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
Facsimile: (305) 358-2382

81

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Peter A. Muhic
Tyler S. Graden
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**KIESEL LAW LLP**
Paul R. Kiesel
Jeffrey A. Konciusn
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

*Attorneys for Plaintiffs and the Proposed Classes*