# EXHIBIT 3

**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CARDENAS et al. v. TOYOTA MOTOR CORPORATION et al.

CIVIL ACTION NO.
18-22798-CIV-MORENO

**Expert Report of Peter E. Rossi**

**November 24, 2020**

## 1. Qualifications

1. I am the James Collins Professor of Marketing, Statistics and Economics at the Anderson School of Management, UCLA. I hold a joint appointment in the Anderson School and the Economics Department. I received my BA in 1976 from Oberlin College with a double major in mathematics and history. My graduate degrees are from University of Chicago (M.B.A. (1980) and Ph.D. (1984)). I received my Ph.D. in Econometrics which is the science of the application of statistical methods to economic data. During my doctoral training, I completed a wide variety of courses in sampling theory, statistics, econometrics, and economics.

2. My first faculty appointment was at the Kellogg Graduate School of Management where I served as Assistant Professor of Managerial Economics. In 1985, I moved to the University of Chicago's Booth School of Business where I was appointed as Assistant Professor of Econometrics and Statistics. In 1994, I was promoted to Professor of Econometrics and Marketing. In 1996, I received an endowed chair. At the University of Chicago, I taught both masters and doctoral courses in statistics, market research, econometrics and economics. In 2009, I joined the Anderson School of Management as the Collins Distinguished Professor. At Anderson, I have taught both doctoral and masters' levels courses in Econometrics, Bayesian Statistics, New Product Development, and Data Analytics.

3. In Appendix A, I provide my Curriculum Vitae. I have authored over 65 refereed publications in leading journals in Statistics, Economics, Econometrics, and Marketing. I am the author of books published by John Wiley and Sons and Princeton University Press. My published research has received wide attention as evidenced by more than 19,000 citations on Google Scholar. I have been elected fellow of the American Statistical Association, the

Journal of Econometrics, and the INFORMS Society of Marketing in partial recognition for my research contributions. My doctoral students are on the faculties of many leading research universities including The Ohio State University, Carnegie Mellon University, and the University of Rochester. I have served as senior editor of Marketing Science and was a founding editor of Quantitative Marketing and Economics (QME). These are two of the top three journals in the area of quantitative marketing. I have also provided the list of my prior testimony in Appendix B and a list of the materials I have considered in Appendix C.

4. I have been a key innovator in developing Bayesian methods appropriate for marketing data, including choice-based conjoint. The most widely used methods for conjoint analysis, Hierarchical Bayesian Choice-Based Conjoint,[1] were developed by my student Greg Allenby, and then extended by both Professor Allenby and myself, working together and independently. I have written the bayesm R package which is used worldwide to analyze conjoint data. I have also authored two recent articles on the valuation of product features of the sort considered in this matter.[2] In addition, I have co-authored an article on the economic foundations of conjoint for the definitive reference handbook, the *Handbook of the Economics of Marketing*.[3]

---

[1] Rossi, P. E., et al. (2005), *Bayesian Statistics and Marketing*, D. J. Balding, et al. eds., England, UK: John Wiley & Sons.

[2] Allenby, G. M. et al. (2014), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12, 4, 421–456 ("Economic Valuation of Product Features"); Allenby, G. M. et al. (2014), "Valuation of Patented Product Features," *The Journal of Law and Economics*, 57, 3, 629–663 ("Valuation of Patented Product Features").

[3] Allenby, G. M., et al. (2019), "Economic Foundations of Conjoint Analysis" in *Handbook of Economics and Marketing*, Vol. 1, J.-P. H. Dubé and P. E. Rossi, eds., Oxford, UK: North-Holland, 151–192 ("Economic Foundations of Conjoint Analysis").

## 2. Assignment

5. I have been asked to review the reports and opinions of Steven Gaskin and Colin Weir. Mr. Gaskin conducted a conjoint survey and Willingness To Pay ("WTP") calculations as a basis for damage calculations by Mr. Weir. I also discuss an alternative measure of damages based on what Mr. Weir calls an average "cost to repair."

6. I am compensated for my work in this matter at the rate of $1,250/hour. I have been assisted by personnel from Cornerstone Research, a litigation support firm, who, under my direction, have reanalyzed the Gaskin conjoint survey data. I receive compensation based upon Cornerstone Research billings in support of my expert work as an affiliate of Cornerstone Research. My compensation in this matter is not in any way contingent or based on the outcome of this or any other matter.

## 3. Summary Of Opinions

7. Mr. Weir endorses a theory that class members overpaid for their vehicles based upon the failure to disclose the potential for odor from the heating, air conditioning, and ventilation ("HVAC") system.[4] He uses Mr. Gaskin's conjoint analysis as the sole basis for a primary measure of "overpayment."[5] Mr. Weir also claims, without economic analysis, that what he calls an average "cost to repair" method could be used as an alternative measure of damages.[6]

[4] Corrected Amended Class Action Complaint, *Cardenas, et al. v. Toyota Motor Corporation, et al.,* United States District Court for the Southern District of Florida, Case No. 1:18-cv-22798-FAM, October 28, 2019, ("Complaint"), ¶¶3, 12. Throughout this report, I provide no opinion on the presence or absence of any alleged defect.
[5] Declaration of Colin B. Weir, October 20, 2020 ("Weir Report"), ¶11.
[6] Weir Report, ¶¶12, 50.

8. Plaintiffs allege that the market price of the vehicles at issue would have been lower had the potential for HVAC odors been more fully disclosed.[7] The Plaintiffs use a conjoint survey to attempt to measure the extent to which market prices would be lower under disclosure. But a conjoint survey, no matter how well conducted, measures only consumer demand for products and cannot be used to calculate an amount of "overpayment." Mr. Gaskin and Mr. Weir have not calculated and cannot calculate a market price in the world in which the potential for HVAC odor is more fully disclosed. Each step in their analysis is flawed.

9. The first step in the conjoint analysis is a conjoint survey, in which respondents are asked to select their preference between three alternative hypothetical Toyota Camry vehicles presented for purchase with different variations of attributes. Mr. Gaskin's conjoint analysis is focused on the "HVAC System" attribute, which is one of two options: (1) "A musty, damp, or sour odor may be emitted from the HVAC system"; or (2) "No musty, damp, or sour odor emitted from the HVAC System."[8]

10. **Mr. Gaskin's Conjoint Survey**. There are many errors and flaws in Mr. Gaskin's survey. Key flaws include:

a) On the key HVAC attribute, respondents were not provided with any information on the likelihood that the vehicle with an HVAC system that "may" emit odor would actually emit odor. Survey data show HVAC odor occurs in less than 5% of 2012-2017 model year Toyota Camry vehicles. Yet, respondents were forced to rely on their own speculation as to the percent chance that odor would be emitted from the HVAC system.

---

[7] Complaint, ¶¶12, 15.
[8] Expert Report of Steven P. Gaskin, October 20, 2020 and backup materials, ("Gaskin Report"), ¶26.

b) Mr. Gaskin had his survey respondents choose between a vehicle with the potential for HVAC odor and a vehicle for which it is certain at the point of purchase that it will never emit any HVAC odors. This presents respondents with a false choice that does not approximate reality. Survey data show that competing vehicles present the potential for HVAC odor. The survey posits a false choice.

c) Mr. Gaskin's conjoint survey assumes that all class members would have been informed of the potential for HVAC odor at the "time and point" of first purchase.[9] This does not approximate reality and is not connected to any articulated theory regarding how Toyota should have more fully disclosed the potential for HVAC odor. In addition, by purporting to extend the conjoint framework to consider alleged product defects, Mr. Gaskin applies a conjoint survey outside of the domain for which this technique was developed without any reference, assurance or argument as to how conjoint might apply to this situation involving information regarding product defects or aspects of product performance not provided at the point of purchase.

d) Mr. Gaskin further violates the requirements for the design of a conjoint study to measure demand for any product feature/defect. He does not include important attributes, uses misleading descriptions, and fails to consider competing brands in the design of his conjoint.

[9] Gaskin Report, ¶11; Gaskin Deposition, p. 24:14–18 ("Q: And what is -- you've referred to the but-for world. What is the but-for world? A: That's the world in which the -- the defect has been disclosed at the time and point of first purchase."); pp. 89:10–90:2 ("Q: What you're saying, then, is that the actual value of the class vehicles in the market is worth 25 percent less when there's a disclosure that, quote, a musty, damp, or sour odor may be emitted from the HVAC system at the time and place of first purchase; is that correct? A: Almost. Time and point of first purchase. Q: And with that change from place to point, my statement is correct, right? A: Yes. I'm saying that if people become aware -- if the -- at the time and point of first purchase, potential purchasers are made aware of this fact, then that would be the change in market value on a percentage basis.").

e) Mr. Gaskin does not follow accepted survey practices in designing and administering his conjoint survey. In particular, Mr. Gaskin has done no primary qualitative research and uses an inadequate sample size.

f) Mr. Gaskin's survey respondents selected vehicles based on Manufacturer Suggested Retail Price ("MSRP"). In reality, the but-for negotiated price paid by each class member would depend on individual circumstances and would not conform to a single, fixed, class-wide percentage reduction.[10] In addition, the Gaskin conjoint survey can provide no information regarding the purchasers or lessees of used vehicles. Not only does Mr. Gaskin's conjoint survey ask respondents to imagine that they are going "to purchase or lease a **new** Toyota Camry [emphasis added],"[11] Mr. Gaskin's methodology assumes that all consumers would be exposed to full disclosure at the "time and point of first purchase or lease."[12] Mr. Gaskin confirmed in deposition that such a purchase is of a new vehicle.[13] As such, Mr. Gaskin's methodology does not extend to purchasers of used vehicles.

g) Mr. Gaskin surveys both hybrid and non-hybrid Camry purchasers, directly contradicting his interpretation of the class[14] and his own proclaimed

[10] The same point is also true if the range of prices used by Mr. Gaskin was based on dealer invoice price.
[11] Gaskin Report, Exhibit D, p. D-5.
[12] Gaskin Report, ¶11.
[13] Gaskin Deposition, p. 91:17–24 ("Q: … Do you assume in your survey that the point of first purchase takes place at an authorized seller of Toyota vehicles? … THE WITNESS: Oh, sorry, Melissa. It's my understanding that the first purchase is when it's a new vehicle. That's what I know."); p. 92:14–18 ("Q: And it's a new vehicle, correct, first purchase of a new vehicle? A: I would say so if it's the first purchase. That's when the damages occur, as I understand it from Mr. Weir.").
[14] Deposition of Steven P. Gaskin, October 20, 2020, ("Gaskin Deposition"), p. 11:10–21 ("Q: Mr. Gaskin, what is your understanding of the putative class of vehicles that plaintiffs seek to certify in this case? A: I believe it's 2012 to 2017 nonhybrid Toyota Camrys. Q: And that would include all purchasers of those vehicles? A: It's purchase or lease, so far as I know. Q: So all -- your understanding is all purchasers or lessees of 2012 to 2017 nonhybrid Camry vehicles; is that fair? A: That's my understanding.").

assignment.[15] Moreover, Mr. Gaskin's sample is highly skewed toward older consumers compared to statistics on the age distribution of Camry owners, proof that his sample is not representative.

11. **Mr. Gaskin's Willingness to Pay (WTP) Calculation**. The second step in Mr. Gaskin's conjoint analysis is what he describes as a "market" simulation. Instead of simulating a realistic purchase situation with competing brands and a true supply curve, Mr. Gaskin has chosen to simulate demand in a scenario in which consumers choose between two otherwise identical Camry vehicles—one with the possibility of HVAC odor and a second for which it is certain to have no HVAC odor. Mr. Gaskin's "market" simulations cannot provide a valid basis for overpayment damages for the following reasons:

a) Mr. Gaskin claims that his calculations are based on "market simulations." Mr. Gaskin's "market simulations" are not market simulations, but simply a measurement of a consumer's WTP based upon certain hypotheticals—not market prices.

b) Mr. Gaskin makes the further error of assuming in his "simulations" that only two Toyota (no competing) products are available in what he believes is the "marketplace," refusing to even test the impact of competing products in his "market simulations." Moreover, Mr. Gaskin assumes without factual basis the existence of alternative vehicles that do not present the possibility of HVAC odor.

c) Mr. Gaskin's conjoint survey is the only input to Mr. Weir's "overpayment" damages calculations. Since a conjoint survey only measures demand, no market price can be inferred as there is no way to construct a supply curve from conjoint

[15] Gaskin Report, ¶11.

survey results. Without a supply curve, there is no way to compute a market price. Mr. Weir has no information regarding the supply of vehicles in the but-for world in which there is a disclosure of the potential for HVAC odor.

d) Mr. Weir's arguments that if the hypothetical prices used in the conjoint are informed by MSRPs for the relevant vehicles, then Mr. Gaskin's analysis can deliver a market price are incorrect and are not supported by economic principles.

12. The results of Mr. Gaskin's WTP calculations are implausibly large and are demonstrably unreliable for many reasons, including the following:

a) Mr. Gaskin estimates that consumers would be willing to pay about $9,500 less for a Camry that has the potential for HVAC odor relative to a Camry that does not have the potential for HVAC odor, a decrease of 25 per cent of the purchase price of $38,000. The unreliably large reduction in supposed market price produced by Mr. Gaskin's conjoint is further evidenced by five other calculations of reductions in willingness to pay which reach as high as 67 per cent of purchase price, or $25,460 for a $38,000 Camry, to avoid the potential for HVAC odor. It should be emphasized that these very large WTP valuations are for the possibility that the Camry HVAC system "may" but will not necessarily emit an odor. The high variability of Mr. Gaskin's WTP calculations demonstrate that Mr. Gaskin's method for assessing "overpayment damages" is wholly unreliable.

b) Mr. Weir also uses a "cost of repair" of only about $1,200, less than a fifth of Mr. Gaskin's WTP estimate, and asserts that this cost can "serve as a proxy for the amount that Plaintiffs and Class members overpaid."[16] This directly contradicts

---

[16] Weir Report, ¶50.

the Weir/Gaskin assertion that the WTP estimate from the conjoint survey is a "market price" as it is not possible for such disparate amounts to both be estimates of market price.

c) In-depth analysis of Mr. Gaskin's own data explains why his WTP calculations are unreliable and implausibly large. Mr. Gaskin's average WTP estimates of about $9,500 or 25 per cent of vehicle price are biased upward by large numbers (at least 20 per cent) of respondents who are willing to pay in excess of $38,000 more (the highest possible price of the vehicle) for a vehicle without the potential for HVAC odor. No survey with at least 20 per cent outlying observations passes any standard of validity for statistical evidence. In addition, applying Mr. Gaskin's change in WTP method to the other features or attributes in his survey confirms just how divorced his results are from any market price determination.

d) Neither Mr. Weir nor Mr. Gaskin provides any measure of the margin of statistical error in their damages estimates, rendering the estimates unusable.

13. ***"Cost of Repair" Damages***. Mr. Weir misrepresents his alternative damages as based on a cost to repair estimate. In fact, this proposal does not use a proper cost to repair—that is, it does not represent the cost of "removing" or "repairing" the potential for HVAC odor. Instead, it represents a measure of the cost of abating odor that an owner may encounter, which is an individualized issue. There is no direct connection between a cost to abate odor and a reduction in market value. Moreover, the "cost to repair" estimate assumes that an owner will hold the vehicle for 10 years, regardless of whether the vehicle is leased, when it is sold, or if and when any odor arises.[17] Thus, Mr. Weir's cost to repair damages

---

[17] Expert Report of Don Wright, October 20, 2020 and backup materials, ("Wright Report"), p. 6.

estimate is inconsistent with a standard economic interpretation of a benefit of the bargain damages estimate, is highly individualized, and would overcompensate class members.

**4. Plaintiffs' Theory Of Damages**

14. The Plaintiffs contend that the HVAC systems of class vehicles (2012–2017 model year Toyota Camrys sold in the U.S.) are "[d]efective" and that these "[d]efect[s]" have the potential to create unpleasant odors that emit from the HVAC system.[18] While it is clear that there was some information regarding HVAC odor available to consumers through word-of-mouth and various sources including notifications and instructions in owners' manuals,[19] the Plaintiffs argue that Toyota should have taken steps to more fully disclose the potential for HVAC odor.[20] Exactly how extensive this disclosure should have been or what the mechanism for disclosure should have been is not clear from the Complaint. Neither Mr. Gaskin nor Mr. Weir discuss disclosure at all in their reports and the degree and method of disclosure is not an explicit part of their damages methodology. This a fundamental failing of Gaskin-Weir as their damages methods must correspond to a well-articulated theory of damages. Any theory of damages must fully specify what actions Toyota should have been expected to undertake to more fully disclose the potential for HVAC odor. Mr. Gaskin's conjoint design assumes that all consumers are aware of the potential for or impossibility of HVAC odor problems at the "time and point of first purchase or lease."[21]

15. Mr. Weir suggests that it might be possible to produce damages methods based on two possible theories of damages:

---

[18] Complaint, ¶¶2–3.
[19] *See* "Manuals & Warranties," *Toyota*, https://www.toyota.com/owners/resources/warranty-owners-manuals. *See also* Corrected Expert Report of Ronald T. Wilcox, Ph.D., November 2, 2020 ("Wilcox Report"), ¶89.
[20] Complaint, ¶8.
[21] Gaskin Report, ¶11.

1. An "overpayment" theory in which class members paid more for their vehicles than if the potential for HVAC odor were more fully disclosed.[22]
2. A "cost to repair" theory in which damages consist of what Mr. Weir claims is a "cost to repair" estimate provided to him by another Plaintiff expert.[23]

Mr. Gaskin, for his part, only plays a role in the construction of "overpayment" damages.

## 5. Mr. Weir's Conjoint Damages Model Is Flawed And Unreliable At Every Stage

### 5.1. Plaintiffs' Experts Must Calculate A Reduction In Market Value

16. The Plaintiffs' theory of "diminished value" suggests that if Toyota had more fully disclosed to consumers that there was the potential for HVAC odor, then the "value" of their vehicles would have declined. As Mr. Gaskin puts it, "I was asked by counsel for Plaintiffs … to assess reduction in market value … that would result from the Defective HVAC System."[24]

17. While Mr. Gaskin refers to "market value" in his report without defining value,[25] he confirmed in his deposition that he uses the terms "market value" and "market price" interchangeably.[26] Mr. Weir also clarified in his deposition that he uses the terms "market value" and "market price" interchangeably as well.[27]

18. Mr. Weir and Mr. Gaskin appear to endorse a benefit of bargain theory of damages in which damages are based on the difference in "value" between the goods as represented and the goods as received. The Plaintiffs' damages experts must provide a measure of this

[22] Weir Report, ¶¶7, 11.
[23] Weir Report, ¶¶7, 12, 50.
[24] Gaskin Report, ¶9.
[25] Gaskin Report, ¶9.
[26] Gaskin Deposition, p. 107:17–22 ("Q: And you're saying it's not just market price, it's market value, according to you, right?…THE WITNESS: As I've discussed before, I use the two terms interchangeably, as does Mr. Weir, I believe.").
[27] Deposition of Colin B. Weir, November 12, 2020, ("Weir Deposition"), p. 126:12–20 ("Q: What do you mean by 'value'? A: Here I'm referring to market value as measured by the market price. Q: So just to make sure from a deferential standpoint, you used value, market value and market price interchangeably? They mean the same thing for the purposes of your report? A: In terms of market value and market price, I think I can be comfortable with that equivalence.").

reduced "value," which is isolated only to the potential for HVAC odor. As an economist and damages expert, the only meaningful, sensible, and logically defensible measure of value is a market price. Thus, when a Plaintiffs' damage expert refers to "overpayment" or a price premium theory of damages, this would require a determination of the difference between the market price actually paid by class members and the market price that would prevail if the potential for HVAC odor were more fully disclosed by Toyota and known to all consumers. The validity of Mr. Gaskin's survey and Mr. Weir's damages calculations must be based on whether or not they can estimate the market price that would prevail with fuller disclosure.

19. I agree with Mr. Weir that the value of goods as represented is properly measured by the market price paid for these vehicles by class members.[28] This is, however, not the difficult problem in damages assessment. The difficult problem is to assess the market price that would prevail with what Plaintiffs contend would be a fuller disclosure. Disclosure of the potential for HVAC odor, according to the Plaintiffs, was incomplete and, therefore, no price observed in the class period could be used to assess the second part of the benefit of the bargain damages—namely, the price in what some call the "but-for" world in which a fuller disclosure was made.[29] For example, suppose a class member purchased a 2017 Toyota Camry for $23,000. We would know what market price was paid for that vehicle ($23,000). This is undisputed. What we don't know is what price that class member would have paid if, according to Plaintiffs' theory, it were more fully disclosed and widely known to consumers that the HVAC system in that vehicle could develop odors. This price of the vehicle as

[28] Weir Report, ¶57. Note that there is no one "market" for vehicles in which all transactions occur at the MSRP. In fact, non-MSRP prices may be negotiated between dealers and consumers. It is possible that the knowledge of alleged defects could affect these negotiations. I discuss this issue in Section 5.3.9 below.
[29] Complaint, ¶139.

received is not computed by Mr. Gaskin or Mr. Weir, nor can it be, using their damages methodology.

20. In summary, an overpayment or benefit of the bargain damages methodology must provide a valid way of assessing the price that would prevail in a world that never existed—the world with a fuller disclosure than the actual world. Therefore, the analysis conducted by Mr. Gaskin and Mr. Weir must be judged on whether or not they are able to compute the market prices for the vehicles as received (under the fuller disclosure desired by the Plaintiffs) in that "but for" world.

21. The only place in either of their reports that Mr. Gaskin or Mr. Weir even discuss the idea that they must provide a market price for the vehicles in the counterfactual "but-for" world is in ¶17 of the Gaskin Report. And even here, Gaskin's statement that "CBC allows [him] to determine the reduction in market price premium… for Camry Vehicles with the Defective HVAC System" is patently untrue;[30] as I detail in Section 5.4.2, Mr. Gaskin is—at best—computing consumer WTP, despite his claims that the concepts of "market value" and "market price" are interchangeable.[31] I will demonstrate that as a matter of fact and economic logic, Mr. Gaskin does not and cannot compute a market price for anything. Since Mr. Weir's damage calculations are based entirely[32] on estimates provided by Mr. Gaskin,[33] Mr. Weir cannot compute a market price for any vehicle either. The only proposed market

---

[30] Gaskin Report, ¶17.

[31] Gaskin Deposition, p. 107:17–22 ("Q: And you're saying it's not just market price, it's market value, according to you, right? A: As I've discussed before, I use the two terms interchangeably, as does Mr. Weir, I believe.").

[32] It is also based on the number of vehicles purchased by class members, but this has nothing to do with whether or not the Gaskin survey can compute a valid but-for price.

[33] Weir Report, ¶¶7, 58–59.

prices that find their way into Mr. Gaskin and Mr. Weir's method are the prices paid by class members, which is only one half of a complete damages calculation.[34]

### 5.2. A Proper Economic Approach To Benefit Of The Bargain Damages

22. Before explaining, in detail, why the Gaskin-Weir conjoint method fails to design a proper conjoint survey and to provide the key market price needed for a proper damages method, I explain how an economist should compute the reduction (if any) of market price that might occur if an alleged product defect were more fully disclosed.

23. It is useful to start with how the market prices actually paid for class vehicles are obtained. In basic economics, the idea is that a market price is determined by the intersection of the demand and supply curves. The demand curve shows the WTP of consumers for a given product.

[34] Mr. Gaskin's survey uses a range of MSRPs of actual class vehicles to "reflect[] the actual market prices that prevailed during the Class Period." Gaskin Report, ¶21. It is inappropriate to use MSRPs as a proxy for transaction prices. Weir proposes "crossheck[ing]" the MSRP range against "dealer invoice pricing data" when such data are produced. Weir Report, ¶37. Like MSRP, dealer invoice price is not an appropriate proxy for transaction prices.

**Figure 1: Demand And Supply Illustrated**




24. For example, the red, downward sloping curve in Figure 1 presents a demand curve for a specific vehicle for illustration purposes. For each price along the horizontal axis, the curve shows how many consumers would purchase that vehicle at that price. For example, consider a price of $38,000. This price is on the high end and a relatively small number (about 400,000) of consumers would be willing to pay $38,000 for that vehicle. Clearly, if the price is lowered, more consumers would be willing to purchase the vehicle at the lowered price. This is why the demand curve slopes downward. It should be emphasized that the demand curve measures WTP only. That is, consumers who might be willing to pay as much as $38,000 for the vehicle do not necessarily have to pay that amount unless the market price is set at $38,000.

25. How then is the market price determined? A market price will be the price at which demand equals supply. Just as the demand curve is defined by the WTP of consumers, the

supply curve shows how many units sellers would supply at any given price. Demand equals supply at the one and only point at which the WTP of consumers is equal to the Willingness To Sell of dealers (the sellers). This is shown on Figure 1 as the intersection of the red demand curve and the purple supply curve. At this point and ONLY at this point does the market clear with buyers and sellers having the same Willingness To Pay/Sell. In Figure 1, the market price is $30,750 with a volume sold of slightly less than 650,000 units.

26. In this illustration, the market price of the vehicle as represented is $30,750. What, then is the market price in the "but-for" world in which the potential for HVAC odor is more fully disclosed and known to all consumers? And will there even be a difference? This market price is determined by demand and supply factors in the same way as the market price of the vehicle as represented. For the sake of illustration only, I draw a new demand curve that corresponds to a reduced WTP of consumers when the potential for an alleged issue with a vehicle is known. This curve is portrayed in Figure 1 by a green curve and labeled "D_but-for." The curve is shifted downward by $6,000[35] for illustration purposes. Demand curves only measure WTP and do not consider supply factors at all. In this illustration, the disclosure of the potential vehicle issue results in a reduction in WTP of $6,000. This does not mean, as Gaskin and Weir wrongly assume, that the market price declines by $6,000. The new market price is set by the intersection of the supply curve and the reduced but-for demand—that is, the "market equilibrium." The new price is only about $4,100 lower at $26,650. As shown, anyone who uses reduction in WTP as a measure of damages will not only find a reduction in market price, but also overstate it. In this example,

[35] A downward shift in aggregate demand is caused by reductions in WTP on an individual consumer basis. This does not mean that each consumer has the same reduction in WTP, but merely that the average reduction in WTP is $6,000.

a reduction in WTP approach would yield damages of $6,000 per class member while the proper market price approach would yield damages of only $4,100 per class member.

27. Instead, in order to compute a market price, one must construct a supply curve. Merely observing and noting market prices in the "actual" world of non-disclosure (assuming that Gaskin and Weir had done so, which they have not) does not say anything about supply. Mr. Gaskin and Mr. Weir would have the Court believe that to properly account for supply one only needs to consider the market price paid by class members and the number of vehicles sold in the past.[36] This is clearly false. To properly account for supply, we must have a supply curve and a market equilibrium, which means a proper methodology must model factors that influence the supply curve such as competition with other firms and costs of production.

28. In other words, the market price is the price at which sellers are willing to sell some quantity and buyers are willing to buy the same quantity. As described below, the Gaskin-Weir conjoint does not show any of this. Mr. Gaskin's survey only provides information about buyers, and it suffers from many other flaws including that it cannot even accurately estimate a willingness to pay (much less a market price) and that the use of a "market simulator" says nothing about a decrease in market price.

### 5.3. Plaintiffs' Conjoint Survey Design Is Flawed, Unreliable, And Does Not Fit The Case For Numerous Independent Reasons

29. The best way to view a conjoint survey is an attempt, with survey methods, to approximate the purchase decisions of actual consumers. Survey respondents are screened to include only those consumers who are in the market for the products that are the subject of the conjoint survey. In the conjoint survey, several hypothetical products are presented to

---

[36] Gaskin Report, ¶21.

the survey respondent in what is called a "choice task." The respondent is asked to pick one of the alternatives presented for purchase. In most conjoint surveys, an "outside" or "none of the above" alternative is also available. This choice task is repeated with different sets of hypothetical products for ten or more repetitions, each with different products. Each hypothetical product is represented to the respondents in the form of a set of product features (called "attributes"), and each feature is specified at a given level.

30. In order to estimate a price premium associated with Toyota's failure to disclose the potential for HVAC odor in the 2012–2017 Toyota Camry, Mr. Gaskin estimates respondents' demand for vehicles with different features through a conjoint survey. Before discussing the flaws in Mr. Gaskin's survey, I will provide a brief summary of his survey.

31. Mr. Gaskin's conjoint survey, conducted in September 2020, had 357 qualified respondents.[37] Respondents were asked to imagine that they were going to purchase or lease a new Toyota Camry. They were instructed that they were to choose the Toyota Camry with the set of features and prices shown that they would most prefer (and whether they would actually be willing to buy or lease the Toyota Camry that they chose at the MSRP indicated).[38] Respondents were instructed to assume that any features not shown in the exercise were the same across the possible choices presented, and that each option was offered by the same authorized dealer or seller.[39] They were then shown three Toyota Camrys, each represented by a combination of seven attributes—Price ($20,000, $26,000,

---

[37] Gaskin Report, ¶¶39–40. Qualified respondents include individuals that Mr. Gaskin identifies as (1) having purchased or leased a new or used 2012–2017 Toyota Camry; (2) taking more than five minutes to complete the survey and/or more than one minute to complete the conjoint task; (3) taking less than one hour to complete the whole survey; and (4) not "straight-lining" their answers to the choice tasks. Gaskin Report, ¶¶33, 40.

[38] Gaskin Report, ¶47.

[39] Gaskin Report, ¶44.

$32,000, or $38,000),[40] whether the vehicle has a Smart Key System,[41] whether the vehicle has a Pre-Collision System and Dynamic Radar Cruise Control,[42] which "Option Packages" the vehicle has (composed of eight to twenty total features),[43] and whether the vehicle has a potential for an accelerator issue,[44] a potential for HVAC odor,[45] and/or a potential for a loudspeaker issue.[46]

---

[40] Gaskin Report, ¶45.
[41] Gaskin Report, ¶45. The Smart Key System allows the driver to unlock the front doors and trunk or start the car with the push of a button; this feature is either included or not.
[42] Gaskin Report, ¶45. The Pre-Collision System (PCS) is designed to determine when a frontal collision is unavoidable and automatically activate brake assist if it senses that a front collision is unavoidable. The Dynamic Radar Cruise Control helps maintain a pre-set following distance from an automobile by reducing throttle and applying brakes if necessary. The PCS and Dynamic Radar Cruise Control attribute has three levels: neither system is included, only the PCS is included, or both are included.
[43] Gaskin Report, ¶45. The Option Packages attribute has three levels:

- Base-Level (Projector-beam halogen headlights with auto on/off feature, driver and front passenger illuminated vanity mirrors, rear-seat reading lights, power door locks with automatic locking feature, 8-way power-adjustable driver's seat with power lumbar support, 4-way power adjustable front passenger seat, two 12V auxiliary power outlets, 6.1-inch touch-screen display with Bluetooth® wireless technology, backup camera, and 17-inch alloy wheels with graphite finish)
- Mid-Level (All features included in Base-Level plus LED daytime running lights, wireless smartphone charging, power tilt/slide moonroof, Entune™ Premium JBL® Audio with integrated navigation and app suite, blind spot monitor warning system, anti-theft system with alarm, and 18-inch alloy wheels with black-painted accents)
- Luxury Level (All features included in Base-Level and Mid-Level plus LED low- and high-beam headlights with auto on/off feature, acoustic noise-reducing front windshield, leather-trimmed multi-stage heated front seats, SiriusXM® Satellite Radio with 3-month complimentary SiriusXM All Access trial, and Safety Connect® with complimentary one-year subscription including emergency and roadside assistance).

[44] Gaskin Report, ¶45. For the Acceleration attribute, "[i]n some vehicles, the accelerator pedal may become a bit harder to press, requiring slightly more effort to operate it." The issue "may or may not be able to be repaired and may or may not be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs."
[45] Gaskin Report, ¶45. For the HVAC attribute, "[a] musty, damp, or sour odor may be emitted from the HVAC system of some vehicles. The HVAC system may have a design that allows condensing water to accumulate and allows naturally present organic contaminants to be trapped and kept moist, and it cultivates organic matter such as microbes, bacteria, mold, and fungus. This issue may or may not be able to be repaired and may or may not be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs." The HVAC attribute has two levels: "Vehicle may emit a musty, damp, or sour odor from the HVAC system" and "Vehicle will not emit a musty, damp, or sour odor from the HVAC system."
[46] Gaskin Report, ¶45. The Loudspeaker attribute has two levels: "The loudspeaker's wires could be moved out of their normal position and short circuit, causing the loudspeaker to stop functioning" and "The loudspeaker works reliably for the lifetime of the vehicle." The issue "may or may not be able to be repaired and may or may not be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs."

32. Respondents then undertook 12 choices tasks, indicating their preferred Toyota Camry and whether or not they would actually purchase or lease that Toyota Camry.[47] In an online conjoint survey, the choice tasks are presented as a sequence of choice screens. Each screen is a table with rows that correspond to features and with columns that correspond to different hypothetical products.[48]

33. As described in Section 5.4.1, Mr. Gaskin used this choice data to estimate the utilities or "partworths" associated with each level of each attribute for each respondent. Section 5.4.2 provides details on how Mr. Gaskin incorrectly uses these estimated partworths in his "market simulator" exercise.

34. Mr. Gaskin does not describe conducting any primary consumer research prior to designing his conjoint survey, as is customary. Instead Mr. Gaskin appears to have relied on his review of "Toyota's websites and vehicle brochures, the National Highway Traffic Safety Administration website, and www.motortrend.com," as well as conversations with Plaintiffs' counsel and Mr. Weir.[49] Indeed, he claims that he did not need to review any survey data reflecting what the class members found important in their purchasing or leasing decisions "under the circumstances of this case and [his] knowledge about the category and the other information [he] looked at."[50] The documents that Mr. Gaskin did review do not provide any information regarding how consumers view the choice between vehicles. In this section, I describe how Mr. Gaskin's lack of care and consideration in designing his conjoint survey discredits his approach and renders his results unreliable.

---

[47] Gaskin Report, ¶46.
[48] *See*, *e.g.*, Gaskin Report, ¶14.
[49] Gaskin Report, ¶24.
[50] Gaskin Deposition, p. 134:17–25 ("Prior to the pretest, did you do any -- did you look at, evaluate, review any survey data reflecting what class members found important in make their purchasing or leasing decisions as to 2012 to 2017 Camry vehicles? A: Not prior to the pretest, no. But, again, I didn't need to under the circumstances of this case and my knowledge about the category and the other information I looked at.").

#### 5.3.1. The HVAC System Attribute Is Ambiguous And Does Not Present Information About How Often HVAC Odor May Occur

35. The central attribute in Mr. Gaskin's conjoint study—the HVAC system—is riddled with ambiguity. In his survey, the HVAC attribute is described as follows:[51]

> "A musty, damp, or sour odor **may** be emitted from the HVAC system of some vehicles. The HVAC system **may** have a design that allows condensing water to accumulate and allows naturally present organic contaminants to be trapped and kept moist, and it cultivates organic matter such as microbes, bacteria, mold, and fungus. This issue **may or may not** be able to be repaired and **may or may not** be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs [emphasis added]."

36. The HVAC attribute has two levels: "A musty, damp, or sour odor <u>may be emitted</u> from the HVAC system [emphasis in original]" and "<u>No</u> musty, damp, or sour odor emitted from the HVAC system [emphasis in original]."[52] Mr. Gaskin never clarifies how likely it is that the HVAC system will emit odor, nor does he clarify for respondents how likely it is that such an issue could be repaired or covered by warranty.[53] Mr. Gaskin's pre-test survey does not ask respondents what they understood the likelihood of either outcome to be.[54] And Mr. Gaskin has not cited any data about the incidence rate of HVAC odor. Indeed, Mr. Gaskin testified that he doesn't know and hasn't run the kind of survey that would allow him to determine whether his results would be impacted if the incidence of HVAC odor in Toyota Camry vehicles was very low.[55] It is my understanding that the average incidence rate

---

[51] Gaskin Report, ¶45.
[52] Gaskin Report, ¶45.
[53] Gaskin Deposition, p. 218:2–9 ("Q…There's no information in the description that you provided to respondents regarding how often, to use your phrase, the malodor occurs, right? A: Right. I'm mirroring the type of language that -- or reflecting the type of language that defendant has used in describing the problem and is frequently used in this sort of situation. The word 'may' is often used.").
[54] Gaskin Report, Exhibit G.
[55] Gaskin Deposition, p. 229:2–14 ("Q…If it turns out that the incident of complaint rate for HVAC odor in Toyota Camry vehicles for particular model years is one percent or event two percent and that is not disclosed in your conjoint, would that impact the results of your conjoint?… A: I guess we'd have to try it to figure it out. You're asking me to do something instantly right here I haven't done. I haven't run that sort of survey, so I really can't tell you for sure if it would have an effect or not.").

of HVAC odor or problems with the HVAC system in 2012–2017 Toyota Camrys is less than 5% across Toyota and third-party surveys.[56] Based on the limited information in Mr. Gaskin's feature description, respondents may have vastly different understandings of the incidence rate of HVAC odor, and data collected from this conjoint survey are only informative as to how respondents might react to the exact nature of the disclosure adopted by Mr. Gaskin.

37. Further, while the ambiguity of the description of the potential for HVAC odor renders Mr. Gaskin's results unreliable, it also fails to approximate reality because it assumes that consumers would be presented with that information at the "time and point of first purchase."[57] Insofar that Toyota would disclose information as to the potential for HVAC odor in any other way—and anywhere other than at the time and point of first purchase—Gaskin's conjoint survey is invalid, even if his survey were otherwise properly designed (which it was not).[58]

#### 5.3.2. The Conjoint Presents A False Choice

38. The second level of Mr. Gaskin's HVAC attribute is equally problematic. Mr. Gaskin's survey presents respondents with a vehicle for which there is *certainty* at the point of purchase of *not* having the potential for HVAC odor (which he even underlines, writing "<u>No</u> musty, damp, or sour odor emitted from the HVAC system [emphasis in original]"[59]). There is no such thing as a vehicle that lacks the potential to emit HVAC odor. Case in point, the

[56] Wilcox Report, Exhibits 6–13.
[57] Gaskin Report, ¶10.
[58] Note that Mr. Weir does not seem to understand that Mr. Gaskin's conjoint survey hinges upon this disclosure. To Mr. Weir, the existence of a defect and the disclosure of a defect are "one and the same." Weir Deposition, p. 117:14–19 ("Q: Do you know whether Mr. Gaskin's conjoint tested consumer reaction to the existence of a defect as opposed to the disclosure of a defect? A: Again, from an economic perspective, I view those things as one and the same, and so I think Mr. Gaskin did both.").
[59] Gaskin Report, ¶45.

potential for HVAC odor is not an issue unique to Toyota.[60] Owners of vehicles comparable to the Toyota Camry report HVAC odor issues,[61] and it is my understanding that the Toyota Camry is not even statistically more likely than its competitors to exhibit such HVAC odor issues.[62]

39. As such, Mr. Gaskin's conjoint survey presents respondents with a false choice between a vehicle with some unspecified likelihood of emitting HVAC odor and a vehicle that is guaranteed not to emit HVAC odor. To the extent that respondents place any value on a vehicle that is guaranteed not to exhibit HVAC odor, the survey results will show a greater decrease in willingness to pay caused by the potential for HVAC odor.

40. The potential for bias from this false choice presented in Mr. Gaskin's crucial HVAC odor attribute can be illustrated by a simple example. Consider a conjoint survey designed to measure the value which consumers place on an unusually long-lived tire. Consider a tire with a life of 100,000 miles and suppose, for the sake of discussion, that existing tires have a life of only about 50,000 miles. In the conjoint survey context, this example would require a tire-life attribute which has two values – 50,000 and 100,000 miles. By making choices in the survey, consumers would reveal their valuation of the extra lifetime of the 100,000 mile tire. If, instead of considering tires with 50,000 miles and 100,000 mile lifetimes, the survey compared a standard 50,000 mile lifetime tire with a hypothetical tire that never wears out, respondents might accord a much higher value to this hypothetical (but non-existent) tire. This is precisely what Mr. Gaskin has done here.

[60] Wilcox Report, ¶78.
[61] Wilcox Report, Exhibits 12–13.
[62] Wilcox Report, ¶¶81, 83.

### 5.3.3. Plaintiffs' Conjoint Does Not Attempt To Approximate Reality And Improperly Assumes That All Consumers Would Have Been Exposed To Any Disclosure About HVAC Odor At The Time Of First Purchase Or Lease

41. Conjoint analysis was designed to simulate the purchase decisions of consumers in the real marketplace. Conjoint assumes 100 per cent awareness of product features and that the information provided by the choice tasks is information available at the point of purchase. As I have pointed out, the Plaintiffs are unclear as to exactly how Toyota should have more fully disclosed information about potential HVAC odor. Mr. Gaskin's conjoint design assumes that all consumers would be exposed to full disclosure at the "time and point of first purchase or lease."[63] Thus, Mr. Gaskin's "overpayment" computations are not applicable to situations in which disclosure is made other than at the point of purchase, and where disclosure information might not reach all consumers. Mr. Gaskin himself confirmed that his survey was only applicable if the disclosure were made at the "time and point of first purchase,"[64] and that his survey assumed that 100 per cent of consumers would have received the disclosure.[65] Mr. Gaskin also agreed that he has never seen a disclosure made by a manufacturer at a dealership regarding a problem with a vehicle at the time of sale.[66]

---

[63] Gaskin Report, ¶11.

[64] Gaskin Deposition, p. 24:14–18 ("Q: And what is -- you've referred to the but-for world. What is the but-for world? A: That's the world in which the – the defect has been disclosed at the time and point of first purchase."); pp. 89:10–90:2 ("Q: What you're saying, then, is that the actual value of the class vehicles in the market is worth 25 percent less when there's a disclosure that, quote, a musty, damp, or sour odor may be emitted from the HVAC system at the time and place of first purchase; is that correct? A: Almost. Time and point of first purchase. Q: And with that change from place to point, my statement is correct, right? A: Yes. I'm saying that if people become aware -- if the -- at the time and point of first purchase, potential purchasers are made aware of this fact, then that would be the change in market value on a percentage basis.").

[65] Gaskin Deposition, p. 90:8–15 ("Q: Are you giving any opinion on, if such a disclosure would have been made, what percentage of class members actually would have received it? A: Well, my assumption is that all potential purchasers are made aware at the time and point of first purchase, so that would be -- it would be given in such a way that 100 percent of them would receive the notification for the disclosure.").

[66] Gaskin Deposition, p. 230:15–20 ("Q: Have you ever seen a disclosure made by a manufacturer at a dealership regarding a problem with a vehicle at the time of sale? A: No. That doesn't mean it -- that doesn't mean it couldn't be done. It just means that they'd rather not do it because they want to sell cars.").

42. More generally, Mr. Gaskin purports to extend the conjoint framework to consider alleged product defects.[67] By introducing product defects directly into the conjoint choice tasks, Mr. Gaskin makes the assumption that all consumers would have been aware of the potential for HVAC odor at the point of purchase had Toyota made a more fulsome disclosure (according to Plaintiffs). This is unrealistic and violates the guiding principle that conjoint surveys should be designed to approximate reality. Mr. Gaskin does not even discuss this assumption or how this assumption might be related to the Plaintiffs' views as to how the potential for HVAC odor should have been more fully disclosed by Toyota, including where, when, and how any such disclosure should have been made. The lack of any connection between the information about the potential for HVAC odor and the point of purchase choice task renders Mr. Gaskin's conjoint design invalid.

#### 5.3.4. Plaintiffs' Conjoint Does Not Even Attempt To Include The Most Important Attributes And Mr. Gaskin Used No Reliable Methodology To Come Up With His Attributes

43. It is vital that a conjoint design include major product features and that these features are described in a way that is intelligible to consumers. As Orme points out,

> "Defining proper attributes and levels is arguably the most fundamental and critical aspect of designing a good conjoint study."[68]

and

> "Attribute descriptions should be concise statements with concrete meaning."[69]

44. Allenby and Rossi make this explicit:

> "This means that … we must include many of the other important features in the product."[70]

---

[67] Gaskin Report, ¶¶26–27.
[68] Getting Started with Conjoint Analysis, 53.
[69] Getting Started with Conjoint Analysis, 54.
[70] Valuation of Patented Product Features, 642.

and

"It is important to undertake research prior to the conjoint survey design to determine the major and most important features of the product."[71]

45. Understanding what the important features are and how consumers understand these features is why careful conjoint practitioners conduct preliminary qualitative research often via focus groups.[72] Mr. Gaskin skipped this stage of design and wrote a conjoint questionnaire without doing any primary research.[73] It is not surprising that he only considers one manufacturer (Toyota) and omits many attributes important for a vehicle purchase. The attributes he includes are arguably not important, and he has no evidence to support his choice of product attributes.[74] For example, keyless entry may not be considered an important feature by Toyota Camry buyers. It is incumbent on Mr. Gaskin to provide evidence that he has included major important features.[75] In my opinion, few of the features considered by Mr. Gaskin would be considered important and many important features, such as gas mileage and performance,[76] are omitted.

46. The omission of obvious important attributes undermines the validity of any conjoint and exaggerates the willingness to pay measures of the type advanced by Mr.

---

[71] Valuation of Patented Product Features, 642.
[72] Economic Foundations of Conjoint Analysis, 165–166.
[73] Gaskin Deposition, p. 134:17–25 ("Prior to the pretest, did you do any -- did you look at, evaluate, review any survey data reflecting what class members found important in making their purchasing or leasing decisions as to 2012 to 2017 Camry vehicles? A: Not prior to the pretest, no. But, again, I didn't need to under the circumstances of this case and my knowledge about the category and the other information I looked at.").
[74] Gaskin Deposition, p. 136:4–10 ("Q: And with respect to the pretesting discussions that you referred to, did you ask customers during the pretest whether or not the various attributes you were including in the conjoint were attributes that are important to them in choosing to purchase a vehicle? A: No. I just asked if they were clear or understandable.").
[75] For example, Mr. Gaskin never considered Maritz data which provide information on attributes consumers find to be important. Gaskin Deposition, pp. 139:21–140:1 ("Q: Fair to say you just -- you never reviewed any data reflecting answers to [question 14 of the Maritz data] by class members in this particular case, right? THE WITNESS: Well, I don't recall seeing this. It's not in my materials reviewed…").
[76] Wilcox Report, Exhibit 4A.

Gaskin. Fundamental to all conjoint exercises is the instruction for respondents to hold "constant" or fixed all features not displayed in the conjoint choice tasks. If important features are mostly omitted and most included features are of secondary importance, then respondents will not follow these critical instructions. For example, if two choice alternatives otherwise identical but for non-important features have very different prices (as occurs frequently in Mr. Gaskin's survey[77]), then respondents will infer that there must be "hidden" features which justify or rationalize the difference in prices. This will lead to a lower measured price sensitivity which will lead directly to a Plaintiff-friendly upward bias in WTP.

#### 5.3.5. The Option Packages Selected By Mr. Gaskin Do Not Exist

47. Mr. Gaskin's Option Packages attribute is arbitrary and is not consistent with attributes of Toyota Camrys sold in the real world. His Option Packages levels "Base-Level," "Mid-Level," and "Luxury-Level" do not exist as pre-set options for Toyota Camrys.[78] Further, the individual features underlying these Option Packages listed by Mr. Gaskin in ¶45 of his report are not all available in the same Toyota Camry model. For example, these features are not all available in 2020 models.[79] To the extent that respondents are familiar with the process of purchasing or leasing a Toyota Camry—which they are given that Mr.

[77] For example, there are cases when theoretical vehicles have the same Pre-Collision System and Acceleration attributes (which one could argue are important as they are based on safety) but different prices.

[78] Gaskin Deposition, p. 237:7–23 ("Q: You agree that there's different model types of Camry vehicles, correct, based upon the Motor Trend documents that you used as a basis for some of your attributes in this case? A: They have different labels for different Camrys, I think SE and LE and things like that. That's typical of most vehicles. Q: Right. So Camry XLE sedan, for instance? A: I can't remember the exact names. I've looked at them, but it does have different names. It's true. Q: Right. And those names are not included expressly in your conjoint survey, correct? A: That's correct, but I did include the options packages, which are indicative of the sort of level of options and luxury that you can have. That's the same concept as those labels generally."). *See also*, "2020 Camry L – Vehicle Overview," *Toyota*, https://www.toyota.com/configurator/build/step/model/year/2020/series/camry.

[79] *See*, Toyota Camry E-Brochures listed in Gaskin Report, Exhibit B. As an example, the 6.1-in. touch-screen display, projector-beam halogen headlights, and 4-way power-adjustable front passenger seat are all 2017 model year features (CARDENAS-GASKIN-000680–715 at 701). Per Exhibit D of the Gaskin Report, survey respondents are asked to imagine purchasing or leasing a *new* Toyota Camry, which would not include these features.

Gaskin has screened to such a sample—these Option Packages and their underlying features will be confusing to them.

48. The Option Packages also present too many individual features[80] for respondents to absorb which may lead to improperly estimated partworths.[81] The "Base-Level Model" includes eight features, the "Mid-Level Model" includes seven additional features, and the "Luxury-Level Model" includes five additional features.[82] Despite listing so many features, these packages nevertheless fail to include attributes considered important by Toyota Camry purchasers, such as fuel efficiency, overall engine performance, and exterior color.[83]

#### 5.3.6. Plaintiffs' Conjoint Does Not Attempt To Include Any Information About Competitors And, Therefore, Does Not Simulate A Real-World Purchase Decision

49. The validity of conjoint survey data is critically dependent on how closely the conjoint choice exercise approximates the actual purchase decisions of consumers. Consumers do not typically set out to purchase a Toyota Camry—ignoring its competitors—described by only a handful of features, not one of which is demonstrably important to any consumer. Consumers choose between specific makes and models of cars. In order for Mr. Gaskin's survey to have any hope of approximating reality, the survey must allow consumers to make informed choices between competing makes and models in the same way many of the car buying websites (such as Kelly Blue Book or Edmunds) display information. Forcing

---

[80] Gaskin, S., "Navigating the Conjoint Analysis Minefield," *PDMA*, Q1 2013, https://www.pdma.org/store/ViewProduct.aspx?ID=10931391 ("Navigating the Conjoint Analysis Minefield"), p. 24 ("Unfortunately, the largest number of attributes a conjoint survey respondent can deal with is about 10.").

[81] "The full-profile method of conjoint analysis works very well when there are only a few (say, six or fewer) attributes … industrial users of conjoint analysis have strained the methodology by requiring larger numbers of attributes and levels within attributes, thus placing a severe information overload on respondents. When faced with such tasks, respondents resort to simplifying tactics and the resulting part-worth estimates may distort their true preference structures…." Green, P. E. and V. Srinivasan (1990), "Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice," *Journal of Marketing* 54, 4, 3–19 at 8–9.

[82] Gaskin Report, ¶45.

[83] Wilcox Report, Exhibit 4A.

respondents to choose only between versions of the same Toyota Camry does not emulate the experience of shopping for vehicles.

50. It is not necessary that every specific product be used in a conjoint but, rather, it is important that the products used in the choice tasks are exemplars of important product features, makes and models. Mr. Gaskin's conjoint design falls far short of this standard.

#### 5.3.7. Mr. Gaskin's Sample Is Not Representative

51. Mr. Gaskin uses a small sample of consumers to represent the larger class.[84] The idea here is that, if the sample is representative of the class, then results based on the sample can be projected to the larger class (or what statisticians call the population). Mr. Gaskin does not provide any discussion of how he can ensure that his sample is representative. Allenby, Hardt, and Rossi (2019) discuss this issue at length and conclude that it is the responsibility of whomever sponsors a conjoint survey to provide affirmative evidence of representativeness.[85] Representativeness must be asserted relative to consumer preferences for vehicle features.

52. While it is not enough to assert demographic representativeness of the sample,[86] Mr. Gaskin's sample is not even demographically representative. The Maritz New Vehicle Customer Study is a third-party survey of buyers of a wide variety of vehicle makes and models.[87] Table 1 displays the demographic data for survey respondents in Mr. Gaskin's conjoint survey and for Maritz survey respondents for 2012-2017 model year Toyota Camrys. As can be seen in the table, Mr. Gaskin oversamples from the 65+ age group and

[84] Gaskin Report, ¶41.
[85] Economic Foundations of Conjoint Analysis, 168–170.
[86] For a discussion, *see* Economic Foundations of Conjoint Analysis, 168–170.
[87] Wilcox Report, n. 25. "The goal of the study is to provide a holistic view into the new car buying process. The survey is conducted monthly. Respondents are recruited via invitations in the mail, and are directed to take the survey online. The study targets a sample of 750 respondents per vehicle model."

undersamples younger respondents.[88] For example, Mr. Gaskin's sample has 68 per cent respondents over 65, while Maritz surveys of the class period have this percentage at about 40 per cent or less. This shows that Mr. Gaskin has not even adhered to very minimal requirements of representativeness on basic demographics.

**Table 1: Age of Toyota Camry Respondents Gaskin's Conjoint Survey vs. Maritz Hybrid and Non-Hybrid [1][2][3]**

| | | Maritz | | | | | |
|---|---|---|---|---|---|---|---|
| **Age**[4] | **Gaskin** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
| Under 18 | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 18-34 | 2% | 12% | 12% | 11% | 13% | 12% | 8% |
| 35-49 | 5% | 17% | 16% | 18% | 18% | 15% | 16% |
| 50-64 | 25% | 39% | 38% | 35% | 32% | 33% | 33% |
| 65+ | 68% | 33% | 35% | 36% | 36% | 40% | 43% |
| **Total** | 357 | 1,028 | 878 | 744 | 1,425 | 1,044 | 1,739 |

Source: 2012–2016 New Vehicle Customer Study, Toyota Camry (TOY-CARDENAS-00097767, 70, 74, 77, and 80); 2017 New Vehicle Customer Study, Toyota Camry, Part 3 (TOY-CARDENAS-00109648); Gaskin Report, Exhibit L; Gaskin Report, Exhibit M

Note:

[1] The Maritz New Vehicle Customer Study asks consumers to indicate their age. See TOY-CARDENAS-00096951–60 at 60.

[2] The Maritz New Vehicle Customer Study is a third-party survey of buyers of a wide variety of vehicle makes and models. The goal of the study is to provide a holistic view into the new car buying process. The survey is conducted monthly. Respondents are recruited via invitations in the mail, and are directed to take the survey online. The study targets a sample of 750 respondents per vehicle model.

[3] The Maritz New Vehicle Customer Study reports the percentages of respondents within each age group relative to the total sample.

[4] A chi-square test between Mr. Gaskin's respondent distribution and each year of the Maritz survey distribution showed that each year of the Maritz survey data had a statistically significantly different distribution than Mr. Gaskin's data.

53. It is clear that Mr. Gaskin has made no effort to ensure that his sample is representative, and I have provided strong evidence that it is not. Given that this basic tenet of survey research has been violated, this alone disqualifies the Gaskin conjoint survey.

[88] I performed chi-squared tests to determine whether Mr. Gaskin's sample is statistically different from the Maritz survey data. The age distribution of Mr. Gaskin's sample and each year of the Maritz survey sample is statistically significantly different.

#### 5.3.8. Mr. Gaskin's Sample Size Is Inadequate

54. If a conjoint survey is designed properly and without any biases, then the issue becomes how many respondents are required to insure sampling error is held to an acceptable minimum.[89] I have already demonstrated that Mr. Gaskin has conducted a non-standard conjoint with choice tasks that are far from what consumers experience when they purchase vehicles. Moreover, Mr. Gaskin has not established that his results are not biased due to lack of representativeness of his sample.

55. Mr. Gaskin is wrong when he suggests that his conjoint survey with 357 respondents has an adequate sample size.[90] It is well known by expert statisticians that it is not possible to determine adequate sample size prior to a conjoint survey administration.[91] The technical reason for this is that the information matrix for a conjoint model is a function of unknown parameters. Simple statistical estimates such as a sample proportion (e.g., the fraction of voters in favor of any candidate in any election) do have sample size formulas that can be used to guide the choice of sample size. For a sample proportion, a relatively small sample size may suffice. However, Mr. Gaskin uses a very complex model to estimate the conjoint parameters. Moreover, he undertakes complex calculations using the conjoint partworth estimates produced by Sawtooth Software.[92]

56. Mr. Gaskin's only basis for his incorrect assertion is a formula given in chapter 7 of Orme. Orme is highly critical of the formula Mr. Gaskin cites.[93] In particular, Orme calls this formula a "rule-of-thumb." Orme is correct in that this formula was not derived from any rigorous statistical analysis and is simply a rough and ready "rule-of-thumb." Orme goes on

[89] For a discussion, *see* Economic Foundations of Conjoint Analysis, 174–175.
[90] Gaskin Report, ¶41.
[91] Economic Foundations of Conjoint Analysis, 174.
[92] Gaskin Report, ¶¶54–55.
[93] Gaskin Report, ¶41, n. 27.

to caution that this "rule-of-thumb" is highly inaccurate and provides an underestimate of an adequate sample size. "Over the years, we have become concerned that practitioners use Johnson's rule-of-thumb to justify sample sizes that are too small."[94] Orme is exactly correct on this.

57. The formula[95] does not have any basis in either experience with conjoint studies or statistical analysis. To illustrate how absurd the formula is, I will evaluate the formula for Mr. Gaskin's study. Gaskin uses 3 choice alternatives (a = 3, note this does not include the outside good), a maximum of 4 attribute levels (for price, this is the "c" parameter).[96] Gaskin uses 12 choice tasks.[97] Using the "rule-of-thumb" formula on the bottom of page 68 of Orme, any sample of size (500*4)/(12*3) ≈ 56 or greater would be adequate according to Mr. Gaskin.[98] This is an absurd result which shows how wrong this "rule-of-thumb" is. I have never seen or heard of a conjoint study with fewer than 100 respondents. In fact, Allenby and Rossi (2019 and 2014) discuss this very issue in the computation of WTP (which is what Gaskin is doing) and market prices (which is a much more complicated calculation) and state that even a much larger sample size of 500-1000 can be inadequate.[99]

58. In summary, Mr. Gaskin's use of a patently incorrect rule-of-thumb to justify an inadequate sample size further shows the flaws in his approach.

---

[94] Getting Started with Conjoint Analysis, 68–69.

[95] $\frac{nta}{c} \geq 500$ where n is the sample size, t is the number of choice tasks, a is the number of choices, and c is the maximum number of attributes. *See* Getting Started with Conjoint Analysis, 68–69.

[96] Gaskin Report, ¶45.

[97] Gaskin Report, ¶¶29, 46.

[98] With respect to the proposed Florida and Tennessee subclasses, Mr. Gaskin's survey only included 32 participants from Florida and 2 participants from Tennessee—well below even the flawed Orme "rule-of-thumb" formula.

[99] *See, e.g.*, Economic Foundations of Conjoint Analysis, 175.

### 5.3.9. Gaskin's Conjoint Survey Does Not Account For Individualized Price Negotiations, Used Purchases, Or The Individualized Circumstances Of Any Purchase

59. Mr. Gaskin's survey respondents select vehicles based on the MSRP and all operate under the same level of disclosure.[100] In reality, many consumers do not pay MSRP for their vehicles. The actual transaction price is often below MSRP and is the result of negotiations between the car dealer and the consumer. Mr. Gaskin has not discussed this problem in his report. In his deposition testimony, Mr. Gaskin acknowledges that negotiations could occur, but the prices in his conjoint survey do not reflect negotiation.[101] As such, respondents are left to individually determine whether they might be able to negotiate prices (to individualized degrees of success), and whether this negotiation might be more successful due to disclosure of the potential for HVAC odor.

60. It is straight forward to see that the but-for negotiated price would depend on individual circumstances and would not conform to a fixed, class-wide percentage reduction. Even Mr. Weir agrees that "some people will be successful in negotiating the price while others will not," even though he incorrectly claims that somehow "aggregate class-wide damages," which are based on the prices paid by individual consumers,[102] would not be affected by class members paying different prices for their vehicles.[103] Thus, the percentage reduction in transaction prices would be expected to be different for each class member. An

---

[100] Gaskin Deposition, p. 165:6–10 ("Q: Did you use actual transaction prices as opposed to MSRPs for the conjoint survey in your case? …A: In my survey I used MSRPs.").

[101] Gaskin Deposition, p. 122:5–13 ("A: … The -- it says that the price -- the MSRPs shown -- I'm just paraphrasing now because we're not going to the price attribute -- are the prices shown, and they are prior to any negotiations or a number of other things. So it does mention that negotiations could occur and that they're allowed to think about that. But these prices shown are prior to the negotiations occurring if they do occur.").

[102] Weir Report, ¶ 56 (showing overpayment damages calculated as a function of "Total Dollar Sales of Vehicles.").

[103] Weir Deposition, p. 207:15–21 ("Q: Would you agree that differences in negotiating skills of a particular consumer may have an impact on what the consumer pays? A: It doesn't impact aggregate class-wide damages, but some people will be successful in negotiating the price while others would not.").

individual analysis would be required for each class member. Indeed, Mr. Gaskin does not purport to be a damages expert.[104]

61. Moreover, the Gaskin-Weir methodology does not account for the fact that for at least some class members, this percentage reduction does not even apply. For example, resale value is totally ignored in Mr. Weir's damages calculations, and Mr. Gaskin's conjoint survey cannot inform any damages calculations related to vehicle resale value. Suppose a consumer does not know of the potential for HVAC odor prior to purchase, yet sells the vehicle before the potential for HVAC odor is disclosed. In such a case, whatever "overpayment" occurs at the first purchase is also included in the resale price, and the consumer has not suffered any overpayment injury.[105] Despite this economic fact, Mr. Weir asserts that his damages estimates apply regardless of the individual circumstances of

---

[104] Gaskin Deposition, pp. 239:21–240:1 ("Q: Mr. Gaskin, you're not a damages expert, right? A: You know, I keep referring you to Mr. Weir and you keep asking me the question anyway. I was trying to answer and caution you that it was a question meant for Mr. Weir, better answered by Mr. Weir.").

[105] Indeed, named Plaintiff Rodney Baker is one such person. Mr. Baker testified that he received what he considered to be a fair price for the trade in of his 2012 and 2014 Toyota Camry vehicles, that he did not disclose any odor issues to the dealership in the trade-in agreement for the 2012 Camry, and that he did not discuss any odor issues with the dealership when he traded in his 2014 Camry. Deposition of Rodney Baker, September 17, 2020, p. 13:9–17 ("Q: Did you negotiate the trade-in price for the 2012 Toyota Camry? A: Yes. Q: Did you get a good trade-in price?…THE WITNESS: Answer? Well, I got a fair price. I negotiated the list price of this new car better, I think, but the net was good."); p. 162:5–25 ("And I've got a number in my head…like I said with the '14, they were having apparently a sales contest because I heard some of the salesmen talking when I went in there. And that's when I thought, well, hey, can you make me a good price? Q: And they -- and they did; right? A: I thought so, yes. Q: And with respect to the -- the Honda vehicle, in terms of the purchase price of that Honda vehicle, you thought you got a pretty good deal too; right?…THE WITNESS: I thought it was a fair deal…Q: And the -- the -- the trade-in value for your 2014 Camry vehicle was one component of the ultimate amount of money that you had to pay towards that vehicle; right? A: Right."); pp. 119:9–120:13 ("The dealership that you traded in your Toyota Camry, 2012 Toyota Camry vehicle to was the same dealership that you said you raised the issue of the HVAC odor in that vehicle with; correct?…THE WITNESS: Correct. …Q: And at least in this document there's nothing indicating that the trade-in vehicle has any latent mechanical defects or anything else concerning defects; right?…THE WITNESS: Answer it? Subject to what I said earlier about mechanical, I -- that would be my answer. So if there's -- for example, if there's a big rip in the back seat, for example, there wasn't, but is that mechanical? No… Q: …Do you have any evidence, sitting here today, that the HVAC system in your 2012 Toyota Camry vehicle or your 2014 Toyota Camry vehicle was defective in any way?…THE WITNESS: Okay. No, I do not. That's been years."); p. 163:18–25 ("Q: Did you tell anyone at the Honda dealership that you experienced vehicle odor in your 2014 Camry vehicle? A: No. Q: That there was no discussion of vehicle odor at all in connection with the trade in of your 2014 Camry vehicle; right? A: No. You're right, yeah.").

consumers and whether they experience the odor.[106] He attempts to claim that the conjoint survey accounts for any variation in awareness of the potential for HVAC odor across class members,[107] but Mr. Gaskin confirmed in his deposition that it is outside the scope of his assignment to contemplate what percentage of class members were actually aware of the potential for HVAC odor in their vehicles.[108]

62. Lastly, the Gaskin-Weir methodology does not address purchasers or lessees of used vehicles. Not only does Mr. Gaskin's conjoint survey ask respondents to imagine that they are going "to purchase or lease a **new** Toyota Camry [emphasis added],"[109] Mr. Gaskin's methodology also assumes that all consumers would be exposed to full disclosure at the "time and point of first purchase or lease."[110] Mr. Gaskin confirmed in deposition that such a purchase is for a new vehicle.[111] As such, Mr. Gaskin's methodology does not extend to purchasers of used vehicles, and the calculation produced by Mr. Gaskin's methodology cannot be applied to purchasers or lessees of used vehicles.[112]

---

[106] Weir Deposition, p. 18:11–14 ("A: And I've made a determination that specific manifestation of the defect is not a trigger for the economic damages at least that I have been asked to calculate in this case"); p. 19:4–6 ("A: … the manifestation or lack of manifestation of the defect is not dispositive of damages").
[107] Weir Deposition, pp. 21:13–22:3 ("Q: So apart from what Mr. Gaskin may or may not have done with respect to what individual class members may have known about the potential for HVAC odor, am I correct that you, in your own analysis, didn't do anything further to try to take that into account? A: Again, Mr. Gaskin has used a represent -- representative sample of class members, and to the extent that any of those people had prior knowledge in the way that you're suggesting – and, of course, I've seen no evidence that there is such a class member -- that is what I believe is necessary to take that into account in the damages analysis and I have not taken further steps beyond what has already been done to satisfy that need.").
[108] Gaskin Deposition, p. 105:11–17 ("Q: You're not giving any opinion in this case on what percentage of class members were actually aware of the potential for a musty, damp, or sour odor to be emitted from the HVAC systems of their class vehicles, right, at the time of purchase? A: That's correct. That's out of the scope of my assignment.").
[109] Gaskin Report, Exhibit D, p. D-5.
[110] Gaskin Report, ¶11.
[111] Gaskin Deposition, p. 91:17–24 ("Q: … Do you assume in your survey that the point of first purchase takes place at an authorized seller of Toyota vehicles? … THE WITNESS: Oh, sorry, Melissa. It's my understanding that the first purchase is when it's a new vehicle. That's what I know."); p. 92:14–18 ("Q: And it's a new vehicle, correct, first purchase of a new vehicle? A: I would say so if it's the first purchase. That's when the damages occur, as I understand it from Mr. Weir.").
[112] Weir Deposition, pp. 114:9–115:7 ("Q: Okay. And I take it that you are not purporting to address damages experienced by used car purchasers. A: In my mind, used car purchasers relate more to the idea of the

#### 5.3.10. Mr. Gaskin's Survey Suffers From Demand Effects

63. Mr. Gaskin did not ask his final survey respondents whether they were aware of litigation regarding HVAC issues as would be standard in litigation surveys. However, in his pre-testing, he did ask respondents "Do you or do you not have a belief about who might be the sponsor of this survey?", to which 7 out of 10 pre-test respondents thought that the survey sponsors was Toyota.[113] This raises the very real possibility of what survey experts call "demand effects," namely attempts by the respondents to infer the purpose of the survey and to bias their responses toward the end of what they think the sponsors of the survey want to see.[114]

#### 5.3.11. Mr. Gaskin Committed An Error In Sample Screening

64. Even if Mr. Gaskin's sample were appropriately representative and of the appropriate size, he nevertheless screens for a sample that is inconsistent with his assignment. Mr. Gaskin characterizes the putative class as people who have "purchased or leased Model Years 2012-2017 Toyota **non-hybrid** Camry vehicles [emphasis added],"[115] and he characterizes his assignment as "estimat[ing] the reduction in the market value… [of non-

---

allocation of damages. So if you flip the terminology and you say that what I'm trying to do is measure the total harm caused by Toyota, that occurs all at the time of the initial transaction. And whether or not you allocate some amount of that recovery to used buyers, it doesn't change the amount of harm that's been caused. Q: And am I correct that you're not offering any opinion one way or the other about how much any such allocation among class members ought to take place? A: Because allocation, for example, during claims administration does not impact the aggregate calculation of harm caused by Toyota or damages in the aggregate sustained by the class, because I have not been asked to opine on the issue, I'm not offering an opinion as of right now on the appropriate way to allocate as between one class member and another.").

[113] Gaskin Report, Exhibit G.

[114] Demand effects (also known as demand artifacts) "include all aspects of the experiment which cause the subject to perceive, interpret, and act upon what he believes is expected or desired of him by the experimenter. … The effects of demand artifacts pose important threats to both internal and external validity." *See* Sawyer, A. G. (1975), "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research* 1, 4, 20–30 at 20. *See also*, Shimp, T. A. et al. (1991), "A Critical Appraisal of Demand Artifacts in Consumer Research," *Journal of Consumer Research*, 18, 3, 273–283.

[115] Gaskin Report, ¶8.

hybrid Camry vehicles]" due to the potential for HVAC odor.[116] He confirmed this characterization in his deposition.[117] Mr. Weir also confirmed that his damages estimates pertain only to non-hybrid vehicles.[118] However, the screener for Mr. Gaskin's survey does not require respondents to have purchased or leased a *non-hybrid* Toyota Camry.[119] As such, his sample includes both hybrid and non-hybrid Toyota Camry purchasers and lessees who may have different preferences. Mr. Weir applies the "overpayment" percentage computed by Mr. Gaskin for this inappropriately screened sample to non-hybrid Toyota Camry vehicles only.[120]

65. Despite Mr. Gaskin's unsupported claim to the contrary in his deposition,[121] there is no reason to believe that owners of gasoline-powered vehicles have the same views about the importance of various features as owners of hybrid vehicles, and neither Mr. Weir nor Mr. Gaskin has substantiated this assumption.[122] Additionally, the Toyota Camry Hybrid is more expensive than the non-hybrid Toyota Camry,[123] so there is no reason to believe that

---

116 Gaskin Report, ¶11.
117 Gaskin Deposition, p. 11:10–21 ("Q: Mr. Gaskin, what is your understanding of the putative class of vehicles that plaintiffs seek to certify in this case? A: I believe it's 2012 to 2017 nonhybrid Toyota Camrys. Q: And that would include all purchasers of those vehicles? A: It's purchase or lease, so far as I know. Q: So all -- your understanding is all purchasers or lessees of 2012 to 2017 nonhybrid Camry vehicles; is that fair? A: That's my understanding.").
118 Weir Deposition, p. 24:19–22 ("A: In my work and in my report, I represent sales tallies and damages, estimates that at least to the best of my understanding relate only to nonhybrid Camrys").
119 Gaskin Report, Exhibit D, Question QS9.
120 Weir Report, ¶4.
121 Gaskin Deposition, p. 185:16–24 ("Q: And that -- and that includes -- is it your understanding the class is nonhybrid Camry vehicles, correct? A: If that's your distinction, I probably interviewed some hybrid vehicle owners, as well. I don't have any reason to believe that they'd respond differently to a bad smell just because they prefer to get better gas mileage, but, you know, I suppose one could look.").
122 Gaskin Deposition, p. 272:2–12 ("Q: But you haven't validated your data here against the actual demographic data of actual class members, right? A: Again, I haven't been given such data, but other times when I've looked at the differences, say, between males and females, there was virtually no difference. The Camry is a pretty mainstream vehicle, so we can see if it makes a difference, but I'd be surprised. Q: You haven't done that, right? A: I think I just answered your question."). Mr. Weir has not indicated in his report or deposition that he considered preference differences between Toyota Camry (non-hybrid) owners and Toyota Camry Hybrid owners.
123 Using Mr. Gaskin's same www.motortrend.com source, the 2020 Toyota Camry Hybrid LE Sedan is $3,460 (13.9%) more expensive than the $24,970 2020 Toyota Camry LE Sedan. *See*, "2020 Toyota Camry Hybrid,"

respondents have the same price sensitivities. If richer consumers are less price sensitive, their inclusion in the survey would tend to inflate the WTP associated with the potential for HVAC odor.

#### 5.3.12. Mr. Gaskin Contradicts His Own Advice Regarding Conjoint Design

66. Mr. Gaskin has written an article advising how practitioners may "navigat[e] the conjoint analysis minefield."[124] In the article, he explores conjoint design considerations to determine "the suitability of conjoint analysis" for a particular situation, and makes recommendations for properly implementing a conjoint analysis.[125] I agree with many of the points Mr. Gaskin makes in this article, particularly on the ease with which conjoint analysis can be misused.[126]

67. Mr. Gaskin suggests:

> "If sales for your product are significantly affected by other important drivers, such as promotions, sales force effort, word of mouth and advertising, you will have to factor these in separately, most likely using judgment."[127]

However, Mr. Gaskin makes no attempt to assess whether such factors are relevant for consumers' purchasing decisions in the automobile industry,[128] nor does he make any attempt to even describe how such factors might be accounted for in his analysis. This point is all the more important as this matter is about evaluating the impact of disclosure of

---

*Motortrend*, https://www.motortrend.com/cars/toyota/camry-hybrid/2020/; "2020 Toyota Camry," *Motortrend*, https://www.motortrend.com/cars/toyota/camry/2020/.

[124] Navigating the Conjoint Analysis Minefield, pp. 22–25.

[125] Navigating the Conjoint Analysis Minefield, pp. 23–25.

[126] Navigating the Conjoint Analysis Minefield, p. 23 ("the sheer ease of use of the conjoint analysis software lends it to misuse. A model is only as good as its assumptions, and once these are violated (which is not always obvious to the user), the results of the model can be seriously compromised (in ways that are not obvious, either).").

[127] Navigating the Conjoint Analysis Minefield, p. 23.

[128] *See* Wilcox Report, ¶¶16–27.

information about HVAC odor. This information can reach consumers by a wide variety of means, including word of mouth and product reviews.

68. Mr. Gaskin also suggests asking whether "the product can be adequately described and realistically valued using a set of discrete features" and to what degree product choices are "determined by more subjective considerations, such as aesthetics."[129] Mr. Gaskin offers an example of failing to consider a consumer purchasing a Ford Mustang "because they think[] they look good while driving it" as an omission that may lead to "a real problem."[130] Mr. Gaskin also goes on to ask whether "all of the important attributes are included" and concludes that "[l]eaving out an important attribute can render the research's results invalid and/or misleading."[131] Mr. Gaskin suggests that up-front qualitative research "is almost always advisable … to make sure that the attributes mirror [customers'] actual decision criteria, are reasonably complete with respect to the most important attributes and are expressed in terms [customers] can understand."[132] However, as discussed above and despite recognizing in his report that his goal is to "simulate a real vehicle comparison experience,"[133] in this matter, Mr. Gaskin has skipped the important stage of conducting preliminary qualitative research, has provided no evidence that the decision to purchase an automobile can be approximated by his survey, and has provided no evidence that the features he includes are important features for consumers.

69. Finally, Mr. Gaskin suggests in his article that "[c]onjoint analysis, like most quantitative techniques, requires sufficient sample size in order to make statistically valid

---

[129] Navigating the Conjoint Analysis Minefield, p. 24.
[130] Navigating the Conjoint Analysis Minefield, p. 24.
[131] Navigating the Conjoint Analysis Minefield, pp. 24–25.
[132] Navigating the Conjoint Analysis Minefield, p. 25.
[133] Gaskin Report, ¶24.

conclusions."[134] However, as I discussed in Section 5.3.8, Mr. Gaskin has a woefully inadequate sample size.

70. Even by his own criteria, Mr. Gaskin's conjoint survey in this matter is flawed.

### 5.3.13. There Is No Exception To A Reliable And Appropriate Conjoint Design For A "Class Action Conjoint"

71. Experts in conjoint as well as Mr. Gaskin have emphasized the importance of at least three critical aspects of conjoint design:

i). Important Attributes (other than price) must be included.[135]
ii). Attributes and their associated levels must be described in a clear and unbiased way.[136]
iii). For any realistic simulation of market share or of the effects of price and attribute changes, it is vital to have a plausible set of competing brands.[137]

72. It is abundantly clear that Mr. Gaskin's conjoint does not satisfy any of these three requirements. Many of his features are unimportant, and he omits gas mileage and car performance, widely known to be important attributes. Mr. Gaskin misleads the survey respondents by failing to specify anything about the incidence of HVAC odors and assumes that it is possible to purchase a vehicle for which it is known at the point of purchase that it will never emit any HVAC odor. He only includes two highly similar Camry products in his "market simulation." He does not include any competing brands at all.

---

[134] Navigating the Conjoint Analysis Minefield, p. 25.
[135] Gaskin Deposition, pp. 124:24–125:4 ("Q: Do you agree, Mr. Gaskin, that the choice of attributes in a conjoint study are important? A: The choice of attributes can sometimes be very important. It depends on exactly what you're talking about, but I take a good deal of care in my choice of attributes.").
[136] Gaskin Deposition, pp. 195:20–196:2 ("Q: Okay. Is it important to provide respondents a clear and accurate description of the features and attributes that are being tested as part of the conjoint? A: Well…it's a good guideline.").
[137] Gaskin Deposition, p. 119:3–6 ("Q: And would you agree that the -- one of the objectives of a valid, choice-based conjoint is to simulate a real vehicle comparison experience? A: In the sense that I'm using it here, sure.").

73. At his deposition, Mr. Gaskin acknowledged all of these errors of design. His argument appears to be that there are lower standards for "class action"[138] conjoint which does not require important attributes (only distractor attributes),[139] does not require accurate descriptions of attributes or levels,[140] and does not require competing brands.[141]

74. Mr. Gaskin says that if a conjoint is going to be used for "new product development" or evaluation of patent damages then there are different design considerations and assumptions from a "class action" conjoint.[142] Judging from the construction of the survey Mr. Gaskin puts forward in this matter, his criteria for a "class action" conjoint deviate from standard best practices in conjoint design.

---

138 Gaskin Deposition, p. 61:9–22 ("Q: Mr. Gaskin, is there any special type of conjoint survey or methodology that applies to class action cases that does -- that does not apply to other situations? A: I think for the conjoint analysis itself, it's very similar to analyses you'd do for other applications. There might be the setup of the simulator and the products might be a little different, but in general the -- and there's certain design considerations that are a little different form, say, new product development or patent infringement. So there's slight differences in the design. But the way the conjoint works is exactly the same, I would think."); p. 210:11–19 ("Q: So there's a unique conjoint methodology that applies just to class action cases; is that right? A: It's part of the supply side assumptions that the quantity of vehicles sold is fixed as a matter of history between the real and but-for worlds. It relates to that. That's different from a patent infringement litigation, for example, or a new product development application.").

139 Gaskin Deposition, p. 136:4–10 ("Q: And with respect to the pretesting discussions that you referred to, did you ask customers during the pretest whether or not the various attributes you were including in the conjoint were attributes that are important to them in choosing to purchase a vehicle? A: No. I just asked if they were clear or understandable.").

140 Gaskin Deposition, p. 97:9–19 ("Q: And this attribute, the one specific to the HVAC system, assumes that there's such a thing as a vehicle for which it is known at the point of purchase will never emit a, quote, musty, damp, or sour odor; is that right?… A: You mean that's the first option shown there? Q: Yes. A: That's what it says, yes.").

141 Gaskin Deposition, p. 197:15–19 ("Q: Okay. You agree that consumers who are purchasing vehicles in the real world can shop across multiple brands of vehicles, right? A: In the real world, divorced from the circumstances of this survey's but-for world, they can.").

142 Gaskin Deposition, p. 61:9–22 ("Q: Mr. Gaskin, is there any special type of conjoint survey or methodology that applies to class action cases that does -- that does not apply to other situations? A: I think for the conjoint analysis itself, it's very similar to analyses you'd do for other applications. There might be the setup of the simulator and the products might be a little different, but in general the -- and there's certain design considerations that are a little different form, say, new product development or patent infringement. So there's slight differences in the design. But the way the conjoint works is exactly the same, I would think."); p. 210:11–19 ("Q: So there's a unique conjoint methodology that applies just to class action cases; is that right? A: It's part of the supply side assumptions that the quantity of vehicles sold is fixed as a matter of history between the real and but-for worlds. It relates to that. That's different from a patent infringement litigation, for example, or a new product development application.").

75. There is no such thing as a "class action" conjoint. There are only properly and improperly designed conjoint surveys. If a conjoint is going to be used to determine any aspect of demand, then the three requirements provided above must be met.[143] Gaskin's conjoint does not meet these standards and should be discarded on the basis of failure to meet standards required for demand estimation.

### 5.4. Mr. Gaskin's And Mr. Weir's "Market Simulator" Analysis Is Flawed, Unreliable, And Does Not Calculate A Decrease In Market Price

#### 5.4.1. "Market Simulators" Explained

76. I have explained that no computations of any kind which rely solely on demand estimates from a conjoint survey can be used to compute the critical market price in the but-for world of "fuller" disclosure. I will now discuss in more detail the problems with the so-called "market simulators" Mr. Gaskin uses in conjunction with his conjoint survey.

77. Before beginning this discussion, I will briefly explain how a conjoint survey works and what conjoint practitioners improperly term "market simulators." The best way to view a conjoint survey is an attempt, with survey methods, to approximate the purchase decisions of actual consumers. Survey respondents are screened to include only those consumers who are in the market for the products that are the subject of the conjoint survey. In the conjoint survey, several hypothetical products are presented to the survey respondent in what is called a "choice task." The respondent is asked to pick one of the alternatives presented for purchase. In most conjoint surveys, an "outside" or "none of the above" alternative is also available. This choice task is repeated with different sets of hypothetical products for ten or

[143] "It is important to undertake research prior to the conjoint survey design to determine the major and most important features of the product." Valuation of Patented Product Features, 642. "Of critical concern in designing a conjoint survey is to ensure that questions are posed in an unambiguous and easy-to-understand manner." Economic Foundations of Conjoint Analysis, 165–166. "The simplest case of conjoint analysis involves just two product features – brand and price – because **every marketplace transaction involves these features** [emphasis added]." Economic Foundations of Conjoint Analysis, 171.

more repetitions, each with different products. Each hypothetical product is represented to the respondents in the form of a set of product features (called "attributes"), and each feature is specified at a given level. For example, Mr. Gaskin's survey represents new Toyota Camrys by a combination of seven attributes – Price, whether the vehicle has a Smart Key System,[144] whether the vehicle has a Pre-Collision System and Dynamic Radar Cruise Control,[145] which "Option Packages" the vehicle has (composed of eight to twenty total features),[146] and whether the vehicle has the potential for an Acceleration issue,[147] the

---

[144] Gaskin Report, ¶45. The Smart Key System allows the driver to unlock the front doors and trunk or start the car with the push of a button; this feature is either included or not.

[145] Gaskin Report, ¶45. The Pre-Collision System (PCS) is designed to determine when a frontal collision is unavoidable and automatically activate brake assist if it senses that a front collision is unavoidable. The Dynamic Radar Cruise Control helps maintain a pre-set following distance from an automobile by reducing throttle and applying brakes if necessary. The PCS and Dynamic Radar Cruise Control attribute has three levels: neither system is included, only the PCS is included, or both are included.

[146] Gaskin Report, ¶45. The Option Packages attribute has three levels:

- Base-Level (Projector-beam halogen headlights with auto on/off feature, driver and front passenger illuminated vanity mirrors, rear-seat reading lights, power door locks with automatic locking feature, 8-way power-adjustable driver's seat with power lumbar support, 4-way power adjustable front passenger seat, two 12V auxiliary power outlets, 6.1-inch touch-screen display with Bluetooth® wireless technology, backup camera, and 17-inch alloy wheels with graphite finish)
- Mid-Level (All features included in Base-Level plus LED daytime running lights, wireless smartphone charging, power tilt/slide moonroof, Entune™ Premium JBL® Audio with integrated navigation and app suite, blind spot monitor warning system, anti-theft system with alarm, and 18-inch alloy wheels with black-painted accents)
- Luxury Level (All features included in Base-Level and Mid-Level plus LED low- and high-beam headlights with auto on/off feature, acoustic noise-reducing front windshield, leather-trimmed multi-stage heated front seats, SiriusXM® Satellite Radio with 3-month complimentary SiriusXM All Access trial, and Safety Connect® with complimentary one-year subscription including emergency and roadside assistance).

[147] Gaskin Report, ¶45. For the Acceleration attribute, "[i]n some vehicles, the accelerator pedal may become a bit harder to press, requiring slightly more effort to operate it." The issue "may or may not be able to be repaired and may or may not be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs."

potential for HVAC odor,[148] and/or the potential for a Loudspeaker issue.[149] For most of these features, the levels used in the conjoint are simply the absence or presence of the feature or the possibility of an issue. There are also four levels of price: $20,000, $26,000, $32,000, and $38,000.[150] In an online conjoint survey, the choice tasks are presented as a sequence of choice screens. Each screen is a table with rows that correspond to features and with columns that correspond to different hypothetical products.[151]

78. The choice data is then collected from hundreds of respondents and analyzed with conjoint software. While the statistical analysis is complicated, the results are a set of weights (called "partworths") for each of the respondents. These weights embody the tradeoffs that the respondents make between attributes. A respondent who is very price sensitive would have a very large weight associated with price. For each respondent, the weights for each attribute correspond to the relative importance of those attributes to that respondent.

79. Conjoint analysis does not end with the production of partworths for each respondent. In order to translate the analysis into something more useful for the sponsor of a conjoint, the partworths are used to simulate or forecast demand for a set of competing products. These demand forecasts are typically in the form of predicted market shares. For example, a manufacturer might be interested in what would happen if adaptive cruise control

---

[148] Gaskin Report, ¶45. For the HVAC attribute, "[a] musty, damp, or sour odor may be emitted from the HVAC system of some vehicles. The HVAC system may have a design that allows condensing water to accumulate and allows naturally present organic contaminants to be trapped and kept moist, and it cultivates organic matter such as microbes, bacteria, mold, and fungus. This issue may or may not be able to be repaired and may or may not be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs." The HVAC attribute has two levels: "Vehicle may emit a musty, damp, or sour odor from the HVAC system" and "Vehicle will not emit a musty, damp, or sour odor from the HVAC system."

[149] Gaskin Report, ¶45. The Loudspeaker attribute has two levels: "The loudspeaker's wires could be moved out of their normal position and short circuit, causing the loudspeaker to stop functioning" and "The loudspeaker works reliably for the lifetime of the vehicle." The issue "may or may not be able to be repaired and may or may not be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs."

[150] Gaskin Report, ¶45.

[151] *See*, *e.g.*, Gaskin Report, ¶14.

was added to a popular model. The conjoint survey (if it included the adaptive cruise control attribute) would be used to see if the addition of this feature to an existing make, model, and trim would result in appreciably increased sales or market share in competition with other major makes and models. This is how "market simulators" came to be popular applications of conjoint analysis. Mr. Gaskin does not use "market simulators" for this intended purpose, as I will explain below.

#### 5.4.2. Mr. Gaskin's Use Of A "Market Simulator" Does Not Account For Competitors Or Key Supply Side Information And, By His Own Admission, Purports To Measure Only Demand

80. In this section, I will describe errors made by Mr. Gaskin in misusing and mischaracterizing what conjoint practitioners refer to as "market simulations." Before going into details of these errors, it is important to remember that "market simulations" are a misnomer:

> "Conjoint practitioners have chosen the unfortunate term "market simulation" to describe demand predictions based on conjoint analyses. These practices are not simulations of any market outcome…"[152]

Mr. Weir and Mr. Gaskin have taken advantage of this confusion in referring to their methodology as a "market-based method," which Mr. Gaskin agreed in his deposition is a variation on the generally understood "market simulation."[153]

81. Conjoint can only compute estimates of consumer demand.[154] Mr. Gaskin agreed in his deposition that "conjoint deals … chiefly with demand."[155] One way of seeing this is that

---

[152] Economic Foundations of Conjoint Analysis, 153.
[153] Gaskin Deposition, p. 246:5–13 ("Q: You and Mr. Weir invented the name market-based method, right? A: What I'm saying is…What I'm saying is that, while we may have come up with this exact term because we're doing something in the context of a class action, the term market simulation is hardly new. So we're just doing a variation of that.").
[154] Economic Foundations of Conjoint Analysis, 153.
[155] Gaskin Deposition, p. 200:19–25 ("Q: Right. And with respect to the supply side assumptions -- well let me ask this. Why do you need to account for supply side factors at all in what you're doing? A: Well, because the conjoint deals with -- chiefly with demand.").

only consumers are surveyed. If it was desired to construct a supply curve *using survey methods*, then one would need to survey dealers and manufacturers, at the very least. Since Mr. Gaskin only surveys consumers, his conjoint, however carefully done, cannot measure supply and therefore cannot be used to compute market prices.

82. Mr. Gaskin uses the "market simulation" capability of Sawtooth Software to compute his "reduction in market value."[156] I will show mathematically that Mr. Gaskin, at best, can only compute the change in consumer WTP with his "market simulation."

83. In chapter 10 of *Getting Started with Conjoint Analysis* (cited by Mr. Gaskin[157]), Bryan Orme (president of Sawtooth Software) explains the purpose of "market simulations" and also describes some common mistakes used in their application.[158] The idea of a "market simulator" is simple. One creates a hypothetical market that contains a set of products designed to represent the principal products in the marketplace. Products are specified by brand and a bundle of other attributes, including prices. That is, in order to execute a "market simulation," one must first determine the major competing products and set hypothetical prices for these products.[159] For example, a new product feature might be available and the "market simulator" would be used to forecast enhanced demand for a firm's product(s) with this added feature. Clearly, this is simply a demand forecast without any supply considerations. That is, prices are a fixed input to this procedure. There is no determination of market price.

84. Mr. Gaskin does not use market simulations for demand forecasting as they were intended. Instead, Mr. Gaskin uses these "market simulators" to compute a WTP for a

---

[156] Gaskin Report, ¶¶54–55.
[157] Gaskin Report, ¶41.
[158] Orme, B, K. (2014), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, 3rd ed. Manhattan Beach, CA: Research Publishers LLC, ("Getting Started with Conjoint Analysis"), 93–109.
[159] Getting Started with Conjoint Analysis, 96.

change in product feature. In order to determine "the reduction in market value" of the potential for HVAC odor, Mr. Gaskin describes a methodology supported by *Becoming an Expert in Conjoint Analysis*, a book authored in part by Bryan Orme, the president of Sawtooth Software.[160] This methodology given in a section titled "WTP Estimation in Conjoint Analysis," is as follows:

> "Finally, one can use conjoint simulations to find WTP. To do this, we simulate a set of competing products A and B. Product A possesses the feature and has the current price. Product B lacks the feature and we set its price so that A and B each have 50% share. **The difference in price that equalizes the shares is an estimate of WTP** [emphasis added]."[161]

85. In Mr. Gaskin's case, "product A" is the vehicle with no potential for HVAC odor and "product B" is the vehicle with a potential for HVAC odor. This is precisely what Mr. Gaskin has done to compute his 25 percent reduction in WTP. Mr. Gaskin agreed in his deposition that the discussion in this section of the book he cites deals "with just the demand or conjoint side of the calculation."[162] At his deposition, Mr. Gaskin testified that he is calculating "classwide willingness to pay."[163]

86. Mr. Gaskin attempts to obscure his admission that he is following Orme by computing a form of average WTP by claiming that he is computing not average WTP but

---

160 Gaskin Report, ¶55.

161 Orme, B. K. and K. Chrzan (2018), *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, Orem, Utah: Sawtooth Software, Inc., 194.

162 Gaskin Deposition, p. 252:8–12 ("Q: Mr. Gaskin, the entire chapter that we're -- in this book describing this analysis is labeled, 'Willingness to Pay,' correct? A: Yes, because they're dealing with just the demand or conjoint side of the calculation.").

163 Gaskin Deposition, p. 251:2–15 ("Q: Okay. And it says, to do this, we simulate a set of competing products A and B. Product A possesses the feature and has the current price. Product B lacks the feature, and we set its price so that A and B each have 50 percent share. The difference in price that equalizes the share is an estimate of WTP. Did I read that correctly? A: Yes, you did. Q: And here isn't that exactly what you've done? A: Yes. As I've explained earlier, the -- we're calculating a classwide willingness to pay, or as Mr. Weir likes to call it, the willingness to pay of the marginal consumer. And that is -- that gives us the change in market value.").

the WTP of the so-called "marginal consumer."[164] Mr. Gaskin is wrong. The "marginal" consumer is the consumer who is indifferent between buying and not buying a product at the product's market equilibrium price. If the market equilibrium price changes due to a change in a product attribute, then there will be a new marginal consumer who would be indifferent between buying and not buying the product at the new market equilibrium price (potentially implying a new equilibrium quantity). The marginal consumer cannot be identified without knowing the market equilibrium price. Mr. Weir agrees that the willingness to pay of the marginal consumer will be the market price,[165] but fails to recognize that Mr. Gaskin's methodology is incapable of determining the equilibrium market price—and by extension is incapable of identifying the marginal consumer—in the but-for world. Contrary to this basic economic principle, Mr. Gaskin assumes that the marginal consumer is the same in the worlds with and without the potential for HVAC odor.[166] Without accounting for the

---

[164] Gaskin Deposition, p. 251:10–15 ("Q: And here isn't that exactly what you've done? A: Yes. As I've explained earlier, the -- we're calculating a classwide willingness to pay, or as Mr. Weir likes to call it, the willingness to pay of the marginal consumer. And that is -- that gives us the change in market value.").

[165] Weir Deposition, pp. 153:23–154:10 ("Q: Do you need to know the market equilibrium price in order to identify the marginal consumer in the but-for world? A: Well, it's sort of tautological because the market price and the marginal consumer -- well, the willingness to pay of the marginal consumer will be one and the same. So if you're running the simulation that answers the question what is the willingness to pay of the marginal consumer, then you are necessarily determining the equilibrium market price of that product B. So it's kind of a chicken and egg. Which one are you doing? You're really doing both at the same time.").

[166] Indeed, from his deposition testimony it isn't clear that Mr. Gaskin understands what or who the marginal consumer is. In an example about Gilligan's Island, Mr. Gaskin asserts that because the wealthy Mr. Howell pays below his willingness to pay, he "is that marginal consumer in this example." Gaskin Deposition, pp. 252:13–253:25 ("Q: Mr. Gaskin, the entire chapter that we're -- in this book describing this analysis is labeled, 'Willingness to Pay,' correct? A: Yes, because they're dealing with just the demand or conjoint side of the calculation. Q: Is there any reference in this text to the marginal consumer? A: Well, actually, yes. This Gilligan's Island story right below talks about supply side effects and the -- it shows how Mr. Thurston Howell the Third would be willing to pay a million dollars to get off the island, he only has to pay I think -- I can't quite read it without my glasses -- about a thousand because another boat comes by and offers him the chance to go back to Hawaii or wherever he left from for that amount of money. He is that marginal consumer in this example, if I'm not mistaken. Again, this being an economics question, you'd do better to ask Mr. Weir, but that's what I was -- Q: Can you point to me -- A: -- (inaudible) over time. Q: Can you point to me where in this section 13.3 there's any reference to the marginal consumer, where that language is used? A: I'm saying that's -- I'm saying that's conceptually what it is…Q: Oh, okay. So you can't point me to any specific language in 13.3 or anywhere else in this chapter that uses the phrase marginal consumer, correct?… THE WITNESS: Well, again they're talking about the need to incorporate supply side factors, and it shows a marginal consumer. So I -

supply side, Mr. Gaskin cannot determine the market equilibrium price in the world when the potential for HVAC odor is disclosed and therefore cannot identify the marginal consumer in that world.

87. Mr. Weir has followed Mr. Gaskin's example, also claiming that the WTP computation conducted by Mr. Gaskin and described in Orme and Chrzan[167] is computing the WTP of the marginal consumer. At his deposition, Mr. Weir admitted that nowhere in Orme and Chrzan discussion of WTP computations is there any reference to the marginal consumer because average WTP is different from the WTP of the marginal consumer.[168] Instead, Mr. Weir claimed that this was discussed in a 2001 paper by Mr. Orme.[169] Examination of this paper reveals that Mr. Weir was mistaken – there is no reference to the WTP of the marginal consumer in Orme's article. What Mr. Weir fails to note is that, in this paper of the very individual Mr. Weir and Mr. Gaskin appeal to as an authority in WTP computations, Mr. Orme states clearly that unless "relevant attributes" and "competitive offerings" are included in the "market simulator," then the simulator will be unsuccessful.[170]

- you know, though it doesn't use those words, I think it's a good example and instructive about how to take a conjoint result that they label as willingness to pay and turn it into a change in market value.").

[167] Orme, B., and K. Chrzan (2018), *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, Orem, Utah: Sawtooth Software, Inc., p. 194.

[168] Weir Deposition, pp. 148:5–149:3 ("Q: Are you aware of anything that Mr. Orme or Mr. Chrzan have written that equates WTP or willingness to pay to the willingness to pay of the marginal consumer? A: I would have to go back and read -- I think there's a 2001 paper by Mr. Orme that may address that topic. But in terms of equating the two things, I think they would acknowledge that they're different. Individual willingness to pay is a different concept than the willingness to pay of the marginal consumer. But here I've confirmed with the authors that their intention was to discuss the MWTP or the willingness to pay of the marginal consumer. Q: And apart from this 2001 article that you don't know one way or the other addresses this issue, you're not aware of anything that Orme or Chrzan have written that equates willingness to pay as they've used on page 194 to the willingness to pay of the marginal consumer? A: Again, if you're saying are they equating individual willingness to pay with willingness to pay of the marginal consumer, I wouldn't expect them to do that.").

[169] Weir Deposition, p. 148:5–11 ("Q: Are you aware of anything that Mr. Orme or Mr. Chrzan have written that equates WTP or willingness to pay to the willingness to pay of the marginal consumer? A: I would have to go back and read -- I think there's a 2001 paper by Mr. Orme that may address that topic."); Orme, B. K. (2001), "*Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions*," Sawtooth Software, Inc. Research Papers Series, 1–5.

[170] Orme, B. K. (2001), "*Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions*," Sawtooth Software, Inc. Research Papers Series, 1–5 at 5 ("[T]he success of the simulation

Mr. Gaskin and Mr. Weir have both testified that important competitors to the Camry include the Honda Accord, Nissan Altima and Maxima, Mazda 6 and various Ford and GM brands.[171] Thus, by his own admission, Mr. Gaskin's "market simulations" do not adhere to Mr. Orme's standards for proper calculations. In Appendix D, I show mathematically that Gaskin's measure based on a market simulator is simply a standard WTP measure.

88. It is clear that Orme views the market simulator as a pure demand forecast.[172] However, Mr. Gaskin does not understand that the usefulness of even a demand forecast depends critically on whether all major competitors are included in the analysis.[173] In Mr. Gaskin's conjoint, only one vehicle (the Toyota Camry) is used without considering any of the many competing vehicles from Toyota and other brands,[174] despite evidence from the sources Mr. Gaskin purported to consider that clearly mention competitors to the Toyota Camry.[175] Indeed, vehicles considered comparable to the Toyota Camry in third-party

approach hinges on a number of assumptions, including: a) the conjoint method produces accurate measures of price sensitivity, b) the relevant attributes have been included in the simulation model, c) the relevant competitive offerings are reflected in the simulation model.").

171 Gaskin Deposition, p. 198:1–198:17 ("Q: Do you know who some of the other competitors are in the -- in the real world with respect to the Camry and the midsize market? A: … But if I were to just say to you from my own knowledge, which is not the same as consulting all of those things, I'd say maybe the Chevy Impala, the Ford Taurus, the Honda Accord, those are some of the competitors that I personally would view to the Camry."); p. 181:13–21 ("Q: Which competitors are within that price range? A: I'm just telling you as a matter of common sense that there's other vehicles out there that are in the Camry's price range, and their prices would be in that price range, as well. Q: Which ones, sir? A: How about, say the Honda Accord or I think there's probably a Nissan model, a Mazda, Ford, a Chevy sedan."); Weir Deposition p. 121:12–19 ("Q: And just focusing again on this third-party records reference, do you recall what, if any, particular competitive vehicles you may have considered? A: It's going back a couple months now, but I recall looking at information about Honda Accords, Mazda 6 series, I think the Chevy Malibu, the Nissan Altima and Maxima.").

172 Getting Started with Conjoint Analysis, 96, 108–109.

173 As President of Sawtooth Software Bryan Orme himself writes, "[T]he success of the simulation approach hinges on a number of assumptions, including: a) the conjoint method produces accurate measures of price sensitivity, b) the relevant attributes have been included in the simulation model, c) the relevant competitive offerings are reflected in the simulation model." Mr. Gaskin has failed at all three criteria. Orme, B. K. (2001), "*Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions*," Sawtooth Software, Inc. Research Papers Series, 1–5 at p. 5.

174 Gaskin Report, ¶44; Gaskin Report, Exhibit D.

175 For example, Exhibit B of the Gaskin Report lists www.motortrend.com as reviewed material. This website provides lists of "Top Competitors," including the Nissan Altima, the Ford Fusion, the Honda Accord, the Chevrolet Malibu, and the Mazda Mazda6.

surveys of consumers include vehicles manufactured by Nissan, Kia, and Hyundai[176] which are absent from Mr. Gaskin's conjoint. Mr. Gaskin goes to even greater extremes by constructing a "market simulator" that depends on only two products (a Toyota Camry with the potential for HVAC odor and one without),[177] despite his (and Mr. Weir's) testimony that the Toyota Camry competes with, for example, the Honda Accord, and Chevy, Nissan, and Mazda vehicles.[178] This is not even a realistic simulator of the sub-segment of the market occupied by the Toyota Camry as there are many different models (such as the Yaris and Corolla) in this segment manufactured by Toyota.[179]

89. Notably, Mr. Weir agrees with me that the automotive industry is a "mature" industry that is "highly competitive."[180] Mr. Weir goes on to say that there are many competitors for Toyota and quotes statements from Toyota and other manufacturers to that

---

[176] Wilcox Report, Exhibits 12 and 13.

[177] Gaskin Report, ¶55.

[178] Gaskin Deposition, pp. 197:20–198:17 ("Q: And do you know what segment of vehicles the Toyota Camry is part of? A: Well, you know I've done segmentation work for one of the big three, and the names could be pretty subjective and up to interpretation. But I'd say it's a midsize sedan personally. Q: Do you know who some of the other competitors are in the -- in the real world with respect to the Camry and the midsize market? A: Again, segmentation is open to some interpretation. There's no one magical segmentation, but -- or definitive authoritative segmentation. You could look on motortrend.com or autotrader.com. At least one of those has segments, and the -- so -- and the website for Toyota has lists of competitors for each vehicle you can compare them to, or at least most automakers' websites do. So that would be one way to find out. But if I were to just say to you from my own knowledge, which is not the same as consulting all of those things, I'd say maybe the Chevy Impala, the Ford Taurus, the Honda Accord, those are some of the competitors that I personally would view to the Camry."); p. 181:13–21 ("Q: Which competitors are within that price range? A: I'm just telling you as a matter of common sense that there's other vehicles out there that are in the Camry's price range, and their prices would be in that price range, as well. Q: Which ones, sir? A: How about, say the Honda Accord or I think there's probably a Nissan model, a Mazda, Ford, a Chevy sedan."); p. 184:9–11 ("A: It's -- it's obvious that other -- there would be other vehicles in the 20 to $38,000 price range, other sedans that could compete with the Camry."); Weir Deposition p. 121:12–19 ("Q: And just focusing again on this third-party records reference, do you recall what, if any, particular competitive vehicles you may have considered? A: It's going back a couple months now, but I recall looking at information about Honda Accords, Mazda 6 series, I think the Chevy Malibu, the Nissan Altima and Maxima.").

[179] *See*, *e.g.*, other sedans or similarly priced vehicles at "Toyota," *Motortrend*, https://www.motortrend.com/cars/toyota/.

[180] Weir Report, ¶¶40–41.

effect.[181] Mr. Weir's statements implicitly criticize Mr. Gaskin for his failure to include any Toyota competitors in his "market simulation."

90. The problem of using unrealistic sets of products to characterize a market has long been known by conjoint practitioners. In fact, Orme has made famous his "Gilligan's Island" example of the danger of not including all major competitive products in a demand simulator.[182] In this example, Orme considers the wealthy Howells and their demand for transportation off of Gilligan's Island. The Howells have a high WTP to leave the island and would certainly buy even expensive transportation off the island. However, if a cheap ferry were established, they wouldn't buy the expensive alternatives anymore. Thus, in order to simulate demand in a realistic setting, one needs to carefully specify the set of competing products in order to properly account for competitive effects.

Allenby and Rossi (2014) conclude

> "Most practitioners of conjoint are aware that, for realistic market simulations, the major competing products must be used. This means that the product attributes in the study should include not only functional attributes … but also the major brands."[183]

91. Mr. Gaskin's "market simulation" is not even a valid demand forecast in the way the developers of the software he uses intend, since Gaskin's "market simulation" lacks even the presence of competing products. Instead, Mr. Gaskin uses his incorrectly designed "market simulation" to compute the price reduction required to bring the demand for a hypothetical Toyota product with the potential for HVAC odor fully disclosed to respondents to that of the demand for the product without any potential for HVAC odor.[184] This is the definition

---

[181] Weir Report, ¶¶41–42.
[182] Getting Started with Conjoint Analysis, 90–91.
[183] Economic Valuation of Product Features, 433.
[184] Gaskin Report, ¶55.

of change in WTP for the product.[185] Mr. Gaskin is not simulating a market price of any kind, much less the market price in the but-for hypothetical world where the potential for HVAC odor is fully disclosed.

### 5.5. Given That The Conjoint Survey And Market Simulator Measure Only Demand, The Gaskin-Weir Conjoint Methodology Only Calculates A Willingness To Pay And Not A Market Price

92. The Gaskin-Weir damages method does not properly compute benefit of the bargain damages as defined as the difference in market prices between the vehicles with and without a fuller disclosure of the potential for HVAC odor. The Gaskin-Weir method is simply a WTP calculation which they have tried to palm off as relating to market prices. I will explain why their method is invalid at a fundamental conceptual level.

93. Figure 2 shows the same illustration of hypothetical demand for a vehicle with and without disclosure of the potential for HVAC odor as Figure 1 (discussed in Section 5.2 above). The red Demand curve is the demand or WTP curve for a vehicle in the actual world without disclosure of the potential for HVAC odor. I have recorded the actual price paid by class members and the quantity sold ($30,750 and slightly more than 650,000 units sold). Mr. Gaskin's entire survey process boils down to the computation of only one number – how much the demand curve will decline if the potential for HVAC odor is more fully disclosed. As in Figure 1, the demand for this vehicle is reduced by $6,000 if the potential for HVAC odor is disclosed and is represented by the green line.

[185] Economic Foundations of Conjoint Analysis, 162.

**Figure 2: Gaskin-Weir Methodology**




94. Mr. Gaskin simply computes that amount by which price must fall in order to keep quantity sold constant.

> "I found the price such that half of the market (as represented by the data from all of the respondents in my analysis) chose the vehicle with the Defective HVAC System and half of the market chose the vehicle without the Defective HVAC System (i.e., each one had a market share of 50%). The reduction in market value equals this difference between the two prices, which represents the amount necessary to compensate for the presence of the Defective HVAC System."[186]

This is exactly the vertical difference in WTP between the red "actual" demand curve and the green "but-for" demand curve shown in Figure 2. This vertical distance is shown by a purple line. In this example, if we consider the world in which a fuller disclosure is made, demand will shift down from the red to the green curve. If we would like exactly the same number of consumers to be willing to buy the vehicle in this full-disclosure "but-for" world, we would

[186] Gaskin Report, ¶55.

simply reduce price by $6,000. At this lowered price of $24,750 ($30,750 – $6,000), exactly the same number of consumers will be willing to buy the product. This is simply a definition of the reduction in WTP caused by the disclosure of the potential for HVAC odor. Thus, Mr. Gaskin is simply computing a reduction in WTP (in this example, a change in WTP of $6,000) which is not a change or reduction in market price. This vertical difference between demand curves has nothing to do with supply considerations of any kind.

95. A proper benefit of the bargain calculation requires a market price of the vehicle with fuller disclosure. Mr. Gaskin does not compute market prices nor does Mr. Weir. The only prices that figure into their damages calculations are the MSRPs of the vehicles purchased by class members, which are not even themselves market prices (as discussed in detail in Section 5.1). What Mr. Gaskin fails to realize is that a reduction in WTP caused by full disclosure is not the same as calculating a new market price under fuller disclosure. This must be done by developing a supply curve which is based on costs of production and introducing competition in the market.[187]

96. Mr. Gaskin has taken the position that, since he uses the MSRP of actual class vehicles to determine the range of prices in his conjoint, he has "account[ed] for" the supply side.[188] At best, all he does is construct an estimate of a demand curve in the range of actual prices paid. This is not the same as constructing a supply curve.

97. Moreover, Mr. Gaskin fails to identify any way in which he has "account[ed] for" supply in the world of greater disclosure. Mr. Gaskin's range of prices in his conjoint survey

---

[187] As is clear in Allenby et al. (2014), computing a market price involves both modeling market equilibrium as well as the costs of production, for both figure in the determination of market price. Allenby et al. use the Nash-Bertrand model of competition which is standard in an industry such as the automotive industry. *See*, Valuation of Patented Product Features, 649–650.
[188] Gaskin Report, ¶21.

does not identify any particular vehicle price.[189] He also does not know the number of class vehicles, so it is unclear how the quantity of Class Vehicles sold could have possibly contributed to his survey or the calculations he has made, as he claims.[190] Indeed, Mr. Gaskin claimed in his deposition that it is outside the scope of his assignment to evaluate whether Toyota would actually sell the class vehicles at the 25 per cent discount he calculates,[191] even though this would be a key component of accounting for the supply side. Only a rigorous calculation of market prices in the world of fuller disclosure can provide valid damages estimates for a benefit of the bargain analysis.

98. Despite his repeated claims to the contrary, Mr. Weir has also not incorporated the supply side of the market. He claims it is sufficient to have used data on "real-world transactions occur[ing] at prices that *already* reflect the supply side factors then extant in the marketplace" and "the quantity of the Class Vehicles supplied… fixed as a matter of history."[192] But Mr. Weir's testimony demonstrates that he has made no attempt to model a supply curve or determine whether Toyota would be willing to sell the same number of vehicles in the but-for world, as he testifies that his analysis assumes that Toyota was willing

[189] Gaskin Deposition, pp. 168:23–169:9 ("Q: How did you select the four prices points that you identified in the conjoint survey from the Motor Trend websites that you used to calculate your pricing attribute? A: Well, I looked at the range of price -- MSRPs that I obtained from these Motor Trend links and went a bit below there to a round-ish -- a round number to give some latitude for negotiation, a bit above to make sure that I'm covering any -- I'm covering it sufficiently. And then I divided that interval into -- I'm trying to figure out how to say -- even breaks or intervals to get my intermediate prices in the conjoint."); p. 174:4–174:12 ("Q…With respect to 38,000, same answer? You can't identify a Camry vehicle that, in actuality, had that MSRP? Is that correct?… A: Once more, I explained to you how I derived these numbers. They're a range. They're not meant to identify any particular vehicle.").
[190] Gaskin Report, ¶21; Gaskin Deposition, p. 193:7–12 ("Q: You have no idea -- do you know how many class vehicles there are, sir? A: That, again, is out of the scope of my assignment. I'm -- you can ask Mr. Weir that. I'm doing a survey.").
[191] Gaskin Deposition, pp. 209:23–210:9 ("Q…For the purposes of your analysis here, you have not evaluated whether Toyota would sell a vehicle for 25 percent less than what someone paid for it either in the real world or in the but-for world, right? You just haven't done that analysis, correct? A: I haven't done that analysis -- because of the particular circumstances of the class action case, it makes it so that -- Toyota has already sold them, so it's not a relevant question to me. And in the real world it's out of the scope of my assignment.").
[192] Weir Report, ¶¶37, 38.

to and did sell every vehicle to class members.[193] He has further admitted that he does not account for how competitors of Toyota might respond in the but-for world, nor is it possible for consumers to "shift from Camrys to competitor vehicles" in the but-for world.[194]

99. The conjoint survey and subsequent computations by Mr. Gaskin provide the key component to Mr. Weir's damages totals, namely the percentage reduction in market "value." The only other information used by Mr. Weir is the total number of class vehicles purchased by class members and the average MSRP of base model year 2012-2017 Camry vehicles.[195] However, what is missing is a supply curve and assumptions regarding competition in the marketplace, which must be used to compute market prices in the but-for world.

100. Put another way, the Gaskin and Weir reports depend only on conjoint survey data for computations of market price reductions required by a benefit of the bargain analysis. As Allenby and Rossi state:

> "It should be emphasized that conjoint analysis can only estimate demand. Conjoint survey data, alone, cannot be used to compute market equilibrium outcomes such as

---

[193] Weir Deposition, p. 224:2–20 ("Q: Okay. And have either you or Mr. Gaskin determined the supply curve here? A: Almost no market pricing is actually determined using a supply chart. So no, like all -- well, not all, but like almost every business, we have conducted an empirical analysis to determine price, not draw on a chart like you might in an early stage economics class. Those supply charts are not regularly used in industry. Q: All right. Keeping quantity fixed in this case, are you assuming that Toyota would be willing to sell exactly the same number of vehicles if the alleged defect were disclosed but at a lower price? A: My analysis takes the framework that Toyota was willing to sell every one of these vehicles and did sell them to class members. And going forward from there, I'm determining the value of the vehicles that are presently sitting in class members' driveways and garages.").

[194] Weir Deposition, pp. 221:10–222:3 ("Q: Am I right that your analysis or Mr. Gaskin's analysis does not account for how competitors of Toyota would respond to any change in Camry's price; is that right? A: We account for competitive behavior as it existed in the real world and use that as the framework in the but-for world. But I think, as I've described already, we do not permit the price of a Camry vehicle in the but-for world to be determined by anything other than the change in defendants' harmful conduct. So both in terms of quantity, we are not permitting the quantity of class vehicles to change, and we are not allowing, you know, a shift from Camrys to competitor vehicles. If you did that, again, you would be unable to determine what part of the change in value was attributable to defendants' harmful conduct and which part of the change in value that you measured would be the result of competitive actions.").

[195] Weir Report, ¶¶51, 56.

> market prices… Clearly, supply assumptions and cost information must be added to conjoint data in order to compute equilibrium quantities."[196]

101. Mr. Weir claims that supply should be fixed at the quantity sold to the proposed class, even in the but-for world where full disclosure is made. He is confusing a fixed quantity supplied with fixed supply conditions. That is, the disclosure of the potential for HVAC odor does not affect the supply curve (or willingness to sell); it only affects the demand curve. The supply curve stays fixed in the real vs but-for world but the reduced demand simply shifts the market equilibrium (where demand equals supply) down the supply curve. Thus, the correct market price determination holds the supply curve, not the quantity supplied, fixed.

102. Indeed, it appears that Mr. Weir has attempted to invent a new economic paradigm in which measures of willingness to pay are proclaimed to be market prices by virtue of assuming a fixed supply. This is wrong as a matter of basic economic logic. If a product declines in buyer-associated value (WTP), then there will be downward pressure on prices. But, at a lower price, it cannot be assumed that sellers will be willing to supply the same number of units as at the original higher price. Therefore, if the actual world is in equilibrium (buyers and sellers agree on prices), then the but-for world invented by Mr. Weir in which supply is fixed at the actual world quantity but demand declines substantially cannot be in market equilibrium.

103. In summary, despite their claims to the contrary, neither Mr. Gaskin nor Mr. Weir can explain how their method can compute valid benefit of the bargain damages defined as the difference between the price paid by class members and the price that would have been paid with fuller disclosure of the potential for HVAC odor. Gaskin and Weir do not take

[196] Economic Foundations of Conjoint Analysis, 153.

into account competition and supply side costs which are the basis of any valid analysis of market prices. They have simply dressed up a change in WTP as a measure of a change in market prices—which it is not and never can be.

### 5.6. Even Mr. Gaskin's WTP Calculations Are Inconsistent And Unreliable, And Defy Common Sense

104. I have explained that Mr. Gaskin's calculations are not of a change in market value or price, but are merely a WTP calculation and therefore are irrelevant for damage assessment. In addition, these WTP calculations are demonstrably unreliable to be used for an assessment of damages; Mr. Gaskin's methodology produces an absurdly high WTP for the HVAC feature that far exceeds the "cost to repair," his implied individual-level WTP calculations far exceed the value of the entire vehicle, and applying his same methodology to other vehicle attributes produces nonsensical results.

#### 5.6.1.1. WTP Relative To "Cost To Repair" Estimates

105. It is not economically credible for Mr. Gaskin's estimate to far exceed the "cost to repair" estimates offered by Mr. Wright and used by Mr. Weir. To the extent that there is an economic justification for the "cost to repair" estimates, the "market value" of the potential for HVAC odor should be similar in magnitude to the "cost to repair" estimates. Indeed, Mr. Weir confirmed in his deposition that these "cost to repair" estimates are intended to be a proxy for market prices, directly comparable to the "market prices" that Mr. Gaskin is purporting to estimate.[197]

[197] Weir Deposition, p. 171:11–23 (Q: Yep. The second approach doesn't actually measure diminished value at the point of sale, correct? A: It's being used as an estimate for the overpayment at the time of sale. Q: It's used as an estimate, but it doesn't purport to measure market price, right? A: No, I disagree. I'm using it as a proxy for an estimate of market price under the conservative assumptions based on the ways in which these calculations have been made to estimate a change in market price due to overpayment related to the presence versus absence of the defect.").

106. To understand why the "market value" of a hypothetical defect should be similar to the "cost to repair" estimates, first suppose this is *not* the case—that is, suppose that the cost to repair were far below the "market value" of a defect. Suppose you can either buy a new phone for $2,000 or the same phone with a defect for $1,000. If the defective phone costs $200 to fix, it would make sense for you to buy the defective phone and get it fixed (totaling $1,200) rather than buying a new one ($2,000). In fact, if you could *sell* a repaired phone for $2,000, it would be profitable to buy defective phones, fix them, and sell them in the market. This is known as an "arbitrage" opportunity. Arbitrage is the simultaneous buying and selling of commodities in different markets to take advantage of different prices for the same asset (repaired phones and new phones). As you bought all the defective phones in the area, the increased demand for defective phones would bid up their price until the arbitrage opportunity disappeared at $1,800, bringing the price of the defect (now $200) in line with the price to repair ($200). None of Plaintiffs' experts account for this very basic economic principle.

107. Mr. Gaskin estimates the "reduction in market value" due to the potential for HVAC odor to be $9,504 per vehicle, or 25% the value of the Toyota Camry.[198] By contrast, Mr. Wright estimates two "cost to repair" values of $1,973.50 and $1,176.05 for the potential for HVAC odor.[199] Mr. Gaskin's estimate is almost five times one of the cost to repair estimates and over eight times the other cost to repair estimate. If Mr. Gaskin's estimate were true, an arbitrage opportunity would exist to purchase vehicles with the potential for HVAC odor, "repair" them, and sell them for nearly $8,000 in profit. Such an arbitrage opportunity would mean that the market price of a car with the potential for HVAC odor would be bid up such

---

[198] Gaskin Report, ¶57.
[199] Wright Report, pp. 22–23.

that the "reduction in market value" due to the potential for HVAC odor would be in line with the "cost to repair" value, *not* the value that Mr. Gaskin estimates. Thus, Mr. Gaskin's estimate is—at best—a vast overstatement. Mr. Weir declined to comment on whether Mr. Gaskin's estimate is realistic or correct, claiming that he would "only offer opinions, again, that relate to the appropriateness of certain steps that Mr. Gaskin took to reach that number, not the number itself."[200]

#### 5.6.1.2. Potential For HVAC Odor WTP

108. Mr. Gaskin has not produced a credible estimate of even an alleged reduction in WTP associated with the potential for HVAC odor. Mr. Gaskin masks fundamental flaws in his approach when he states in his report that his estimate of change in WTP is 25.0%.[201] In fact, Mr. Gaskin produces six different WTP percentage reductions.[202] He does not report these calculations in the main body of his report and, even in the appendix, Mr. Gaskin does not convert his numbers into percentages. This makes it difficult for a casual reader to appreciate how unreliable his calculations are.

109. To implement his WTP calculations, Mr. Gaskin must "simulate" market shares for two products—one vehicle that "may emit…[an] odor from the HVAC system" and one that will not.[203] He must pick a base price for his calculation. His conjoint survey uses an unrealistic range of four prices—$20,000, $26,000, $32,000, and $38,000.[204] He has two methods to compute WTP. He could set the price for the vehicle that will not emit any HVAC odor and then adjust the price of the other, potentially odor-emitting vehicle downward so that the sales of each vehicle are the same. The difference in these prices,

---

[200] Weir Deposition, p. 132:15–18.
[201] Gaskin Report, ¶57.
[202] Gaskin Report, Exhibit K.
[203] Gaskin Report, ¶45.
[204] Gaskin Report, ¶45.

expressed as a percentage, would be an estimate of the reduction in WTP. The other way to implement such a calculation is to fix the price of the vehicle that may or may not emit an odor from the HVAC system, and to adjust the price of the vehicle that will not emit any odor upwards until sales are equal. Thus, there are a total of six possible reductions in WTP computations depending on which of the four base prices are used, and whether Mr. Gaskin raises the price of the vehicle that will not emit any odor from the HVAC system, or lower the price of the vehicle that may emit odor.[205] If Mr. Gaskin's method and data were at all reliable, these six calculations would agree closely. They do not.

110. Table 2 below shows all six calculations of WTP expressed as a percentage. Mr. Gaskin did not provide all of his WTP calculations in the body of his report as they reveal the unreliability of his procedure. If his WTP procedure were reliable, we would expect that the WTP calculations would be robust to different assumptions regarding precisely which price is used and whether or not we increase the price of the vehicle without the potential for HVAC odor or decrease the price of the vehicle with the potential for HVAC odor. Table 2 shows that this is not true. In particular, half (three of six) calculations cannot be performed as the results are undefined. In other words, the WTP calculations have no solution in the range of prices that Mr. Gaskin feels so strongly reflect the marketplace reality.

[205] Note that the price cannot be lowered beyond $20,000 or raised above $38,000 so that there are six, not eight, possibilities.

**Table 2: Mr. Gaskin's WTP Calculations As A Percentage [1]**

| | Lowering the Price of the Less Preferred Vehicle | | | | Raising the Price of the More Preferred Vehicle | | |
|---|---|---|---|---|---|---|---|
| **Feature** | **$26,000 Baseline** | **$32,000 Baseline** | **$38,000 Baseline** | | **$20,000 Baseline** | **$26,000 Baseline** | **$32,000 Baseline** |
| Percentage change in WTP for HVAC Odor vs. No HVAC Odor | Undefined | Undefined | 25.0% ($9,504) | | 67.3% ($13,462) | 37.4% ($9,712) | Undefined |
| Source: Gaskin Report, Exhibit K | | | | | | | |
| Note: [1] The price premium is undefined when the algorithm is unable to find a price in the $20,000 to $38,000 interval that would equalize the shares of the two vehicles. | | | | | | | |

111. Among the three permutations that are defined, the estimates in Table 2 range widely from 25.0% to 67.3%. Mr. Gaskin argues that he is being "conservative" in selecting the lowest percentage.[206] But that is not an economically sound assumption, nor is it justified as a matter of economic theory. Rather, Mr. Gaskin's own calculations demonstrate extreme sensitivity to choice of base price and, therefore, demonstrate that his methodology is not reliable. Moreover, for the reasons I describe in this report, all of Mr. Gaskin's results are flawed. Simply taking the lowest percentage of implausible and incorrect numbers does not make his conclusions correct.

#### 5.6.2. Individual-Level WTP For Vehicle With Potential For HVAC Odor

112. Mr. Gaskin sponsors a measure of WTP of 25 per cent of the vehicle price or about $9,500 for a vehicle priced at $38,000.[207] The magnitude of Mr. Gaskin's WTP measure is remarkable. I have explained that Mr. Gaskin simply sums up the individual results to estimate a market demand and that, therefore, his measure of "classwide WTP" – as he calls it[208] – is a type of average WTP. The high estimates of Mr. Gaskin's WTP are a result of a

[206] Gaskin Report, ¶55.
[207] Gaskin Report, ¶57.
[208] Gaskin Deposition, p. 251:2–15 ("Q: Okay. And it says, to do this, we simulate a set of competing products A and B. Product A possesses the feature and has the current price. Product B lacks the feature, and we set its

very large number of unreasonable and outlying individual respondent WTP values. Figure 3 shows the distribution of individual WTP computed using the distribution of partworths estimated by Mr. Gaskin. The source of Mr. Gaskin's high WTP value is immediately obvious. More than 20 per cent of his sample have changes in WTP values which are larger than the highest price Mr. Gaskin assumes for the Toyota Camry ($38,000). This is an impossibility, as the potential for HVAC odor here does not render the vehicle of zero value or less. I hasten to add that these huge numbers of invalid outliers are not the result of sampling error. I have only considered outliers that are statistically significant from the Bayesian perspective.

price so that A and B each have 50 percent share. The difference in price that equalizes the share is an estimate of WTP. Did I read that correctly? A: Yes, you did. Q: And here isn't that exactly what you've done? A: Yes. As I've explained earlier, the -- we're calculating a classwide willingness to pay, or as Mr. Weir likes to call it, the willingness to pay of the marginal consumer. And that is -- that gives us the change in market value.").

**Figure 3: Individual-level WTP Estimates Without Zero In 95% Credible Interval**

**$32,000 - $38,000 Price Coefficient**




Source: Gaskin Report
Note:
[1] The individual WTP estimates are individual-level averages of the WTP across 10,000 Hierarchical Bayesian draws. WTP estimates are truncated at -$100,000 and $100,000 before averaging to reduce the influence of outliers.
[2] The proportion of respondents with WTP above $20,000 and without zero in their 95% credible interval is 42.02%.
[3] The proportion of respondents with WTP above $38,000 and without zero in their 95% credible interval is 26.61%.
[4] The proportion of respondents with WTP above $50,000 and without zero in their 95% credible interval is 18.21%.

### 5.6.3. WTP For Other Attributes

113. To further demonstrate the unreliability of Mr. Gaskin's method, I also apply Mr. Gaskin's change in WTP method to the other features or attributes in his survey. I consider five other features: the Loudspeaker, the Smart Key System, the Pre-Collision System and Dynamic Radar Cruise Control, the Option Packages, and Acceleration. I computed a percentage change in WTP using the Gaskin methodology, which under Mr. Gaskin's proposed method would purportedly show the premium consumers would be willing to pay for that feature (or would value the vehicle less if it did not have that feature), holding all other features the same. These calculations are shown in Table 3 below.

## Table 3: Estimated Aggregate WTP For Vehicle Features [1]

| | Lowering the Price of the Less Preferred Vehicle | | | Raising the Price of the More Preferred Vehicle | | |
|---|---|---|---|---|---|---|
| **Feature** | **$26,000 Baseline** | **$32,000 Baseline** | **$38,000 Baseline** | **$20,000 Baseline** | **$26,000 Baseline** | **$32,000 Baseline** |
| Percentage change in WTP for HVAC Odor vs. No HVAC Odor | Undefined | Undefined | 25.2% ($9,573) | 66.7% ($13,345) | 37.0% ($9,629) | Undefined |
| Percentage change in WTP for Base-Level Option Package vs. Mid-Level Option Package | 13.2% ($3,441) | 5.0% ($1,606) | 4.9% ($1,848) | 17.3% ($3,456) | 6.2% ($1,611) | 5.8% ($1,852) |
| Percentage change in WTP for Mid-Level Option Package vs. Luxury-Level Option Package | 0.4% ($92) | -0.1% (-$34) | Undefined | Undefined | -0.5% (-$140) | 0.0% ($4) |
| Percentage change in WTP for Smart Key System vs. No Smart Key System | Undefined | 10.2% ($3,267) | 9.7% ($3,682) | 33.6% ($6,715) | 12.6% ($3,273) | 11.5% ($3,685) |
| Percentage change in WTP for Loudspeaker vs. No Loudspeaker | Undefined | 16.4% ($5,247) | 15.1% ($5,720) | 43.1% ($8,616) | 20.1% ($5,237) | 17.0% ($5,443) |
| Percentage change in WTP for Pre-Collision System vs. No Pre-Collision System | 19.8% ($5,151) | 8.2% ($2,618) | 8.0% ($3,030) | 28.4% ($5,672) | 10.1% ($2,622) | 9.5% ($3,032) |
| Percentage change in WTP for Dynamic Radar Cruise Control vs. No Dynamic Radar Cruise Control | 17.7% ($4,612) | 6.5% ($2,077) | 6.1% ($2,335) | 24.2% ($4,834) | 8.0% ($2,079) | 7.3% ($2,340) |
| Percentage change in WTP for Working Acceleration vs. Defective Acceleration | Undefined | 13.1% ($4,200) | 12.2% ($4,617) | 37.9% ($7,573) | 16.2% ($4,204) | 14.4% ($4,614) |

Source: Gaskin Report

Note:
[1] Results are based off of 10,000 Hierarchical Bayesian (HB) draws and 1,000 iterations in the Randomized First Choice procedure. The price premium is undefined when the algorithm is unable to find a price in the $20,000 to $38,000 interval that would equalize the shares of the two vehicles for at least 5,000 iterations.

[2] Gaskin calculates the WTP values in his analysis by assuming that individuals' partworths are the average partworths across all draws, which does not allow for any evaluation of sampling or simulation error. My approach instead calculates WTP using the randomized first choice simulator Gaskin endorses from each of 10,000 draws of individuals' partworths, which allows for the calculation of the 95% credible interval around the average WTP estimates for each feature at each price level. These intervals are reported in Appendix E.

114. Mr. Gaskin's results are contrary to market reality with respect to the Loudspeaker attribute. Mr. Gaskin's description of the Loudspeaker attribute contains two levels: one that "works reliably for the lifetime of the vehicle" and one that "could… short circuit, causing the loudspeaker to stop functioning."[209] As Table 3 shows, respondents valued the "reliable" level of the Loudspeaker by a minimum of $5,237. However, the MSRP for a new loudspeaker in 2020 Toyota Camrys is $742.62.[210] Even conservatively factoring in installation costs and improvements in the subwoofer (i.e., doubling or tripling the price), Mr. Gaskin's predicted value for this feature is clearly at odds with the market price.

115. The same is true for the Smart Key System. In Mr. Gaskin's survey, this attribute is either present or not.[211] As Table 3 shows, respondents valued the Smart Key System at a minimum of $3,267. However, the MSRP for this feature is at most $1,315.[212]

116. Mr. Gaskin's WTP calculations for his Pre-Collision System attribute also demonstrate the unreliability and profound biases that exist in his survey. I would expect the value of additional safety in the event of a potential, possibly fatal, rear-end accident to be larger than avoiding the possibility of HVAC odor. But Mr. Gaskin's results disagree with the proposition. He finds $9,504 for his HVAC attribute but only $2,618 to $5,672 for WTP for the Pre-Collision System attribute.[213]

---

[209] Gaskin Report, ¶45.

[210] *See*, "Pkg Tray Speaker – Toyota (86150-06020)," *OEM Genuine Parts*, https://www.oemgenuineparts.com/oem-parts/toyota-pkg-tray-speaker-8615006020?c=Zz1ib2R5JnM9c291bmQtc3lzdGVtJmw9NCZuPVNlYXJjaCBSZXN1bHRzJmE9dG95b3RhJm89Y2FtcnkmeT0yMDIwJnQ9bGUmZT0yLTVsLWw0LWdhcw%3D%3D. This product is a 2020 Toyota Camry rear "woofer." Mr. Gaskin describes the Loudspeaker as a subwoofer mounted in the trunk of a vehicle in ¶45 of his report. Because Mr. Gaskin asks about new Toyota Camrys in his conjoint survey, the 2020 model is appropriate.

[211] Gaskin Report, ¶45.

[212] *See*, "Convenience Package with Options," *Toyota*, https://www.toyota.com/configurator/build/step/package/year/2020/series/camry/model/2532/exteriorcolor/0218/interiorcolor/FA40/packages/option1. The "Convenience Package with options" costs $1,315 and includes, among other features, the Smart Key System.

[213] The WTP estimate for the pre-collision system level of Mr. Gaskin's Pre-Collision System and Dynamic Radar Cruise Control feature ranges between $2,612.52 and $5,848.38 across the six calculations.

117. Mr. Gaskin fails to explain why his methodology would produce such inconsistencies, and neither he nor Mr. Weir has validated any of these results with real-world market data.

### 5.7. Lack Of A Margin Of Error Methodology

118. Mr. Gaskin has violated a fundamental rule for the presentation of statistical evidence. Mr. Gaskin's ultimate calculation, and the only calculation which Mr. Weir would use, is a reduction in "market value" expressed as a percentage. Mr. Gaskin claims that the potential for HVAC odor caused a 25 per cent reduction in market value.[214] This 25 per cent is based on complicated calculations performed on conjoint survey data. Any calculation based on data is called an estimator by statisticians. The resulting calculations are a statistical estimate. All statistical estimates contain sampling error. For example, if we were to take a small sample of U.S. adults and measure the proportion of that sample that has brown eyes, it would be incorrect for a statistician to pretend that this estimate does not have sampling error. Mr. Gaskin's analysis is flawed in this respect. He offers no discussion of this in his report and says little in his deposition[215] regarding the sampling error which, by definition, afflicts his estimates of the percentage reduction in "market value."

119. It should be noted that all computations of a margin of statistical error are only useful to the extent that the methodology is valid and free from bias. I have demonstrated that Mr. Gaskin's survey is biased and improperly designed, and the Gaskin-Weir damages methodology is invalid. Computations of a margin of error only addresses the statistical

---

[214] Gaskin Report, ¶57.

[215] Gaskin Deposition, p. 187:9–16 ("Q: What -- can you describe to me some of the problems if the size of the sample selection is not sufficient? A: Okay. That's what I was going to clarify, the size. Sorry. Thank you. If the sample size is not sufficient, then it has an effect on the -- chiefly on the error range of the estimate."); pp. 288:24–289:6 ("Q: The error range increases with -- as -- the less respondents you have? … A: I think I have -- sorry. I was attempting to say it the opposite way, which is that the error range decreases with the square root of the sample size. So as it goes up, you get a smaller error range.").

reliability of Gaskin's damages estimates and cannot be used to assert validity or freedom from bias.

### 6. Plaintiffs' Average "Cost To Repair" Methodology Is Also Unreliable, Does Not Measure What It Purports To Measure, And Is Subject To Individualized Issues

120. Mr. Weir's second damages methodology is simply to apply what Mr. Weir calls "cost to repair" estimates sponsored by another Plaintiffs' expert.[216] Mr. Weir describes the "cost to repair" as the cost of "continuous, ongoing repairs to the HVAC system need to abate the HVAC odor."[217] This is flawed for many reasons.

#### 6.1. Mr. Weir's Average "Cost to Repair" Approach Does Not Measure Market Value Or Anything To Do With Benefit Of The Bargain Damages

121. Cost to repair an alleged defect is not a valid benefit of the bargain measure of damages. A valid benefit of the bargain economic analysis must be based on the difference between the prices actually paid for vehicles and the market price that would prevail if the potential for HVAC odor were more fully disclosed. Cost to repair is not, in general, equal to a difference in market prices.

122. Mr. Weir seems to recognize this by referring to this method as a "proxy," though in his deposition he clarified that this "proxy" is an estimate of the market price.[218] But in this situation, the disconnect between "cost to repair" and market prices is even more extreme.

---

[216] Weir Report, ¶¶12, 50.
[217] Weir Report, ¶12.
[218] Weir Report, ¶50 ("Either of these costs to remediate the Defect can serve as a proxy for the amount that Plaintiffs and Class members overpaid for the Vehicles at the time of purchase or lease as a result of the Defect."). Weir Deposition, p. 171:11–23 (Q: Yep. The second approach doesn't actually measure diminished value at the point of sale, correct? A: It's being used as an estimate for the overpayment at the time of sale. Q: It's used as an estimate, but it doesn't purport to measure market price, right? A: No, I disagree. I'm using it as a proxy for an estimate of market price under the conservative assumptions based on the ways in which these calculations have been made to estimate a change in market price due to overpayment related to the presence versus absence of the defect.").

This is because HVAC odor does not occur in all class vehicles. It is my understanding that only a small fraction of 2012–2017 Toyota Camrys exhibit HVAC odor and that it can happen in vehicles from competitor manufacturers.[219] From a "cost to repair" point of view, there is no reason to repair a vehicle that performs acceptably and cannot be distinguished from any other vehicle that does not have the potential for HVAC odor. This has nothing to do with the market price of the vehicle in the but-for world in which the potential for HVAC odor is more fully disclosed.

123. Additionally, it is my understanding that the "cost to repair" estimates given to Mr. Weir are not actually a cost of removing or fixing the potential for HVAC odor, but merely estimates of the costs of addressing what Plaintiffs claim to be the symptoms of the potential for HVAC odor. In Mr. Weir's words, this reflects the "cost of continuous, ongoing repairs to the HVAC system needed to abate the HVAC odor."[220]

### 6.2. Mr. Weir's Calculations Are Substantively Flawed And Unreliable For Other Reasons

124. Plaintiffs' expert, Mr. Wright, proposes two repairs with two separate "cost to repair" estimates: (1) "installation of an Afterblow add on, coupled with an HVAC system cleaning and use of charcoal filters," totaling $1,176.05;[221] and (2) "routine evaporator cleanings and charcoal filter replacement," totaling $1,973.50.[222] As such, these are not "cost to repair" damages estimates in the first place. Mr. Weir relies on the estimate of Mr. Wright for the cost not of repairing the potential for HVAC odor but of abating the odors, should they occur, via routine filter replacement, (possibly routine) evaporator cleaning, and

---

[219] Wilcox Report, ¶¶68–72, 78–84, Exhibit 8.
[220] Weir Report, ¶7.
[221] Wright Report, p. 22.
[222] Wright Report, p. 23.

possibly the installation of an Afterblow device.[223] Of course, whether it is necessary to abate odor in a vehicle will vary by class member.[224]

125. This expert also assumes that such costs are to be incurred over a 10-year period without justification.[225] Clearly, the length of time class members would incur abatement costs would vary across individuals (it is noteworthy that the class includes owners who purchased used vehicles or those who leased vehicles), if class members incurred abatement costs at all.

### 6.3. Individual Issues And Mr. Weir's "Cost To Repair"

126. There are several issues of individualized experiences which render it impossible to apply Mr. Weir's "cost to repair" theory to the class. First, "cost to repair" is not a cost to repair but a cost of abating the manifestation of the potential for HVAC odor, which would only be incurred if the HVAC system emitted odors that the vehicle owner deemed unacceptable. This is highly individualized.

127. Moreover, Mr. Weir's "cost to repair" theory presumes that all odors in the vehicle were actually caused by the HVAC system. If there were no HVAC odor or the HVAC system did not produce odor, Mr. Weir's "cost to repair" would not apply.

128. Second, the use of a fixed 10-year period for the "cost to repair" is clearly inappropriate and requires an individualized estimate that depends on the length of

---

[223] Wright Report, p. 6.

[224] Mr. Wright described this as "mitigating" HVAC odor. Nor could Mr. Wright say that HVAC odor would be eliminated through these measures. Wright Deposition, p. 82:17–24 ("Q: Well, is there any way, including following these procedures and enabling afterblow, that would eliminate entirely the potential for HVAC odor in vehicles? … A: I don't know. This is a really inclusive set of actions. I can't imagine that it wouldn't solve a customer's problem, but I have no factual basis to say yes or no."); p. 86:1–9 ("Q: Yeah. I'm just trying to find out, is it your opinion that after following these procedures, that the potential for HVAC odor would be completely eliminated in the vehicles that had these procedures? A: In these -- … Yeah, I don't know. I really don't know in these particular vehicles.").

[225] Wright Report, p. 6.

ownership. Indeed, Mr. Weir clarified in his deposition that his purported "cost to repair" damages are not specific to any one person and do not consider the cost to repair of any one vehicle in some location.[226] Thus, Mr. Weir has not calculated damages for any specific Plaintiff or class member under this theory.

129. Third, Mr. Wright's estimate includes the cost of installing a charcoal filter. However, some class members may have had a charcoal filter installed as a standard feature (for certain 2016 and 2017 Camry model vehicles),[227] or elected to install a charcoal filter in their Camry vehicle for reasons other than HVAC odor. Presumably, as Mr. Wright acknowledges, such purchasers would have expected to incur the cost of replacing the charcoal filter over time, suggesting that the cost to replace the charcoal filter on some Camry vehicles should not be included as an additional, unexpected cost that consumers would incur to "repair" the potential for HVAC odor.[228] Indeed, Mr. Wright concedes that charcoal filters were standard on 2016 and 2017 Toyota Camry vehicles.[229] However, neither Mr. Wright nor Mr. Weir makes any mention of what fraction of class members this may be, and Mr. Weir applies

---

[226] Weir Deposition, p. 248:6–16 ("Q: And I think earlier in the day you were talking about aggregate and class-wide damages with respect to the conjoint. Is your calculation of damages with respect to cost of repair also an aggregate calculation? A: Yes. I'm looking at aggregate overpayment. Again, I'm not trying to find out what any one person has paid or might pay to repair their vehicle. I'm just trying to estimate, using the cost to repair, what a bare minimum conservative estimate of the overpayment might be."); pp. 254:24–255:9 ("Q: Okay. So this model doesn't take into account any regional variations that may exist with regard to the cost of parts and labor? A: Again, I've been provided with single estimates from Mr. Wright. Whether or not he's made geographic variations or covered across geographic variations, you'd have to ask him. But again, I'm not looking at what is the cost to repair any one vehicle in some location. I'm saying, what is there in terms of the available evidence to estimate by how much these people have overpaid?").

[227] Wright Report, p. 6 ("With respect to the 2016-2017 model year Camry Vehicles, which came standard with a charcoal filter…").

[228] Wright Deposition, pp. 233:20–234:10, ("Q: Okay. Mr. Wright, in both your afterblow cost calculation and in the -- what you call routine evaporator cleaning and charcoal filter replacements, you have a cost for replacing charcoal filters over a period of ten years, right? A: Yes. Q: Is that a cost that you are calculating for vehicles that originally came with a pollen filter for vehicles that originally came with charcoal filter, or for both? A: The differential in the calculation would be the deferential (sic) between a pollen filter, which is the cost of ownership the customer expected, and a charcoal filter. So if a vehicle was produced with a charcoal filter, I suppose that cost would be less because the expectation is that they're going to replace a charcoal filter.").

[229] Wright Report, p. 22.

"cost to repair" to all class members equally.[230] Determining which class members had the charcoal filter installed at purchase requires individualized analysis.

## 7. Conclusions

130. Mr. Weir endorses a theory of damages which is the reduction of "market value" associated with the potential for HVAC odor. In simple terms, Mr. Weir suggests that class members "overpaid" for their vehicles at the time and point of first purchase because the marketplace was not aware of the potential for HVAC odor. He uses: (a) a percentage reduction in "market value" provided by Mr. Gaskin and simply applies this percentage to the average MSRP for base model year 2012-2017 Toyota Camry vehicles; (b) the average cost of abating HVAC odor, even for those vehicles that don't experience it.

131. The validity of the Gaskin-Weir damage approach hinges on whether or not they have used a valid method to infer what market prices would prevail in the counterfactual, but-for world in which the potential for HVAC odor was more fully disclosed to the marketplace. Mr. Gaskin and Mr. Weir do not observe the market price that would prevail in the but-for world. Thus, the entire validity of the Gaskin-Weir exercise is dependent on their ability to estimate this but-for market price. Nothing that Mr. Gaskin has performed in his conjoint survey can provide that price. A conjoint survey is only a measurement of demand – it does not provide any information about supply. Mr. Gaskin has clearly explained that he computed the reduction in what he calls "market value" as that reduction in price necessary to equate the demand for a specific hypothetical vehicle with disclosure of the potential for HVAC odor. This is the definition of the reduction in WTP on the basis of disclosure. It is not, nor can it ever be, a measure of market price.

---

[230] Weir Report, ¶¶60–61.

132. Therefore, the Gaskin-Weir methodology is invalid and can never be used, in any form, to compute the market price in the but-for world. Mr. Gaskin and Mr. Weir claim, incorrectly, to have considered "supply side factors."[231] The only information that they claim is evidence of "supply side factors" is a range of MSRP prices for 2012-2017 Toyota Camry vehicles and the number of vehicles actually sold.[232] This is not sufficient to compute a market price in a but-for world in which the potential for HVAC odor is known to the marketplace.

133. Lastly, the "cost to repair" theory is flawed for many reasons, including that it does not measure the cost of actually repairing the alleged HVAC issue, and overstates damages by assuming that there is a need to "abate" HVAC odor in every vehicle, all HVAC odor will be caused by the alleged HVAC issue, and each class member will hold his or her vehicle for 10 years.[233] All of these issues are individual issues, and Mr. Weir does not purport to calculate damages for any actual class member. Mr. Weir claims, without justification, that the cost of repair can be used to estimate market prices. Mr. Weir cannot reconcile the fact that Mr. Gaskin's WTP measure of damages is more than 5 times the cost of repair method of damages and, yet, Mr. Weir claims both methodologies are designed to measure the same thing—a change in market price.

[231] Gaskin Report, ¶21; Weir Report, ¶¶31–32.
[232] Gaskin Report, ¶21.
[233] Weir Report, ¶ 50; Wright Report, p. 24.

Respectfully submitted,



Peter E. Rossi

November 24, 2020

**Appendix A**

CURRICULUM VITAE
PETER E. ROSSI
(November 2020)

Date of Birth: November 25, 1955
Citizenship: United States

Business address:
UCLA
Anderson School of Management
110 Westwood Plaza, B5.15
Los Angeles, CA 90095
email: perossichi@gmail.com

Education:
B.A., 1976, Oberlin College (Mathematics and History).
M.B.A., 1980, Graduate School of Business, The University of Chicago (Management Science).
Ph.D., 1984, Graduate School of Business, The University of Chicago (Econometrics).
Dissertation Title: "Specification and Analysis of Econometric Production Models."

Fellowships, Honors, and Grants
Phi Beta Kappa Zeta of Ohio, elected 1975.
University of Chicago Fellowship, 1978-1980.
G.M. Fellowship, University of Chicago, 1980-1981.
Kellogg Research Chair, Northwestern University, 1983-84.
1987 Savage Prize for best dissertation in Bayesian Econometrics and Statistics.
I. B. M. Scholar, Graduate School of Business, University of Chicago, 1988-89.
Bozell, Jacobs, Kenyon and Eckhardt Faculty Scholar, Graduate School of Business, University of Chicago, 1994-95.
Elected Fellow, American Statistical Association, June 1998.
1999 Mitchell Prize for Best Applications Paper in Bayesian Statistics for "Estimating Price Elasticities with Theory-based Priors (with A. Montgomery)," awarded by American Statistical Association, Bayesian Statistics Section.
2000 Arthur Kelly Faculty Price, GSB, U of Chicago, (awarded bi-annually for service to school).
"Bayesian Analysis of Stochastic Volatility Models" named one of most influential articles in twentieth anniversary issue of *Journal of Business and Economic Statistics* (2002).
Named Fellow, *Journal of Econometrics*, 2001.
2010 Long-term Impact Award, Marketing Science Society (with Greg Allenby).
2016 Dean's Prize for Exceptional Faculty Mentorship of PhD Students.
2019, Elected INFORMS Society of Marketing Fellow.

Areas of Research Interest
*Marketing*: Brand Choice, Target Marketing, Price Promotions, Consumer Heterogeneity,

Couponing, Search Theory, Direct Marketing
*Econometrics*: Hypothesis testing in systems of equations, non-nested hypothesis-testing procedures, Bayesian methods, limited dependent variable models, non-parametric time series methods.
*Microeconomics*: demand analysis applied to individual consumer expenditure data.

Positions Held:
Analyst, Abt Associates Inc., 1976-1977.
Consultant, SRI International Inc., 1978.
Research Assistant, University of Chicago, 1979-1981.
Lecturer in Managerial Economics, Kellogg Graduate School of Management, Northwestern University, 1981-1983.
Assistant Professor of Managerial Economics, Kellogg Graduate School of Management, Northwestern University, 1983-86.
Visiting Assistant Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1985-1986.
Assistant Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1986-1990.
Associate Professor of Econometrics and Statistics, Graduate School of Business, The University of Chicago, 1990-1994.
Professor of Marketing, Econometrics and Statistics, Graduate School of Business, University of Chicago, 1994-1997.
Joseph T. and Bernice S. Lewis Professor of Marketing and Statistics, Booth School of Business, University of Chicago, 1997-2010.
James Collins Professor of Marketing, Statistics, and Economics, Anderson School of Management, UCLA, 2010-present.

Consultant for RFG Options, Harris Bank, Hull Trading, GE Capital, Ernst and Young, KPMG Peat Marwick, Abbott Labs, Department of Defense, Booz Allen and Hamilton, Arthur Andersen, Kestnbaum and Company, Oliver, Wyman and Co.

Expert Witness for various legal proceedings involving statistical analysis, survey sampling, marketing and pricing, anti-trust, valuation of lost personal and business income, franchise rights, patent and trademark infringement, bio-statistics and job discrimination, and trademark infringement. Law firms involved include: Ross and Hardies, Rudnick and Wolfe, Seyfarth and Shaw, Sidley and Austin, Winston and Strawn, Arnold, White and Durkee, Hinshaw and Culbertson, Kirkland and Ellis, Cravath, Swaine and Moore, Mayer, Brown and Platt, Howrey, Bryan Cave LLP, Jones Day, Latham and Watkins, WilmerHale.

**Publications**: (click on links below to open full article in pdf)
Google Scholar Cites: 19,000+, H-index: 50 as of 6/2020. Google Scholar Citations
**Note: All articles are the sole copyright of the respective publishers. Materials are provided for educational use only.**

**Software**
R package, bayesm, downloaded more than 130,000 times from RStudio mirror alone in the year ending 7/30/19.

**Books**

*Bayesian Statistics and Marketing*, with G. Allenby and R. McCulloch (2005), John Wiley & Sons, Probability and Statistics Series.
*Bayesian Semi-Parametric and Non-Parametric Methods in Marketing and Micro-Econometrics* (2014), Princeton University Press.
*Handbook of the Economics of Marketing* (2019), Elsevier (co-editor with JP Dube).

**Working Papers**

Available on SSRN

**Articles**

**All articles are the sole copyright of the respective publishers. Materials are provided for educational use only.**

"Scalable Target Marketing: Distributed MCMC for Bayesian Hierarchical Models," (2020) with R. Bumbaca and S. Misra, *Journal of Marketing Research,* forthcoming.
"State Dependent Demand with Initial Conditions Correction," (2020) with A. Simonov, JP Dube, and G. Hitsch, *Journal of Marketing Research, 57, No. 5, 789-809.*
"Inferences for Product Competition and Separable Demand" (2019) with A. Smith and G. Allenby, *Marketing Science, 38, No. 4, 690-710.*
"The Value of Flexible Work: Evidence from Uber Drivers" (2019) with J. Chevalier, K. Chen, and E. Olsen, *Journal of Political Economy 127, No. 6, 2735-2794.*
"Income and Wealth Effects on Private Label Demand" (2018) with G. Hitsch and JP Dube, *Marketing Science, 37, No. 1, 22-53.*
"Economic Valuation of Product Features" (2014) with G. Allenby, J. Howell, and J. Brazell, *Quantitative Marketing and Economics 12, 4,* 421-456.
"All Roads Lead to Arnold" (2014), *Econometric Reviews* 33, 1-4, 421-423.
"Even the Rich Can Make Themselves Poor: a critical examination of the use of IV methods in marketing" (2014), *Marketing Science*, 33, No. 5, 655-672.
"Valuation of Patented Product Features" (2014) with G. Allenby, J. Howell, and J. Brazell, *Journal of Law and Economics*, 57, 629-663.
"Plausibly Exogenous" (2012) with T. Conley and C. Hansen, *Review of Economics and Statistics*, 94, pp. 260-272.
"State Dependence and Alternative Explanations for Consumer Inertia" (2010) with J. P. Dubé,and G. J. Hitsch, Rand Journal of Economics, Vol 41, No 3, 417-445.
"A Model for Trade-Up and Change in Considered Brands" (2010) with G. M. Allenby and M. J. Garratt , *Marketing Science*, 29, No. 1, January-February, pp. 40-56.
"Do Switching Costs Make Markets Less Competitive? " and "Commentaries and Rejoinder to Shin and Sudhir and to Cabral" (2009) with G. J. Hitsch and J. P. Dubé, *Journal of Marketing Research*, Vol. XLVI, August.
"Bayesian Analysis of Random Coefficient Logit Models Using Aggregate Data" (2009) with R. Jiang and P. Manchanda, *Journal of Econometrics*, Vol.149, April, pp. 136-148.
"Teaching Bayesian Statistics to Marketing and Business Students" (2008) with G. Allenby, *The American Statistician*, August, 62, No. 3, 195-198.
"A Semi-Parametric Bayesian Approach to the Instrumental Variable Problem" (2008) with T. Conley, C. Hansen and R. McCulloch, *Journal of Econometrics*, 144, 276–305.

"Category Pricing with State Dependent Utility, " (2008) with J. P. Dubé, G. J. Hitsch, and M. Vitorino , *Marketing Science*, 27, No. 3, May–June, pp. 417–429.
"Product Attributes and Models of Multiple Discreteness" (2007) with J. Kim and G. Allenby (2007), *Journal of Econometrics*, 138, pp. 208-230.
"Structural Modeling in Marketing: Review and Assessment" (2006) with P. Chintagunta, T. Erdem and M. Wedel (2006), *Marketing Science*, Vol. 25, No. 6, November–December, 581-605.
"A Direct Approach to Data Fusion" (2006) with Z. Gilula and R. McCulloch, *Journal of Marketing Research*, Vol. XLIII, February, 73-83.
"Structural Modeling and Policy Simulation" (2005) with B.Bronnenberg and N.Vilcassim, *Journal of Marketing Research*, Vol. XLII, February, 22–26.
"Response Modeling with Non-random Marketing Mix Variables" (2004) with P. Chintagunta and P. Manchanda, *Journal of Marketing Research*, Vol. XLI, November, 467–478.
"The Role of Retail Competition and Retail Strategy as Drivers of Promotional Sensitivity" (2004) with P. Boatwright and S. Dhar, *Quantitative Marketing and Economics*, 2, 169–190.
"Bayesian analysis of stochastic volatility models with fat-tails and correlated errors" (2004) with E. Jacquier and N. Polson, *Journal of Econometrics,* 122, 185-212 .
"Bayesian Statistics and Marketing" (2003) with G. Allenby, *Marketing Science*, 22, Summer, 304-329.
"Why Don't Prices Rise During Periods of Peak Demand? " (2003) with J. Chevalier and A. Kashyap, *AER,* 93(1), 15-37.
"Modeling Consumer Demand for Variety" (2002) with G. Allenby and J. Kim , *Marketing Science,* 21, Summer, 229-250.
"Overcoming Scale Usage Heterogeneity: a Bayesian Hierarchical Approach" (2001) with G. Allenby and Z. Gilula, *Journal of the American Statistical Association* 96, 20-31
"Bayesian Analysis of the Multinomial Probit Model with Fully Identified Parameters" (2000) with R. McCulloch, *Journal of Econometrics*, 99, 173-193.
"Statistics and Marketing" (2000) with G. Allenby, *Journal of the American Statistical Association,* 65, 635-638.
"Account-Level Modeling for Trade Promotion: An Application of a Constrained Parameter Hierarchical Model" (1999) with P. Boatwright and R. McCulloch , *JASA* , 94, December, 1063-1073.
"Estimating Price Elasticities with Theory-Based Priors, " (1999) with A. Montgomery, *Journal of Marketing Research* 36, 413-423.
"Marketing Models of Consumer Heterogeneity" (1999) with G. Allenby, *Journal of Econometrics*, 89, 57-78.
"Similarities in Choice Behavior Across Product Categories" (1998) with A. Ainslie, *Marketing Science*, 17, 2, 91-106.
"On the Taxation of Capital Income, " (1997), *Journal of Economic Theory*, 73, 93-117(with L. Jones and R. Manuelli).
"The Value of Purchase History Data in Target Marketing" (1996) with G. Allenby and R. McCulloch, *Marketing Science*, 15, 4, 321-340.
"Modelling the Distribution of Price Sensitivity and Implications for Optimal Retail Pricing" (1995) with B. Kim and R. Blattberg , *Journal of Business and Economics Statistics*, 13, 291-304.
"Determinants of Store-level Price Elasticity" (1995) with S. Hoch, B. Kim and A. Montgomery, *Journal of Marketing Research*, 32, 17-29.
"Advances in Random Utility Models," (1994) with Joel Horowitz, et al, *Marketing Letters*, 5, 311-322.

"Bayesian Analysis of Stochastic Volatility Models" (1994) with N. Polson and E. Jacquier, *Journal of Business and Economic Statistics*, 12 , 371-418.
"Purchase Frequency, Sample Selection and Price Sensitivity" (1994) with B. Kim , *Marketing Letters* (1994), 5, 57-68.
"An Exact Likelihood Analysis of the Multinomial Probit Model" (1994) with R. McCulloch (1994), *Journal of Econometrics*, 64, 207-240.
"A Marginal-Predictive Approach to Estimating Household Parameters" (1993) with G. Allenby, *Marketing Letters,* 4, 227-239.
"Nonlinear Dynamic Structures" (1993) with A. R. Gallant and G. Tauchen, *Econometrica* 61, 871-908.
"Optimal Taxation in Models of Endogenous Growth" (1993) with L. Jones and R. Manuelli, *Journal of Political Economy*, 485-517.
"A Bayesian Approach to Estimating Household Parameters" (1993) with G. Allenby, *Journal of Marketing Research,* 30, 2, 171-182.
"Bayes Factors for Nonlinear Hypotheses and Likelihood Distributions" (1992) with R. McCulloch, *Biometrika* 79, 4, 663-676.
"Stock Prices and Volume" (1992) with A. R. Gallant and G. Tauchen , *Review of Financial Studies,* 5, 199-242.
"Quality Perceptions and Asymmetric Switching Between Brands" (1991) with G. Allenby, *Marketing Science,* 10, 185-204.
"Posterior, Predictive, and Utility-Based Approaches to Testing the Arbitrage Pricing Theory" (1991) with R. McCulloch, *Journal of Financial Economics* 2,8, 7-38
"A Bayesian Approach to Testing the Arbitrage Pricing Theory" (1991) with R. McCulloch, *Journal of Econometrics* 49, 141-168.
"There is No Aggregation Bias: Why Macro Logit Models Work" (1991) with G. Allenby *Journal of Business and Economic Statistics,* 9, 2-14.
"*Econometric Theory* Interview with Arnold Zellner" (1989) *Econometric Theory,* 5 , 287-317.
"Comparison of Functional Forms in Production" (1985) *Journal of Econometrics* 30 (1985) 345-361.
"Bayesian Analysis of Dichotomous Quantal Response Models" (1984) with A. Zellner, *Journal of Econometrics,* 25, 365-394.
"Asymptotic Search Behavior Based on the Weibull Distribution" (1979) *Economics Letters* 3, 211-213.
"The Cost of Search and Rational Random Behavior" (1979), *Economics Letters,* 3, 5-8.
"The Independence Transformation of Specific Substitutes and Specific Complements" (1979), *Economics Letters,* 2, 299-301.
"Body Time and Social Time: Mood Patterns by Menstrual Cycle Phase and Day of the Week" (1977) with A. S. Rossi, *Social Science Research,* 6, 273-308.

**Book Chapters**
"Economic Foundations of Conjoint Analysis," (2019) with G. Allenby and N. Hardt, in *Handbook of the Economics of Marketing*, J.P. Dube and P. Rossi, eds. Elsevier.
"Inference for Marketing Decisions" (2019) with G. Allenby in *Handbook of the Economics of Marketing*, J.P. Dube and P. Rossi, eds. Elsevier.
"Bayesian Econometrics" (2018)) with G. Allenby in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.

"Causal Inference in Marketing Applications" (2018) in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.
"Feature Valuation Using Equilibrium Analysis" (2018) with J. R. Howell and G. Allenby in *Handbook of Marketing Analytics*: Methods and Applications in Marketing Management, Public Policy, and Litigation Support, N. Mizik and D. Hanssens, eds, Edward Elgar Publishing.
"Economics Models of Choice" (2017 ) with G. Allenby and J. Kim in *Handbook of Marketing Decision Models*, B. Wierenga and R. Lands, eds, 199-222, Springer.
"Bayesian Applications in Marketing" (2011) with G. Allenby in *Handbook of Bayesian Econometrics* (Geweke, Koop, and Van Dijk eds), Chapter 8, pp. 390-438, Oxford: Oxford University Press.
"Choice Models in Marketing: Economic Assumptions, Challenges and Trends" (2009) with S. Chandukala, J. Kim, T. Otter, and G. Allenby in *Foundations and Trends in Marketing,* 2, No. 2, 97-184, Now Publishers.
"Hierarchial Bayes Models: A Practitioner's Guide" (2006) with G. Allenby in *Handbook of Marketing Research*, R. Grover and M.Vriens (eds.), Sage Publications."
"When BDT in Marketing Meant Bayesian Decision Theory: The Influence of Paul Green's Research" (2004) with E. Bradlow, P. Lenk, and G. Allenby, in *Marketing Research and modeling: Progress and Prospects, A Tribute to Paul Green*, Y. Wind and P.E. Green (eds.), p. 17-39, Kluwer Academic Press.
"Bayesian Analysis of Multinomial Probit Model" (2000) with R. McCulloch *Simulation-Based Inference in Econometrics*, (Mariano, Weeks and Schuermann, eds), Cambridge: Cambridge University.
"Existence of Bayes Estimators for the Binomial Logit Model" (1996) in D. Berry, K. Chaloner, and J. Geweke (eds), *Bayesian Statistics and Econometrics: Essays in Honor of Arnold Zellner* , New York: John Wiley and Sons, 91-100.
"Bayes Factors for Testing the Equality of Covariance Matrix Eigenvalues" (1996) in *Modelling and Prediction*, W. Johnson (ed), New York: Springer, 305-314.
"Hierarchical Modelling of Consumer Heterogeneity: An Application to Target Marketing" (1995) in *Case Studies in Bayesian Statistics*, Kass and Singpurwalla (eds), New York: Springer Verlag., 323-350.
"Comparison of Dynamic Factor Demand Model, " (1987) in *Austin Symposia in Economics: Dynamic Econometric Models*, Cambridge: Cambridge University Press.
"Evaluating the Methodology of Social Experiments" (1985) in *The Income Maintenance Experiments* edited by J. Peckman, Boston: Federal Reserve Bank of Boston (with A. Zellner).

**Misc Articles**
"Calculating Reasonable Royalty Damages Using Conjoint Analysis, " (2017) with G. Allenby, L. Cameron, J. Verlinda and Y. Li, *AIPLA Quarterly Journal*, 45, 234-253.
"The HB Revolution" (2004) with G. Allenby and D. Bakken, (2004), *Marketing Research,* Summer, 20-25.
"Making Sense of Scanner Data" (2000) with P. Delurgio and D. Kantor , *Harvard Business Review, March-April*, 24.

**Discussions**
"Both Network Effects and Quality are Important" (2009) Journal of Marketing Research, XLVI, April.

"Discussion: 'Statistical Properties of Generalized Method of Moments Estimates Using Financial Market Data'" (1986) *Journal of Business and Economic Statistics,* 4, 417-419.

PhD Students (year)
Eric Gyhsels (84), Professor of Economics, University of North Carolina
Greg Allenby (88), Kurtz Professor of Marketing, Ohio State University
Eric Jacquier (91), Associate Professor of Finance, HEC Montreal
Byung-Do Kim (92), Professor of Marketing, Seoul National University
Alan Montgomery (94), Associate Professor of Marketing, CMU
Peter Boatwright (98), Associate Professor of Marketing, CMU
Andrew Ainslie (98), Associate Professor of Marketing, UCLA
Renna Jiang (09), Assistant Professor of Marketing, UC Davis

Professional Activities
Associate Editor, Journal of Business and Economic Statistics (1986- 1988)
Associate Editor, Journal of Econometrics, 1987-1995.
Member, Editorial Board Marketing Science, 1994-2003.
Member, Editorial Board, Journal of Marketing Research, 1998- .
Associate Editor, Journal of American Statistical Association (applications section), 1995-2001.
Founding Editor (with Rajiv Lal), Quantitative Marketing and Economics, 2000-2010.
Senior Editor, Marketing Science, 2015-2018.
Chair, Business and Economics Section, American Statistical Association, 1995.
Seminar Leader, NBER/NSF Seminar on Bayesian Inference in Econometrics, 1995-1998.
Member, Savage Award Committee, ASA, 1995-2000.
Member, Advanced Research Forum Program Committee, AMA, 2000-2003
Referee for Econometrica, Journal of Econometrics, Journal of Political Economy, Journal of the American Statistical Association, American Statistician, Econometric Theory, Journal of Applied Econometrics, Journal of Business, Marketing Science, Review of Financial Studies, Review of Economics and Statistics, Management Science, Journal of Marketing Research, Journal of the Royal Statistical Society.

Anderson/UCLA Service Activities
Vice-Chair, FEC (faculty policy committee advisory to Dean), 2013-2014.
Chair, Staffing Committee, 2012-13.
Chair, MFE Review Committee, 2012.
Member, Committee to propose and develop MSBA (MS in Business Analytics) degree, 2015- .

Chicago Booth Service Activities
Director, Strategic Marketing Management (short course exec ed program), 96-09.
Chair, Deans Reappointment Committee, 05.
Elected member, Dean's Search Committee, 96.
Elected member, Dean's Policy Committee, 96-09.
Chair of Recruiting, Marketing Group, 96-00, 01-03, 05-09.
Course Scheduler, Marketing Group, 96-00.
Founder, Kilts Center for Marketing.

## Appendix B

Prior Testimony (last four years)

2016 In re Anthem, Inc. Data Breach Litigation, US District Court, Northern District of California, San Jose Division. Deposition testimony.

2016 Alvin Todd, et al V. Tempur-Sealy, US District Court, Northern District of California. Deposition testimony.

2016 Dzielak et al V. Whirlpool Corporation, US District Court, District of New Jersey. Deposition testimony.

2017 Dyson V. SharkNinja, US District Court, Northern District of Illinois, Eastern Division. Deposition testimony.

2017 The People of the State of California acting by and through Orange County District Attorney Tony Rackauckas v. General Motors, LLC, US District Court, Central District of California. Deposition testimony.

2018 In re GM LLC Ignition Switch Litigation, US District Court, Southern District of NY. Deposition testimony.

2018 USA V. ATT/Time Warner, US District Court, Washington DC. Prepared expert report, gave deposition and trial testimony.

2018 In re Navistar Maxxforce Engines Mktg., Sales Practices and Products Liability Litigation, US District Court, Northern District of Illinois, Eastern Division. Deposition testimony.

2018 In Premera Blue Cross Customer Data § Security Breach litigation, US District Court, Oregon. Deposition testimony.

2018 Blitz V. Monsanto, US District Court, Western District of Wisconsin. Deposition testimony.

2018 Nestle USA v. Crest Foods, US District Court, Central District of California. Deposition testimony.

2019 Riley Johannessohn et al. v. Polaris Industries, Inc., US District Court, District of Minnesota, Deposition testimony.

2019 Nestle SA v. Crest Foods, International Arbitration. Testimony.

2019 Stockinger et al v. Toyota Motor Sales, U.S.A., Inc., US District Court, Central District of California. Deposition testimony.

2020 Nemet et al v. Volkswagen of American, US District Court, Northern District of California. Deposition testimony.

**Appendix C**

# Materials Considered

**Academic Articles**

- Allenby, G. M. et al. (2014), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12, 4, 421–456.
- Allenby, G. M. et al. (2014), "Valuation of Patented Product Features," *The Journal of Law and Economics*, 57, 3, 629–663.
- Green, P. E. and V. Srinivasan (1990), "Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice," *Journal of Marketing* 54, 4, 3–19.
- Orme, B. K. (2001), "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions," Sawtooth Software, Inc. Research Paper Series.
- Sawyer, A. G. (1975), "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research* 1, 4, 20–30.
- Shimp, T. A. et al. (1991), "A Critical Appraisal of Demand Artifacts in Consumer Research," *Journal of Consumer Research*, 18, 3, 273–283.

**Bates Numbered Documents**

- CARDENAS-GASKIN-000082–116.
- CARDENAS-GASKIN-000117–153.
- CARDENAS-GASKIN-000201–237.
- CARDENAS-GASKIN-000270–302.
- CARDENAS-GASKIN-000680–715.
- CARDENAS-GASKIN-000716–765.
- CARDENAS-GASKIN-000766–798.
- CARDENAS-GASKIN-000799–838.
- CARDENAS-GASKIN-000839–875.
- TOY-CARDENAS-00152325.
- TOY-CARDENAS-00152328.
- TOY-CARDENAS-00152370.
- TOY-CARDENAS-00152372.
- TOY-CARDENAS-00152374.
- TOY-CARDENAS-00152376.
- TOY-CARDENAS-00152377.

**Books and Book Chapters**

- Allenby, G. M., et al. (2019), "Economic Foundations of Conjoint Analysis," in *Handbook of the Economics of Marketing*, Vol. 1, J.-P. H. Dubé and P. E. Rossi, eds., Oxford, UK: North-Holland, 151–192.

- Orme, B. K. (2014), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, 3rd ed., Manhattan Beach, CA: Research Publishers LLC.
- Orme, B. K. and K. Chrzan (2018), *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros,* Orem, Utah: Sawtooth Software, Inc.
- Rossi, P. E., et al. (2005), *Bayesian Statistics and Marketing*, D. J. Balding, et al. eds., England, UK: John Wiley & Sons.

**Depositions**

- Deposition of Colin B. Weir, November 12, 2020.
- Deposition of Rodney Baker, September 17, 2020.
- Deposition of Steven P. Gaskin, November 6, 2020.

**Expert Reports**

- Corrected Expert Report of Ronald T. Wilcox, Ph.D., November 2, 2020.
- Declaration of Colin B. Weir, October 20, 2020.
- Expert Report of Don Wright, October 20, 2020 and backup materials.
- Expert Report of Steven P. Gaskin, October 20, 2020 and backup materials.

**Pleadings**

- Corrected Amended Class Action Complaint, *Cardenas, et al. v. Toyota Motor Corporation, et al.*, United States District Court for the Southern District of Florida, Case No. 1:18-cv-22798-FAM, October 28, 2019.

**Other Documents**

- Allenby, G. M. et al. (October 2013), "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference, 341–355.

**Websites**

- "2020 Camry L – Vehicle Overview," *Toyota*, https://www.toyota.com/configurator/build/step/model/year/2020/series/camry.
- "2020 Toyota Camry Hybrid," *Motortrend*, https://www.motortrend.com/cars/toyota/camry-hybrid/2020/.
- "2020 Toyota Camry," *Motortrend*, https://www.motortrend.com/cars/toyota/camry/2020/.
- "Convenience Package with Options," *Toyota*, https://www.toyota.com/configurator/build/step/package/year/2020/series/camry/model/2532/exteriorcolor/0218/interiorcolor/FA40/packages/option1.
- Gaskin, S., "Navigating the Conjoint Analysis Minefield," *PDMA*, Q1 2013, https://www.pdma.org/store/ViewProduct.aspx?ID=10931391.
- "Manuals & Warranties," *Toyota*, https://www.toyota.com/owners/resources/warranty-owners-manuals.
- "Pkg Tray Speaker – Toyota (86150-06020)," *OEM Genuine Parts*, https://www.oemgenuineparts.com/oem-parts/toyota-pkg-tray-speaker-

8615006020?c=Zz1ib2R5JnM9c291bmQtc3lzdGVtJmw9NCZuPVNlYXJjaCBSZXN1bHRzJmE9dG95b3RhJm89Y2FtcnkmeT0yMDIwJnQ9bGUmZT0yLTVsLWw0LWdhcw%3D%3D.

- "Toyota," *Motortrend*, https://www.motortrend.com/cars/toyota/.

**Appendix D**: Mr. Gaskin's Reduction in Market Value is Change in WTP

Mr. Gaskin uses a conjoint "market simulation" to determine the change in price necessary to equate the sales of two Toyota products that are identical in all features except the presence of the potential for HVAC odor. He calculates the reduction in "price" required to equate the sales (market share) of the vehicle with the potential for HVAC odor with the vehicle without the potential for HVAC odor.

To simplify this discussion, I will assume a linear price term.

According to the logit model, the expected market share for products depends on the conjoint partworths and the levels of product attribute. Mr. Gaskin considers two products whose conjoint utility can be written as follows:

1. Utility of product without the potential for HVAC odor: $U = \gamma + \beta_p P$
2. Utility of product with the potential for HVAC odor: $U = \gamma + \delta_{HVAC} + \beta_p P_{HVAC}$

Here, $\delta_{HVAC}$ , is the partworth for the potential for HVAC odor (presumably negative). *P* is the price without the potential for HVAC odor and $P_{HVAC}$ is the price with the potential for HVAC odor.

Equating the expected market share for these two products, we can solve for the change in price.

$$\frac{e^{\gamma+\delta_{HVAC}+\beta_p P_{HVAC}}}{e^{\gamma+\delta_{HVAC}+\beta_p P}+e^{\gamma+\beta_p P}} = \frac{e^{\gamma+\beta_p P}}{e^{\gamma+\delta_{HVAC}+\beta_p P}+e^{\gamma+\beta_p P}}$$

$$\Rightarrow P_{HVAC} = P - \frac{\delta_{HVAC}}{\beta_p}$$

$$or \ \ \Delta P = -\frac{\delta_{HVAC}}{\beta_p}$$

Thus, Mr. Gaskin's measure is nothing more than a change in WTP. With many consumers, this measure simply becomes a measure of average WTP.