**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 18-CV-22798-MORENO/LOUIS**

JAVIER CARDENAS, RODNEY BAKER,
and MICHELLE MONGE, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

TOYOTA MOTOR CORPORATION,
TOYOTA MOTOR SALES, U.S.A., INC.,
TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA,
INC., and SOUTHEAST TOYOTA
DISTRIBUTORS, LLC,

Defendants.

---

**TOYOTA DEFENDANTS' OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 4

      A.    There Is No Common Type Or Source Of Odor In Vehicles ................................ 4

      B.    HVAC Odor Occurs Across The Automotive Industry; There Is No Such
            Thing As A Vehicle That Lacks The Potential For HVAC Odor .......................... 4

      C.    The Existence of HVAC Odor Is Not Common To The Class Vehicles .............. 5

      D.    There is No Common Evidence About What Causes HVAC Odor ..................... 5

      E.    Class Vehicles Do Not Have A Common HVAC Design, Software, Or
            Components ........................................................................................................ 6

      F.    There Is No Common Evidence Of Microbial Growth Causing Odor In
            Class Vehicles, And No Evidence of Any Odor-Related Health Or Safety
            Hazard ................................................................................................................ 7

      G.    Class Vehicles Were Purchased From Many Different Sources, Based
            Upon  Different Information ................................................................................ 9

      H.    Each Customer's Knowledge Of The Potential For HVAC Odor At The
            Time Of Purchase Varies, And, Thus, There Is No Common Proof .................. 10

      I.    Reaction To Any Additional Disclosure Would Vary And Is Not Common ...... 11

      J.    Plaintiffs Offer No Reliable Class-Wide Evidence Of Injury Or Damages ........ 12

            1.    The Conjoint Analysis Cannot Measure Class-Wide Damages ............. 12

            2.    The Cost To Abate Odor Model Cannot Measure Class-Wide
                  Damages ................................................................................................ 13

      K.    Some Class Members Agreed To Individually Arbitrate Their Claims ............. 14

III.  Plaintiffs Have Not Met Their Heavy Evidentiary Burden To Certify A Class ............. 14

      A.    A Class Trial Has No Capacity To Generate Common Answers Under
            Rule 23(a)(2) And Individual Issues Predominate Under Rule 23(b)(3) ............. 15

            1.    All Claims Require the Presence Of A Common Defective Design
                  Causing Odor, But There Is No Such Common Evidence ...................... 16

            2.    There Is No Common Evidence And Individual Issues
                  Predominate On The Remaining Elements Of Plaintiffs' RICO
                  Claims .................................................................................................... 19

            3.    No Class Can Be Certified On Plaintiffs' RICO Conspiracy Claim
                  For The Same Reasons As Plaintiffs' Underlying Substantive
                  RICO Claim ........................................................................................... 28

            4.    No Class Can Be Certified On Plaintiffs' FDUTPA Claim .................... 28

# TABLE OF CONTENTS
(continued)

**Page**

     5.    Plaintiffs' Proposed Classes Must Be Denied Because Of Toyota's Individualized Defenses As To Each Claim ............................................. 34

B.    The Named Plaintiffs' Claims Are Not Typical Or Suffer From Adequacy Problems, Or Both ..................................................................................... 36

C.    Plaintiffs' Proposed Classes Are Invalid And Overbroad .................................. 37

D.    The Proposed Classes Are Not Ascertainable ...................................................... 38

E.    Plaintiffs Have Not Shown That A Class Action Is Superior Or Manageable .......................................................................................................... 40

IV.    CONCLUSION ................................................................................................................... 40

## I.  **INTRODUCTION**

Plaintiffs' claims based on an alleged HVAC design defect depend on individual facts. Plaintiffs' experts concede that the asserted defect requires the presence of HVAC odor; yet, undisputed evidence shows that approximately ▮ of US-bound 2012–2014 Toyota Camry vehicle owners have no complaints of HVAC odor.  Each vehicle—and the circumstances of each purchase—must be separately evaluated.  Several named Plaintiffs admitted they experienced no odor from their HVAC systems.  Other named Plaintiffs and class members purchased used Camry vehicles "as is" (accepting all defects and without reliance on any statement or omission); some did not make the purchasing decision; others were aware of the potential for HVAC odor at the time of purchase; some traded in their Camry vehicles for good deals; and still others purchased a second Camry vehicle because they liked their first so much.  Two of the original named Plaintiffs voluntarily dismissed their claims ***with prejudice***, precisely because of their individual facts. These varying circumstances are summarized in Exhibit 1.  Fundamental class action rules preclude certifying a class consisting of members with no valid basis for a claim or where each claim hinges on individual proof.

The remaining Plaintiffs have abandoned their proposed nationwide class (that included lessees and hybrid vehicles).  Plaintiffs now seek to certify a class of "purchasers" of 2012–2014 model year non-hybrid Camry vehicles ("Class Vehicles") in select states (Florida, Georgia, Alabama, North Carolina, and South Carolina) pursuing Racketeer Influenced and Corrupt Organizations Act ("RICO") claims.  Plaintiffs also seek to certify a sub-class of Florida-only "purchasers" pursuing a Florida consumer protection ("FDUTPA") claim.[1]  No matter how Plaintiffs narrow their proposed classes, they cannot escape that their claims turn on individual evidence, based on the particular facts of each individual purchase, the HVAC performance of each vehicle, and each class member's unique knowledge of HVAC odor before purchase.

This Court recognized that "[l]iterally the whole case is the HVAC [system] and the

---

[1]  Plaintiffs submitted a so-called "trial plan" as Exhibit 63 to their class certification motion ("Motion").  Toyota has submitted an annotated response as Exhibit 2, highlighting why Plaintiffs' cursory "plan" ignores key legal issues and individual proof that would overrun any trial.

odor." (Ex. 3, October 8, 2020 Hr'g Tr. 17:25–18:1.)[2] Plaintiffs' design expert concedes that the HVAC systems of the Class Vehicles are not inherently defective, and, in his opinion, only ***become defective*** if HVAC odor caused by microbial growth from too much moisture occurs within the HVAC system. He concedes: "If you drive a vehicle under different conditions on a large number of occasions, then in the absence of any evidence of malodors, one can conclude that a defect ***does not exist*** which causes odors." (Ex. 4, Okçuoğlu Dep. 59:2–16 (emphasis added).) The overwhelming majority of class members fit into that category.

It is undisputed that all vehicles, offered by all manufacturers, have the potential for HVAC odor. It is undisputed that HVAC odor occurs only in a tiny percentage of Class Vehicles, and its occurrence is based on how and where the vehicles and HVAC systems are used. And it is undisputed that Class Vehicles have different types of HVAC systems (manual versus automatic), different HVAC software logic, and different cabin filters, and were subject to different evaporator coating processes—all of which can impact the potential for, and the occurrence of, odor. Accordingly, there is no class-wide evidence capable of determining that odor has occurred, or will in fact occur, in all Class Vehicles due to some alleged HVAC design issue.

Plaintiffs' motion for class certification should be denied for many separate reasons:

***First***, Plaintiffs have not satisfied Rule 23(a) because, among other things, there is no common evidence capable of providing common answers to the fundamental questions for each set of claims, as required by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Rather, individual evidence and factual determinations are required to resolve key issues, including: (a) the design, software, and components of the HVAC system of each Class Vehicle; (b) whether HVAC odor occurred in each Vehicle; (c) if odor manifests, whether any such odor was caused by microbial growth from excessive moisture in the HVAC system, as opposed to some other cause unrelated to the alleged defect; (d) whether each class member was aware of the potential for HVAC odor at the time of purchase; (e) from whom the class member purchased the Vehicle and the basis for

---

[2]    An index of Toyota's exhibits, including the name and position of all deponents, is included in the Ercole Declaration, attached as Exhibit 47.

the purchase; (f) what impact, if any, an additional HVAC disclosure would have had on the purchasing decision; and (g) the existence and amount of any damage incurred by each class member.  At a minimum, Toyota is entitled to offer individual evidence on these important issues to support its individual defenses.  *Id.* at 367.

*Second*, Plaintiffs cannot satisfy Rule 23(b)(3) because individual issues predominate over common ones, including class-member specific evidence Toyota is entitled to present to disprove each key issue.  Further, Plaintiffs offer no reliable methodology capable of measuring each class member's alleged "overpayment" damages.  As explained in Toyota's *Daubert* motions (ECF Nos. 195–96), Plaintiffs' experts offer:  (a) an inadmissible conjoint survey that, at best, measures the difference between what consumers would be willing to pay (not a difference in market value) for a vehicle with the potential for HVAC odor and a non-existent vehicle; and (b) the average cost of abating HVAC odor for each vehicle over ten years, even though only a tiny fraction of owners will experience such odor and most will keep their cars for significantly less time.  Neither model is reliable, much less attempts to calculate actual damages for any class member—and both yield absurd results that contradict each other.  Plaintiffs simply ignore Toyota's defenses as to damages, which must be resolved for each class member individually.

*Third*, Baker, Monge, and Cardenas are not adequate class representatives and/or their claims are not typical of those of the putative classes.  Plaintiffs' unique individual circumstances and legal issues would overwhelm any class trial and preclude class certification.

*Fourth*, the proposed classes are invalid as a definitional matter because, among other things, they include "purchasers" who have never—and will never—experience HVAC odor due to any alleged defect, and, thus, have never been harmed or injured.

*Fifth*, Plaintiffs offer no ascertainable way of proving class membership.  Toyota does not sell vehicles directly to consumers, and does not know who actually paid money for each Class Vehicle.  Plaintiffs do not offer any evidence capable of showing how class membership can be determined without individual inquiry into each purchase transaction.

*Finally*, a class action is not superior or manageable, given that individual issues predominate.  The small number of class members who experience odor and seek redress can bring

3

individual claims (including pursuant to Toyota's informal and expedient dispute resolution process) if they experience HVAC odor or believe they have been harmed.  Class members may even obtain more expansive relief, such as a vehicle buyback, through such individual actions.

Plaintiffs cannot meet their heavy evidentiary burden with rhetoric and conclusory statements.   The actual evidence shows the varying circumstances of class members, including the named Plaintiffs alone (*see* Ex. 1).  The evidence makes clear that this is not the rare one-size-fits-all case where class treatment might be appropriate for a cohesive group of class members.

## II.   FACTUAL BACKGROUND

### A.  There Is No Common Type Or Source Of Odor In Vehicles.

There are many different types of vehicle odor, caused by many different sources, such as cigarettes, air fresheners, pets, or food.  (Ex. 5A, Kuhn Rep. 16.)  HVAC systems can emit many different smells, based upon what enters the vehicle.  (Ex. 4 at 153:7–17.)

The presence of a musty or damp odor in a vehicle does not mean that the odor is caused by the HVAC system.   (*Id.* at 154:7–14.)   For instance, Plaintiff Baker smelled an odor immediately upon entering his vehicle after it had been parked outside in the sun and ***before*** turning the vehicle on.  (Ex. 6, Baker Dep. 83:11–16, 84:19–85:4, 136:8–19.)  Baker conceded that he never experienced any odor associated with the ***use*** of his ***HVAC system***.  (*Id.* at 92:1–18.)

### B.  HVAC Odor Occurs Across The Automotive Industry; There Is No Such Thing As A Vehicle That Lacks The Potential For HVAC Odor.

All vehicles—regardless of manufacturer—can experience HVAC odor, including a musty, damp, or sour odor.  (Ex. 5A at 16–17; Ex. 7, Young Dep. 25:15–26:7, 95:6–17; Ex. 8, TMC Dep. 210:7–15; Ex. 9, Suzuki Dep. 22:7–15, 27:24–28:11.)  Plaintiffs' expert conceded that all vehicles can produce HVAC odor:  "It is well known that all automotive HVAC systems can emit HVAC odors caused by microbial growth . . . ."  (Ex. 10, Wright Rebuttal Rep. 7; *see also* Ex. 11, Wright Dep. 121:9–122:9 (unable to identify vehicle with no potential for HVAC odor).)

JD Power surveys of vehicle purchasers have long included a question as to whether owners experience "unpleasant" odors, including "moldy/stale" odors, from air vents.  (Ex. 12A, Wilcox Rep. ¶ 71.)  The existence of this question reflects the industry-wide potential for such

odors.  These surveys make clear that owners of competitor vehicles to the Toyota Camry also report HVAC odor—at varying rates—across different models and years.  (*Id.* at ¶¶ 78–84 & Exs. 12–13; Ex. 12B, Wilcox Rebuttal Rep. ¶¶ 20–22 & Ex.1.)

### C.  <u>The Existence of HVAC Odor Is Not Common To The Class Vehicles</u>.

Most Camry owners never experience HVAC odor.  Based upon JD Power survey data, less than ▮ of 2012–2014 Class Vehicle owners reported odor from their HVAC vents three years after purchase.  (Ex. 12B at ¶¶ 20–22 & Ex.1)  This is consistent with rates for competitor vehicles, where Camry on average falls in the middle.  (*Id.*)[3]  Approximately ▮ of surveyed Class Vehicle owners were at least "satisfied" with their HVAC systems.  (Ex. 12A at ¶ 95 & Ex. 14A.)  Two of the original named Plaintiffs did not experience HVAC odor.  (Ex. 6 at 84:19–85:4, 92:1–18; Ex. 13, Kirton Dep. 12:21–13:7.)

The nature of HVAC odor varies significantly, too.  Pamela Dalton, Toyota's olfactory expert, demonstrates that each class member's ability to detect odor, and whether it is perceived as unpleasant, is highly subjective.  (Ex. 14A, Dalton Rep. 2, 4–8.)  Just because an owner perceives a "moldy" smell does not mean that others will perceive that same (or any) smell—much less that mold actually exists.  (*Id.* at 4–13.)  For example, while Monge claims to have perceived an odor in her vehicle, the primary driver of that same vehicle never detected HVAC odor.  (Ex. 15, Monge Dep. 76:1–6, 18:15–20, 160:6–9, 161:13–16.)  For the small percentage of class members who experience HVAC odor, the duration of the odor varies, too.  (Ex. 12A at ¶¶ 104, 106; Ex. 16, Cardenas Dep. 114:1–4 (varies); Ex. 15 at 164:7–19 (few minutes).)

### D.  <u>There is No Common Evidence About What Causes HVAC Odor</u>.

HVAC systems work by drawing in air from outside the vehicle (*i.e.*, fresh mode) and from within the vehicle cabin (*i.e.*, recirculation mode).  (Ex. 5A at 8.)  Air flowing through the HVAC system draws in odorants (*i.e.*, anything one smells in the air), based on exterior and interior conditions.  (*Id.* at 11, 16; Ex. 17A, Hicks Rep. 4–5; Ex. 8 at 22:14–23:12, 33:14–34:2.)  Those odorants can attach to the HVAC system and be expelled during use.  (Ex. 8 at 21:3–15.)  Thus,

---

[3]      For example, complaints of HVAC odor for 2012 competitor vehicles three years after purchase ranged from ▮ to ▮ compared to ▮ for 2012 Camry vehicles.  (*Id.*)

HVAC odor in vehicles can be caused by many different sources, including the following:

*Odorants From The Ambient Air*.  Items brought into the HVAC system from the external environment can cause HVAC odor.  (Ex. 18, Parkhurst Rep. 4; Ex. 19, Parkhurst Dep. 244:19–20; Ex. 8 at 22:14–23:12.)  This includes any odorants in the outside air, such as exhaust fumes, pollen, trash, or pollutants.  (Ex. 5A at 16; Ex. 7 at 81:5–10.)

*Customer Usage and Operation of HVAC System*.  How a particular owner operates the individual Class Vehicle and HVAC system can affect the occurrence of HVAC odor.  (Ex. 5A at 16–17.)  For example, an owner who smokes, brings foods, or keeps sweaty workout attire inside the vehicle may be more likely to experience HVAC odor.  (*Id.* at 16; *see* Ex. 8 at 22:14–23:12.)  Likewise, an individual driver's use of recirculated air (versus another setting) can impact the occurrence and strength of HVAC odor.  (Ex. 5A at 16; Ex. 4 at 109:12–22.)

*Environmental Conditions*.  Outside temperature and humidity can affect the potential for HVAC odor.  (Ex. 5A at 16; Ex. 4 at 159:1–7; Ex. 7 at 95:6–17; Ex. 20, Cosgrove Dep. 14:13–22, 59:23–60:3; Ex. 21, Silva Dep. 39:16–17, 143:23–144:6, 279:12–280:18; Ex. 22, Pollock Dep. 8:16–18, 23:14–19, 132:7–133:12.)   Owners in high humidity areas may be more likely to experience HVAC odor than those in low humidity areas.  (Ex. 5A, at 16–17; Ex. 4 at 159:1–7.)

*Other vehicle-specific facts*.  Facts unique to each vehicle, such as how often the cabin air filter is changed, also can impact the occurrence of HVAC odor.  (Ex. 5A at 11, 16.)

**E.   Class Vehicles Do Not Have A Common HVAC Design, Software, Or Components.**

As explained by Toyota's HVAC design expert, Robert Kuhn, there are key differences in the design, components, and software of the HVAC systems within different configurations of 2012–2014 Camry vehicles:

*The HVAC Systems Differ Across Class Vehicles*.  The Class Vehicles differ as to whether they have manual or automatic HVAC systems.  These systems manage airflow differently.   (Ex. 5A at 8–11.)  Okçuoğlu identifies airflow design as a potential defect (Ex. 23, Okçuoğlu Rep. 23), but fails to consider that Class Vehicles have different systems.  Manual HVAC systems also do not include certain HVAC software that impacts the potential for HVAC odor, while automatic HVAC systems include such software.  (Ex. 5A, at 11–12.)

6

***The Type Of HVAC Software Logic Varies Across Class Vehicles***.  Certain Class Vehicles with automatic HVAC systems (*e.g.*, 2014 Camry vehicles with automatic HVAC systems) incorporate a software logic called "Parking Fresh Logic," which helps dry out the evaporator when a driver parks.  (*Id.* at 12.)  Parking Fresh Logic reduces the potential for HVAC odor.  (Ex. 7 at 112:23–113:1.)   Likewise, only Class Vehicles with automatic (but not manual) HVAC systems use a software logic called "Kimori Odor Logic," which blows air at the driver's feet at initial start up to dissipate any perceived odor.  (Ex. 5A at 11–12.)

Certain other Class Vehicles (*e.g.*, 2013 and 2014 Camry vehicles) also use "Greenhouse Gas Logic," which switches the HVAC system from fresh air to recirculated air when the outside temperature is above 75 degrees.  (*Id.* at 12.)  This software may influence the occurrence and strength of HVAC odor.  (*Id.*; Ex. 7 at 187:22–189:22.)

***The Type of Cabin Air Filter Varies Across Class Vehicles***.   The Class Vehicles have different types of cabin air filters comprised of different materials.  All were originally equipped with pollen filters, but some owners chose to install charcoal filters.  (Ex. 4 at 196:8–18; Ex. 9 at 231:21–25; Ex. 8 at 244:8–245:11; 2013 TSB (Pls.' Mot. Ex. 40 at 5–7 (recommending use of charcoal filter as option to address odor complaints if they arise)).)  Some dealers installed those charcoal filters free of charge as "goodwill."  (Ex. 7 at 60:2–11; Ex. 22 at 43:12–24.)  The charcoal filter helps to better absorb odor particles and prevent debris from entering the HVAC system, further reducing the already-low potential for HVAC odor.  (Ex. 5A at 11; Ex. 4 at 101:19–23; Ex. 24, Saenz Dep. 157:24–158:10, 159:3–23, Ex. 7 at 81:5–19.)

***Evaporator Coating Performance Varies Across Class Vehicles***.  HVAC evaporators have a coating to increase the drainage of moisture.  (Ex. 5A at 12.)  This coating impacts the potential for HVAC odor.  (Ex. 4 at 211:14–212:14.)  For some Class Vehicles (certain 2012 and 2013 Camrys), there was a manufacturing (not a design) issue in certain plants whereby the evaporator coating did not cure properly; this, in turn, impacts HVAC odor in some Class Vehicles.  (Ex. 9 at 118:1–120:7.)

**F. There Is No Common Evidence Of Microbial Growth Causing Odor In Class Vehicles, And No Evidence of Any Odor-Related Health Or Safety Hazard.**

Plaintiffs' HVAC design expert (Murat Okçuoğlu) claims that an HVAC defect depends upon the potential for "moisture [to] accumulate[] in the . . . HVAC system[], leading to microbial growth and resulting odor" when the HVAC system is turned on.  (Ex. 23 at 22; ECF No. 49 ("CAC") ¶ 4; Mot. 12.)  Plaintiffs, however, offer no class-wide proof of any accumulation of moisture leading to microbial growth causing malodors in Class Vehicles.[4]

Microbial growth can lead to odors only when such growth produces sufficient "MVOCs" above an odor threshold.  (Ex. 19 at 108:2–13; *see also id.* at 170:25–171:2; 242:9–14.)  Yet Okçuoğlu did not test for excess moisture, microbial growth, or resulting odor,[5] and Plaintiffs' industrial hygienist (Steven Parkhurst) found no evidence of any MVOCs above an odor threshold from any microbial growth in the three named-Plaintiffs' Camry vehicles that he tested.  (*Id.* at 56:12–59:11, 77:2–22, 95:9–96:22.)  Parkhurst, in fact, found that turning on the HVAC system either had ***no*** impact on or actually ***decreased*** the level of MVOCs in each vehicle.  (*Id.* at 103:9–18, 161:17–13, 245:20–24, 248:25–249:9, 260:4–261:10.)  Toyota's industrial hygiene expert, Jeff Hicks, also found:  (a) no fungal growth in the HVAC systems causing odors; and (b) MVOC levels decreased or were less than the ambient air with use of the HVAC system in each vehicle.  (Ex. 17A at 4–5, 11, 13–16, 18–20.)[6]  These results are summarized in Exhibit 1.

Plaintiffs' experts also admit they have no evidence, and are not offering any opinion, that any class member was exposed to a health hazard from his or her HVAC system.  (Ex. 4 at 70:13–17, 141:20–24, 159:9–13; Ex. 19 at 86:12–16; Ex. 25, Sobek Dep. 105:14–106:8.)  Parkhurst, in fact, found that use of the HVAC systems generally ***improved*** air quality in Plaintiffs' vehicles.  (Ex. 19 at 204:16–205:4, 248:16–23.)  In fact, a separate testing expert hired by Plaintiffs (but

---

[4]   Toyota has moved to exclude the opinions of Plaintiffs' experts Murat Okçuoğlu, Steven Parkhurst, Don Wright, Steven Gaskin, and Collin Weir for failure to comply with *Daubert* standards.  (ECF Nos. 195–96.).  Nonetheless, to the extent the Court considers them, they should be given no weight and certainly do not support class certification.

[5]   (Ex. 4 at 95:4–98:13, 99:9–16, 166:9–14 (no evidence of excess moisture); *id.* at 136:10–15, 166:15–19, 172:20–173:2, 188:7–12 (no evidence of microbial growth); *id.* at 88:23–89:8, 162:3–25 (no evidence of HVAC odor from microbial growth).)

[6]   Baker traded in his vehicles, but testified that he has no evidence that:  (a) any organic growth existed in his HVAC systems (Ex. 6 at 16:18–23, 20:16–21:6, 120:6–13); and (b) the HVAC systems of his vehicles were defective in any way (*id.* 120:6–13, 193:19–23).

never disclosed) reached the same conclusion *during the summer of 2020*.  (Ex. 17B, Hicks Rebuttal Rep. 6–7; Ex. 19 at 224:17–23, 227:4–228:12.)  Hicks also confirmed that Plaintiffs' HVAC systems pose no increased health risk, comparing the relative "risk" of using such systems to walking outdoors.  (Ex. 17A at 4–5, 11, 13–16, 18–20; Ex. 26, Hicks Dep. 67:6–10, 79:1–8, 160:13–23, 236:4–237:6.)  Plaintiffs concede they have not experienced any adverse health effects caused by any alleged HVAC defect.  (Ex. 27, Pls.' Answers to Toyota Interrog. No. 10; Ex. 6 at 20:25–21:3; Ex. 16 at 20:16–21:24.)  In short, Plaintiffs offer no proof of *any* safety-related issue, much less class-wide evidence of such an issue.

### G. Class Vehicles Were Purchased From Many Different Sources, Based Upon Different Information.

Class members purchased Class Vehicles from different sources, including authorized dealerships, independent dealerships, and other third parties selling used vehicles.  (Ex. 12A at ¶ 58.)  Monge, for example, purchased a used vehicle "as is" from a dealership with no affiliation to Toyota.  (Ex. 15 at 12:6–18, 132:17–24.)  Cardenas, by contrast, acquired a new vehicle from an authorized Toyota dealership.  (Ex. 16 at 60:23–25.)  Given these key differences in how and where class members purchased their vehicles, no class-wide evidence exists showing that all class members received the same information at the time of purchase, much less would have received any further disclosure about potential HVAC odor.

As Professor Ron Wilcox makes clear, each class member received and relied on different information from many different sources, such as consumer reports, websites, and brochures, prior to making his or her purchase.  (Ex. 12A at ¶¶ 16–27.)  Baker, for instance, looked at and relied upon third-party industry reports in making his purchase of a new vehicle, but cannot identify any statements made by Toyota at the time of the purchase.  (Ex. 6 at 62:17–63:23, 202:19–23.)  Monge, by contrast, did not review *any* vehicle-specific information prior to purchase; she was only involved at the payment stage because her partner's financing application was denied.  (Ex. 15 at 133:2–18, 134:10–11, 135:6–9; 229:4–13.)  Other purchasers (like Kirton) signed agreements confirming they did not rely upon any statement or omission in purchasing their "as is" used vehicles.  (Ex. 13 at 47:23–48:6, 51:2–10.)  Surveys of Class Vehicle purchasers also show that

more than half considered dealer/manufacturer websites to be either "Not At All Important" or "Not Very Important" as an informational source, and the same for dealer/manufacturer's brochures.  (Ex. 12A at ¶ 23 & Ex. 2A.)  This demonstrates the variation in each class member's knowledge at the time of purchase, in whether she received any statement or would have received any further disclosure, and in whether any such statement or disclosure would have mattered.

There is also variation in what Plaintiffs say should have been disclosed and where.  For example, Cardenas testified that he wanted Toyota to have told him that "[t]here's a faulty system in the car that will release an odor with [sic] you turn the AC on" (Ex. 16 at 153:19–22), while Rodney Baker testified that he would have liked a disclosure about the "potential for vehicle odor" (which he already knew about)—and nothing more—in "trade magazines and maybe a piece of information at the [authorized] dealership" (Ex. 6 at 195–97).

## H. Each Customer's Knowledge Of The Potential For HVAC Odor At The Time Of Purchase Varies, And, Thus, There Is No Common Proof.

Class members had different knowledge of the potential for HVAC odor at the time of acquisition, an issue of critical importance in a failure to disclose case and one that depends on individual proof.  (Ex. 12A at ¶¶ 85–93.)  For example, before owning his 2012 and 2014 Camry vehicles, Baker experienced HVAC odor in prior vehicles from another manufacturer.  (Ex. 6 at. 83:11–25; 197:10–24.)  Although his 2012 Camry had non-HVAC odor, it didn't matter to him; he liked that vehicle so much that he purchased a 2014 Camry.  (*Id.* at 12:21–13:5, 202:24–203:1.)

Toyota disclosed the possibility for HVAC odor in the owner's manuals for Class Vehicles and other vehicles.[7]  (Ex. 12A at ¶ 89; *see also* Ex. 28, Camry Owner's Manuals.)  Repeat Toyota owners may have read the disclosure in the owner's manual of their previous Toyota vehicle before purchasing their Class Vehicles.  (Ex. 12A at ¶ 89)  Baker, for instance, typically reads owner's manuals and he read the manual for his 2012 Camry that contained a disclosure regarding HVAC odor before purchasing his 2014 Camry.  (Ex. 6 at 81:25–82:2, 88:15–21; Ex. 28 2012 Toyota Camry Owner's Manual at 231, 239.)  Other putative class members would have learned about the

---

[7]     In addition to being provided to owners with the purchased vehicle, the manuals have been available online since 2012.  (Ex. 12A at ¶ 89 n.130.)

potential for HVAC odor—prior to acquiring their Class Vehicles—from other sources, including online forums, chat rooms, articles, or technical service bulletins that describe HVAC odor and are available online.  (Ex. 12A at ¶¶ 85–90.)  The potential for HVAC odor is so industry-wide that many companies sell after-market products designed to combat HVAC odor in cars.  (*Id.* at ¶ 91.)

### I.   <u>Reaction To Any Additional Disclosure Would Vary And Is Not Common</u>.

Plaintiffs allege that if Toyota had made some (undefined) enhanced HVAC disclosure all class members would not have purchased their vehicles or, alternatively, would have paid less.  (CAC ¶ 11.)  But not every class member would have reacted the same way to any disclosure.

As explained by Professor Wilcox, the impact on purchasing decisions, if any, of a further disclosure about HVAC odor is highly individual.  It would vary by class member, given that: (1) consumers differ in why they purchase vehicles and what features they find important; (2) consumers receive and place different weight on different pieces of information and may discount statements from manufacturers; (3) HVAC odor can impact all manufacturers' vehicles; (4) the vast majority of class members did not experience HVAC odor; (5) consumers have different levels of knowledge regarding the potential for HVAC odor; (6) consumers perceive HVAC odor differently; and (7) third-party sources, which many class members relied on, provided positive reviews of the Class Vehicles.  (Ex. 12A at ¶¶ 60–107.)  These factors show that, for many class members, any disclosure would not have mattered; at a minimum, whether it would have impacted purchasing decisions turns on individual facts.  (*Id.* at ¶¶ 64–66, 69–77.)

Toyota's expert, Sarah Butler, conducted a survey to test Plaintiffs' contention that an alleged omission was material to all class members.  Butler surveyed 412 potential purchasers of Camry vehicles to understand whether any disclosure about the potential for musty, sour, or damp odor from an alleged design problem would have changed their purchasing decision.  (Ex. 29A, Butler Rep. ¶¶ 8–9, 15–50.)  The survey was broken into two groups—a control group and a disclosure group.  (*Id.* ¶¶ 36–43.)  Respondents who received a disclosure also had the opportunity to get further information about the alleged HVAC defect.  (*Id.* ¶¶ 38–39.)  The results demonstrate that the impact, if any, of any HVAC disclosure varies by individual.  Only approximately 15% of respondents stated the disclosure negatively impacted their perception of the vehicle.  (*Id.* ¶ 59.)

Even with the disclosure, approximately 80% of the respondents stated they were somewhat or very likely to purchase the vehicle at the price listed, while about 9% said they were not. (*Id.* ¶ 63.) There was no statistical difference between the control and disclosure groups, showing that any additional disclosure would not matter to nearly all consumers. (*Id.* ¶¶ 64, 68.)

**J.   Plaintiffs Offer No Reliable Class-Wide Evidence Of Injury Or Damages.**

Plaintiffs assert that they can prove aggregate "overpayment damages by identifying the difference in the value of Class Vehicles with the [alleged] HVAC Defect compared to the value of the Class Vehicles without the [alleged] HVAC Defect at the time and point of first purchase." (Mot. 26.)  Plaintiffs' experts (Gaskin and Weir) offer two damages models:   (1) a so-called "conjoint analysis," based on a survey that asks customers to select their preference between a new vehicle with the potential for HVAC odor and a non-existent vehicle guaranteed never to have HVAC odor; and (2) a so-called "average cost to repair" analysis, which is really the unsupported "cost" of abating HVAC odor over 10 years, even though fewer than ▮ of Class Vehicle owners have complained about HVAC odor.  As explained by Professor Peter Rossi, a leader in the field of conjoint surveys and economics, neither model is reliable or can measure individual or class-wide damages.  (Ex. 30A, Rossi Rep. ¶¶ 8–132.)

**1.   The Conjoint Analysis Cannot Measure Class-Wide Damages.**

As described more fully in Toyota's pending motion to exclude (ECF No. 196), Gaskin had purchasers or lessees of new or used 2012–2017 Camry vehicles complete an online survey. (Ex. 31, Gaskin Rep. ¶¶ 33, 39–40.)  The survey measured respondents' willingness to pay for vehicles with two different "HVAC System" features:   one where "A musty, damp or sour odor may be emitted from the HVAC system" and one with "No musty, damp, or sour odor emitted from the HVAC system."  (*Id.* at ¶ 45 (emphasis in original).)  The latter does not exist and could not be known at the point of purchase.

Given its flawed design, Gaskin's conjoint analysis claims that all consumers would want to pay one of three widely varying amounts (25%, 37.4%, or 67%) less for a vehicle that may emit HVAC odor (Ex. 30A at ¶¶ 108–111)—despite the uncontroverted evidence that only a small percentage of Camry purchasers actually complained of HVAC odor and "all automotive HVAC

systems can emit HVAC odors caused by microbial growth . . . ."  (Ex. 10 at 7.)  Gaskin arbitrarily chose the 25% decrease in willingness-to-pay, and then called this a reduction in "market price," even though it is, at most, only a measure of change in demand.  (Ex. 31 at ¶ 12, 56–57.)  Weir then multiplied Gaskin's 25% "overpayment" figure by the average MSRP (or dealer invoice price) for each model year Class Vehicle to yield aggregate damages of more than $1.2 billion for just the SET region.  (Ex. 32, Weir Rep. ¶ 59 & tbl.1.)  Weir offers no method of calculating either fact of injury or damages for any actual class member, but, instead, claims that those issues somehow can be dealt with at some later date.  (Ex. 33, Weir Dep. 28:1–29:2, 100:9–13, 242:17–24, 243:3–6, 245:5–6.)

This conjoint analysis suffers from core flaws:  it does not measure the actual market value of any Class Vehicle with the alleged defect more fully disclosed.  (Ex. 30A at ¶¶ 8, 16–28, 76–103.)  At most, it attempts to measure consumers' willingness to pay (or demand) for a fictional vehicle.  (*Id.* at ¶¶ 92–103.)  But market value is determined by both demand *and supply*, and Gaskin and Weir did nothing to measure supply in the "but for" world of more disclosure.  (*Id.*)  The conjoint analysis also suffers from many other design flaws that prevent it from reliably measuring any damages (*id.* at ¶¶ 35–120), including that it presented survey participants with a *false* choice between a vehicle with potential for HVAC odor and a non-existent vehicle that has no potential to emit HVAC odor (*id.* at ¶¶ 38–40); it did not include information about how infrequently HVAC odor "may be emitted" (*id.* at ¶¶ 35–37); it did not incorporate features that class members found to be most important when purchasing a Class Vehicle and included no information about competitors (*id.* at ¶¶ 43–46, 49–50); it used an inadequate sample size (*id.* at ¶¶ 54–58); and it violated Gaskin's own rules for a conjoint survey (*id.* at ¶¶ 66–70).[8]  Given these flaws, as Professor Rossi demonstrates, the results are unreliable and absurd, and have no connection to market value.  (*Id.* at ¶¶ 104–17; *see also* ECF No. 196, at 6–20.)

**2.   The Cost To Abate Odor Model Cannot Measure Class-Wide Damages.**

Plaintiffs alternatively contend that each class member is entitled to the "average" cost

---

[8]      Toyota's motion to exclude addresses many other design flaws.  (ECF No. 196, at 12–20.)

"needed to abate the HVAC odor" for each Class Vehicle over 10 years, regardless of whether HVAC odor has occurred or its cause. (Mot. 28; Ex. 32 at ¶¶ 7, 12.) Plaintiffs propose two countermeasures involving combinations of another manufacturer's afterblow software logic, charcoal filters, and evaporator cleanings. (Ex. 34, Wright Rep. 22–23; Ex. 32 at ¶ 50.)

As Professor Rossi explains (and as detailed in Toyota's pending motion to exclude), this model is invalid, too. While Weir incorrectly contends that this approach is a "proxy" for a decrease in market value at the time of payment, it does not measure anything associated with market value. (Ex. 30A at ¶¶ 120–23.) Moreover, while Weir describes this as a "cost to repair" model, it does not measure the cost of repairing or redesigning the HVAC system, much less establish a measure of injury at the time of purchase. (*Id.*) Instead, it measures the cost of abating actual odor, the existence of which is an individual issue. (*Id.* at ¶¶ 122–23.) It also makes no economic sense to award 10 years of the cost of abating odor to a class member who experienced no odor and held the car for only a few years. (*Id.* at ¶¶ 125, 128.) And this model relies upon many other unsupported assumptions. (ECF No. 196, at 20–23.)

### K. Some Class Members Agreed To Individually Arbitrate Their Claims.

Many consumers within the proposed classes are subject to binding arbitration agreements. Many class members, for instance, entered into financing agreements for their Class Vehicles through Southeast Toyota Finance, an affiliate of SET. (*See* Pollock Decl., ECF No. 203-12, at ¶¶ 2–5 & Exs.) Those agreements contain mandatory arbitration provisions—covering the dispute here related to the purchase of the vehicles—with class action waivers. (*Id.*) Individual factual and legal determinations are required resolve whether each class member must arbitrate her claims.

### III. Plaintiffs Have Not Met Their Heavy Evidentiary Burden To Certify A Class.

To certify their proposed classes, Plaintiffs bear the heavy evidentiary burden of showing that they have Article III standing, the class is ascertainable, and each Rule 23(a) requirement is satisfied. *See, e.g.*, *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). In addition, Plaintiffs must satisfy the more stringent requirements of Rule 23(b)(3). *See, e.g.*, *Sellers v. Rushmore Loan Mgmt. Servs.*, *LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019).

The Supreme Court has announced clear rules that govern this Court's Rule 23 analysis.

*First*, class certification is the "exception," not the rule.  *Dukes*, 564 U.S. at 350–51.  There is no "presumption" in favor of class certification.  *Second*, Plaintiffs bear the ***evidentiary burden*** of showing that the Rule 23 requirements have been satisfied; they cannot rely on the pleadings, speculation, or insufficient evidence.  *Id.* at 350.  *Third*, this Court must conduct a "rigorous analysis" of the claims, defenses, issues, and evidence.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013).  In doing so, it must identify the elements of the claims and then evaluate whether the proof relevant to those elements is individual or common.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  *Fourth*, in conducting this analysis, the Court must consider Toyota's due process "entitle[ment] to litigate its statutory [or other] defenses to individual claims" through individual proof.  *Dukes*, 564 U.S. at 367.  *Finally*, this Court ***must*** resolve factual (including expert-related) disputes relevant to the Rule 23 requirements, even if they overlap with merits issues.  *Comcast Corp.,* 569 U.S. at 33–34.

Applying these principles, Plaintiffs' class certification motion must be denied.

### A. A Class Trial Has No Capacity To Generate Common Answers Under Rule 23(a)(2) And Individual Issues Predominate Under Rule 23(b)(3).

Plaintiffs must show under Rule 23(a)(2) that there are "answers to common questions" that are "capable of classwide resolution" and will help resolve the claim in "one stroke." *Dukes*, 564 U.S. at 350, 356.  Plaintiffs also must satisfy the heavier burden under Rule 23(b)(3) by proving that any "common" issues "predominate" over individual ones.  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009).  In evaluating whether Plaintiffs have met their burden of proof, the Court must "take into account [all] the claims, defenses, relevant facts, and applicable substantive law." *Klay v. Humana,* 382 F.3d 1241, 1254 (11th Cir. 2004) (internal quotation marks omitted).  It also must resolve factual disputes related to the Rule 23 requirements that overlap with the merits.  *Dukes*, 564 U.S. at 355 (denying certification and concluding that there was no "'[s]ignificant proof' that Wal-Mart 'operated under a general policy of discrimination'").

Plaintiffs seek certification of three different claims—(a) multistate substantive RICO claim under § 1962(c); (b) multistate conspiracy RICO claim under § 1962(d); and (c) and a Florida sub-class under FDUTPA.  Plaintiffs fail to and cannot meet their burden as to any claim.

**1. All Claims Require the Presence Of A Common Defective Design Causing Odor, But There Is No Such Common Evidence.**

All of Plaintiffs' claims require proof of an odor-causing HVAC design defect (Order, ECF No. 45 at 8–9, 17, 23), yet Plaintiffs offer no common evidence capable of establishing this defect across all Class Vehicles.[9]   In product defect cases (like this one), "[c]ourts have routinely found differences amongst various models fatal to class certification."  *Harris v. Nortek Glob. HVAC LLC*, 2016 WL 4543108, at *14 (S.D. Jan. 29, Fla. 2016) (collecting cases); *see also Melton v. Century Arms, Inc.*, 2018 WL 6980715, at *15 (S.D. Fla. Nov. 28, 2018) (Louis, M.J.) (denying certification due to variance in configurations among products and need to evaluate each specific part configuration); *Justice v. Rheem Mfg. Co.*, 318 F.R.D. 687, 696 (S.D. Fla. 2016) (same); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080–81 (6th Cir. 1996) (same); *Butler v. Porsche Cars N. Am., Inc.,* 2017 WL 1398316, at *9 (N.D. Cal. Apr. 19, 2017) (same).

Plaintiffs rely on their design expert to satisfy their burden (Mot. 11–12), but he cannot identify a common design defect across all Class Vehicles.  Okçuoğlu identifies eight HVAC features that he acknowledges are ***not*** in and of themselves defective; instead, he says that under certain circumstances, they "may" lead to too much moisture in the HVAC system, then to microbial growth, and then to HVAC odor.  (Ex. 4 at 54:11–55:2, 206:24–207:2.)[10]  Okçuoğlu acknowledges that if there is no HVAC odor from microbial growth, then there is no defect:

> If you drive a vehicle under different conditions on a large number of occasions, then in the absence of any malodors, one can conclude that a defect ***does not exist*** which causes odors.

(*Id.* at 59:2–16 (emphasis added); *see also* Ex. 5B, Kuhn Rebuttal Rep. 2–3, 5–15.)[11]  In addition

---

[9]     While the burden to prove an HVAC defect is just one element of Plaintiffs' claims, the absence of such proof alone defeats a RICO or FDUTPA claim.  (ECF No. 175 at 28–32.)

[10]    (*See also* ECF No. 175, at 28–32, 17–18; Ex. 4 at 167:20–168:6, 176:9–13, 185:14–23, 190:21–191:13, 192:22–193:1, 196:20–197:3, 198:21–199:23.)

[11]    Plaintiffs, their counsel, and their experts acknowledge that the alleged defect requires the presence of actual HVAC odor in each vehicle.  (CAC ¶ 4; Ex. 15 at 204:19–205:7 (defect includes "foul, noxious, and/or toxic odors" in vehicle); Ex. 13 at 116:10–117:1 (same); Ex. 35, Fleeger Dep. 9:6–13, 23:15–18 (counsel explaining that "this case is about -- plaintiffs allege in this case that the HVAC system in Toyota Camrys is defective ***because*** it results in this A/C odor"); Ex. 36, Gaskin Dep. 86:18–20 (if "the musty, damp, or sour odor was never emitted, there's no defect").)

to the performance-based nature of the alleged defect, Toyota's design expert, Robert Kuhn, identifies several key design differences that vary across Class Vehicles and that impact the infrequent occurrence of HVAC odor, including the type of HVAC system, HVAC software, evaporator coating, and cabin air filter in each Class Vehicle.  (Ex. 5A at 2–3, 10–13, 17–28.)

As explained in Section II(E) above, there is no way to generate common answers as to a class-wide design defect, given these differences.  Each feature for each Class Vehicle must be evaluated separately and in combination to determine whether a defect exists.  For instance, it is insufficient to show that Class Vehicles have the same evaporator housing, given that different model year vehicles have different software logics (such as "Greenhouse Gas Logic" and "Parking Fresh Logic").  (Ex. 5A at 2, 10–12.)  Still other Class Vehicle owners have already installed a charcoal filter, which Plaintiffs concede helps abate HVAC odor.  (Mot. 10.)  And still other Class Vehicles were subject to evaporator coating curing issues, which can lead to a certain HVAC odor. (Ex. 9 at 118:1–120:7.)

Plaintiffs' vehicles alone illustrate some of these variations.  As Exhibit 1 shows, Cardenas and Monge purchased Class Vehicles with a manual HVAC system that did not include "Kimori Odor Logic" or "Parking Fresh Logic."  Unlike those vehicles, Baker's first Class Vehicle (a 2012 Camry) lacked even "Greenhouse Gas Logic" (which was implemented in 2013).  Baker's second Class Vehicle (a 2014 Camry with an automatic HVAC system), by contrast, came with all three forms of HVAC software logic.  Baker experienced no odor from his HVAC system, yet Cardenas and Monge claim that they did.  Each different configuration of HVAC components would have to be separately evaluated for any alleged HVAC defect.  *See Melton*, 2018 WL 6980715, at *6.

In addition, there is no class-wide evidence that HVAC odor will occur in each Class Vehicle—a critical element of Plaintiffs' defect theory.  As described in Sections II(C)–(D), only a very small percentage (less than █) of Class Vehicles experience HVAC odor, and complaints differ by model and year.  Various external factors, such as how a consumer maintains the vehicle or where and how it is driven, affect whether odor will occur in any Class Vehicle.  (*Supra*, §§ II(C)–(D).)  Therefore, to determine whether an HVAC design defect exists that causes HVAC odor, a jury would need to consider the different design features and components of each Class

Vehicle's HVAC system, whether that vehicle experienced odor while the HVAC system was in use, and whether any odor was caused by microbial growth, as opposed to a different cause.

Judge Phillips recently denied class certification in another HVAC class action against Toyota, because plaintiffs could not establish a class-wide defect, given material differences in HVAC software logic, design, and components. *See Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, 2020 WL 1289549, at *7–8 (C.D. Cal. Mar. 3, 2020). Although that decision involved multiple model vehicles, the *Stockinger* court relied on the expert report of Robert Kuhn and found that several of the design differences present here, including differences in HVAC software, cabin filters, and evaporator coating, created "material" differences. *Id.* at *7. By contrast, Okçuoğlu's reports trying to show a common class-wide design "fail[ed] to pass the 'rigorous analysis' required by Rule 23." *Id.* at *8.

Ignoring *Stockinger*, Plaintiffs rely heavily upon *Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2019 WL 1940619 (C.D. Cal. Mar. 27, 2019)*.* (Mot. 3, 16, 29.) That case involved Camry vehicles, but different claims under California law, and it lacked the record evidence presented by Toyota here, including Okçuoğlu's and Plaintiffs' admissions that their defect theory is tied to the vehicle-specific occurrence of odor under certain circumstances. The *Salas* court further relied on California legal presumptions not available here and did not conduct a rigorous analysis of the elements and defenses to the claims, particularly given the low incidence of HVAC odor and individual issues as to design, exposure, materiality, and causation. No class can be certified because there is no common evidence of an odor-causing HVAC defect.

Plaintiffs also rely heavily on *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529 (S.D. Fla. 2015), but that case is inapposite. It involved a uniform alleged design defect that allowed potentially toxic gas to enter the vehicle, thereby presenting a clear safety hazard. *Id.* at 537–38. This case, by contrast, involves different HVAC systems, no safety issue, and a defect theory tied to the presence of HVAC odor based on how and where the user operates the vehicle. If anything, *Sanchez-Knutson* weighs in favor of denying class certification.

**2.  There Is No Common Evidence And Individual Issues Predominate On The Remaining Elements Of Plaintiffs' RICO Claims.**

Ignoring that an assessment of commonality and predominance begins with the "elements of the underlying cause of action," *Halliburton*, 563 U.S. at 809, Plaintiffs spend only two pages addressing select elements of their RICO claims and ***offer no record evidence***. (Mot. 20–22.) Their so-called "trial plan" does not identify a single RICO element, a single piece of class-wide evidence, or a single witness. (Ex. 2, Annotated Trial Plan, at 4–6.) Plaintiffs merely list supposedly common questions unlinked to any claim—which *Dukes* forbids. 564 U.S. at 350.

To establish a RICO claim under § 1962(c), Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006). Plaintiffs also must demonstrate (5) the "requisite injury to 'business or property'"; and (6) "that such injury was 'by reason of' the substantive RICO violation." *Id.* at 1283. Plaintiffs' RICO claims here rest on alleged acts of mail and wire fraud, but, given RICO's stringent causation requirement, "it is quite difficult, though not impossible, to certify a class in a RICO mail-fraud case." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015); *see also UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133 (2d Cir. 2010) (certification of RICO claim was an abuse of discretion).

Here, even if Plaintiffs could present common evidence necessary to show a uniform odor-causing HVAC defect (as required for each claim), Plaintiffs' Motion fails to show that the remaining elements of their RICO claims can be established through common proof.

### a. Plaintiffs' Lack Common Evidence Of Mail And Wire Fraud.

As Plaintiffs and this Court recognize, "[a] 'scheme to defraud' requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." (ECF No. 45, at 5–6 (quoting *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009)); *see also* Mot. 20.) "A misrepresentation is material if it has a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed." *Maxwell*, 579 F.3d at 1299. Key to this showing, under the facts of this case, is that the misstatement or omission must be uniform and "material" to each class member's purchasing decision. Plaintiffs' fail to making this showing for several reasons.

***First***, Plaintiffs' motion fails to identify any uniform misrepresentation that allegedly

reached all class members prior to purchase.  Named Plaintiffs cannot identify any.  (Ex. 27 at No. 13.)  And for the few affirmative representations referenced in their motion, these purportedly occurred in "Tech Tips" and "TSBs," which Plaintiffs acknowledge are issued to dealers and not consumers, or in "Owner's Manuals," which may or may not have been read by consumers prior to purchase.[12]  (Mot. 2–4, 8–9.)  Plaintiffs present no class-wide evidence of *any affirmative* misrepresentation reaching (much less misleading) all class members.  *See, e.g.*, *Rollins, Inc. v. Butland*, 951 So. 2d 860, 879 (Fla. 2d DCA 2006) (denying certification of state RICO claim because no common proof that class members "reviewed or relied on the identical advertising").

**Second**, Plaintiffs rely primarily, if not exclusively, on an "omission" theory to support their RICO claims.  (Mot. 20–22.)[13]  As explained in Toyota's motion for summary judgment (ECF No. 175, at 20–21), there is no duty to disclose under RICO absent a special relationship.  *See, e.g.*, *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1368 n.33 (11th Cir. 2011).  There is no "special relationship" here between Toyota and purchasers of Class Vehicles.  (ECF No. 175, at 20–21.)  Thus, this omission-based RICO theory is legally invalid.

Even if Plaintiffs could pursue a RICO claim based on a fraudulent omission theory (and they cannot), Plaintiffs offer no class-wide evidence of materiality—that class members would have been exposed to any alleged omission, much less would have attached importance to that omission.  *Maxwell*, 579 F.3d at 1299.  In fact, as Exhibits 1 and 2 show, neither Plaintiffs' Motion nor their "trial plan" meaningfully addresses this element of their RICO claims.

Neither Plaintiffs' motion nor their trial plan identifies what should have been disclosed, when, or where.  As explained in Section II(G), Plaintiffs offer conflicting testimony.  This alone shows that Plaintiffs cannot meet their class certification burden.

Moreover, there is no evidence that all putative class members purchased their vehicles in

---

[12]    For example, Baker read the entire 2012 Camry owner's manual prior to purchasing his 2014 Camry (Ex. 6 at 81:25–82:2, 88:15–21), while Monge never read the Camry owner's manual (Ex. 15 at 185:25–186:2), and Cardenas read "portions of the owner's manual . . . but nothing related to the HVAC system" (Ex. 16 at 134:4–6).
[13]    Plaintiffs say "their RICO claims . . . rest on a core set of omissions of material fact concerning the existence of the Defect and Defendants' conspiracy to conceal the Defect."  (*Id.*)

the same way or reviewed similar information prior to purchase, such that all class members would have received any further (unidentified) disclosure by Toyota about alleged HVAC odor.  As explained in Section II(G), Plaintiffs' proposed classes include those who acquired their vehicles from sources unaffiliated with Toyota, such as from the internet, private sales, and independent and used car dealers, based upon many different types of information.  Even with respect to class members who purchased a Class Vehicle through an authorized Toyota dealer, individual issues include whether they received marketing materials from Toyota, whether they reviewed those materials, and how they interacted with any sales representative.  (*Id.*).  Given these varied purchasing circumstances, the *Stockinger* court found that there was no class-wide proof of exposure to any supposed omission by Toyota, as required to support class certification on the same HVAC defect theory here.  *Stockinger*, 2020 WL 1289549, at *9.

In addition to lacking class-wide evidence of exposure, Plaintiffs fail to offer any class-wide evidence to show that all class members would attach significance to any proposed HVAC disclosure from Toyota; nor can they, as this is an inherently individual analysis.  As described in Sections II(H)–(I), Professor Wilcox explains the many reasons why an HVAC disclosure would not have mattered to most class members, including to those who had pre-acquisition knowledge about the alleged HVAC odor problem.  (Ex. 12A at ¶¶ 85–93.)

This analysis is reinforced by Butler's opinions regarding survey results of potential Camry purchasers.  (Ex. 29A at ¶¶ 53–69.)  Only a small percentage of participants reported that the potential for HVAC odor negatively impacted their perception of the vehicle.  (*Id.* at ¶¶ 59–61 & tbl.5.)  And most participants reported that they were "very" or "somewhat likely" to purchase the vehicle at the listed price notwithstanding the possibility for "musty, damp, or sour" HVAC odor.  (*Id.* at ¶¶ 62–65 & tbl.6.)  On this issue, *no* statistically significant difference existed between those participants who received the HVAC disclosure and those who did not.  (*Id.*)  Butler's survey results demonstrate that whether any alleged omission was material is an individual issue, and Toyota is entitled to defend itself by showing that individual class members would have purchased the Class Vehicles at the same price, regardless of any additional HVAC disclosure.

Plaintiffs' testimony also confirms that the significance of any statement or omission is an

individual issue.  Baker, for instance, concedes that he was already aware of the very thing he says should have been disclosed to him—the potential for vehicle odor—when he purchased both of his Class Vehicles.  (Ex. 6 at 197:10–24.)  Plaintiffs' allegations of racketeering activity cannot be resolve by common evidence, given the need for purchaser-specific evidence as to materiality.

### b.  Plaintiffs Offer No Class-Wide Evidence Of RICO Causation.

To satisfy RICO causation, each class member must suffer injury "directly caused by the RICO violation." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1307–08 (11th Cir. 2003).  Although reliance is not an express "element of a RICO mail-fraud claim, the plaintiffs' theory of injury in most RICO mail-fraud cases will nevertheless depend on establishing that someone—whether the plaintiffs themselves or third parties—relied on the defendant's misrepresentation." *Sergeants*, 806 F.3d at 87; *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658–59 (2008) ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation"; "complete absence of reliance [will] prevent [Plaintiffs] from establishing proximate cause").

That is the case here, where Plaintiffs' theory of mail and wire fraud is that consumers were misled by alleged false statements and omissions from Toyota.  (CAC ¶¶ 10–11, 40–41, 136, 151.)  In this context, the Eleventh Circuit has made clear that RICO claims require actual reliance by someone on the alleged material misstatement or omission.  *See, e.g., Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1351 (11th Cir. 2016); *see also Beck v. Prupis*, 162 F.3d 1090, 1097 (11th Cir. 1998) (plaintiffs failed to show causation because they "presented no evidence that [they] saw, let alone relied upon, any false . . . statements prior to making [their purchasing] decisions"), *aff'd*, 529 U.S. 494 (2000).  Indeed, "if the person who was allegedly deceived by the misrepresentation (plaintiff or not) would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury." *Sergeants*, 806 F.3d at 87.

Courts deny or reverse certification on RICO claims where, as here, reliance cannot be shown by class-wide proof.  *See UFCW Local 1776*, 620 F.3d at 131, 133 (reversing certification because plaintiffs must prove "reliance as part of their chain of causation" and plaintiffs failed to

show "whether reliance can be shown by generalized proof"); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004) (affirming denial of class certification of civil RICO and RICO conspiracy claims due to individual issues of causation).[14]

Here, Plaintiffs do not even attempt to present any class-wide evidence of causation or meaningfully address the causation element of their RICO claims.  (Mot. 21–22.)  Plaintiffs' trial plan does not even reference the word causation, much less identify a single piece of common evidence capable of showing RICO causation.  (Ex. 2 at 4–6.)  The undisputed record shows that Plaintiffs cannot meet their burden.

With respect to Plaintiffs' affirmative misrepresentation theory, Plaintiffs offer no common evidence that *all* class members (or someone in connection with their purchases) received and then relied on some misstatement by Toyota in making their purchases.  Named Plaintiffs themselves could not identify *any* misstatements by Toyota (Ex. 27 at No. 13), much less one that they received and relied on.  (ECF No. 175, at 14–17, 24–25.)  Plaintiffs' motion does not attempt to identify *any* uniform statement by Toyota that reached all class members.

Plaintiffs' legally invalid omission theory is plagued by even more individual issues.  As Professor Wilcox makes clear, people purchase cars for many different reasons, and any additional disclosure about the potential for HVAC odor would not have impacted the purchasing decision of most consumers.  (Ex. 12A at ¶¶ 22–41 & Exs. 1A–5A (showing class members placed importance on many different vehicle attributes and consulted many different sources in making purchase).)  Butler's survey further confirms that causation cannot be established on a class-wide basis, given that many consumers would not care about any disclosure about the potential from HVAC odor from any alleged HVAC defect.  (Ex. 29A at ¶¶ 53–65.)

Plaintiffs' circumstances demonstrate this, too.  Baker, for instance, testified that he purchased a second Class Vehicle because of his positive experience with his first Class Vehicle (Ex. 6 at 12:21–13:17, 124:25–125:11, 128:4–14, 202:24–203:1), and was aware of what he says

---

[14]     *See, e.g.*, *Martinelli v. Petland, Inc.*, 274 F.R.D. 658, 661 (D. Ariz. 2011) (applying principle); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 315 (S.D. Ala. 2006) (same); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 487 (E.D. Tex. 2004) (same).

should have been disclosed for both vehicle purchases (*id.* at 202:24–203:1); in short, he would have made the same purchasing decisions anyway.  Likewise, Monge purchased her Class Vehicle "as is" without relying on anything from Toyota.  (Ex. 15 at 129:6–16, 132:9–11, 133:2–18, 134:10–11, 135:6–9; 229:4–13.)  Kirton relied upon no statements or omissions from Toyota.  (Ex. 13 at 47:23–48:6; 51:2–10.)  Determining reliance will require an individual assessment of each purchasing decision of each Class Vehicle.

Plaintiffs are incorrect that *Klay* "compels certification here."  (Mot. 20.)  In *Klay*, the Eleventh Circuit found sufficient circumstantial evidence of first-party reliance because each medical provider received and "relied upon the defendants' [uniform] representations" in contracts with insurers and "assumed they would be paid the amounts they were due."  382 F.3d at 1259. By contrast, Plaintiffs here have no evidence of any class-wide misrepresentation and instead advance an omission theory; they offer no common evidence of reliance among the many disparate class members; and the evidence shows that class members would have attached varying significance to any further disclosure, even assuming they received it.  No RICO class can be certified here.  *See Poulos*, 379 F.3d at 668 (because people gamble for many different reasons, "classwide circumstantial evidence would not suffice to prove [RICO] causation in this case").

### c. No Class-Wide Evidence Of RICO Injury Or Damages.

To establish a cognizable RICO injury, Plaintiffs must show that they were injured in their "business or property."  *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495 (1985); *accord* 18 U.S.C. § 1964(c).  The Supreme Court has made clear that, for class certification, Plaintiffs must present evidence that "damages are susceptible of measurement across the entire class" and "measure only those damages attributable to" Plaintiffs' theory of liability.  *Comcast Corp.*, 569 U.S. at 35; *see also Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 697–98 (S.D. Fla. 2014). *Comcast* also holds that significant individualized damages issues can make certification improper. 569 U.S. at 34; *see also Donoff v. Delta Air Lines, Inc.*, 2020 WL 3268272, at *8 (S.D. Fla. Jan. 24, 2020) (denying certification for lack of "reasonable method of calculating damages").

Here, Plaintiffs rely solely on the invalid "conjoint" and "cost to repair" models presented by Gaskin and Weir to measure "overpayment" damages.  (Mot. 26–29.)  But as explained below

and in Toyota's pending motion to exclude (ECF No. 196), neither model actually or accurately measures a decrease in market value or can reliably calculate individual damages for all class members.  This Court must make findings on the reliability of such expert evidence, resolve any factual disputes, and determine the weight such evidence should be given.  *Sher v. Raytheon Co.*, 419 F. App'x 887, 891 (11th Cir. 2011) (vacating grant of certification for failure to do so).  Here, Plaintiffs' damages models should be excluded or given no weight.

  *Conjoint Survey*.  As explained in Toyota's motion to exclude (ECF No. 196), Section II(J)(1) above, and Professor Rossi's expert report, Plaintiffs' conjoint survey does not measure overpayment damages (or ascertain a change in market value); at most, it measures only a consumers' willingness to pay (*i.e.*, demand) between a vehicle that may emit odor and a hypothetical, non-existent vehicle with no potential to emit HVAC odor.  (Ex. 30A at ¶¶ 8, 16–28, 76–103.)  Several courts have recently rejected the Gaskin-Weir conjoint methodology in automobile cases for this reason.  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.* ("*Clean Diesel*"), ---F. Supp. 3d ---, 2020 WL 6688912, at *4–7 (N.D. Cal. Nov. 12, 2020) (excluding Gaskin-Weir methodology because it cannot measure overpayment damages); *MacDougall v. Am. Honda Motor Co.*, 2020 WL 5583534, at *6 (C.D. Cal. Sept. 11, 2020) (rejecting conjoint); *In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374, 385 (S.D.N.Y. 2019) (rejecting conjoint survey because it did not provide "evidence of the market price of 'what [class members] received'").

  The conjoint survey also suffers from other serious flaws that render it unreliable even as a measure of just willingness to pay, including that it presents a false choice to survey participants. (ECF No. 196, at 15–20.)  As a result, Gaskin's demand simulation yielded three excessive but divergent overpayment percentages—ranging from 25% to 67%.  (Ex. 30A at ¶¶ 108, 110 & tbl.2.) A range of 25–65% of the price of a vehicle itself shows a lack of reliability.  (*Id.* ¶ 109); *see Clean Diesel*, 2020 WL 6688912, at *8.  Gaskin's own data also yields other absurd results, including:

- Consumers would pay up to $5,237 more for a car Loudspeaker that works reliably over one that may short circuit, even though, in reality, a new Loudspeaker typically

costs around $750 (Ex. 30A at ¶ 114 & tbl.3); and

- Consumers would pay nearly 2–3 times more for a non-existent vehicle with no potential to emit HVAC odor than for a Pre-Collision system that provides additional safety in the event of a possibly fatal accident (*Id.* at ¶ 116 & tbl.3).

The Court should exclude the Gaskin-Weir conjoint (or give it no weight) and deny certification. *Clean Diesel*, 2020 WL 6688912, at *8 (rejecting conjoint where Gaskin's analysis yielded similar absurd results); *MacDougall*, 2020 WL 5583534, at *5, *8–9 (applying principle).

Worse yet, Plaintiffs' damages model does not even purport to determine injury or measure damages for ***any*** class member.  Weir concedes that he has only measured "aggregate" damages to the class as a whole based upon the total vehicles sold; he acknowledges that whether any class member was injured, and, if so, by how much, would have to be addressed through the resolution of individual evidence during some undetermined process at a later time.  (Ex. 33 at 114:9–116:12, 249:10–19.)  At a minimum, Toyota would have the right to show a jury that individual class members were not harmed and to dispute any amount of damages.  *See Dukes,* 564 U.S. at 367. This alone defeats certification.  *See Comcast*, 569 U.S. at 35.

Plaintiffs argue that courts have accepted similar conjoint analyses as a valid method of establishing class-wide damages.  Plaintiffs primarily rely upon *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116 (C.D. Cal. Sept. 23, 2020), but, in that case, Gaskin had not run the proposed conjoint survey and the court found only that "Gaskin provides a methodologically plausible means of calculating damages."  *Id.* at *6.  Similarly, in *Sanchez-Knutson*, "the court approved of the conjoint analysis with little or no consideration of the market price issue."  *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 238 (S.D.N.Y. 2019), *motion to certify appeal granted, reconsideration denied*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019) (rejecting *Sanchez-Kutson*).  Here, as in *Clean Diesel*, *GM Ignition Switch,* and the other cases above, the invalid methodologies and absurd results from Gaskin's survey show that what was done here does not measure market value and cannot support class certification.

***Cost To Abate HVAC Odor***.  As Professor Rossi explains, there is no sound economic

principle under which "repair" costs can serve as a so-called "proxy" for overpayment damages, because they have no economic relationship to market value.  (Ex. 30A at ¶¶ 7, 12(b), 13, 121–29.)  Even if they could, Plaintiffs' proposed repair costs do not fix the alleged defect and are only two different countermeasures to "abate" odor if it occurs.  (Ex. 32 at ¶¶ 7, 12 (measuring costs for measures "***needed to abate the HVAC odor***" (emphasis added); *see also* Ex. 34 at 6, 20–23 (same).)  These countermeasures do not eliminate the potential for HVAC odor.  They do not even attempt to calculate the cost to provide a purportedly defect-free vehicle.  As a result, this model does not "fit" with Plaintiffs' liability theory and does not measure any market value decrease at the time of purchase.  (ECF No. 196, at 20–23; Ex. 30A at ¶¶ 123, 126, 133.)

This model also cannot reliably calculate class-wide damages, because it would award the cost of combatting odor to the vast majority of class members who have experienced ***no*** odor and have ***no*** need for any countermeasure.  (Ex. 30A at ¶¶ 13, 122–24.)  Even Plaintiffs' experts testified that it is good practice to implement these countermeasures only if a customer ***complains about*** HVAC odor.  (Ex. 11 at 188:17–20 ("this is a really rational process to wait until a vehicle has a complaint before you enable afterblow"); *id.* at 120:21–131:5; *see also* Ex. 5B at 19–20.)  Moreover, this model would award damages for each vehicle for 10 years, and it would do so regardless of the cause of the odor or even if one of the "repairs" (a charcoal filter) had already been implemented.  (Ex. 30A at ¶¶ 124–29.)[15]  Therefore, Weir's model is inapplicable and unreliable for the vast majority of class members, would be overrun by individual damages calculations, and cannot support class certification.  *See Melton*, 2018 WL 6980715, at *16.

Plaintiffs fail to cite a single RICO case approving this damages model.  Instead, Plaintiffs rely (Mot. 28) upon the damages model in *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811 (9th Cir. 2019), but that model addressed California state-law claims about a safety defect and the plaintiffs'

---

[15]    This model also rests upon unreliable data inputs from another expert (Wright).  (ECF No. 195, at 18–23.)  For example, there is no evidence that another manufacturer's afterblow module could be implemented in Class Vehicles or what problems doing so might create—an issue Plaintiffs' experts never bothered to evaluate.  (*Id.* at 22; Ex. 11 at 139:9–141:20; Ex. 5B at 20.)

expert calculated the cost of replacing the defective part to eliminate the safety issue.  *Id.* at 815–

16.  The *Nguyen* court expressly recognized the distinction between a claim involving a safety

issue versus a claim, as here, based on the product's use and performance.  *Id.* at 819–20.

### 3.   No Class Can Be Certified On Plaintiffs' RICO Conspiracy Claim For The Same Reasons As Plaintiffs' Underlying Substantive RICO Claim.

Plaintiffs' RICO conspiracy (as alleged here) requires proof of a substantive RICO

violation.  *See, e.g.*, *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152–53 (11th Cir. 2011)

(conspiracy claim requires proof of injury from agreement to violate substantive RICO provision

and affirming dismissal of claim for failure to allege underling substantive RICO violation); *Super*

*Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008)

(same).  As a result, the RICO conspiracy claim cannot be certified for the same reasons discussed

above with respect to Plaintiffs' substantive RICO claim.  *See, e.g.*, *UFCW Local 1776*, 620 F.3d

at 129, 137 (reversing class certification order on plaintiffs' substantive RICO and RICO

conspiracy claims); *Poulos*, 379 F.3d at 664 (affirming denial of class certification of civil RICO

and RICO conspiracy claims).

### 4.   No Class Can Be Certified On Plaintiffs' FDUTPA Claim.

Plaintiffs also seek to certify a sub-class of Florida purchasers on their FDUTPA claim.

(Mot. 1.)   A FDUTPA claim requires proof of three elements:   "'(1) a deceptive act or unfair

practice; (2) causation; and (3) actual damages.'"  *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329,

1338 n.25 (11th Cir. 2012).   Courts within the Eleventh Circuit routinely deny FDUTPA claims

based upon false statements or omissions about alleged defects involving the performance of

products, including HVAC systems, where common proof is lacking on these elements.  *See, e.g.*,

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.* ("*Point Blank*"), --- F. Supp. 3d ---,

2020 WL 5667766, at *15 (S.D. Fla. Aug. 24, 2020) (bullet-proof vest); *Justice*, 318 F.R.D. at 697

(HVAC system); *PB Prop. Mgmt., Inc. v. Goodman Mfg. Co.*, 2016 WL 7666179, at *26–27 (M.D.

Fla. May 12, 2016) (HVAC system); *Harris*, 2016 WL 4543108, at *5 (HVAC system); *Porsche*

*Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1099 (Fla. 3d DCA 2014) (vehicle headlights);

*Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008) (vehicle break

system).  This Court should reach the same conclusion.

### a. There Is No Common Evidence Of A Uniform Defect, Much Less HVAC Odor Caused By Design Features Identified By Plaintiffs' Experts.

Plaintiffs claim that Toyota engaged in a deceptive practice because it "failed to disclose the HVAC Defect to Florida consumers prior to their purchase of the Class Vehicles."  (Mot. 24.) But as described in Sections II(A)–(F) and III(A)(1), the design, components, and materials of the HVAC systems differ, the alleged HVAC defect requires the presence of HVAC odor, only a small fraction of owners experience HVAC odor, and the presence of HVAC odor depends upon how the vehicle is used and other similar post-purchase factors (unrelated to design).  Because "there is no generalized proof available to demonstrate the existence of a uniform defect, there can be no general evidence of a deceptive practice" necessary to certify a FDUTPA claim.  *Point Blank*, 2020 WL 5667766, at *9, *15 (collecting cases); *Harris*, 2016 WL 4543108, at *5 (same).

Moreover, for those few customers who experience vehicle odor, there is no common evidence as to what caused it.  As Sections II(A) and (D) make clear, an individual inquiry is needed to determine the source of the odor, and, *if* it is from the HVAC system, whether such odor was caused by microbial growth (essential to Plaintiffs' expert's contention), as opposed to other sources, like the vehicle's use or maintenance.  No class can be certified.  *See Point Blank,* 2020 WL 5667766, at *15 (applying principle to deny certification); *PB Prop. Mgmt., Inc.*, 2016 WL 7666179, at *19 (denying certification regarding claim of HVAC defect "because the question of *whether* and *why* a particular coil failed are individual questions that will be unique to each class member and would overwhelm the litigation"); *Breakstone v. Caterpillar, Inc.*, 2010 WL 2164440, at *6 (S.D. Fla. May 26, 2010) (same); *Kia Motors Am. Corp.*, 985 So. 2d at 1140 (same).

### b. There Is No Common Evidence Of Exposure To Any Alleged False Statement Or Material Omission.

Although a plaintiff is not required to show reliance upon a false statement or material omission to establish a FDUTPA violation, a plaintiff must nevertheless show causation.  *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009).  To do so, each plaintiff must demonstrate, at a minimum, actual exposure to the misstatement or material omission at

issue; otherwise, there can be no causal link. *Justice*, 318 F.R.D. at 697 (denying certification of FDUTPA claim because "individualized inquiries" required as to exposure to and materiality of statements and omissions); *Maor v. Dollar Thrifty Auto. Grp., Inc.*, 2018 WL 4698512, at *8 (S.D. Fla. Sept. 30, 2018) (summary judgment on FDUTPA claim because "the misrepresentation must have been *available* to have been relied on by a reasonably objective consumer" even absent an individual reliance requirement).

Courts routinely deny certification of FDUTPA classes where plaintiffs fail to provide class-wide evidence that all consumers were exposed to the allegedly false statements at issue or, with respect to an omission theory, that they would have received any purported disclosure that allegedly should have been made. *Id.; see also Donoff*, 2020 WL 3268272, at *6 (denying class certification on FDUTPA claim because "variability in the offers that consumers see when purchasing trip insurance demonstrates that individual issues predominate"); *Perisic v. Ashley Furniture Indus., Inc.*, 2018 WL 3391359, at *6 (M.D. Fla. 2018), *report and recommendation adopted*, 2018 WL 4381184 (M.D. Fla. Aug. 13, 2018) (denying certification of FDUTPA claim because each class member "had a unique sales experience and exposure to varying allegations regarding" the product); *DA Air Taxi LLC v. Diamond Aircraft Indus., Inc.*, 2009 WL 10668159, at *5 (S.D. Fla. Nov. 5, 2009) (denying certification because "significant individualized issues of fact regarding what information each putative class member received from his or her respective dealer"); *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 628 (S.D. Fla. 2008) (same).

In *Justice*, for instance, consumers sought certification of a FDUTPA claim based upon the failure to disclose an alleged defect in the evaporator coil of household HVAC systems. 318 F.R.D. at 697. Judge Dimitrouleas denied certification. Although FDUTPA uses a "reasonable consumer" standard, the court reasoned that "some nexus between the deceptive act and damages must exist." *Id.* He further reasoned that "individual inquiries would be necessary to determine what marketing materials or information class members were exposed to prior to obtaining their Rheem ACs and whether pertinent information about formicary corrosion would have been material to purchasing decisions." *Id.* Judge Dimitrouleas credited defendant's expert that "many consumers do not review central AC system product brochures or the websites of AC

manufacturers, and thus would be unlikely to be exposed to a disclosure of an alleged defect." *Id.*

Judge Phillips reached the same result in *Stockinger*, where she denied certification of a FDUTPA class on the **very theory** advanced here.  Like here, Plaintiffs proposed class included many disparate purchasing situations, including purchasers of used vehicles from third parties unaffiliated with Toyota.  *Stockinger*, 2020 WL 1289549, at *9.  As a result, the court found that "individual issues predominate with respect to whether any given class member would have been exposed to Defendant's disclosure of the alleged defect if it had made one." *Id.*

These principles defeat certification of Plaintiffs' FDUTPA class here, too.  As described in Section III(A)(2)(a) above, Plaintiffs offer no evidence of any uniform class-wide misstatement at the time of purchase.  Thus, they have no common evidence capable of showing class-wide exposure to any alleged misstatement.  *See, e.g.*, *Donoff*, 2020 WL 3268272, at *6 (denying certification where class members exposed to different materials at time of purchase); *Perisic*, 2018 WL 3391359, at *6 (same); *PB Prop. Mgmt., Inc.*, 2016 WL 7666179, at *27 (same).

Likewise, with respect to their omission theory, Plaintiffs have no evidence to show that each class member would have received and attached significance to some additional disclosure about HVAC odor at the time of purchase.  As explained in Sections II(G)–(I), consumers rely upon many different sources for purchasing vehicles, and the proposed class covers individuals who had no interactions with Toyota dealerships, such as sales between private parties or purchases from non-affiliated Toyota dealerships.  As a result, there is no class-wide evidence that purchasers would have received some additional disclosure about the alleged HVAC defect had one been made.  *Justice*, 318 F.R.D. at 697; *Stockinger*, 2020 WL 1289549, at *9; *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 686 (S.D. Fla. 2008) (applying principle).

At a minimum, Toyota has the due process right to defend the FDUTPA claims here on class-member specific evidence.  For instance, Baker testified that Toyota should have disclosed the alleged HVAC defect in trade magazines and at an authorized dealership (Ex. 6 at 197:3–16), but many class members would never have seen such information.  (Ex. 12A at ¶ 23 & Ex. 2A (manufacturer brochures and websites "not at all" important to approximately ▮▮ of Camry purchasers; consumer reports "not at all" important to ▮▮ of Camry purchasers).)  Monge, for

instance, did not review any trade magazines, signed the purchase agreement for her "as is" vehicle at a dealership with no connection to Toyota, and only did so because her partner lacked credit. (Ex. 15 at 12:3–7, 129:6–16, 132:9–11, 133:2–18, 134:10–11, 135:6–9; 229:4–13.)  Toyota cannot be denied the opportunity to defend individual claims on these and other individual facts.  Thus, individual issues predominate and no FDUTPA sub-class can be certified.

### c.  There Is No Common Evidence Capable Of Showing That Toyota's Conduct Was Likely To Deceive All Reasonable Consumers In Their Particular Circumstances.

The Eleventh Circuit has explained that even if the plaintiff is exposed to the deceptive practice at issue, she still must prove that the "alleged practice was likely to deceive a consumer acting reasonably *in the same circumstances*."  *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) (emphasis added); *Melton*, 2018 WL 6980715, at *14 (same).  The requirement of the "same circumstances" contains a plaintiff-specific component; it necessitates "inquiry into the context of the alleged offense; that is, one can only assess reasonableness when the inquiry requires consideration of the factual circumstances that counsel a reasonable person to act in a particular way or hold a particular belief."  *In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices*, 715 F. Supp. 2d 1265, 1282 (S.D. Fla. 2010).  If a reasonable consumer would not have acted differently under the *same circumstances* as the plaintiff, then there is no causation.  *Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 627 (11th Cir. 2015) (dismissing FDUTPA claim because plaintiff does not "allege that, but for the quoted statement on Aurora's and Nationstar's websites, she would not have applied for (or would have received) a loan modification"); *CWELT-2008 Series 1045 LLC v. PHH Corp.*, 2020 WL 2744191, at *5 (S.D. Fla. May 27, 2020) (dismissing FDUTPA claim for failure to show reasonable consumer would have acted differently under plaintiff's circumstances); *Melton*, 2018 WL 6980715, at *10 (if plaintiff "knew [about alleged problem at time of purchase], it could break the causal link between Defendants' deceptive acts and his damages").

Here, Plaintiffs offer no common evidence capable of proving these elements, because the undisputed evidence shows that the "same purchasing circumstances" do not exist for all class members.  For instance, as Exhibit 1 shows, some individuals (like Monge and Kirton) purchased

used vehicles "as is" (with any defects), in some cases (like Monge) from unaffiliated dealers, and for reasons wholly unconnected to any statement or omission from Toyota. Some class members (like Cardenas) did not make the ultimate decision to purchase the vehicle. Some class members (like Baker) were aware of vehicle odor at the time of purchase, yet purchased the vehicle (and another one) anyway. Some class members (similar to Kirton) acknowledged in writing that they relied on nothing from the dealer or Toyota. Toyota has the right to present individual evidence of these disparate purchasing circumstances to show that a reasonable consumer would not have acted differently under those "same circumstances." *See, e.g.*, *Townhouse Rest. of Oviedo, Inc. v. NuCO2, LLC*, 2020 WL 5440581, at *9 (S.D. Fla. Sept. 9, 2020) (applying principle to deny certification); *Pop's Pancakes, Inc.*, 251 F.R.D. at 686 (same); *Cohen*, 259 F.R.D. at 644 (same).

Plaintiffs ask this Court to ignore the varying circumstances of each class member because FDUTPA causation involves an objective "reasonable person" test. (Mot. 23–24.) Courts have repeatedly rejected this argument in denying FDUTPA classes (such as in *Stockinger*, *Townhouse Rest.*, *Pop's Pancakes*, *Justice*, *Persic*, and *Cohen*), because FDUTPA's objective standard requires consideration of the specific circumstances of consumers—which may vary. Plaintiffs fail to provide ***class-wide*** proof that class members had such similar circumstances that resolution of Plaintiffs' claims under an objective standard will resolve causation for all others.

Plaintiffs rely upon *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016), but, in that case, there was class-wide evidence that each class member was exposed to and impacted by the same allegedly false statement (an erroneous Monroney label on every vehicle) about the vehicle safety ratings. *Id.* at 981–82, 987–88. So, too, in *Fitzpatrick v. General Mills*, 635 F.3d 1279 (11th Cir. 2011), where each class member was exposed to the allegedly false statement on the label of a yogurt product. *Id.* at 1281. Not so here. Plaintiffs offer ***no*** class-wide proof of exposure, that consumers were in similar circumstances at the time of purchase, or that reasonable consumers in these particular circumstances would have behaved differently with some alleged HVAC disclosure. *See Townhouse Rest. of Oviedo, Inc.*, 2020 WL 5440581, at *11 (distinguishing *Carriulo* and denying certification); *Donoff*, 2020 WL 3268272, at *8 (same).

### d.   There Is No Common Evidence Of Actual Damages Or Any Ability To Calculate Such Damages For Any Class Member.

FDUTPA requires "actual damages," which is limited to the difference between the market value of the product as delivered and of the product that should have been delivered.  *Rollins*, 951 So. 2d at 869; *see also Melton*, 2018 WL 6980715, at *10; *Randolph*, 303 F.R.D. at 698.  Plaintiffs damages models do not satisfy *Comcast* nor do they show class-wide "actual damages."

*First*, for all the reasons explained in Section III(A)(2)(c) and Toyota's motion to exclude (ECF No. 196), Plaintiffs "conjoint" and "cost to repair" damages models do not measure market value.  They also are inherently unreliable and contain multiple flaws.  *Id.*

*Second*, as described in Section II(J) above, Plaintiffs' damages models cannot show whether any class member has been injured, and, if so, the amount of any damages.  (ECF No. 175, at 26.)  Courts have repeatedly denied certification of FDUTPA claims where such individual determinations are necessary.  *Point Blank*, 2020 WL 5667766, at *16; *Melton*, 2018 WL 6980715, at *16; *Harris*, 2016 WL 4543108, at *5; *PB Prop. Mgmt., Inc.*, 2016 WL 7666179, at *27.

*Third*, Plaintiffs' average "cost to repair" model is wholly inapplicable to FDUTPA.  Under FDUTPA, "'actual damages' do not include consequential damages, such as repair damages . . . ." *Kia Motors Am. Corp.*, 985 So. 2d at 1140; *see also Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. at 538 (reduction of purchase price by repair costs is "contrary to law as an attempt to recover vehicle repair costs, which are unrecoverable under FDUPTA").  Judge Ruiz recently applied this rule to deny certification of a FDUTPA class for which plaintiffs proposed a cost of repair damages model.  *Point Blank*, 2020 WL 5667766, at *15.  This Court should do the same.

*Finally*, even if Plaintiffs' conjoint analysis were capable of measuring FDUTPA damages (and it is not), the survey lacks sufficient sample size for a Florida-specific class.  According to Gaskin's *own* standard, the survey must include approximately 150 respondents to ensure an acceptable rate of sampling error.  (Ex. 36 at 189:7–20.)  But Gaskin surveyed only 32 participants from Florida.  This is insufficient.  (Ex. 38, Rossi Dep. 260:4–261:23.)

### 5.   Plaintiffs' Proposed Classes Must Be Denied Because Of Toyota's Individualized Defenses As To Each Claim.

### a. An Individual Analysis Is Required To Determine Which Class Members' RICO And FDUTPA Claims Are Time-Barred.

The Eleventh Circuit has recognized that, when significant, affirmative defenses alone can defeat class certification.  *See, e.g.*, *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1241 (11th Cir. 2016); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 321 F.R.D. 430, 445 (N.D. Ga. 2017) (denying certification due to statute of limitations problems); *Shamblin v. Obama for Am.*, 2015 WL 1909765, at *12 (M.D. Fla. Apr. 27, 2015) (applying principle).

Plaintiffs have narrowed their class to purchasers of 2012–2014 Camry vehicles, but this narrower creates significant individual statute of limitation issues, given that:  (a) this action was filed in July 2018; and (b) RICO and FDUTPA carry a 4-year statute of limitation period.  (ECF No. 175, at 28, 35.)  For instance, Baker's RICO and FDUTPA claims are both time-barred, based upon the applicable (but different) accrual rules for each claim.[16]  (*Id.*)  When other putative class members' claims accrued and whether they are similarly time-barred will require an individual inquiry into each class members' circumstances.

Plaintiffs purport to invoke the fraudulent concealment tolling doctrine (CAC ¶¶ 101–04), but this only exacerbates the individual issues.  A plaintiff "seeking to toll the statute of limitations as a result of fraudulent concealment 'must allege [and prove] . . . (1) successful concealment of the cause of action, (2) fraudulent means to achieve that concealment, and (3) plaintiff exercised reasonable care and diligence in seeking to discover the] facts that form the basis of his claim.'" *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013) (citation omitted).  Any class trial will be overwhelmed with issues about what each putative class member knew or should have known, when, and whether he or she exercised reasonable care and diligence to discover his or her claim.  (*See* §§ II(G)–(H).)  This individual inquiry will need to be made for countless individual class members—and for each claim.

---

[16]    The 4-year statute of limitations for FDUTPA claims "accrues at the time the product at issue is purchased."  *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017).  For RICO claims, the 4-year limitation period "begins to run 'when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering.'"  *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013) (internal quote omitted).

### b. Some Class Members Signed Arbitration Waivers, Thereby Requiring Arbitration Of Their RICO And FDUTPA Claims.

As set forth in Section II(K), many putative class members are subject to binding arbitration with class action waivers, depending on whether they entered into financing agreements with an SET affiliate at the time of purchase.  (ECF No. 203-12.)  These arbitration agreements expressly cover SET, and, because of Plaintiffs' conspiracy allegations (that Toyota and SET worked together to defraud purchasers), Toyota also would be entitled to invoke those arbitration clauses under an equitable estoppel theory.  *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir. 1999) (equitable estoppel permits a nonsignatory to enforce an arbitration clause "when the signatory to a written agreement containing an arbitration clause . . . raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract"); *Morselife Found., Inc. v. Merrill Lynch Bank & Tr. Co., FSB,* 2010 WL 2889932, at *3 (S.D. Fla. July 21, 2010) (applying principle).  Thus, individual inquiries are needed into whether class members signed such agreements, when, whether they cover these claims, and any parol evidence issues those class members may raise.  *See Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594, 612 (S.D. Cal. 2015) (denying certification on this ground).

### B. The Named Plaintiffs' Claims Are Not Typical Or Suffer From Adequacy Problems, Or Both.

It is well-settled that the "presence of unique or individual defenses against the plaintiffs . . . precludes any finding of typicality."  *Hall v. Burger King Corp.*, 1992 WL 372354, at *8 (S.D. Fla. Oct. 26, 1992); *see also Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) ("A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).")  In addition, Rule 23(a)(4) "requires that the representative party in a class action 'must adequately protect the interests of those he purports to represent.'"  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).

Here, each named Plaintiff either asserts claims that will be overrun by unique defenses or is not adequate to protect the interests of the putative class.  Monge purchased a used vehicle "as is," did not even drive her vehicle, did not consider anything Toyota said or did not say, and only agreed at the end to sign the financing documents for the vehicle.  (Ex. 15 at 12:3–18; 129:6–16,

132:9–24, 133:2–18, 134:10–11, 135:6–9; 229:4–13.)   Monge only decided to join this case after speaking with the mother-in-law of counsel, knows very little about the case, believes she has no obligation to read legal filings, never had her vehicle inspected to address any concerns about HVAC odor, and identifies her only damages as her time spent related to the litigation.   (*Id.* at 78:6–80:15, 87:3–8, 132:9–11, 166:7–19, 210:16–211:10, 212:17–23.)  This cannot be the same interest or injury as absent class members.  *Murray*, 244 F.3d at 811.

Baker, too, asserts claims that are subject to unique defenses and is otherwise inadequate as a class representative.  Contrary to Plaintiffs' allegations, Baker purchased a second Class Vehicle with knowledge about the potential for odor because he liked his first Class Vehicle so much, and then sold both for what he described as a good and fair price.  *Melton*, 2018 WL 6980715, at *10 (similar facts defeated typicality).  Although his Camry vehicles had odor, neither had HVAC odor.  (Ex. 6 at 84:19–85:4, 92:1–18.)  Moreover, Baker was never looking to sue Toyota until he surfed the internet while bored, reviewed only a few filings about the case until his deposition, and, even at this deposition, did not know the names of his Florida counsel.  (*Id.* at 167:21–170:3, 172:6–173:22.)  He has virtually no knowledge of the case, has no knowledge of any wrongdoing by Toyota, and his claims are time-barred.  (*Id.* at 120:6–13, 193:19–23; ECF No. 175, at 28, 35); *see Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1349 (11th Cir. 2001) (reversing grant of certification where plaintiff's clams were time-barred and therefore not typical).

Cardenas' claims are also overrun by unique defenses.  Cardenas was a student at the time of his vehicle purchase, did not make the purchase decision, and does not even know how much he has paid towards it.  (Ex. 16 at 67:17–21, 68:17–19, 76:22–77:7.)  In addition, FDUTPA does not apply to Cardenas, given that he lives in Missouri, paid for his vehicle from there, and experienced any injury there.  (ECF No. 175, at 35–36.)  Cardenas cannot represent a class asserting a claim that does not apply to him.  *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (announcing principle).

C.  **Plaintiffs' Proposed Classes Are Invalid And Overbroad**.

A class cannot be certified if it consists of members who were not injured by the challenged conduct or who lack standing.  *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273–74 (11th

Cir. 2019); *Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012).  Courts in the Eleventh Circuit have held that it "is inappropriate to certify a class containing both individuals who have 'manifested a deficiency' and those whose product has 'performed satisfactorily.'" *Breakstone*, 2010 WL 2164440, at *6; *Harris*, 2016 WL 4543108, at *5 (same); *PB Prop. Mgmt., Inc.*, 2016 WL 7666179, at *19 (same); *Kia Motors Am. Corp.*, 985 So. 2d at 1139 (same).

Recently, Judge Ruiz denied certification of a class that included "all purchasers" of an allegedly defective product, where the alleged defect hinged upon consumer's specific use of the product and not all products exhibited that problem.  *Point Blank*, 2020 WL 5667766, at *9 & n.9.  Likewise, in *Melton*, this Court denied certification of an "all purchaser" class in part because the putative class included individuals who purchased products that did not exhibit the problem and other consumers who suffered no harm, notwithstanding plaintiffs' theory that all products had a diminished value from the defect.  *Melton*, 2018 WL 6980715, at *7.

Likewise, Plaintiffs' defect theory hinges on how each vehicle is used and whether HVAC odor actually occurs, but the record evidence shows that most Class Vehicle owners experienced no defect or injury because they have not and will not experience any odor from their HVAC systems.  For those few owners who do experience HVAC odor, the cause may be factors other than microbial growth (like Cardenas and Monge), it may already have been addressed by the dealer—at no cost to the owner—as a matter of customer satisfaction, or the owner (like Baker) may have been aware of this potential at the time of purchase or resold the vehicles for a good deal.  Thus, Plaintiffs' proposed classes are invalid because they include uninjured individuals.

### D.  The Proposed Classes Are Not Ascertainable.

Plaintiffs must show "a manageable process [for determining class membership] that does not require much, if any, individual inquiry."  *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014); *see also Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015).  Where "a plaintiff provides no more than unsupported 'asserti[ons] that class members can be identified using the defendant's records,' it does not satisfy the ascertainability requirement."  *Wasser v. All Mkt., Inc.*, 329 F.R.D. 464, 473 (S.D. Fla. 2018).

In *Melton*, the manufacturer defendant did not sell directly to consumers, but, instead,

through distributors and retailers.  2018 WL 69807, at *6.  Although plaintiffs proposed to "identify class members by contacting the retailers . . . and requesting that retailers produce a list of the purchasers of these weapons," *id.*, this Court rejected this approach as unmanageable and speculative because "Plaintiffs have not shown that the customer lists that constitute the basis for their plan of class membership identification in fact exist, or what data has been maintained by the subject distributors, as is their burden." *Id.*  Likewise, in *Point Blank*, Judge Ruiz found that an "all purchaser" class was not ascertainable because defendant's records did not identify all retail purchasers and a process involving "self-identification affidavits" from class members would be legally inadequate and too individualized.  2020 WL 5667766, at *7; *see also Vision Power, LLC v. Midnight Express Power Boats, Inc.*, 2020 WL 808284, at *6 (S.D. Fla. Feb. 18, 2020) (same).

Here, Plaintiffs' showing is more deficient than in *Melton* and *Point Blank*.  Plaintiffs provide *no* methodology, *no* evidence, and *no* expert testimony to establish members of the proposed classes, but merely argue—in a single paragraph—that "purchases can be verified through Defendants' records, Class members' records and public records."  (Mot. 14.)  Plaintiffs offer no explanation—much less evidence—for *how* this can feasibly be done.  It cannot be.

Defendants' records cannot identify each "purchaser."  TMS sells Camry vehicles to SET as an authorized distributor.  (ECF No. 58, ¶¶ 21, 46, 51.)  SET subsequently sells to independent dealerships.  (ECF No. 55, ¶¶ 50–51.)  Neither TMS nor SET sells directly to consumers.  (Ex. 22 at 149:8–10.)  Defendants do not know each and every individual who "purchased" each of the more than 400,000 Class Vehicles from dealers, particularly given the inclusion of used vehicles.

Plaintiffs' circumstances exemplify these problems.  For instance, Cardenas alleges to be the purchaser of a new Camry, but discovery records and testimony show that Cardenas was a "co-buyer" with his grandmother and his mother made the down payment.  (Ex. 39, CARDENAS_TOYOTA_000661–64, at 61; Ex. 16 at 62:17–23, 67:10–16.)  It is only by evaluating the purchase agreement and other purchase-specific facts that it is possible to determine that Cardenas, his mother, and his grandmother are all potential "purchasers" of the vehicle. Similarly, Toyota has no records showing Monge as a purchaser of a Class Vehicle; rather, an analysis of her specific circumstances is needed to understand that she only paid money when her

ex-partner stopped making payments.  (Ex. 15 at 114:22–25, 136:23–138:3.)

This problem is critical to class membership.  Because Plaintiffs offer no evidence that it is feasible to determine who is a class member, or even whether there is more than one "purchaser" for each Class Vehicle, without extensive individual inquiry, no class can be certified.

### E. **Plaintiffs Have Not Shown That A Class Action Is Superior Or Manageable**.

Individual issues predominate here and even a determination of class membership is riddled with individual issues.  As a result, Plaintiffs cannot show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), such as individual lawsuits or use of Toyota's more expedient dispute resolution program (Ex. 6 at 94:4–96:18; Ex. 40, Warranty & Maintenance Guide, 5 at Step 3), for the few class members who experience HVAC odor.  *See Klay*, 382 F.3d at 1269 (when common issues do not predominate, "class treatment would be either singularly inefficient . . . or unjust"); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 n. 12 (11th Cir. 1997) (same).

Moreover, class members have multiple incentives to bring and control their own individual actions where they reside, to the extent they are part of the small fraction of owners who experience HVAC odor.  Fed. R. Civ. P. 23(b)(3)(A)–(C).  Potential damages are not *de minimis*, and RICO and FDUTPA allow for attorneys' fees.  *See Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 669 (N.D. Ala. 2010) (availability of attorneys' fees and damages rendered individual suits superior to a class action).  Moreover, class members can seek broader and more immediate relief, including re-purchase of their Class Vehicles, through state lemon law claims or alternative dispute resolution processes, like those made available to owners by Toyota.  (Ex. 40 at 5 Step 3.)  Some have already done so.  (Ex. 41, Geiger Dep. 30:1–22; Ex. 22 at 126:20–127:5.)  There is simply no need for a class action, as the *Stockinger* court found.

## IV.  **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

Dated: January 8, 2020

Respectfully submitted,

_s/ Brian M. Ercole_____
Robert M. Brochin  (Florida Bar No. 319661)
bobby.brochin@morganlewis.com
Brian M. Ercole (Florida Bar No. 102189)
brian.ercole@morganlewis.com
Melissa M. Coates (Florida Bar No. 111420)
melissa.coates@morganlewis.com
Matthew M. Papkin (Florida Bar No. 106565)
matthew.papkin@morganlewis.com
Morgan, Lewis & Bockius LLP
200 South Biscayne Boulevard, Suite 5300
Miami, Florida  33131-2339
Tel:  +1.305.415.3000
Fax:  +1.305.415.3001

Gordon Cooney, Jr. (admitted _pro hac vice_)
gordon.cooney@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA  19103-2921
Tel:  +1.215.963.4806
Fax:  +1.215.963.5001

David L. Schrader (admitted _pro hac vice_)
david.schrader@morganlewis.com
Lisa R. Weddle (admitted _pro hac vice_)
lisa.weddle@morganlewis.com
Mark Feller (admitted _pro hac vice_)
mark.feller@morganlewis.com
Morgan, Lewis & Bockius LLP
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel: +1.213.612.2500
Fax: +1.213.612.2501

_Attorneys for Defendants Toyota Motor_
_Corporation, Toyota Motor Sales, U.S.A., Inc.,_
_and Toyota Motor Engineering &_
_Manufacturing North America, Inc._

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of January, 2020, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ Brian M. Ercole*

Brian M. Ercole
