# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 18-cv-22798-CIV-FAM

JAVIER CARDENAS, RODNEY BAKER,
and MICHELLE MONGE, individually and
on behalf of all others similarly situated,

     Plaintiffs,

     v.

TOYOTA MOTOR CORPORATION,
TOYOTA MOTOR SALES, U.S.A., INC.,
TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA,
INC., and SOUTHEAST TOYOTA
DISTRIBUTORS, LLC,

     Defendants.
_____/


**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS TOYOTA MOTOR
CORPORATION, TOYOTA MOTORS SALES, U.S.A., INC., AND TOYOTA MOTOR
ENGINEERING & MANUFACTURING NORTH AMERICA, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................................. 3

  A. Defendants Engaged in a Uniform Scheme to Conceal the Defect .................................... 3

    1. The Toyota Defendants Actively Concealed the Defect .................................................. 3

    2. SET Played an Active Role in Concealing the Defect from Consumers ......................... 4

    3. Defendants' Concealment Efforts Included Misleading TSBs and
       Owner's Manual Language .............................................................................................. 6

    4. Toyota Refused to Ameliorate the Problem Caused by the Defect................................. 8

  B. The Camry Vehicles' HVAC Systems Were Defective ..................................................... 9

III. LEGAL STANDARD......................................................................................................... 10

IV. ARGUMENT ...................................................................................................................... 11

  A. Summary Judgment Should Be Denied on Plaintiffs' RICO Claims................................. 11

    1. There Are Triable Issues of Fact as to Whether Defendants Engaged in the RICO
       Predicate Acts of Mail and Wire Fraud ........................................................................ 12

    2. There Are Triable Issues of Fact as to Whether Defendants Formed
       a RICO Enterprise .......................................................................................................... 19

    3. There Are Triable Issues of Fact as to Whether Plaintiffs Were Injured By Reason of
       Defendants' RICO Violations........................................................................................ 21

    4. There Are Triable Issues of Fact as to Whether Plaintiffs Have Suffered
       RICO Injury .................................................................................................................... 24

    5. There Are Triable Issues of Fact as to Whether Defendants Engaged in
       a RICO Conspiracy ......................................................................................................... 27

    6. Baker's RICO Claims Are Not Time-Barred................................................................. 28

  B. There Are Triable Issues of Material Fact as to Whether the HVAC Systems
    Are Defective ..................................................................................................................... 29

  C. Summary Judgment on Plaintiffs' FDUTPA Claims Should Be Denied........................... 34

    1. Monge and Baker Have Raised Triable Issues of Fact as to Whether Defendants'
       Conduct Caused Them to Overpay for their Camry Vehicles ....................................... 34

    2. Plaintiffs Have Raised a Triable Issue of Fact as to Whether They
       Overpaid for Their Vehicles .......................................................................................... 36

    3. Baker's FDUTPA Claim Is Not Time-Barred............................................................... 38

    4. Cardenas Has Standing to Assert FDUTPA Claims ..................................................... 39

    5. Plaintiffs Have Standing to Seek Injunctive Relief....................................................... 40

V. CONCLUSION ................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ADT LLC v. Vision Sec., LLC,*
    2014 WL 3764152 (S.D. Fla. July 30, 2014)..........................................................................39

*Am. Dental Ass'n v. Cigna Corp.,*
    605 F.3d 1283 (11th Cir. 2010) ..........................................................................27

*Am. United Life Ins. Co. v. Martinez,*
    480 F.3d 1043 (11th Cir. 2007) ..........................................................................18

*Amin v. Mercedes-Benz USA, LLC,*
    301 F. Supp. 3d 1277 (N.D. Ga. 2018) ..........................................................................40

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..........................................................................10

*Astro Tel, Inc. v. Verizon Fla., LLC,*
    979 F. Supp. 2d 1284 (M.D. Fla. 2013)..........................................................................27

*Ayres v. Gen. Motors Corp.,*
    234 F.3d 514 (11th Cir. 2000) ..........................................................................19

*Beck v. Prupis,*
    162 F.3d 1090 (11th Cir. 1998) ..........................................................................23

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..........................................................................20

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.,*
    582 F.3d 1227 (11th Cir. 2009) ..........................................................................25

*Bouton v. Ocean Props., Ltd.,*
    2017 WL 4792488 (S.D. Fla. Oct. 23, 2017)..........................................................................16

*Bridge v. Phoenix Bond & Indem. Co.,*
    553 U.S. 639 (2008)..........................................................................21, 22, 23, 24

*Cannon v. Wells Fargo Bank, N.A.,*
    2014 WL 324556 (N.D. Cal. Jan. 29, 2014)..........................................................................23

*Cardenas v. Toyota Motor Corp.*
    418 F.Supp.3d 1090 (S.D. Fla. 1090) ........................................................................... *passim*

*Carriuolo v. Gen. Motors Co.*,
   823 F.3d 977 (11th Cir. 2016) ................................................................. *passim*

*Century Land Dev., L.P. v. FFL Dev., L.L.C.*,
   2008 WL 1850753 (S.D. Fla. Apr. 24, 2008) ..........................................36

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ..............................................21, 25

*Cisneros v. Petland, Inc.*,
   972 F.3d 1204 (11th Cir. 2020) ................................................................20

*Coghlan v. Wellcraft Marine Corp.*,
   240 F.3d 449 (5th Cir. 2001) ...................................................................37

*Cohen v. Implant Innovations, Inc.*,
   259 F.R.D. 617 (S.D. Fla. 2008) ..............................................................39

*Cox v. Porsche Fin. Servs., Inc.*,
   342 F. Supp. 3d 1271 (S.D. Fla. 2018) ...................................................36

*Crawford's Auto Ctr., Inc. v State Farm Mut. Auto. Ins. Co.*,
   945 F.3d 1150 (11th Cir. 2019) ................................................................18

*CWELT-2008 Series 1045 LLC v. PHH Corp.*,
   2020 WL 2744191 (S.D. Fla. May 27, 2020) ..........................................35

*Dolan v. JetBlue Airways Corp.*,
   385 F. Supp. 3d 1338 (S.D. Fla. 2019) ...................................................24

*Eclipse Med. v. Am. Hydro-Surgical Instruments*,
   262 F. Supp. 2d 1334 (S.D. Fla. 1999) ...................................................37

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
   2017 WL 1382297 (E.D. Mich. Apr. 18, 2017)........................................21

*Feliciano v. City of Miami Beach*,
   707 F.3d 1244 (11th Cir. 2013) ................................................................29

*Francis v. Gen. Motors, LLC*,
   2020 WL 7042935 (E.D. Mich. Nov. 30, 2020) ......................................40

*Galstadi v. Sunvest Cmty. USA, LLC*,
   637 F. Supp. 2d 1045 (S.D. Fla. 2009) ...................................................40

*GoITV, Inc. v. Fox Sports Latin Am., Ltd.*,
   2018 WL 1393790 (S.D. Fla. Jan. 26, 2018), .........................................29

*Gomes v. Portfolio Recovery Assocs., LLC*,
2019 WL 978806 (S.D. Fla. Feb. 28, 2019) ........................................................16

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)..........................................................................................11

*Hartford Steam Boiler Inspection and Ins. Co. v. Space 01 Condo Ass'n., Inc.*,
2020 WL 3315974 (S.D. Fla. Apr. 27, 2020) .......................................................25

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*,
634 F.3d 1352 (11th Cir. 2011) ..........................................................................18

*Kaupelis v. Harbor Freight Tools USA, Inc.*,
2020 WL 5901116 (C.D. Cal. Sept. 23, 2020) ....................................................38

*Kemp v. Am. Tel. & Tel. Co.*,
393 F.3d 1354 (11th Cir. 2004) ...............................................................16, 17, 18

*Langford v. Rite Aid of Ala., Inc.*,
231 F.3d 1308 (11th Cir. 2000) ...............................................................16, 17, 18

*Leon v. Cont'l AG*,
301 F. Supp. 3d 1203 (S.D. Fla. 2017) (Mot. ) .....................................................19

*Licul v. Volkswagen Grp. of Am., Inc.*,
2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ........................................................38

*London v. Fieldale Farms Corp.*,
410 F.3d 1295 (11th Cir. 2005) (Mot. ) ...........................................................25, 26

*In re Managed Care*,
2004 WL 7334075 (S.D. Fla. July 21, 2004)........................................................29

*In re Managed Care Litig.*,
298 F. Supp. 2d 1259 (S.D. Fla. 2003) ......................................................... *passim*

*Molina v. Aurora Loan Servs., LLC*,
35 F. App'x 618 (11th Cir. 2015) .......................................................................35

*Montgomery v. New Piper Aircraft, Inc.*,
209 F.R.D. 221 (S.D. Fla. 2002)........................................................................39

*Montoya v. PNC Bank, N.A.*,
94 F. Supp. 3d 1293 (S.D. Fla. 2015) .................................................................22

*Nguyen v. Nissan N. Am. Inc.*,
932 F.3d 811 (9th Cir. 2019) ............................................................................38

*Padilla v. Porsche Cars N. Am., Inc.*,
  391 F. Supp. 3d 1108 (S.D. Fla. 2019) ................................................39

*Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
  781 F.3d 1245 (11th Cir. 2015) ........................................................11

*Ray v. Spirit Airlines, Inc.*,
  836 F.3d 1340 (11th Cir. 2016) ....................................................21, 22

*Roche Diagnostics Corp. v. Priority Healthcare Corp.*,
  407 F. Supp. 3d 1216 (N.D. Ala. 2019) ..............................................27

*Salas v. Toyota Motor Sales, U.S.A., Inc.*,
  2017 WL 11247885 (C.D. Cal. Sept. 29, 2017) ..................................9, 30

*Sanchez-Knutson v. Ford Motor Co.*,
  310 F.R.D. 529 (S.D. Fla. 2015) ..........................................26, 36, 38

*Sanchez-Knutson v. Ford Motor Co.*,
  52 F. Supp. 3d 1223 (S.D. Fla. 2014) ..............................................21, 37

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985) .....................................................................11

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
  806 F.3d 71 (2d Cir. 2015) ..............................................................23

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*,
  782 F.3d 922 (7th Cir. 2015) ............................................................28

*Spadaro v. City of Miramar*,
  855 F. Supp. 2d 1317 (S.D. Fla. 2012) ..............................................29

*Stockinger v. Toyota Motor Sales, U.S.A., Inc.*,
  2019 WL 1452908 (C.D. Cal. Mar. 8, 2019) ........................9, 30, 31, 33

*Strickland v. Norfolk S. Ry. Co.*,
  692 F.3d 1151 (11th Cir. 2012) ........................................................30

*In re Takata Airbag Prod.Liab. Litig.*,
  193 F. Supp. 3d 1324 (S.D. Fla. 2016) ..............................................39

*In re Takata Airbag Prod. Liab. Litig.*,
  2015 WL 9987659 (S.D. Fla. Dec. 2, 2015) ......................................21, 23

*In re Takata Airbag Prod. Liab. Litig.*,
  396 F. Supp. 3d 1101 (S.D. Fla. 2019) ............................................24, 25

*In re Toyota Motor Corp.*,
    790 F. Supp. 2d 1152 (C.D. Cal. 2011) ..............................................................21

*United States v. $1,200,000,000 in U.S. Currency*,
    14-cv-1907 (S.D.N.Y. Mar. 19, 2014), ECF No. 2-1 .........................................11

*United States v. Brown*,
    79 F.3d 1550 (11th Cir. 1996) .........................................................................18

*United States v. Ellington*,
    348 F.3d 984 (11th Cir. 2003) .........................................................................12

*United States v. Goldin Indus., Inc.*,
    219 F.3d 1271 (11th Cir. 2000) .......................................................................19

*Vazquez v. Gen. Motors, LLC*,
    2018 WL 447644 (S.D. Fla. Jan. 16, 2018) .....................................................35

*Walker v. Darby*,
    911 F.2d 1573 (11th Cir. 1990) .............................................................1, 11, 12

*Waters v. Int'l Precious Metals Corp.*,
    172 F.R.D. 479 (S.D. Fla. 1996) ...............................................................25, 26

*Weiss v. Gen. Motors LLC*,
    418 F. Supp. 3d 1173 (S.D. Fla. 2019) ............................................................39

*Weiss v. General Motors LLC*,
    418 F. Supp. 3d at 1185–86 .............................................................................40

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ...........................................................................21

**State Cases**

*Bd. of Tr. of Santa Fe Cmty. Coll. v. Caudill Rowlett Scott, Inc.*,
    461 So.2d 239 (Fla. Dist. Ct. App. 1984) .......................................................39

*Bishop v. Fla. Specialty Paint Co.*,
    389 So. 2d 999 (Fla. 1980) ..............................................................................39

*Collins v. DaimlerChrysler Corp.*,
    894 So.2d 988 (Fla. Dist. Ct. App. 2004) .......................................................37

*Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen.*,
    761 So. 2d 1256 (Fla. Dist. Ct. App. 2000) ....................................................39

**Rules**

Federal Rule of Civil Procedure 56 .....................................................................................1, 10, 29

Plaintiffs Javier Cardenas, Rodney Baker and Michelle Monge ("Plaintiffs")[1] submit the following Response in Opposition to Defendants Toyota Motor Corporation ("TMC"), Toyota Motors Sales, U.S.A., Inc. ("TMS"), Toyota Motor Engineering & Manufacturing North America, Inc.'s ("TEMA") (collectively "Toyota" or the "Toyota Defendants") Motion for Summary Judgment ("Motion" or "Mot.")[2].

## I.    INTRODUCTION[3]

Toyota's Motion is a misguided attempt to rehash arguments already rejected by this Court. *Cardenas v. Toyota Motor Corp.* 418 F.Supp.3d 1090 (S.D. Fla. 1090). Ignoring the relevant summary judgment standard and this Court's well-reasoned findings, Toyota attempts to poke holes at Plaintiffs' allegations without establishing that there are no genuine issues of material fact in dispute. But that is not how summary judgment works. In order for this Court to find judgment as a matter of law under Federal Rule of Civil Procedure 56, it is Toyota's burden to establish the absence of a material factual dispute regarding Plaintiffs' claims such that a jury could only return one reasonable verdict. *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990). Toyota has wholly failed to meet that burden here.

Discovery has confirmed that Toyota and SET—one of Toyota's largest distributors and the "face of Toyota" in the Southeast—conspired to bury the flood of HVAC odor complaints that were coming from customers in Florida and the Southeastern United States. While Camry owners repeatedly complained about odor coming from their cars' HVAC systems, comparing it to the smell of "dirty socks" and "vomit," Defendants engaged in a strategy of denial, telling Camry

---

[1] The parties stipulated to dismiss Plaintiff Kurt Kirton's claims on January 5, 2021. ECF No. 199.
[2] Plaintiffs are simultaneously filing their Statement of Genuine Disputes of Material Facts in Opposition to Toyota's Motion Summary Judgment ("PTSOF"), the paragraphs of which are cited herein as "PTSOF ¶ __."
[3] All emphases herein are added and internal citations omitted unless otherwise noted.

drivers the odor was normal, occurs in all cars and cannot be fixed. But, in reality, Defendants have known for years that the odor was the result of defective design features that lead to the accumulation of moisture, resulting in microbial growth and malodors (the "Defect"). They also knew that the only way to resolve the root cause of the Defect is to redesign the HVAC system— a costly endeavor. Rather than investing the money required to fix the problem, Defendants developed ineffective strategies to mask HVAC odor and concealed the Defect. The common goal of this deception was clear: sell more Camrys, refuse to cover repairs under warranty, transfer the costs of repair to consumers and avoid buybacks under state Lemon Laws.

Based on the evidence, a jury could easily find that Defendants violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) and Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), rendering summary judgment inappropriate. Specifically, the evidence shows that: (1) Defendants knowingly engaged in a scheme to defraud Plaintiffs and other Camry purchasers through affirmative misrepresentations, omissions, and concealment of the Defect; (2) Defendants conspired and engaged in a RICO enterprise with a common purpose to, *inter alia*, "sell as many Defective HVAC Systems and Class Vehicles containing the Defective HVAC Systems, as possible, and thereby maximize the revenue and profitability of the Toyota RICO Enterprise's members" (*Cardenas*, 418 F.Supp.3d at 1102); (3) Defendants' deceptive acts were likely to mislead a reasonable consumer; and (4) Defendants' scheme injured Plaintiffs by causing them to overpay for Camry Vehicles containing the concealed Defect. PTSOF ¶¶ 109-111.

Rather than contend with these facts, Toyota ignores them. Instead, it attempts to limit RICO to mafia-like conduct, recasts the Defect as odor-dependent, and repeats the very same misrepresentations that form the basis of Plaintiffs' claims—arguing that HVAC odor is "industry-

wide" and not the result of the Defect. Mot. at 1-2. None of these arguments are valid. But, more importantly, none supports judgment as a matter of law. The Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Defendants Engaged in a Uniform Scheme to Conceal the Defect

Toyota has known for over a decade that Camry vehicles contain a Defect that allows accumulation of moisture and organic matter, leading to microbial growth and malodors. Toyota has also known that resolving the root cause of the Defect requires a costly redesign of the HVAC Systems. PTSOF ¶ 112. Prior to the sale of the Camry Vehicles,[4] Toyota acknowledged that HVAC odor in its vehicles was due to microbial growth. Toyota issued Technical Service Bulletin ("TSB") AC002-97 to inform its dealers that a "musty odor may be emitted from the air conditioning system of some vehicles," due to "[m]icrobial growth in the evaporator, arising from dampness in the evaporator housing where the cooling air flow is dehumidified." PTSOF ¶ 113. TMS also informed its technicians that the two primary causes of HVAC odors are: "[d]irt or microscopic particles which are trapped in the evaporator, then later blown into the vents [which] results in a 'musty' or 'stale' odor" and "[m]icrobes growing on the evaporator surfaces . . . which are carried into the evaporator case, then grow in the warm, moist environment." PTSOF ¶ 114. This information was never disclosed to purchasers of Camry Vehicles.

#### 1.    The Toyota Defendants Actively Concealed the Defect

Rather than fixing the Defect, Toyota hatched a uniform scheme to conceal it. Internally, Toyota studied the Defect, tracked odor complaints, and developed ineffective strategies to mask it. For example, Toyota developed Komori Odor Logic, which was designed as a so-called "countermeasure." In truth, it simply re-directed putrid air from the HVAC Systems to the feet of

---

[4] "Camry Vehicles" means 2012-2014 model year non-hybrid Toyota Camry vehicles.

occupants rather than directly in their faces in an ill-conceived effort to "hide" the odor. PTSOF ¶ 115.

In fact, Toyota's entire plan to deal with HVAC odor complaints in Camry Vehicles was to deny and deceive. Toyota told Camry drivers that HVAC odor was "normal" so that it could refuse to cover repairs under warranty and avoid costly Lemon Law buybacks. PTSOF ¶ 116. One of Toyota's own employees acknowledged the unjust nature of Defendants' deceptive scheme, stating in an email to colleagues it is "challenging to explain why to get what a customer should expect as a standard condition for the air conditioner (no odor) we charge more?" PTSOF ¶ 117. It was understood that having an HVAC system free from odor "is a basic requirement of the system" and that customers should not have to pay for repairs to abate odor resulting from the Defect. *See id*; Ex. 15 ("[C]ustomers see the odor issue as design related. Convincing them that they should spend more money [charcoal filter] to 'fix' an issue the vehicle never should have had is very difficult."); Ex. 16 ("I am still struggling why the customer needs to pay for this").

A substantial percentage of the HVAC odor complaints Defendants received were from the SET region, where hot, humid conditions create the ideal environment for the Defect to lead to microbial growth. PTSOF ¶ 118. When accumulated moisture in the evaporator core is subject to hot temperatures, mold and bacteria thrive and create malodorous chemicals as byproducts. PTSOF ¶ 119. As part of its scheme, Toyota conspired with SET to inform customers that HVAC odor is naturally occurring and cannot be fixed. The goal of this concerted scheme was simple— conceal the Defect, protect the Toyota brand, sell more Camry Vehicles, and avoid costly repairs and buybacks. PTSOF ¶ 120.

### 2. SET Played an Active Role in Concealing the Defect from Consumers

SET worked closely with Toyota on HVAC odor-related issues. Representatives of SET participated in joint HVAC odor investigations with Toyota, attended Toyota's HVAC odor

conferences, and worked together in shared offices. PTSOF ¶ 121. Indeed, Toyota had an entire Product Quality Field Office ("PQFO") devoted to working "hand in hand" with SET on HVAC odor issues. PTSOF ¶ 122. Prior to the sale of the Camry Vehicles, SET participated with Toyota in HVAC odor testing, which confirmed that odor was emitting from the HVAC systems in Toyota vehicles. PTSOF ¶ 123. Defendants also implemented HVAC odor inspection protocols allegedly "to find the source of the odor (and not just try to mask the effects of it)." PTSOF ¶ 124.

During that time, Toyota was using an evaporator coating called CC2 to mask the odors; this coating contained hydrophilic (i.e., attracted to water) properties that helped mask odors resulting from moisture accumulation in the evaporator. PTSOF ¶ 125. But Toyota discovered that the CC2 caused rust to form on evaporator cores. *Id*. So, to counteract the rust problem, Toyota switched in 2012 from CC2 to EPC evaporator coating. *Id*. EPC did not have the same hydrophilic properties as CC2, and, as a result, could not mask the odors caused by the Defect. With the switch to EPC, HVAC odor complaints predictably skyrocketed. *Id*.

By 2012, Toyota was internally describing HVAC odor as a "chronic issue" with field technical reports showing an upward trend beginning from the "2012 AC Odor season." PTSOF ¶ 126. Toyota's 1-800 number received 9 times the number of HVAC odor complaints in 2012 than it received on the 2011 Camry. PTSOF ¶ 128. SET frequently contacted Toyota to relay the numerous HVAC odor complaints its dealerships were receiving, but it was told by TMS and PQFO to "essentially do nothing." PTSOF ¶ 129. Recognizing this "increase in Camry AC Odor complaints for the 2012 MY," in July 2012, Defendants conducted a "Florida AC Odor Investigation" to "[i]dentify Camry AC Odor ranking compared to competitors in the high complaint area of Florida." PTSOF ¶ 130. The results were not good—the investigation revealed that the 2012 "Toyota Camry showed AC Odor was one of the poorest of surveyed competitors."

*Id.*

Toyota viewed HVAC odor as one of the top issues it faced globally by July 2013, and into 2014, ranking it a "GR3" on Toyota's global ranking scale. PTSOF ¶ 127. As detailed by Plaintiffs' Expert Don Wright:

> The high number of HVAC odor complaints in the Camry that Toyota identified in 2012 continued in later years. For example, in Toyota's DQPS (Design Quality Planning system) PP100 (Problems Per 100) data for Fall 2014, in the category of AC Odor, the Camry shows an increase in 2012, and is worst non-hybrid in the Toyota car categories (Prius is higher at 11.8), which remained consistently high through at least the 2014 Model Year.

*Id.* Wright further explains that the "J.D. Power Vehicle Dependability Survey (VDS) [covering] the 2013 Model Year Camry[] also shows that the Camry had the highest HVAC odor complaints among all vehicles in Toyota's lineup" and "HVAC odor complaints for the Camry were more than twice that of the industry average." PTSOF ¶ 126. Taken together, the Camry Vehicles had a *172% increase in HVAC odor complaints over the 2011 Camry*. *Id.*

### 3. Defendants' Concealment Efforts Included Misleading TSBs and Owner's Manual Language

Defendants conspired to conceal the Defect from consumers, including by spreading false information to consumers about the root cause of HVAC odor in Camry Vehicles. TMS, the authorized importer and distributor of Toyota vehicles in the U.S., stood at the center of this scheme and served as the primary conduit between its Japanese parent, TMC, Toyota's North American engineering affiliate, TEMA, and consumers. PTSOF ¶ 131. TMS regularly funneled false and misleading information about the Defect from TMC, through SET, to consumers. As Defendants secretly discussed how to handle complaints resulting from the Defect, they devised a plan to publicly represent that HVAC odor was "normal" and unfixable so that they could avoid costly repairs and buybacks of the Camry Vehicles under state Lemon Laws—in particular Florida's strong Lemon Law that required a buyback after three failed repair attempts. *See* PTSOF

¶ 10 ("***SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida. SET started to tell customers the condition was normal***"); PTSOF ¶ 133 ("Dealers are not creating repair orders/warranty claims to prevent possible buyback situations"); *id.* ("At this time we are not recommending any repairs as it only adds repair attempts and increases the possibility of a buyback.").

TMS coordinated with the other Defendants to falsely portray HVAC odor as a naturally occurring phenomenon, and not the result of the Defect. PTSOF ¶ 134. This included distribution of TSBs and "Tech Tips," which misleadingly informed consumers that "[o]dors emitted from the A/C system are a normal characteristic of automotive A/C systems." *Id.* As part of this scheme, Toyota issued TSB 142-13 in September 2013, telling dealers the HVAC odors in the Camry Vehicles are "naturally occurring from the HVAC system and/or related environmental factors" and that "there is no way to eliminate these odors." PTSOF ¶ 11, 134. It also included language used to inform customers that "[i]t is normal to experience odor upon the initial startup" and recommending costly procedures that could be performed at the customer's expense to "minimize the odors experienced." *Id.* This TSB created a uniform script for SET dealerships to deceive customers complaining about HVAC odor. PTSOF ¶ 134. Defendants also misled consumers by including language in the Camry Vehicles' Owner's Manuals recommending that the HVAC systems be set to outside air mode prior to turning off the vehicle to reduce potential odors. PTSOF ¶ 135. TMS included this language despite knowing that these passive features, which rely on natural forces to remove humidity, did not remove enough moisture to remedy the Defect. *Id.*

And SET engaged in additional efforts to conceal the Defect and disseminate misinformation about the cause of HVAC odor. In April 2013, SET Consumer Retention Specialist, Jennifer Geiger, created a "best practices" document for dealing with HVAC odor

which directed dealerships, to among other things, refer customers to TMS' misleading Owner's Manual language and the misleading Tech Tips. PTSOF ¶ 136. When TMS employees at Toyota's Customer Experience Center ("CEC") strayed from Defendants' false and misleading narrative and instead instructed customers to have a repair performed for AC odor, Geiger became "infuriated." PTSOF ¶ 137. SET Field Technical Specialist, Daniel Silva, instructed:

> We need to relay to customers when speaking to them that a/c odor is a possible characteristic of the vehicle based on environmental conditions (it's in the owners manual). ***They do not need to say things like "we've seen this a lot" or "we know about this problem but have no solution."***

*Id*. When SET became aware that CEC was informing customers that HVAC odor was caused by "bacteria, spores, and dirt" that "remain on a moist evaporator," and directing customers to contact Toyota dealerships for a thorough evaluation, Geiger responded: "This is NOT an OK explanation. I am contacting our tech center immediately." PTSOF ¶ 138.

### 4. Toyota Refused to Ameliorate the Problem Caused by the Defect

In addition to claiming that HVAC odor was normal and refusing to redesign the HVAC Systems,[5] the Toyota Defendants refused to implement standard equipment that would abate HVAC odor caused by the Defect. Toyota's internal studies confirmed that an active design feature such as Afterblow—which forces air through the HVAC system after the vehicle is turned off— was necessary to remove the accumulated moisture that encourages microbial growth and odors. PTSOF ¶ 139. Despite studying Afterblow and acknowledging its effectiveness, the Toyota Defendants never installed it in the Camry Vehicles. *Id.* Defendants also knew incorporating charcoal filters as original equipment would improve HVAC odor, but this was never done because TMC did not want to absorb the cost of installation or pay for filter replacements every 10,000 miles (in order to maintain effectiveness) under warranty. PTSOF ¶ 140. Defendants also feared

---

[5] "HVAC Systems" refers to the HVAC systems in the Camry Vehicles.

shifting the cost of charcoal filter replacement to customers because it would impact third-party cost of ownership ratings, thereby potentially decreasing Camry Vehicle sales. *Id.*

Beginning with the 2016 Camry, in a tacit acknowledgment of the Defect, Defendants began installing charcoal filters as a short term solution to odor complaints. PTSOF ¶ 141. In a notably deliberate and brazen effort to continue hiding the truth, TMS Vice President Andrew Coetzee acknowledged a redesign was necessary to remedy HVAC odors and agreed with a proposal to install charcoal filters as a temporary fix—but recommended that TMS conceal that the charcoal filter was to help with HVAC odor. Instead, Coetzee suggested: "come up with a good marketing terminology for this filter to avoid questions from customers." PTSOF ¶ 142. Thus, instead of disclosing that charcoal filters were intended to abate HVAC odor, TMS deceived customers by marketing the filter change on Coetzee's proposed false premise—that charcoal filters "filter[] pollen etc [sic] better than normal filter[s]?" *Id.*

### B. The Camry Vehicles' HVAC Systems Were Defective

Plaintiffs' experts have confirmed that a common Defect existed in Plaintiffs' Camry Vehicles at the time of sale. PTSOF ¶ 143. Murat Okçuoğlu—an automotive engineer with over 40 years of experience (whose expert opinions regarding design defects in Toyota's HVAC systems have been accepted twice to defeat summary judgment motions)[6]—has opined that that "[g]iven the design defects in the Camry Vehicles, moisture accumulates in the Camry Vehicles' HVAC systems, leading to microbial growth and resulting odor." *Id.* A properly designed HVAC system will not allow moisture, humidity and organic matter to accumulate within the HVAC system because that leads to microbial growth and odors. PTSOF ¶ 8. HVAC odors shouldn't

---

[6] *See Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2017 WL 11247885, at *4-5 (C.D. Cal. Sept. 29, 2017); *Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, 2019 WL 1452908, at *3-6 (C.D. Cal. Mar. 8, 2019).

present themselves to the customer in a properly designed vehicle. *Id*. Mr. Okçuoğlu explained:

> The design traps, instead of flushing out, the contaminants with flowing condensation, creating an ideal breeding habitat for organic matter" and "[t]he contamination causes microbial growth and resulting malodors, most obvious right after first startup of the vehicle after an extended period, when organic activity of biologic matter and accumulation of resultant byproduct odors are expelled into the cabin.

PTSOF ¶ 143. Industrial hygienist, Steven Parkhurst, who analyzed air and surface samples from the Camry Vehicles, also opined that "the conditions created by the design of the Camry Vehicles' HVAC systems promote microbial growth, including mold and bacteria and resulting malodors."

PTSOF ¶ 144. As Mr. Parkhurst explains:

> Nutrient particles, organic matter, and dusts can become trapped in the nooks and crevices identified in the Camry Vehicles' HVAC Systems' evaporator housings, supplying a food source for microorganisms. With food, water, and temperature biologically available, mold and bacteria germinate, colonize, and proliferate. Once biologic agents enter their metabolic primary and secondary phases, MVOCs (aka: malodors) are released from reproducing microorganism cells into the evaporator housing. Next, the forced-air fan actively distributes malodors and sometimes the microorganisms themselves into the passenger compartment. Design flaws such as defective air flow, dead spots, inadequate condensate water drainage, and porous foam materials only serve to amplify the favorable microbial growth environment.

*Id.*. Based on his own air and surface sampling, and analysis of record evidence, Mr. Parkhurst has opined "that the design defects described by Mr. Okçuoğlu lead to the three sentinel criteria for microbial growth in the HVAC Systems—food, temperature, and moisture—and that, as a result, all Camry Vehicles are subject to mold and bacteria growth and resulting malodors" and health hazards. *Id.*

## III.    LEGAL STANDARD

A motion for summary judgment will only be granted when there is no genuine issue as to any material fact, entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must show that, "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The

moving party bears the burden to demonstrate that it is entitled to summary judgment, including identifying the elements of the claim or defense and all the evidence it believes proves the absence of a material factual dispute. *Walker*, 911 F.2d at 1576 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). A court must construe the evidence in the light most favorable to the non-moving party. *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1253 (11th Cir. 2015).

## IV.     ARGUMENT

### A.     Summary Judgment Should Be Denied on Plaintiffs' RICO Claims

Defendants' attempt to escape liability by reframing RICO as a statute directed solely at the "mafia" or "gangs" has long been rejected. If RICO is to be limited to organized crime, that is the job of Congress—not the courts. It is well-established that legitimate businesses like Toyota and SET will be held liable under RICO where, as here, they engage in racketeering activity to defraud consumers.[7] Indeed, the Supreme Court has expressly recognized that RICO's application is not limited to conduct that is "characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 243 (1989). Rather, any conduct that satisfies RICO's elements will suffice, as legitimate enterprises have "neither an inherent incapacity for criminal activity nor immunity from its consequences." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985).

---

[7] Toyota is no stranger to criminal conduct. Several years ago, Toyota entered into a settlement resolving a wire fraud charge, agreeing to pay a $1.2 billion fine and specifically "admit[ting] that it misled U.S. consumers by concealing and making deceptive statements about two safety related issues affecting its vehicles" and "also concealed from [its] regulator one safety-related issue and minimized the scope of another [safety-related issue]." Verified Complaint at ¶¶ 1, 23, 24, *United States v. $1,200,000,000 in U.S. Currency*, 14-cv-1907 (S.D.N.Y. Mar. 19, 2014), ECF No. 2-1.

Here, Plaintiffs have sufficient evidence to establish—or at the very least raise a genuine factual dispute—as to each of the elements of their RICO claims. As set forth below, Defendants were part of a RICO enterprise, conspired and committed mail and wire fraud to further their scheme, and injured Plaintiffs by causing them to overpay for their Camry Vehicles. Toyota has not come close to satisfying its burden to show that there are no triable issues of fact. *Walker*, 911 F.2d at 1576.

      **1.**      **There Are Triable Issues of Fact as to Whether Defendants Engaged in the RICO Predicate Acts of Mail and Wire Fraud**

Plaintiffs have established a racketeering claim predicated on mail and wire fraud, including Defendants' "(1) intentional participation in a scheme to defraud; and (2) [ ] use of the interstate mails or wires in furtherance of that scheme." *Cardenas*, 418 F.Supp.3d at 1099; *United States v. Ellington*, 348 F.3d 984, 990 (11th Cir. 2003). As this Court already recognized, a "scheme to defraud" can be shown either through a material misrepresentation, or through an omission or concealment of a material fact calculated to deceive another out of money or property—both of which Plaintiffs have established through discovery. *Cardenas*, 418 F.Supp.3d at 1099. Previously, this Court found that several allegations "stand out" as strong evidence that Defendants engaged in mail and wire fraud by taking "actions to mislead consumers, or conceal from them, the existence and/or full nature of the [HVAC] Defect in order to avoid liability and to maintain revenue." *Id.* at 1100. Those allegations concerned that: (i) SET had stopped attempting to repair vehicles with HVAC odor because of the severity of state Lemon Laws, including in the state of Florida; (ii) Defendants disseminated standardized language to explain to customers that the HVAC odor was "normal"; and (iii) Toyota employees recognized the challenges explaining "why to get what a customer should expect as a standard condition for the air conditioner (no odor) [Defendants] charge more." *Id.* at 8.

Discovery has confirmed that Defendants misrepresented and omitted these material facts and they did so in furtherance of a scheme to conceal the Defect, protect the Toyota brand name, sell more vehicles, and avoid costly repairs and buybacks.

### a. Plaintiffs Have Evidence of Affirmative Misrepresentations

Discovery has shown that Defendants made affirmative misrepresentations: they misrepresented that HVAC odor is "normal"; a natural phenomenon not caused by microbial growth in the HVAC system; and a problem that cannot be remediated.

***Camry Owner's Manuals.*** Toyota included misleading statements in the Owner's Manuals distributed to Class Members stating that air conditioning odors were not a result of microbial growth in a damp environment, but instead were caused by "various odors from inside and outside the vehicle," which during use, "may enter into and accumulate in the air conditioning system."[8] PTSOF ¶ 135. Defendants also recommended that the HVAC Systems be set to outside air mode prior to turning off the vehicle to reduce potential odors, despite knowing that the effect of such passive features, which rely on natural forces to remove humidity, did not remove enough moisture to remedy the Defect. *Id.*

These affirmative representations were intentionally false and misleading. For example, by the time these Owner's Manuals were distributed to Class Members, Toyota had already issued TSB AC002-97, which internally acknowledged "[m]icrobial growth in the evaporator [of the HVAC system], arising from dampness in the evaporator housing where the cooling air flow is dehumidified." PTSOF ¶ 113. It had also issued training materials informing its technicians that HVAC odors in its vehicles were caused by "[m]icrobes growing on the evaporator surfaces . . . which are carried into the evaporator case, then grow in the warm, moist environment," PTSOF ¶

---

[8] The Toyota Camry Owner's Manuals are available online. *See* PTSOF ¶ 135.

114. Thus, despite the fact that Toyota knew that the HVAC odor issue in its vehicles was the result of accumulated moisture and microbial growth—just as Plaintiffs assert here—it worked with SET, the "face of Toyota" in the Southeast, to misleadingly communicate to consumers that the odors were naturally occurring and could not be fixed. PTSOF ¶ 120

*TSBs, Tech Tips and Best Practices Memo.* In 2013, Toyota further standardized its script to communicate this misleading information to consumers by issuing TSB 142-13, which informed SET dealerships that HVAC odors are "naturally occurring from the HVAC system and/or related environmental factors" and that "[i]t is normal to experience odor upon the initial startup." PTSOF ¶¶ 11, 134. TSB 142-13 provided Toyota dealers with express language to inform customers that "there is no way to eliminate these odors" and recommend costly procedures that could be performed at customers' expense to "minimize the odors experienced." *Id.* Toyota also issued Tech Tips to SET dealerships with similarly misleading information, (*see* PTSOF ¶ 134 ("Odors emitted from the A/C system are a normal characteristic of automotive A/C systems.")), with the expectation that that information would be relayed to consumers and reduce warranty claims and buybacks. *Id.* Toyota's and SET's plan worked. PTSOF ¶ 134 ("Warranty has gone down as no other effective repairs are available and customers are being told this condition is 'normal'"); PTSOF ¶ 135 ("customer is to be advised that odors emitted from the A/C system are a normal characteristic of automotive a/c systems and that it is normal to experience odor upon the initial startup due to the moist/humid air that is trapped in the HVAC system, after the vehicle has been parked"); *Id.* SET Consumer Retention Specialist Jennifer Geiger also created a "best practices" document for dealing with HVAC odor complaints, telling dealerships to direct customers to TMS' misleading Owner's Manual language and the misleading Tech Tips. PTSOF ¶ 136.

These TSBs, Tech Tips, and "best practices" document, which created a uniform script for SET dealerships to deceive customers complaining about HVAC odor, were clearly false and misleading. Moreover, in April 2012, TMC's Overseas Service Field Operations Division ("OFSOD") conducted a Field Visit in South Florida with TMS and SET personnel to investigate dissatisfaction with Komori Odor Logic. While there, they observed that dealerships were explaining to customers that the HVAC odor "is normal," and that no repairs were available, in order to avoid Lemon Law liability. PTSOF ¶ 116, 133. Later that year, TMS Product Engineer, Christopher Hitt, noted in an email to Bill Bergen, Toyota's National Manager for Field Technical Operations, that "AC odor has been one the top issues for SET for the last few years," but "because of the severity of the Lemon Law in the state of Florida . . . SET started to tell customers the condition was normal." PTSOF ¶ 116, 133.

But internally, Defendants acknowledged that certain fixes *were* available, including redesigning the HVAC systems or implementing charcoal filters, Afterblow, or evaporator coating changes,[9] and that HVAC odor in the Camry was among the worst of its competitors.[10] PTSOF ¶ (Initial Wright Report at 5) ("[R]ather than attempt to find a system design remediation, which would be standard industry practice, Toyota portrayed HVAC odor as a natural phenomenon not caused by the HVAC system and that could not be remediated. This is false."). Defendants made clear affirmative misrepresentations as part of their unlawful scheme to defraud consumers, including Plaintiffs.

And Toyota's argument that summary judgment is appropriate because Plaintiffs and their experts have not identified which affirmative misrepresentations are actionable should be given

---

[9] *See, e.g*, PTSOF ¶¶125, 139-142
[10] *See, e.g*, PTSOF ¶¶ 14, 21, 130

short shrift. It is well-established that named plaintiffs are not required to have a full understanding of the facts and legal theories of a case and experts do not offer legal conclusions. *Gomes v. Portfolio Recovery Assocs., LLC*, 2019 WL 978806, at *9 (S.D. Fla. Feb. 28, 2019); *Bouton v. Ocean Props., Ltd.*, 2017 WL 4792488, at *14 (S.D. Fla. Oct. 23, 2017). Moreover, this is a red herring as there is no doubt that here, Toyota's misrepresentations were directed at purchasers of Camry Vehicles, including Plaintiffs, making Toyota's cited cases inapposite.[11]

### b. Plaintiffs Have Evidence of Actionable Omissions

Plaintiffs have also raised actionable claims based on Defendants' omissions regarding the Defect. As the Eleventh Circuit has explained: "The nondisclosure of material information, even in the absence of any patently false statements, can also constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose. . . . Such a duty can be judicially created where there is a special relationship of trust between the parties, ***or may be based on other circumstances.***" *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359–60 (11th Cir. 2004). *See also Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000) ("[M]aterial omissions can be fraudulent if they are intended to create a false impression").

Toyota's argument that it is entitled to summary judgment because it did not have a duty to disclose the Defect is wrong. As this Court recognized in *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1278 (S.D. Fla. 2003), transactional relationships "can provide the context for RICO mail fraud claims if there is a pattern of misrepresentations amounting to both a scheme to

---

[11] In *Meridian Tr. Co. v. Batista*, a decision on a motion to dismiss, the court found plaintiffs did "not identify in the Complaint any misrepresentations made by [defendant.]" 2018 WL 4693533, at *8 (S.D. Fla. Sept. 26, 2018). This Court already denied Toyota's motion to dismiss and Plaintiffs have established evidence of affirmative misrepresentations; *Meridian* is irrelevant. Likewise, in *Allocco v. City of Coral Gables*, the court found that the letters at issue either did not contain fraudulent statements or were private communications sent to third parties and not plaintiffs—circumstances that do not exist here. 221 F. Supp. 2d 1317, 1365 (S.D. Fla. 2002), *aff'd*, 88 F. App'x 380 (11th Cir. 2003).

defraud and racketeering activity[.]" Significantly, "[c]oncealment of critical data, even without a formalized duty to disclose, may also constitute mail and/or wire fraud in certain situations." *Id.* The Eleventh Circuit has further cautioned: "It would be unduly constrictive to hold that a duty to disclose can only exist where it is statutorily or contractually implied; the complexity of transactional relationships is such that duties to disclose may exist in other situations if the transaction is to be legitimate." *Langford*, 231 F.3d at 1313 ("Determinations as to whether a duty to disclose information exists must be made on a case by case basis, with appropriate attention given to the nature of the transaction and the relationship between the parties.").

Here, Plaintiffs have, at a minimum, raised triable issues of fact as to whether Toyota had a duty to disclose material information about the Defect. Instead, Defendants repeatedly misled the public by disseminating misinformation through TSBs, Tech Tips and other communications, as well as through internet postings and Owner's Manuals. Toyota was, in light of these misrepresentations, also duty bound to correct the mistaken impression it intentionally fostered through representations describing HVAC odor as a normal and naturally occurring industry-wide issue. *See Kemp*, 393 F.3d at 1360 (duty to disclose exists "to correct the mistaken impression [defendant] fostered"); *In re Managed Care*, 298 F. Supp. 2d at 1278 (finding duty to disclose exists where "disclosure was necessary to prevent the [plaintiffs] from being misled by Defendants' apparent actions and statements").

As in *In re Managed Care*, Defendants here had a duty to correct the misleading impression they fostered, since the "failed disclosures" regarding the nature and existence of the Defect "go to the heart of [the Parties'] relationship and disclosure was necessary to prevent [Plaintiffs] from being misled." 298 F. Supp. 2d at 1278 ("While Defendants insist on focusing on the individual

contractual level in this class action, the Plaintiffs' allegations of a fraudulent scheme takes place on a far wider systematic level—a significant distinction").

The caselaw on which Toyota relies is inapposite. First, contrary to Toyota's suggestion, *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043 (11th Cir. 2007), *Crawford's Auto Ctr., Inc. v State Farm Mut. Auto. Ins. Co*., 945 F.3d 1150 (11th Cir. 2019), and *Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352 (11th Cir. 2011) do ***not*** hold that a duty to disclose ***only*** arises under statute or where a fiduciary relationship exists. Mot. at 12-13. Significantly, Toyota misleadingly quotes only a portion of the Eleventh Circuit's decision in *Am. United Life Ins. Co*. to suggest that a duty to disclose can only arise "by statute;" instead, the full quote shows that the Eleventh Circuit actually found that a duty to disclose can arise "either by statute ***or otherwise***"—directly in line with this Court's holding in *In re Managed Care*.[12] *Am. United Life Ins. Co*, 480 F.3d at 1065. Similarly, in *Crawford's Auto Ctr*. and *Ironworkers Local Union 68*, the Eleventh Circuit did not limit the duty to disclose to fiduciary relationships or statutorily imposed obligation, but instead found that plaintiffs failed to allege any duty to disclose under completely dissimilar sets of facts.[13]

---

[12] Indeed, Toyota's use of an incomplete quotation from *Am. United Life Ins. Co.* to assert that "[t]he Eleventh Circuit ***has made clear that***, under the mail and wire fraud statutes, a duty to disclose arises only 'by statute'" is disingenuous. Mot. at 12.

[13] For example, in *Crawford's Auto Ctr.*, the court found that a group of auto repair shops failed to allege that a group of insurance companies working with competing auto repair shops had a duty to disclose—no such competitive situation exists here and Plaintiffs allege actionable misrepresentations and omissions. 945 F.3d at 1159. Similarly, in *Ironworkers Local Union 68*, a group of third-party payers for health care services brought claims against a pharmaceutical company, alleging that it fraudulently induced healthcare providers into writing off-label prescriptions; however, the court found that plaintiffs had not suffered any economic injury and, in dicta, noted that the plaintiffs' direct fraud claims hinged on requiring the pharmaceutical company to disclose "its fraudulent conduct *to allow the insurers to amend their existing business practices*[]" and there was no duty to disclose under these circumstances. 634 F.3d at 1368, n.33. Notably, in support, the Eleventh Circuit cites *United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir. 1996), which predates *In re Managed Care*, *Langford*, and *Kemp*.

18

Here, as in *In re Managed Care*, Defendants had a duty to disclose the truth about the Defect based on their concerted efforts to foster the mistaken impression that HVAC odor was "normal" in order to further their scheme to conceal the Defect. 298 F. Supp. at 1278. [14]

## 2. There Are Triable Issues of Fact as to Whether Defendants Formed a RICO Enterprise

Toyota has also failed to refute this Court's prior finding that Plaintiffs have established an association-in-fact RICO enterprise with "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Cardenas*, 418 F.Supp.3d at 1101-02 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009); *In re Managed Care*, 298 F. Supp. 2d at 1273-75 (rejecting argument that enterprise is not "sufficiently discrete" and noting "the Eleventh Circuit has not bound itself to strict metaphysical structural requirement" in defining RICO enterprises).

Plaintiffs have proffered evidence that Toyota and SET, separate and distinct entities, worked together to enrich themselves by concealing the Defect and portraying HVAC odor as normal and industrywide. PTSOF ¶¶ 13, 120. *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (all that is required to show a RICO enterprise is "an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity"). Plaintiffs have established that Toyota and SET engaged in a RICO enterprise with a common purpose, including selling

---

[14] Toyota's reliance on *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 522 (11th Cir. 2000) and *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1236 (S.D. Fla. 2017) (Mot. at 13) is misplaced because the duty to disclose in those cases was predicated on the Safety Act, which has its own remedies for nondisclosure. *Drummond v. Zimmerman* is also distinguishable because the court found, on a motion to dismiss, that, not only had plaintiffs' own standard not been met, but plaintiffs also failed to identify what information was omitted. 454 F. Supp. 3d 1210, 219 (S.D. Fla. 2020). Here, having survived Defendants' motion to dismiss, Plaintiffs have established that there is no statutory or fiduciary relationship required to establish a duty to disclose; Defendants' concealment of a material fact is enough to create a duty to disclose.

more Camry Vehicles, transferring the costs of repair, denying warranty claims and avoiding buybacks. PTSOF ¶ 134. Indeed, this Court previously recognized that Toyota and SET "served a common purpose: to sell as many Defective HVAC Systems and Class Vehicles containing the Defective HVAC Systems, as possible, and thereby maximize the revenue and profitability of the Toyota RICO Enterprise's members." *Cardenas*, 418 F.Supp.3d at 1102. Based on the evidence, a jury could find that Defendants collectively served a common purpose to conceal and misrepresent the nature and existence the Defect in order to enrich themselves through ***fraud***. *In re Managed Care*, 298 F. Supp. 2d at 1275 (finding enterprise where the entities "are alleged to have a stake in the ongoing function of the enterprise").

Toyota's citation to *Cisneros v. Petland, Inc.*, 972 F.3d 1204 (11th Cir. 2020) does not change this analysis.[15] The *Cisneros* court affirmed dismissal of the complaint, citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), on the grounds that the plaintiff—unlike Plaintiffs here—***had failed to allege any facts showing a shared purpose to defraud***, instead merely alleging that the defendant "operates a franchise business like any other franchisor." *Cisneros*, 972 F. 3d at 1215. Here, this Court already found that Plaintiffs' allegations satisfied *Twombly*—which is irrelevant on summary judgment. In any event, as the *Cisneros* court explained, Plaintiffs can establish a RICO enterprise "where the participants' ultimate purpose is to make money for themselves" by alleging "that the participants shared the purpose of enriching themselves through a particular criminal course of conduct." *Id.* at 1211. Here, Plaintiffs have done just that. PTSOF ¶¶ 13, 92, 120, 134. Notably, discovery has further shown that Defendants engaged in a RICO

---

[15] Toyota's arguments regarding a "distinctiveness requirement" under RICO are irrelevant (Mot. at 14), as Plaintiffs have established that the RICO enterprise does not merely consist of TMC, TMS and TEMA (or their employees), but also includes SET and others. ==PTSOF ¶ 13; PSSOF ¶¶ 6, 7, 16,19, 28, 55-57.==

enterprise with a common purpose to defraud Plaintiffs. *Cardenas*, 418 F.Supp.3d at 1102; PTSOF ¶ 92. At bottom, Toyota has failed to show there are no genuine issues of material fact in dispute as to the formation of a RICO enterprise.

### 3. There Are Triable Issues of Fact as to Whether Plaintiffs Were Injured By Reason of Defendants' RICO Violations

To establish RICO causation, a plaintiff need only show a direct link between Defendants' unlawful scheme and Plaintiffs' injury. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653-54 (2008) (finding RICO causation only requires that the alleged violation led directly to plaintiffs' injuries); PTSOF¶¶ 108-111. *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) (to show RICO causation, the "injurious conduct need not be the sole cause of the plaintiffs' injuries, but there must be 'some direct relation' between the conduct and the injury to sustain a claim."). Here, Plaintiffs have proffered evidence that Defendants' misrepresentations and omissions regarding the nature and existence of the Defect directly and proximately caused Plaintiffs to overpay for their Camry Vehicles. As multiple courts have recognized, a product with a defect is worth less than one without a defect.[16] Moreover, Plaintiffs have submitted evidence that, "if Defendants had disclosed the Defect, Plaintiff[s] would not have purchased or would have paid less for the Class Vehicle." PTSOF ¶¶ 40, 57, 72. Plaintiffs' experts Steven Gaskin and Colin Weir have further shown Plaintiffs' injuries are the "direct result" of Defendants' RICO violations by calculating the amount that Plaintiffs and Class Members overpaid for their Camry Vehicles with the undisclosed Defect. *Bridge*, 553 U.S. at 653-54; *In re Takata Airbag Prod. Liab. Litig.*,

---

[16] *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 951 (N.D. Cal. 2018); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 1382297, at *5 (E.D. Mich. Apr. 18, 2017); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1229 (S.D. Fla. 2014); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011).

2015 WL 9987659, at *1-2 (S.D. Fla. Dec. 2, 2015) (finding overpayment for defective vehicles as a result of a conspiracy to conceal a defect may support RICO causation).

Toyota's assertion that Plaintiffs may only demonstrate RICO causation by showing reliance is wrong. Mot. at 16–17. As the Supreme Court stated in *Bridge*: "Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate racketeering act under RICO, ***even if no one relied*** on any misrepresentation." 553 U.S. at 648; *see also id.* at 648, 661 (finding nothing on the face of the RICO statute imposes a first-party reliance requirement and no showing of reliance is required to establish a RICO violation). The fact that Defendants' RICO violations caused Plaintiffs' injuries (i.e., overpayment for the defective Camry Vehicles) remains true regardless of whether Plaintiffs relied on Defendants' misrepresentations or omissions. *See id.* at 649-50; *Ray*, 836 F.3d at 1350 ("To be sure, ***RICO does not contain a requirement that the plaintiff personally relied on the defendant's fraudulent misrepresentation***."); *Montoya v. PNC Bank, N.A.*, 94 F. Supp. 3d 1293, 1306 (S.D. Fla. 2015) ("The *Bridge* Court was unequivocal: '[O]ne can conduct the affairs of a qualifying enterprise through a pattern of [racketeering activity indictable as mail fraud] without *anyone* relying on a fraudulent misrepresentation.'"). [17]

Indeed, while Toyota conflates reliance and causation, the Supreme Court has made clear that reliance and causation are distinct concepts: "[T]he fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action." *Bridge*, 553 U.S. at 659; *see also*

---

[17] Toyota's citation to *Ray* to impose a reliance requirement is off base. Mot. at 16. In *Ray*, the court found plaintiff did not plead a RICO injury where the complaint rested on bald conclusions and there were no allegations that Plaintiffs would not have purchased an airline ticket had they known an $8.99 fee was imposed by Defendants rather than the government. 836 F.3d at 1350-51.

*id.* at 661 (finding a RICO plaintiff "***need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentation****s*."). The Supreme Court explicitly found that RICO causation ***does not require reliance*** on any of the misrepresentations or omissions that constitute the separate predicate act of mail or wire fraud.[18] *Id.* at 648. Here, Plaintiffs' injury (i.e., overpayment for defective Camry Vehicles) was directly caused by Defendants' RICO violations. *See id.* at 647 ("The gravamen of the offense is the scheme to defraud").

Toyota's citations to the Second Circuit's decision in *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71 (2d Cir. 2015) and irrelevant testimony from Plaintiffs do not save its arguments. Mot. at 16-17. In fact, Plaintiffs have proffered individual and classwide evidence demonstrating that they overpaid for their Camry Vehicles as a result of Defendants' fraudulent scheme—this establishes RICO causation and injury.[19] *See, e.g.*, PTSOF ¶¶ 40, 57, 72; PTSOF ¶¶ 53, 66, 83, 109; *Takata*, 2015 WL 9987659, at *1-2; *Cannon v. Wells Fargo Bank, N.A.*, 2014 WL 324556, at *3 (N.D. Cal. Jan. 29, 2014) (finding that plaintiff demonstrated RICO causation because "it is plausible that [p]laintiffs would not have paid, or would have contested, the premiums for the force-placed insurance, if [d]efendants had disclosed that the premiums included unearned kickbacks rather than earned commissions"). By contrast,

---

[18] Toyota's reliance on *Beck v. Prupis*, 162 F.3d 1090 (11th Cir. 1998) is misguided, as the Eleventh Circuit's decision in *Beck* predates *Bridge* by a decade.

[19] Each Plaintiff made payments and overpaid for their Camry Vehicles with the concealed Defect as a result of Defendants' unlawful scheme. PTSOF ¶¶ 43, 53, 59, 66, 67, 83. Contrary to Toyota's assertions (Mot. at 16-18), there is no requirement that Plaintiffs pay the down payment, recall the exact amount paid to date or specifically describe the disclosure Toyota should have made regarding the Defect. Moreover, Baker's knowledge of the "potential for vehicle odor" does not equate with knowledge of the concealed Defect and Toyota's assertion that Baker "experienced no HVAC odor" in his Camry Vehicles is belied by the facts. PTSOF ¶¶ 41, 44, 46, 47. *See* Mot at 17-18.

Toyota has presented **no evidence** that Plaintiffs, who each paid for their Camry Vehicles, would have paid the same amount had the Defect been disclosed. PTSOF ¶ 110. At a minimum, Toyota has failed to show an absence of disputed issues of fact regarding whether Defendants' RICO violations caused injury to Plaintiffs and summary judgment is inappropriate.

### 4. There Are Triable Issues of Fact as to Whether Plaintiffs Have Suffered RICO Injury

As described above, Plaintiffs have proffered evidence to establish they overpaid for their defective Camry Vehicles as a result of Defendants' fraudulent scheme—establishing RICO injury. *See Bridge*, 553 U.S. at 654-55 (finding RICO injury focuses on the ability to "ascertain[] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors"). Courts have regularly found RICO injury can be established by demonstrating plaintiffs overpaid for a product or service, as Plaintiffs have done here. *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1121 (S.D. Fla. 2019) (sustaining RICO claim and finding plaintiffs alleged the requisite economic injury where "[p]laintiffs . . . assert they suffered economic injuries and are entitled to damages comprising the value they overpaid for their vehicles[.]"); *Dolan v. JetBlue Airways Corp.*, 385 F. Supp. 3d 1338, 1354 (S.D. Fla. 2019) (holding that plaintiff adequately alleged requisite injury to business or property pursuant to RICO "by paying more for a service than its actual value").

Here, Plaintiffs have proffered expert testimony establishing overpayment damages, through a conjoint analysis and cost of repair overpayment proxies, demonstrating the amount that members of the Classes, including Plaintiffs, overpaid for their Camry Vehicles due to Defendants' unlawful scheme to conceal the Defect.[20] PTSOF ¶¶ 108-111. Plaintiffs' evidence of overpayment

---

[20] Plaintiffs' experts do not concede that their damages models are not applicable to purchasers of used vehicles or those who resold their vehicles as Toyota suggests. Mot. at 18. Rather, Plaintiffs' experts calculate damages at the time and point of first purchase in order to calculate the aggregate

damages establishes the economic injury required to succeed on a RICO claim and precludes summary judgment. *See In re Chrysler-Dodge-Jeep Ecodiesel*, 295 F. Supp. 3d at 959 (upholding RICO claim where "[p]laintiffs' alleged overpayment constitutes a harm to a specific. . . property interest"); *Hartford Steam Boiler Inspection and Ins. Co. v. Space 01 Condo Ass'n., Inc.*, 2020 WL 3315974, at *4 (S.D. Fla. Apr. 27, 2020) (denying summary judgment because there were questions of fact that should "be determined by battling experts and a jury evaluating their testimony").

Inexplicably, one of the cases that Toyota cites to support summary judgment on RICO injury does not involve RICO and involves circumstances where the plaintiffs proffered ***no evidence*** of actual damages. *See London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1306 (11th Cir. 2005) (plaintiffs "proffered *no evidence* from which a jury could calculate any alleged loss with reasonable certainty" on state law claims) (Mot. at 18). The other, *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1234 (11th Cir. 2009), is inapposite because plaintiff's expert opinion on injury and damages (which in no way relates to the overpayment damages alleged here) had already been excluded and therefore plaintiff was left with no evidence of injury. In stark contrast, here, Plaintiffs have offered two expert reports demonstrating overpayment damages, which can be used to support a RICO claim. *See In re Takata*, 396 F. Supp. 3d at 1121 (sustaining RICO claim and finding plaintiffs alleged the requisite economic injury where "[p]laintiffs . . . assert they suffered economic injuries and are entitled to damages comprising the value they overpaid for their vehicles[.]").

---

classwide damages, which can then be applied to each individual class member, including Plaintiffs. PTSOF ¶ 111; *Waters*, 172 F.R.D. at 506.

Toyota's argument against Plaintiffs' use of classwide damages is puzzling and, not surprisingly, Toyota cites no caselaw in support of its flawed argument.[21] To the contrary, aggregate classwide damages, such as those calculated by Mr. Weir and Gaskin, are routinely applied to establish direct economic injury in class actions including RICO class actions. *See Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 506 (S.D. Fla. 1996) (finding that RICO damages could be calculated based on the aggregate amount of class members injuries). Here, Plaintiffs have calculated the "total harm caused by" Defendants and, more fundamentally, damages have been calculated on a per vehicle basis. Ex. 52. Thus, any assertion that "no expert has attempted to evaluate whether any individual plaintiff has suffered actual damage and, if so, the amount of his or her injury" (Mot. at 18) is flatly wrong. Plaintiffs, like members of the classes, sustained damages and those damages have been calculated – per vehicle – and then simply aggregated to arrive at a classwide amount. Ex. 52. RICO injury, both of the Plaintiffs individually and the class as a whole, has been established and nothing further is required at this time. Any argument as to which purchasers are entitled to recover will be dealt with post-judgment. Post-judgment allocation will determine the exact amount any individual class members, including Plaintiffs, can recover. *See Waters*, 172 F.R.D. at 484 (finding in class case "that the jury can assess damages on an aggregate basis subject to adjustments and a claims administration process"); *cf. Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) (accepting Gaskin's conjoint analysis as a measure of actual damages for a class that included used vehicle purchasers). Accordingly, Plaintiffs have offered evidence demonstrating that, at a minimum, there are triable issues of fact concerning whether Plaintiffs suffered RICO injury.

---

[21] *London* does not support Toyota's suggestion that Plaintiffs' damages cannot be established based on a calculation of classwide damages. *See* PTSOF ¶¶ 108-111.

5. **There Are Triable Issues of Fact as to Whether Defendants Engaged in a RICO Conspiracy**

Plaintiffs have proffered evidence that Defendants engaged in a RICO conspiracy. Indeed, this Court has already found that Plaintiffs have provided "specific communications between separate Toyota entities, showing the Toyota Defendants and Southeast Toyota had knowledge of the Defect, yet did not disclose, and actually concealed, the Defect from the public." *Cardenas*, 418 F.Supp.3d at 1102. Notably, "[a] defendant may also be guilty of conspiracy even if he did not commit the substantive acts that could constitute violations of an underlying RICO count." *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 407 F. Supp. 3d 1216, 1243 (N.D. Ala. 2019) (quoting *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007)). Rather, a plaintiff can establish a RICO conspiracy claim by showing defendants: (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010); *see also Cardenas*, 418 F.Supp.3d at 1103 ("An agreement under RICO need not be established by direct evidence, however; it may be inferred from the conduct of the participants.").

As detailed in Plaintiffs' Opposition to SET's Motion for Summary Judgment ("SET Opp."), which is incorporated herein by reference, the record is replete with evidence that SET was aware of and agreed to the overall objective of the conspiracy—to conceal a known Defect in the HVAC Systems of Camry Vehicles in order to sell more vehicles, transfer the cost of repair to consumers, and avoid costly warranty claims and buybacks under Florida's and other states' Lemon Laws.[22] SET Opp. at **

---

[22] Toyota's citation to *Astro Tel, Inc. v. Verizon Fla., LLC*, 979 F. Supp. 2d 1284, 1295 (M.D. Fla. 2013) is inapposite as there the court found that plaintiff had not set forth any evidentiary foundation for a RICO conspiracy. By contrast here, Plaintiffs have clearly set forth evidence of a RICO conspiracy and Toyota cannot show there are no disputed issues of fact as to whether it conspired with SET to misrepresent the existence and nature of the Defect and conceal the Defect.

Acutely aware that HVAC odor complaints were "one of the top issues" for SET, complaints that SET consistently relayed to Toyota, SET partnered with Toyota to investigate, diagnose, and ascertain the cause of the Defect and to develop potential solutions. SET Opp. at ** SET also conspired with Toyota to conceal this known Defect, mislead customers about it, prevent the release of information that would reveal the Defect, and maintain a consistent and misleading public position that HVAC odor in the Camry Vehicles was naturally occurring when they knew it was not. SET Opp. at **. SET even went so far as to strategize with Toyota to coach dealerships and technicians on what terminology to avoid, and how to increase SET's chances of success in defending Toyota in arbitration and Lemon Law Proceedings. SET Opp. at **. SET's agreement to the overall objective of the conspiracy is also exemplified by its development, review, and approval of deceptive marketing materials related to the HVAC odor defect on Toyota's behalf. SET Opp. at **. At a minimum, triable issues of fact exist.

### 6.  Baker's RICO Claims Are Not Time-Barred

Baker's RICO claims are timely. First, Toyota's argument that "Baker testified that he smelled odor in his 2012 Camry in May 2012, and smelled odor in his 2014 Camry in May 2014" (Mot. at 20) in order to support its statute of limitations defense, directly contradicts Toyota's argument a few pages earlier where it plainly states "Baker experienced no HVAC odor." Mot. at 18; *id.* at 1. At least one of these arguments is disingenuous. Second, Baker's testimony indicating that he experienced HVAC odor in 2012 and 2014 does not cause the four-year RICO statute of limitations to run from those dates. Defendants have provided no evidence, much less undisputed evidence, supporting a claim that, at that time, Baker knew or should have known that he overpaid for his Camry Vehicles because they contained an undisclosed Defect. *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (RICO statute of limitations runs when plaintiff becomes aware that it paid more because of illegal conduct).

Moreover, a plaintiff may sue after the statutory time period has expired where, as here, Plaintiffs have established that Defendants have fraudulently concealed their misconduct. PTSOF ¶¶ 41, 133, 135, 137-138; *Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1334-35 (S.D. Fla. 2012); *GoITV, Inc. v. Fox Sports Latin Am., Ltd*., 2018 WL 1393790 (S.D. Fla. Jan. 26, 2018), at *1-2 (finding RICO statute of limitations tolled because "there is no indication Plaintiffs should have suspected they had been injured by Defendant prior to the May 2015 indictment"). Indeed, Baker took his Camry Vehicles to Toyota dealerships on numerous occasions to complain about the moldy HVAC odor, but no remedy or repair was ever completed as a result of Defendants' scheme to deny warranty claims, avoid repairs and conceal the Defect. PTSOF ¶ 41. Further, "[w]hether an individual, by the exercise of reasonable diligence, should have known he had a cause of action against the defendant is, ordinarily, an issue of fact which should be left to the trier of fact." *In re Managed Care*, 2004 WL 7334075, at *10 (S.D. Fla. July 21, 2004) (R. & R. adopted by Moreno, J., *In re Managed Care*, 2004 WL 7334073)). Thus, summary judgment is inappropriate.

### B. There Are Triable Issues of Material Fact as to Whether the HVAC Systems Are Defective

Plaintiffs have also proffered sufficient evidence showing triable issues of fact as to whether the Camry Vehicles have defective HVAC Systems. At most, Toyota's proffered evidence shows that Toyota's experts disagree with Plaintiffs' experts—such a "battle of the experts" precludes summary judgment. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) ("Federal Rule of Civil Procedure 56 and countless decisions applying it express the modern rule that a case should be put to the jury if there is any genuine issue of material fact, including one created solely by the testimony of a party.") "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

Indeed, two other courts have found plaintiffs raised triable issues of fact as to the existence of a design defect in the HVAC systems of Toyota vehicles, relying in large part on expert testimony of Murat Okçuoğlu. First, in *Salas*, which involved design defects in the HVAC systems of certain Camrys, Okçuoğlu opined that the HVAC system in the subject vehicles "lack[s] efficient drainage and contain[s] nooks and crevices that can form ideal habitats for biological matter growth[; that t]he warm, humid, dark crevices present inside this HVAC system may harbor organic matter[; and that t]he foam material design used around the evaporator also has several crevices and inherent porosity that may harbor moisture and growth." 2017 WL 11247885, at *5. Based on Okçuoğlu's opinion, and Plaintiffs' testimony that they would not have purchased the vehicles if they had known of the defect, the Court concluded that "there are triable issues regarding the existence of a design defect that causes the foul odors at issue, and whether such odors are material." *Id.* Similarly, in *Stockinger*, the court found that, "[b]ased on Okçuoğlu's opinion, Plaintiffs have raised sufficient triable issues of fact as to the existence of a design defect" which the Court found to be "more than sufficient" to defeat summary judgement. 2019 WL 1452908, at *6.

***Plaintiffs Have Identified a Defect in their Camry Vehicles.*** Here, Okçuoğlu has identified design elements in the HVAC Systems that inhibit proper draining and airflow and allow moisture accumulation, leading to microbial growth and resulting odor. PTSOF ¶ 144. Okçuoğlu explains:

> The design traps, instead of flushing out, the contaminants with flowing condensation, creating an ideal breeding habitat for organic matter. The contamination causes microbial growth and resulting malodors, most obvious right after first startup of the vehicle after an extended period, when organic activity of

> biologic matter and accumulation of resultant byproduct odors are expelled into the cabin.

*Id.* Plaintiffs' expert, Don Wright, provides further support, agreeing as an engineering matter that these design features cause HVAC odor by allowing moisture and humidity to accumulate with the HVAC system, supporting microbial growth and resulting odors. PTSOF ¶¶ 5-9, 87. Moreover, Plaintiffs' industrial hygiene expert, Steven Parkhurst, analyzed air and surface sampling taken from certain Plaintiffs' vehicles, as well as record evidence, and further opines "that the design defects described by Mr. Okçuoğlu lead to the three sentinel criteria for microbial growth in the Camry Vehicles' HVAC Systems—food, temperature, and moisture—and that, as a result, all Camry Vehicles are subject to mold and bacteria growth and resulting malodors" and health hazards. PTSOF ¶ 145.

Contrary to Toyota's assertions, Okçuoğlu specifically opines "that the microbial growth and resulting HVAC odors in the HVAC vehicles *are caused* by" the eight defective design features. PTSOF ¶ 86. Okçuoğlu describes how each of these design features act to inhibit proper airflow and drainage and/or trap organic matter within the HVAC Systems, rendering the HVAC Systems defective. PTSOF ¶¶ 5, 6, 8, 87. Okçuoğlu has consistently opined that these design defects are present in all Plaintiffs' Camry Vehicles, regardless of whether odor is produced.[23] PTSOF ¶¶ 90-91.

**Plaintiffs Have Evidence of Excess Moisture Accumulation.** Plaintiffs have also shown evidence of excess moisture accumulation. Okçuoğlu has opined, in no uncertain terms, that "[g]iven the design defects in the Camry Vehicles, moisture accumulates in the Camry Vehicles' HVAC systems, leading to microbial growth and resulting odor." PTSOF ¶ 143. Wright and

---

[23] Toyota improperly cites testimony taken out of context. Mot. at 20-21. Okçuoğlu has clearly opined that the HVAC Systems are defective, regardless of whether occupants smell odor and Plaintiffs' counsel has consistently defined the Defect in the same way. PTSOF ¶ 85, 90, 91.

Parkhurst have both also found evidence of excess moisture in the Camry Vehicles. PTSOF ¶ 87, 100 Moreover, Toyota's own documents and expert opinions show evidence of excess moisture accumulation, leading to microbial growth and odor. Prior to the sale of the Camry Vehicles, Toyota knew that a "musty odor may be emitted from the air conditioning system of some vehicles," due to "[m]icrobial growth in the evaporator, *arising from dampness in the evaporator housing* where the cooling air flow is dehumidified." PTSOF ¶ 113. Thus, Toyota informed its technicians that HVAC odors are caused by "[m]icrobes growing on the evaporator surfaces . . . which are carried into the evaporator case, then grow in the warm, moist environment." PTSOF ¶ 114. Toyota also knew that "t[o] really improve the issue, Engineering would need to redesign the condenser cover to reduce the amount of water that gets caught and the particles that get into the water that promote mold growth." PTSOF ¶ 9. Further, Toyota acknowledged that installation of Afterblow would more effectively prevent HVAC odor from developing because it "gets more of the moisture out of the dark case where the mold starts." PTSOF ¶ 139. Finally, Toyota's own expert found microbial growth in of all the Plaintiffs' vehicles tested, which could not exist without accumulated moisture, and found *Chaetomium* in Monge's vehicle—a water-loving microbe that undisputedly requires high moisture levels to grow (near saturation) and indicates significant accumulation of moisture. PTSOF ¶ 82.

 *Plaintiffs Have Evidence of Odor-Causing Organic Growth.* Plaintiffs' experts, Toyota's internal documents, and Toyota's experts all provide evidence of odor-causing organic growth. Whether any particular microorganism produced sufficient MVOCs on the day of testing to meet an "odor threshold" is not dispositive. Any time there is microbial growth, MVOCs are produced. PTSOF ¶ 93. Individuals will smell malodorous MVOCs at times when enough MVOCs are produced; however, whether an individual will smell an MVOC on a given day does not change

the malodorous characteristics of MVOCs, or the fact that MVOCs will be produced by the microbial growth found in Plaintiffs' vehicles. PTSOF ¶ 94. While Toyota contends that MVOCs must meet a certain "odor threshold", those thresholds are not the ultimate determinant of whether an odor exists. PTSOF ¶ 95. Toyota's experts couldn't even agree on which "odor thresholds" to apply and admit there is not a "generally accepted odor threshold for" MVOCs. PTSOF ¶ 95. Notwithstanding this, Toyota's expert found malodorous MVOCs in all plaintiff vehicles he tested, including some over his own proffered odor threshold. PTSOF ¶ 99.

Toyota's contention that Baker "experienced a smell only when the HVAC system was not in use," and that the odor was "unrelated to the HVAC system," is false. Baker has repeatedly confirmed that he experienced HVAC odor from the vents of his Camry Vehicles that he smelled after he turned his HVAC system. PTSOF ¶ 32. As Baker explained, the HVAC odor would be strongest at startup, but would dissipate after he put down the windows and ran the HVAC fan on high for up to 5 minutes. PTSOF ¶ 33. This description is exactly what Plaintiffs' experts have explained would be typical and consistent with the nature of the Defect. PTSOF ¶ 78. Because the HVAC Systems' evaporator housing has a finite volume, once the HVAC is turned on, a new aliquot of MVOCs and spores are ejected, and dilution of concentrations from cabin air and outside air lower overall MVOC and spore concentration. *Id.*

Toyota also falsely claims that testing showed that use of the HVAC systems improved air quality. Unlike the testing upon which Plaintiffs rely, the testing that Toyota claims shows improved air quality did not differentiate between mold species. PTSOF ¶ 106. As a result, any comparison between outdoor air samples and interior air samples is inherently flawed. It is impossible to tell whether certain mold species appear in greater or lesser amounts inside or outside of the vehicles based on that testing and Toyota's expert cannot reliably draw conclusions as to

the quality of inside versus outside air. PTSOF ¶ 107**. Moreover, by using 30-minute sampling periods, Toyota's expert effectively dilutes MVOC concentrations rather than capturing the MVOC levels that occur at the onset of HVAC system activation—missing the moment when spore levels and MVOCs would be the highest, which is within the first 5 minutes of HVAC operation. PTSOF ¶ 143.

     ***Plaintiffs Have Evidence of a Health Hazard***.  Plaintiffs do not allege personal injury and are not required to prove a health hazard. However, Plaintiffs are exposed to a health hazard as a result of the microbial growth in the HVAC Systems because there are no safe levels of mold exposure or microbial growth in built environments. SOF **

### C.    Summary Judgment on Plaintiffs' FDUTPA Claims Should Be Denied

     Plaintiffs have proffered evidence that Defendants engaged in deceptive acts and unfair practices, including their unlawful scheme to misrepresent and conceal the Defect, which caused Plaintiffs to overpay for their Camry Vehicles. PTSOF ¶¶ 109-111.[24]

### 1.    Monge and Baker Have Raised Triable Issues of Fact as to Whether Defendants' Conduct Caused Them to Overpay for their Camry Vehicles

     Monge and Baker have raised triable issues of fact as to whether Defendants' conduct caused them to overpay for their Camry Vehicles. Akin to its failed reliance arguments under RICO, Toyota wrongly asserts that reliance is required to state a FDUTPA claim. It is well–settled law that under FDUTPA, "an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably." *Carriuolo v. Gen. Motors Co*., 823 F.3d 977, 984 (11th Cir. 2016). Accordingly, "[a] party asserting a deceptive trade practice claim ***need not show actual reliance*** on the representation or omission at issue." *Id.* Thus, "FDUTPA recovery depends

---

[24] Notably, Toyota does not does not challenge Plaintiffs' assertion that Defendants engaged in deceptive acts or unfair practices or that Cardenas has established causation.

on whether plaintiffs paid a price premium, not on whether plaintiffs actually relied on the illegal misrepresentation." *Id.* at 986. Here, Plaintiffs have set forth evidence that they overpaid for the defective Camry Vehicles. PTSOF ¶¶ 109-111. Given that the "mental state of each class member is irrelevant[,]" Toyota's arguments regarding Monge and Baker (Mot. at 24-25) carry no weight. *Id.* at 985; *see also Vazquez v. Gen. Motors, LLC*, 2018 WL 447644, at *7 (S.D. Fla. Jan. 16, 2018) (rejecting similar argument by an automobile manufacturer that plaintiffs failed to show "causation because they fail[ed] to allege that they actually saw the allegedly deceptive advertisements and that seeing the advertisements caused them to purchase their vehicles"). As the Eleventh Circuit observed in *Carriuolo*, requiring a plaintiff to be subjectively deceived by a defendant's misrepresentation "simply seek[s] a reliance inquiry by another name." *Id.*

Indeed, Toyota's cited authority does not support its position and instead reinforces that plaintiffs are not required to show that they were exposed to a material misstatement or omission in order to prove FDUTPA causation.[25] While the court in *Maor v. Dollar Thrifty Auto Grp., Inc.* dismissed plaintiff's FDUTPA claims on the grounds that plaintiff *failed to show any deceptive act* (unlike Plaintiffs here), it further observed "*[b]ecause individual reliance is not required,* had Plaintiff satisfied element one [i.e., a deceptive act]*, causation and damages would have been sufficiently shown by the fact that Plaintiff parted with mone*y . . . ." 2018 WL 4698512, at *6, n.7 (S.D. Fla. Sept. 30, 2018).[26] Here, Plaintiffs have provided evidence that (i) a reasonable

---

[25] Additionally, Defendants' argument that Baker cannot establish causation conflates awareness of odor with awareness of the Defect. Mot at 25. Baker did not know about the concealed Defect prior to the purchase of his vehicles. SOF ¶ 48. Nor is his individual knowledge relevant to establishing FDUTPA causation. *Vazquez*, 2018 WL 447644, at *7.

[26] Similar to *Maor*, the court in *CWELT-2008 Series 1045 LLC v. PHH Corp.*, 2020 WL 2744191, at *6 (S.D. Fla. May 27, 2020) found no FDUTPA violation because there was "nothing deceptive" about the fees at issue. In *Molina v. Aurora Loan Servs., LLC*, 35 F. App'x 618, 627 (11th Cir. 2015), the plaintiff did not even allege what was deceptive about the websites in question. Here, Plaintiffs have set forth evidence that the deceptive act—Defendants' misrepresentations,

consumer would have been deceived by Defendants' scheme to misrepresent HVAC odor as "normal" and conceal the Defect and (ii) Defendants' deceptive acts caused purchasers of the Camry Vehicles to overpay for their cars. This establishes FDUTPA causation regardless of whether any individual plaintiff relied on Defendants' misrepresentations and omissions when deciding to purchase their vehicle.[27] *See* PTSOF ¶¶ 52, 92; Cardenas, 418 F.Supp.3d at 1105; *Carriuolo*, 823 F.3d at 986 (finding "it does not matter that there may have been differences among the class members' subjective reliance" and "the proper question is not how much the [deception] may have reduced the vehicle's perceived value for any individual purchaser or lessee").[28]

### 2. Plaintiffs Have Raised a Triable Issue of Fact as to Whether They Overpaid for Their Vehicles

Toyota has failed to show that there are no triable issues of fact related to FDUTPA damages. Indeed, Plaintiffs have proffered evidence of the exact type of damages the Eleventh Circuit in *Carriuolo* made clear are sufficient to establish a FDUTPA claim—overpayment damages based on the difference in market value of a Camry Vehicle with the Defect and the

---

[27] The fact that Monge purchased a used vehicle purportedly "as is" from an unauthorized dealer does not change the fact that Defendants' conduct caused her to overpay for a defective vehicle. *Sanchez-Knutson*, 310 F.R.D. at 542. Moreover, even if subjective reliance was required (it is not), the evidence shows that "if Defendants had disclosed the Defect, [Monge] would not have purchased or would have paid less for the Class Vehicle." PTSOF ¶ 72. Monge also testified that information about the Defect should have been disclosed and that such information was material to her as a purchaser of a Class Vehicle. PTSOF ¶ 69.

[28] *Cox v. Porsche Fin. Servs., Inc.*, 342 F. Supp. 3d 1271 (S.D. Fla. 2018) and *Century Land Dev., L.P. v. FFL Dev., L.L.C.*, 2008 WL 1850753 (S.D. Fla. Apr. 24, 2008) are also inapposite. In *Cox*, the court found a single interrogatory response was not evidence that defendant's procedures had a connection to dealers' determination regarding "whether to apply trade-in value as a capitalized cost reduction." 342 F. Supp. 3d at 1289. *Century Land* involved a real estate transaction where there was no deception because plaintiff, "a sophisticated purchaser of a commercial property[,]" who could inspect the property, signed a contract *with Defendant* that contradicted the alleged misrepresentations. 2008 WL 1850753, at *3. Here, Monge is not a sophisticated party, signed no contract with Defendants, and had no ability to discover the Defect prior to her purchase.

market value of a Camry Vehicle without the Defect. 823 F.3d at 986 (finding "damages should reflect the difference between the market value of a 2014 Cadillac CTS with perfect safety ratings for three standardized categories and the market value of a 2014 Cadillac CTS with no safety ratings"). PTSOF ¶¶ 43, 66, 83. *Carriuolo* expressly rejected Toyota's argument that Plaintiffs' experts must calculate damages for each plaintiff "based upon his or her circumstances." Mot. at 26. The Eleventh Circuit stated: "Unlike the calculation of an individual consumer's direct pecuniary loss, which would limit the plaintiff to the difference of what she paid and the actual value received, the FDUTPA 'benefit of the bargain' model provides a standardized class-wide damages figure because the plaintiff's out-of-pocket payment is immaterial." *Carriuolo*, 823 F.3d at 986; *see also Eclipse Med. v. Am. Hydro-Surgical Instruments*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999); *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 453 (5th Cir. 2001) (recognizing FDUTPA damages as "the value of the product as promised minus the value of the product delivered").

As the court explained in *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988, 991 (Fla. Dist. Ct. App. 2004), a case holding that a plaintiff adequately alleged actual damages under FDUTPA when she purchased a vehicle with defective seatbelts, "[t]his case turns on a relatively simple question, at least as to damages—Is a car with defective seatbelt buckles worth less than a car with operational seatbelt buckles? Common sense indicates that it is."

All Plaintiffs here suffered actual damages by overpaying for vehicles that had an undisclosed Defect. Plaintiffs show overpayment damages in two ways. First, Plaintiffs establish damages through conjoint analysis, which is a methodology that has been accepted to establish FDUTPA damages. Specifically, in *Sanchez-Knutson v. Ford Motor Co.*, a court in this district accepted Mr. Gaskin's conjoint analysis damages model for purposes of establishing FDUTPA

damages. 310 F.R.D. 529, 539 (S.D. Fla. 2015). This methodology is appropriate here because a "conjoint analysis is a methodologically plausible way of calculating damages" where—like here—the measurement of damages is "an estimation of the fair market value of the allegedly defective [product] in a world where the defect is disclosed." *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, at *14 (C.D. Cal. Sept. 23, 2020) (accepting conjoint analysis and damages methodology proffered by Mr. Gaskin and Mr. Weir to determine fair market value if product defect were disclosed). Second, Plaintiffs use cost of repair as a proxy for overpayment damages. PTSOF ¶¶ 43, 66, 83; *Nguyen v. Nissan N. Am. Inc.*, 932 F.3d 811, 821 (9th Cir. 2019) (accepting a damages model demonstrating the "cost of replacing [ ] a defective component, which is a proxy for . . . overpayment of the vehicle at the point of sale").[29]

Toyota's reliance on *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, is misplaced as there was no undisclosed defect there. 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015) (finding plaintiff purchased multiple products and did not show she could have paid "the same or less money for a higher SPF product").[30] Here, Plaintiffs have provided evidence of FDUTPA damages. PTSOF ¶¶ 52, 92.

### 3. Baker's FDUTPA Claim Is Not Time-Barred

Baker's FDUTPA claim was tolled by Defendants' fraudulent concealment. As this Court has previously recognized, "[t]he doctrine of fraudulent concealment will operate to toll the statute

---

[29] The *Nguyen* court relied on *Carriuolo*, 823 F.3d at 987, where the Eleventh Circuit explained that, under FDUTPA, "a manufacturer's misrepresentation may allow it to command a price premium and to overcharge customers systematically." *Nguyen*, 932 F.3d at 821, n.7.

[30] *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *5 (S.D. Fla. Dec. 5, 2013), is also distinguishable. There, plaintiffs' claim was dismissed for failing to plead actual damages because plaintiff did not plead the defect at issue existed in her car during the time she owned it. *See id.* Here, Plaintiffs have already survived Defendants' Motion to Dismiss and the Defect existed at purchase.

of limitations when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury." *In re Takata Airbag Prod.Liab. Litig.*, 193 F. Supp. 3d 1324, 1344 (S.D. Fla. 2016); *Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1113 (S.D. Fla. 2019). Here, Plaintiffs have proffered evidence that Defendants deliberately and actively concealed the Defect. PTSOF ¶ 13. As such, the FDUTPA statute of limitations has been tolled. Further, to succeed on a motion for summary judgment, the movant must "conclusively show that there exists no disputed issue of fact with respect to the date of commencement of the limitations period," an inquiry which "is, ordinarily, a question of fact which should be left to the jury." *Bd. of Tr. of Santa Fe Cmty. Coll. v. Caudill Rowlett Scott, Inc.*, 461 So.2d 239, 242–43 (Fla. Dist. Ct. App. 1984).

#### 4. Cardenas Has Standing to Assert FDUTPA Claims

It is undisputed that Cardenas purchased his vehicle at West Kendall Toyota in Miami, Florida. Ex. __ (Cardenas Dep. at 26:16-24); SOF ¶ 55, Ex. 30. By its terms, "the provisions of FDUTPA are applicable to offending conduct occurring inside Florida to non-Florida residents." *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen.*, 761 So. 2d 1256, 1262-63 (Fla. Dist. Ct. App. 2000). Cardenas suffered an injury in Florida, which is where he purchased his vehicle and where his vehicle was delivered to him. PTSOF ¶ 60; PTSOF ¶ 55. *Carriuolo*, 823 F.3d at 986. FDUTPA covers those who, like Cardenas, purchased vehicles in the state of Florida. *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1181 (S.D. Fla. 2019) (finding plaintiff had standing to assert FDUTPA claims on behalf of those who purchased vehicles in Florida). None of the cases Toyota cites hold to the contrary.[31]

---

[31] In *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617 (S.D. Fla. 2008), *Montgomery v. New Piper Aircraft, Inc.,* 209 F.R.D. 221 (S.D. Fla. 2002), *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980) and *ADT LLC v. Vision Sec., LLC,* 2014 WL 3764152 (S.D. Fla. July 30, 2014),

### 5. Plaintiffs Have Standing to Seek Injunctive Relief

FDUTPA provides that "anyone aggrieved by a violation [of FDUTPA] may bring action . . . to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." Fla. Stat. § 501.211(1). *Galstadi v. Sunvest Cmty. USA, LLC*, 637 F. Supp. 2d 1045, 1057 (S.D. Fla. 2009) (finding injunctive relief can be sought on behalf of public). "There is no requirement that a plaintiff show an ongoing practice or irreparable harm, and declaratory relief is available regardless of whether an adequate remedy at law also exists." *Weiss v. General Motors LLC*, 418 F. Supp. 3d at 1185–86. Moreover, there is a threat of future injury here because Toyota denies the Defect exists and refuses to repair it under warranty. *Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1295 (N.D. Ga. 2018); *Francis v. Gen. Motors, LLC*, 2020 WL 7042935, at *22 (E.D. Mich. Nov. 30, 2020). As such, injunctive relief is appropriate.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Toyota's Motion.

Dated: January 8, 2021                       Respectfully submitted,

                                             **PODHURST ORSECK, P.A.**

                                             */s/ Peter Prieto*
                                             Peter Prieto (FBN 501492)
                                             pprieto@podhurst.com
                                             John Gravante, III (FBN 617113)
                                             jgravante@podhurst.com
                                             Matthew Weinshall (FBN 84783)
                                             mweinshall@podhurst.com
                                             Alissa Del Riego (FBN 99742)
                                             adelriego@podhurst.com
                                             SunTrust International Center
                                             One S.E. 3rd Avenue, Suite 2300
                                             Miami, FL 33131

---

the challenged transaction or conduct took place outside of Florida or in multiple states. Here, Cardenas was injured in Florida where the vehicle was purchased.

Tel.: (305) 358-2800/Fax: (305)358-2382

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
Joseph H. Meltzer
jmeltzer@ktmc.com
Melissa L. Troutner
mtroutner@ktmc.com
Tyler S. Graden
tgraden@ktmc.com
Natalie Lesser
nlesser@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs and the*
*Proposed Classes*

**KIESEL LAW LLP**
Paul R. Kiesel
kiesel@kiesel.law
Jeffrey A. Koncius
koncius@kiesel.law
Nicole Ramirez
ramirez@kiesel.law
8648 Wilshire Boulevard Beverly Hills,
CA 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

*Additional Counsel for Plaintiffs and the*
*Proposed Classes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 8, 2021, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all

counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

<div style="margin-left: 50%;">

*/s/ Peter Prieto*

Peter Prieto

</div>