**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 18-cv-22798-CIV-FAM**

JAVIER CARDENAS, RODNEY BAKER,
and MICHELLE MONGE, individually and
on behalf of all others similarly situated,

      Plaintiffs,

      v.

TOYOTA MOTOR CORPORATION,
TOYOTA MOTOR SALES, U.S.A., INC.,
TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA,
INC., and SOUTHEAST TOYOTA
DISTRIBUTORS, LLC,

      Defendants.

_____/

**REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION**
**FOR CLASS CERTIFICATION**

THIS CAUSE comes before the Court upon Plaintiffs Javier Cardenas, Rodney Baker, and

Michelle Monge's Motion for Class Certification, brought on behalf of themselves and all others

similarly situated.  ECF No. 181.  Defendant Toyota Motor Corporation ("TMC"), Toyota Motor

Sales, U.S.A., Inc. ("TMS"), Toyota Motor Engineering & Manufacturing North America, Inc.

("TEMA") (collectively, "Toyota") filed a Response in Opposition, ECF No. 205, as did

Defendant Southeast Toyota Distributors, LLC's ("SET"), ECF No. 203, and Plaintiffs filed a

Reply, ECF No. 243.  The Court has also considered, to the extent necessary to resolve this Motion,

the motions in limine filed by both sides challenging the experts advanced by the respective parties.

Upon consideration of the Motion, Responses, Reply, and with the benefit of a hearing conducted

on July 14, 2021, the undersigned hereby **RECOMMENDS** that Plaintiffs' Motion for Class

Certification be **GRANTED, in part.**

## I.    INTRODUCTION

This litigation arises from the alleged concealment of a defect in the Heating, Ventilation, and Air Conditioning (HVAC) systems in non-hybrid Toyota Camrys, from model years 2012 through 2014 (hereinafter the "Class Vehicles").  The Plaintiffs here are current and former owners of the Class Vehicles in the SET region[1] and claim the HVAC systems are defective because they are designed in such a way as to permit the accumulation of moisture and microbial growth within the HVAC system, causing it to emit foul odors in the passenger compartment.  Plaintiffs allege that the defective design of the HVAC systems "allows condensing water to accumulate and allows naturally present organic contaminants to be trapped, kept moist and cultivate organic matter such as microbes, bacteria, mold and fungus."  ECF No. 181-4 (Murat Okçuoğlu Expert Report (Oct. 20, 2020)) at 24 ("Initial Okçuoğlu Report").

Plaintiffs brought suit against the three Toyota entities responsible for designing, manufacturing, and testing the vehicles, along with SET, which is a distributor of Toyota parts and vehicles to authorized Toyota dealers, who in turn sell the parts and vehicles to the public. Plaintiffs claim that Toyota and SET conspired and engaged in a plot to conceal the defect in order to protect the Toyota brand, overcharge consumers for the Class Vehicles, and avoid repairs and buybacks under the Florida Lemon Laws.  Plaintiffs allege violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Plaintiffs allege that Defendants executed this plot by engaging in deceptive trade practices, noting that, for example, Defendants disseminated a misleading Technical Service bulletin used by SET dealerships to inform complaining owners of the class

---

[1] The SET region includes Alabama, Florida, Georgia, North Carolina, and South Carolina.

vehicles that the HVAC odor was naturally occurring and could not be repaired, whether that be under warranty or otherwise.

Plaintiffs claim that this deception by Toyota and SET had the effect of defrauding the more than 200,000 purchasers of Class Vehicles within the SET region, which includes Florida. Specifically, Plaintiffs claim that all putative class members were injured by overpaying for their Class Vehicles, all of which contained the hidden defect.

Plaintiffs now move to certify two classes under Rule 23(b)(3):

1. Florida FDUTPA Class: All persons who purchased a 2012-2014 model year non-hybrid Toyota Camry in the state of Florida (the "FDUTPA Class").[2]

2. SET Region RICO Class: All persons who purchased a 2012-2014 model year non-hybrid Toyota Camry in the SET Region (the "RICO Class");

ECF No. 181 at 1. Plaintiffs ask the Court to appoint Plaintiffs Javier Cardenas, Rodney Baker, and Michelle Monge as Class Representatives for both classes, and to appoint Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Podhurst Orseck, P.A. ("Podhurst") as Class Counsel. *Id.*

## II.   FACTUAL BACKGROUND

### a.   HVAC Odor in Class Vehicles

HVAC systems work by drawing in air either from outside the vehicle or inside the cabin, and to the extent the air flowing into the system contains odorants (which would depend on exterior

---

[2] Plaintiffs note that excluded from the classes would be: "(a) all Judges who have presided over the Action and their spouses; (b) all current employees, officers, directors, agents, and representatives of Defendants, and their family members; (c) any affiliate, parent or subsidiary of Defendants and any entity in which Defendants have a controlling interest; (d) issuers of extended vehicle warranties and service contracts; (e) any person or entity who settled with and released Defendants from any pending cause of action that was asserted in Plaintiffs' Amended Class Action Complaint; and (f) any person or entity who files a timely and proper request for exclusion." ECF No. 181 at 1 n.3.

and interior conditions), those odors can attach to the HVAC system and be expelled during use, resulting in odor within the cabin of the vehicle. The HVAC systems in the Class Vehicles were all manufactured by the same supplier, DENSO, and in all respects relevant to HVAC odor, the systems are identical or substantially similar and were so at the time of sale.  ECF No. 181 at 11-12 (citing the Initial Okçuoğlu Report).  In each Class Vehicle, the HVAC system was designed such that "nutrient particles, organic matter, and dusts" could become "trapped in the nooks and crevices" found in the evaporator housing the of HVAC systems, *id.* at 12 (citing the Parkhurst Report), and the system design "traps, instead of flushing out, the contaminants with flowing condensation, creating an ideal breeding habitat for organic matter and leading to microbial growth and malodor that is then expelled back into the cabin, *id.* at 12 (citing the Initial Okçuoğlu Report).

### b.  Defendants Recognition of HVAC Odor

The potential for HVAC odor is neither new nor unique to the Class Vehicles.  At least as early as in 1997, Toyota issued a Technical Service Bulletin ("TSB")[3] informing dealers that a "musty odor may be emitted from the air conditioning system of some vehicles" due to "[m]icrobial growth in the evaporator, arising from dampness in the evaporator housing where the cooling air flow is dehumidified."  ECF No. 181 at 4 (citing ECF No. 181-9 at TSB AC002-97). In 2005, Toyota told its technicians that the two primary causes of HVAC odor were either dirt or microscopic particles trapped in the evaporator or microbes growing on the evaporator surfaces ultimate carried into the warm and moist evaporator case, permitting them to flourish.  *Id.* (citing ECF Nos. 181-10; 181-11).

---

[3] Toyota defines a TSB as "a communication between Toyota and its dealerships that can serve as an update to Toyota publications, describe parts updates, or relay enhanced or new service procedures. Service procedures may explain diagnostic steps, implementation of recommended updates, or how to perform certain repairs. . . . Toyota makes all available TSBs accessible to the public by subscribing to our Technical Information System."  *What is a Technical Service Bulletin (TSB) and how is it obtained?*, FAQs:  Frequently Asked Questions for all things Toyota (http://toyota.custhelp.com/app/answers/detail/a_id/7656/~/what-is-a-technical-service-bulletin-(tsb)-and-how-is-it-obtained%3F, last visited: July 27, 2021).

From 2007 to 2010, Toyota utilized an evaporator coating known as CC2; CC2 contained what are known as hydrophilic properties, meaning that it attracts water.  ECF No. 181-28.  Toyota realized this coating caused rust to form on the evaporator cores, however, and moved from CC2 coating to EPC chemical coating beginning in 2010, completing the transition in December 2012. *Id*.  EPC did not have the same hydrophilic property as the CC2 coating, and Toyota observed that warranty claims increased after the transition away from the CC2 hydrophilic coating.  *Id.*

In 2010, SET and Toyota together participated in HVAC odor testing, confirming that odor was emanating from the HVAC systems in Toyota vehicles.  ECF No. 181 at 6.  SET participated in HVAC odor testing in 2010 that confirmed odor was being emitted from the HVAC systems in Toyota vehicles.  ECF No. 181-26.  In 2011, the Defendants together implemented HVAC odor inspection protocols designed to find the source of the odor rather than simply masking it.  ECF No. 181-27.

Toyota internally described HVAC odor as a "chronic issue" by 2012, and field technical reports reflected an upward trend from what Toyota referred to as the "2012 AC Odor season." ECF No. 181-30 at TOY-CARDENAS-00037125.  Toyota's 1-800 number for customer complaints received more complaints regarding HVAC odor in the 2012 Camry than it received about any other component in the vehicle, and nine times as many HVAC odor complaints as it received regarding the 2011 model year Camry.  ECF No. 181-31.  As of July 2013, Toyota ranked HVAC odor as a three on its on its ranking scale for all problems Toyota faced globally.  ECF Nos. 181-32; 181-33 at 31:16-32:8.  A significant percentage of the HVAC odor complaints originated in the SET region, which is more prone to the hot and humid environmental conditions most hospitable for microbial growth.  ECF Nos. 181-17; 181-18.

HVAC odor complaints persisted regarding the 2013 and 2014 Camry vehicles, with fall

2014 HVAC odor data from Toyota's Design Quality Planning system reflecting more problems with the 2012 Camry than any other non-hybrid Toyota vehicle; this increase began in 2012 and remained high through the 2014 model year.  ECF No. 181-29 (Wright Expert Report).  J.D. Power survey data reflects that the 2013 model year Camry received more HVAC odor complaints than any other Toyota vehicle and were more than twice the industry average.  *Id*.

JD Power survey data also reflects that less than 5 percent of Class Vehicle owners reported HVAC odor three years following their purchase of the vehicle, while 99 percent of those surveyed owners were at least "satisfied" with the HVAC system.  *Id*.  As compared to competitor vehicles, the survey data shows that odor complaints ranged from .74 percent to 3.26 percent as compared to 1.05 percent for the 2012 Camry.  ECF No. 205 at 5 n.3.

After not being able to pinpoint the root cause of the warranty trend, Toyota planned to transition back to a hydrophilic evaporator coating beginning with model year 2015 vehicles.  *Id.* Early figures reflected that warranty claims related to HVAC odor were at zero after the transition, and Toyota expected that trend to continue.  *Id.*

### c.  Response to Customer Complaints about HVAC Odor

Toyota developed technical service bulletins and "Tech Tips" documents that, at least in part, SET would distribute to its authorized dealers, who might then potentially share the same information with consumers and potential consumers.  Some of these documents stated that the odors "emitted from the A/C system are a normal characteristic of automotive A/C systems."  ECF No. 181-40; *see also* ECF Nos. 181-37, 181-41.  Technical Service Bulletin 142-13 issued in September 2013 informed the dealers that the HVAC odors in Class Vehicles were "naturally occurring from the HVAC system and/or related environmental factors" and that "there is no way to eliminate these odors."  ECF No. 181-40.  The bulletin included further language directed at

consumers informing them that it was "normal to experience odor upon the initial startup," and it noted that procedures could be performed to minimize the odors at the customer's expense. *Id.*[4] Toyota also included a recommendation in the Owner's Manuals for the Class Vehicles that the HVAC systems be set to "outside air" mode before turning off the vehicle because this would reduce potential odors. ECF No. 181-29 (Wright Report) at 14-15. Toyota knew, however, that relying on natural forces to remove humidity would not remove enough moisture to entirely remedy the resulting odor in the HVAC system. ECF No. 181-44.

SET and Toyota both took the position that customers should be told the HVAC odor was "normal," in part to avoid Florida's Lemon Law, which required a buyback after three failed attempts to repair the issue. *See, e.g.*, ECF Nos. 181-2 at TOY-CARDENAS-00021839 ("There isn't any effective repair method, and Florida's strong application of Lemon law, Dealership just has to explain to customers that 'It is normal' and can't perform a repair of customer's vehicles about HVAC odor"); 181-3 (discussing Lemon Law HVAC odor claims, recognizing "we are aware of it, and until we find a fix, we're going to maintain the position that it's 'normal.'"); 181-14 ("SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida. SET started to tell customers the condition was normal"); 181-38 at TOY-CARDENAS-00023980 ("Dealers are not creating repair orders/warranty claims to prevent possible buyback situations"); 181-39 ("At this time we are not recommending any repairs as it only adds repair attempts and increases the possibility of a buyback.").

Some Toyota employees questioned the notion that the odor was normal and that customers should shoulder the cost to eliminate odor. *See, e.g.*, ECF Nos. 181-6 (stating in an internal email that it is "challenging to explain why to get what a customer should expect as a standard condition

---

[4] Also cites Ex. 9; Ex. 37; Ex. 41; Ex. 42; Ex. 43.

for the air conditioner (no odor) we charge more?"); 181-15 ("[C]ustomers see the odor issue as design related. Convincing them that they should spend more money [charcoal filter] to 'fix' an issue the vehicle never should have had is very difficult."); 181-16 ("I am still struggling why the customer needs to pay for this").

### d.  Solutions Implemented Regarding HVAC Odor

Toyota continued to monitor the HVAC odor and investigate potential solutions.  One such solution was a countermeasure known as the Komori Odor Logic, which redirected air from the HVAC system away from the face and toward the feet of the vehicle occupants upon starting the car.  ECF Nos. 181-12 (TMC 30(b)(6) Dep. Tr.) at 124:9-12; 181-13 at TOY-CARDENAS-00051747.  Toyota's internal studies also identified an active design feature known as Afterblow, which would force air through the HVAC system after the vehicle was turned off, was effective at removing the moisture that encouraged microbial growth and resulting odors.  ECF Nos. 181-4 at 22-23 (Okçuoğlu Report); 181-29 (Wright Report) at 20-22; 181-51; 181-52.  Toyota did not ultimately install the Afterblow technology in the Class Vehicles.  ECF No. 181-53 (citing Response to Plaintiffs' Request for Interrogatory No. 6).

Toyota also knew that charcoal filters, rather than the pollen filters that came with the vehicles as original equipment, would reduce HVAC odor.  ECF No. 181-28.  Toyota decided not to provide the charcoal filters with the original equipment with respect to the class vehicles, citing cost concerns; Toyota was concerned with absorbing the original cost outright, as well as the cost to replace the filter every 10,000 miles as necessary, and even the potential of shifting the cost to consumers, as this would impact third-party cost of ownership ratings and thus possibly decrease class vehicle sales.  ECF Nos. 181-54; 181-55; 181-56.  In one discussion internal to Toyota, upon

hearing a proposal that Toyota offer charcoal filters as an option to consumers in the SET region,[5] the TMS Vice President of Product Planning stated that despite what he saw as relatively low claims numbers, he would support the proposal to open the option; he suggested they develop marketing terminology for the filter that would "avoid questions from customers," noting as an example that his impression was that the charcoal would filter "pollen etc [sic]" better than a normal filter. ECF No. 181-8.  Toyota ultimately began installing the charcoal filters as standard in Camry vehicles in May 2016.  ECF No. 181-53 (Response to Plaintiffs' Request for Interrogatory No. 11).

### e.  Putative Class Members

The putative class is comprised of individuals who purchased a 2012, 2013 and/or 2014 model year non-hybrid Toyota Camry.  ECF No. 181 at 11.  Each of the classes assert one set of claims arising under either RICO or FDUTPA; the RICO class is comprised of individuals who purchased their Camry in the SET region,[6] and the FDUTPA class is comprised of individuals who purchased their Camry in Florida.  *Id.*

#### i.  Named Plaintiffs

##### 1.  *Rodney Baker*

Rodney Baker, a Florida resident, purchased a 2012 Toyota Camry in December of 2011 from the Central Florida Toyota dealership in Orlando, Florida, an authorized Toyota dealership. ECF No. 49 (Amended Class Complaint).  Shortly after purchase, Baker observed a "moldy smell" emitting from the vehicle vents immediately upon entering his vehicle after it was parked outside in the sun and before turning the vehicle on.  ECF No. 205-6 (Baker Dep.).  Baker complained

---

[5] Toyota engineers felt the charcoal filter was a "specification issue" rather than an engineering issue given the prevalence of high humidity in the SET region.  This meant that specific regions, like SET, would be able to order the charcoal filters in light of the climate. ECF No. 181-8.

[6] Made up of Alabama, Florida, Georgia, North Carolina, and South Carolina.

about the odor each of the numerous times he took the vehicle in for servicing at a Toyota dealership, but no remedy or repair was completed on the 2012 Camry.  ECF No. 49.

In February 2014, Baker traded the 2012 Camry in for a 2014 Camry at the AutoNation Toyota Scion dealership in Winter Park, Florida.  *Id*.  Shortly after purchasing the 2014 Camry, Baker noticed the same odor coming from the vents,[7] and again complained about the odor when taking the vehicle in for serving at the AutoNation Toyota Scion dealership.  *Id*.   No remedy or repair was completed on the 2014 Camry, and in May 2017, Baker traded in the 2014 Camry for a Honda vehicle.  *Id.*

Baker had experienced HVAC odor in prior vehicles from another manufacturer, ECF No. 205-6 at 83:11–25, 197:10–24, and conceded that he was thus aware of the possibility for HVAC odor in the class vehicles, *id*. at 197:10-24. Before purchasing the Class Vehicles, Baker looked at and relied upon third-party industry reports, and he read the manual for the 2012 Camry in full, as he typically does before purchasing a car.  ECF No. 205-6.  Baker did not identify any particular statements made by Toyota at the time of the purchase but testified that Toyota should have disclosed the "potential for vehicle odor" in trade magazines and at an authorized dealership.  ECF No. 205-6 at 197:3-16.  Had Baker known of the defective HVAC system, he would have either not purchased the Class Vehicles or would have paid significantly less for them.  ECF No. 213-36 (Baker Supplemental Response to Toyota Interrogatory No. 13 (citing ECF No. 49 at 10-11)).

### 2.  Michelle Monge

Michelle Monge, a Florida resident, purchased a used 2013 Toyota Camry around July 2016 from the Modern Auto Sales dealership in Hollywood, Florida for approximately $16,873.00,

---

[7] Baker's first class vehicle did not employ Komori Odor, Parking Fresh, or Greenhouse Gas Logic, while the second class vehicle came equipped with an automatic HVAC system and all three forms of the logic described above.  ECF No. 205 at 17.

and owned it still at the time the Complaint was filed.  ECF No. 49 at 11.  Modern Auto Sales is not an authorized Toyota dealership, Toyota has no records of Monge as a purchaser of a Class Vehicle, ECF No. 205 at 39, and Monge does not report that she had any interaction with any Toyota representative either prior to or following the purchase.  She purchased the Camry from Modern Auto Sales in "as is" condition without relying on any information from Toyota.  ECF No. 205-15 (Monge Dep.) at 12:6–18, 132:17–24.  Monge did not review any vehicle-specific information prior to purchase; she simply became involved at the financing stage when her partner's application for financing was denied.  *Id.* at 133:2–18, 134:10–11, 135:6–9; 229:4–13.

Monge states that her vehicle has been emitting a "moldy, rotten smell," ECF No. 49 at 11, though Monge is not the primary driver of the vehicle; her former partner drives the vehicle 90 percent of the time, with Monge's son driving the vehicle the other 10 percent, and Monge acknowledged that her former partner has not detected any odor while driving the car.  ECF No. 205-15 at 76:1–6, 18:15–20, 160:6–9, 161:13–16.  Monge never had the vehicle inspected to address concerns about the HVAC odor.  *Id.* at 212:17–23.

Notwithstanding, Monge contends that if she had known of the defective HVAC system, she would have either not purchased the class vehicle or would have paid significantly less for it. ECF No. 243-7 (Monge Supplemental Answer to Toyota Interrogatory No. 13 (citing Corrected Amended Complaint, ECF No. 49 at 11)).  Having never had the vehicle inspected for HVAC odor, Monge does not report that she incurred any damages related to servicing the vehicle for the HVAC odor, nor does she report that she incurred any costs in trying to repair the issue.  Instead, when asked what damages she suffered by virtue of the alleged HVAC defect, she cited only the time she has spent being a named plaintiff in this litigation.  ECF No. 205-15 at 210:16–211:10.

### 3. *Javier Cardenas*

Javier Cardenas is a Missouri resident who purchased a new 2014 Camry[8] in August of 2014 from Kendall Toyota in Miami, an authorized Toyota dealership.  ECF No. 49 at 8.  Beginning a few months after purchasing the car, a "funky, horrid, old smell" would emit from the HVAC system upon turning it on, and the smell becomes more noticeable the cooler Cardenas sets the temperature.  ECF No. 49 at 9.  Even upon switching to fresh mode from the recirculated air mode, the smell persists.  *Id.* Other passengers in the car have observed the odor as well.  *Id.* Cardenas took the vehicle to Lou Fusz Toyota, an authorized Toyota dealership in St. Louis, Missouri for routine maintenance on June 9, 2015.  ECF No. 49 at 9.  While there Cardenas complained about the HVAC odor, but he was told by an employee of the dealer that the smell was attributable to the humidity and Cardenas should open the vents of the car.  The dealer represented to Cardenas that heat would reduce the smell, but advised Cardenas that should those remedies not work, it would cost $300 for the dealership to open the dashboard and inspect the vehicle.  ECF No. 49 at 9.  Cardenas attempted to open the vents and turn on the heat to reduce the odor, but the odor has continued.  ECF No. 49 at 9.  Cardenas called TMS directly to lodge a complaint and spoke with a TMS employee over the phone.  *Id.*  Cardenas testified that he read portions of the owner's manual, but "nothing related to the HVAC system." ECF No. 205-16 at 134:4-6.

Cardenas's mother made the $6,000 dollar down payment for the car at the time of purchase.  ECF No. 205-16 at 62:17-23.  The remaining $18,545.54 amount owed for the car has since been paid in full; Cardenas's mother made approximately the first five months of payments on the financing, while he made the remainder.  *Id.* at 67:5-21.  Cardenas still owned the 2014

---

[8] Defendants state that Cardenas's Camry has a manual HVAC system that does not include either Komori Odor Logic or Parking Fresh Logic.  ECF No. 205 at 17.

Camry at the time of filing the Amended Class Action Complaint.  ECF No. 49 at 8.  Had Cardenas known of the defective HVAC system, however, he would have either not purchased the class vehicle or would have paid significantly less for it. ECF No. 213-41 (Cardenas Answer to Toyota Interrogatory No. 13 (citing ECF No, 49 at 8-9)).  He testified that he wanted to Toyota to have told him that there was a "faulty system in the car that will release an odor [when] you turn the AC on."  ECF No. 205-16 at 153:19-22.

### f.  **Injury and Damages**

Plaintiffs assert that for both the RICO and the FDUPTA class, each class member was injured in overpaying for their class vehicle based on misinformation Toyota and SET provided or omitted to the market, under the theory that a defective vehicle is worth less than a non-defective vehicle.  ECF No. 181 at 25-26.  Plaintiffs seek recovery for the amount of overpayment, to be measured classwide on the basis of a conjoint analysis.  ECF Nos. 181-61 (Gaskin Report); 181-62 (Weir Report).  In a conjoint analysis, consumers are surveyed and asked to assign values to particular product attributes; here, survey respondents were asked about their willingness to pay for two different vehicles:  one in which the HVAC system may emit a "musty, damp, or sour odor," as compared against a vehicle with "*no* musty, damp, or sour odor will emit from the HVAC system.  ECF No. 205-31 ¶ 45.  The data is then extrapolated to determine the difference in market value between a Class Vehicle and a vehicle without the HVAC defect at the time and point of the first purchase.  ECF Nos. 181-61; 181-62.  The resulting difference—of a 25 percent reduction in value—would then be multiplied by the number of vehicles to calculate a classwide damages figure.  ECF No. 181-62.

Alternatively, Plaintiffs offer the cost to repair the vehicle as a proxy for overpayment. Under this theory, Plaintiffs determined the amount it would cost over time to perform repairs to

the HVAC systems to negate the odor (either by installing Afterblow or a combination of a charcoal filter installation and replacement with routine evaporator cleanings) and again multiplied this figure by the number of class vehicles to determine classwide damages.  ECF No. 181-62. The "cost over time" in this instance would account for repair costs made over the course of ten years.

### III.    LEGAL STANDARD

In order to state a claim that is appropriate for class treatment, the Federal Rules of Civil Procedure require that the suit meet four prerequisites, commonly referred to as numerosity, commonality, typicality, and adequacy of representation. *Piazza v. EBSCO Industries, Inc.*, 273 F.3d 1341, 1345 (11th Cir. 2001). Specifically, the Rule states that:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

To be certified as a class action, the case must then also meet one of three additional requirements of Rule 23(b). Plaintiffs pursue monetary relief and thus seek certification of both classes pursuant to Rule 23(b)(3). Rule 23(b)(3) requires a plaintiff to prove that common questions predominate over any questions affecting only individual members; and class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. *Harris v. Nortek Glob. HVAC LLC*, No. 14-CIV-21884, 2016 WL 4543108, at *3 (S.D. Fla. Jan. 29, 2016) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).  Additionally, though not explicitly contemplated by the Rule, ascertainability is an implicit requirement for class certification.  *Cox v. Porsche Fin. Servs., Inc.*, 330 F.R.D. 322, 330 (S.D. Fla. 2019) (citing *Bussey*

*v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014)).

The burden here rests with the Plaintiffs to show that their case satisfies the Rule 23 requirements, which they must do at this point in the proceedings using evidence to support each factual assertion. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).   In contemplating each element of each claim and the evidence provided, the court must determine whether that evidence is at the individual level, or whether it offers proof on a classwide basis. *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 809 (2011).  The court's charge at this stage is not to render findings on the merits, but the merits may be considered insofar as they bear on questions of class certification. *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013).

## IV. ANALYSIS

### a. Numerosity

Rule 23(a)(2)'s numerosity prerequisite requires that "the class is so numerous that joinder of all members is impracticable." "[A] plaintiff need not show the precise number of members in the class." *Evans v. U.S. Pipe & Foundry Co*., 696 F.2d 925, 930 (11th Cir. 1983) (citations omitted). "A reasonable estimate is enough." *Bostwick v. SMH (US) Inc.*, 1998 WL 934642, at *3 (N.D. Ga. Oct. 30, 1998), *aff'd sub nom. Bostick v. SMH (US), Inc.*, 228 F.3d 413 (11th Cir.2000) (citing *Evans*). While there is no exact number to establish numerosity, the Eleventh Circuit has found that "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (internal citation omitted). Accordingly, the numerosity requirement is a "generally low hurdle." *Vega*, 564 F.3d at 1267. Even so, a plaintiff still has the burden to make "*some* showing" that the class meets the numerosity requirement. *Id.* The Eleventh Circuit has

acknowledged that at least one court has recognized that when the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity because the court has the option to decertify pursuant to Rule 23(c)(1). *Evans*, 696 F.2d at 930.

Plaintiffs here have satisfied the numerosity requirement, and Defendants do not argue otherwise.  Under Plaintiffs' proposed classes, there are 205,392 Class Vehicles in the SET Region RICO Class and 91,606 Class Vehicles in the Florida FDUTPA Class.  ECF No. 181-58. Joinder of all class members would be impracticable.

### b. Commonality

Rule 23(a)(2)'s commonality requirement demands "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As with numerosity, the Eleventh Circuit has described the commonality requirement as a "low hurdle" or a "light burden," as commonality "does not require that all questions of law and fact raised be common." *Williams v. Mohawk Indus., Inc.*, 13 568 F.3d 1350, 1356 (11th Cir. 2009); *Vega*, 564 F.3d at 1268. The Supreme Court has found that the commonality inquiry requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Dukes*, 564 U.S. at 350 (internal citation omitted). Additionally, the court must take into account whether certification of the class will "generate common answers to drive the resolution of the litigation." *Id.* Even "a single common question" will suffice. *Id.* at 359.

Plaintiffs advance a series of questions that will be answered through common proof, including whether the HVAC systems in the Class Vehicles are defective as alleged; whether Defendants knew or should have known about the defect; and whether the Defendants misrepresented or concealed the material facts about the defect and engaged in a scheme to defraud the class.  Plaintiffs contend that the class is defined to be limited to purchasers of the Camry models which were identically designed in the defective manner alleged.

Defendants argue that there is no common design defect, ECF No. 205-4 at 54:11–55:2, 206:24–207:2, and differences amongst the various models of the class vehicles should defeat certification for both the RICO and the FDUTPA classes.  ECF No. 205 at 16 (citing ECF No. 205-5 Ex. A at 2-3, 10-13, 17-28; *Harris v. Nortek Glob. HVAC LLC*, 2016 WL 4543108, at *14 (S.D. Jan. 29, Fla. 2016)).  Relatedly, Defendants argue there is a lack of classwide evidence showing that HVAC odor will occur in each vehicle.  *Id.* at 17.  At the core of Defendants' argument here is that each class vehicle would need to be individually tested to determine whether HVAC odor *will* occur, characterizing this as a "critical element" of Plaintiffs' theory.  *Id.*

This misconstrues Plaintiffs' theory of the case.  The harm here was *not* the odor; Plaintiffs' theory is that each class member was harmed at the moment they overpaid for a vehicle with an undisclosed defect that *could* lead to HVAC odor.  "The primary right alleged to have been violated … is the right to take a product free from defect. The defect did not cause the plaintiffs' injury; the defect was the injury." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 822 (9th Cir. 2019) (reversing denial of class certification for claims brought under California's Consumers Legal Remedies Act for vehicles sold with faulty clutch).

The relevant inquiry is whether Plaintiffs have offered evidence that would establish on a classwide basis that all class vehicles contain the defect that *they allege* is present.  Plaintiffs advance their expert Okçuoğlu, who conducted inspection on a sample of HVAC systems from the Class Vehicles and opines that all class vehicles share identical or substantially similar HVAC designs, manufactured by the supplier DENSO, and all share the same features that Plaintiffs allege are defects in that design—all utilize the same uneven evaporator core air flow design, inadequate condensation and drainage design, a housing design with nooks and crevices, porous open cell foam used in temperature blend doors, and evaporator edge seal foam design.  ECF Nos. 243-4 at

9-17, 24-29; 243-57 at 4-5.  Additionally, none of the class vehicles came standard with a charcoal filter or Afterblow technology.  ECF Nos. 243-4 at 9-17, 24-29; 243-57 at 4-5.

Defendants move to exclude Okçuoğlu's opinion of a common defect in the Class Vehicles. It bears noting that this is the third time a trial court has been asked to certify as a class action a suit predicated on the alleged defect in Toyota's 2012-2014 vehicles.  In the first case, the court certified the class and rejected the challenges Defendants here advance, including the challenge to Okçuoğlu's opinion of a common defect. *See Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-8629 FMO (EX), 2019 WL 1940619, at *4 (C.D. Cal. Mar. 27, 2019).  Though not controlling, the court's analysis of Okcuoglu's opinion and the motion to exclude are here persuasive, and I too find that the Defendants' attack on his opinions on the basis that he failed to identify a uniform, particular defect and that he failed to inspect a sufficiently representative sample of Class Vehicles, go to the weight, not admissibility of the opinion.

Defendants' expert automotive engineer Robert Kuhn attempts to rebut Okçuoğlu by opining that these features are not defective on their own and do not guarantee HVAC odor will result, but this is simply a collateral attack on whether the HVAC systems in the class vehicles were defectively designed, which is a merits-based question that may ultimately defeat Plaintiffs' claims, but this will not preclude a finding of commonality for class certification.

Plaintiffs have supported their allegation of a defect existing in all Class vehicles and met their burden with respect to commonality.  *Accord Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 537 (S.D. Fla. 2015) (finding commonality satisfied upon substantial evidence that the alleged defect was caused by design and manufacturing defects).

### c.  Predominance

Predominance, while similar to the commonality requirement under Rule 23(a)(2), is "far more demanding." *Vega*, 564 F.3d at 1270 (11th Cir. 2009) (internal citation omitted). Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability that is more substantial than the impact of any individualized issues in resolving the claims of each class member.  *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010).  However, common issues will not predominate over individual questions if "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009). The court's inquiry is typically focused on "whether there are common liability issues which may be resolved efficiently on a class-wide basis." *Brown v. SCI Funeral Servs. of Fla.*, 212 F.R.D. 602, 606 (S.D. Fla. 2003). To conduct this inquiry, the Court must consider the cause of action and "what value the resolution of the class-wide issue will have in each member's underlying cause of action."  *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000).

Overall, subject to a revision to the class definition, I find that these common issues of fact and law predominate over individualized issues.  Plaintiffs' FDUTPA and RICO classes thus both satisfy the predominance requirements of Rule 23(b)(3), for the reasons set forth below.

### i.  Due Process

Toyota argues, as an overarching challenge to Plaintiffs' ability to satisfy predominance, that its Due Process right to present specific evidence rebutting various allegations should defeat the commonality and predominance inquiry.  *See* ECF No. 205 at 15 ("[T]he Court must consider Toyota's due process 'entitlement to litigate its statutory [or other] defenses to individual claims'"

through individual proof; *see also id.* at 21, 31, 33).  Defendants' reliance on *Dukes* is misplaced in this regard.  564 U.S. at 367.  In *Dukes*, an employment discrimination case, the certifying court approved a proposed method for determining class damages by using a sample set of class members, calculating the amount of back pay owed to each, then multiplying an average amount to calculate the class recovery.  *Id.*  The Supreme Court rejected the "novel project," noting that determinations about how much backpay a class member may be owned must include an opportunity for the employer to present evidence of individual affirmative defenses.  *Id.*

Toyota's persistent invocation of the Due Process Clause as an impediment to certification suggests that, like entitlement to back wages, every element of Plaintiffs' claims here is incapable of common proof and includes a statutory affirmative defense to which Toyota is entitled to advance individualized proof.  *Dukes* is an ill fit to this consumer fraud case and does not support Toyota's broad attack on predominance.  Nor will class certification in this case deny Toyota the opportunity, to the extent relevant, to raise individual challenges to class members' claims; the Court's recognition and consideration of individualized issues—including defenses—is necessarily folded into the question of whether certain questions can fairly be resolved on a classwide basis.

ii.   Florida Deceptive and Unfair Trade Practices Act Class

FDUTPA, Florida's consumer protection statute, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  A successful FDUTPA claim requires a showing of:  (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 167 (Fla. Dist. Ct. App. 2015).  Failures to disclose, or omissions, qualify as "deceptive acts" under

the statute. *Id.* at 169; *see also Horton v. Hoosier Racing Tire Corp.*, 2015 WL 12859316, at *3 (M.D. Fla. Dec. 15, 2015) ("FDUTPA claim is stated where the defendant knowingly fails to disclose a material defect that diminishes a product's value.").

Defendants here challenge Plaintiffs' ability to certify the FDUTPA class on the basis of causation, first averring that Plaintiffs have not offered classwide evidence of uniform misstatements to which all class members were exposed, or disclosures that, if made, would reach all class members. Next, and relatedly, Defendants argue the disparate purchasing circumstances render it impossible to decide on a classwide basis whether a reasonable consumer would have found the act or omission deceptive under the circumstances.[9]

### 1. Failure To Disclose The Defect As A Deceptive Act

Toyota argues that Plaintiffs cannot show a deceptive practice because the class theory depends on proof of a uniform defect present in all Class Vehicles. As noted above, Plaintiffs have advanced evidence of a uniform defect in the design of all Class Vehicles. Toyota further avers that there is no common evidence as to what caused the HVAC odor, but this again is a merits attack on Plaintiffs' expert opinion. The proof of a deceptive act is susceptible to common proof.

### 2. Causation

To satisfy the causation element of their FDUPTA claim, Plaintiffs "need not show actual reliance on the representation or omission at issue" because "the mental state of each class member is irrelevant." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016). Plaintiffs argue that establishing FDUTPA causation will not require individualized proof, and that they only need show that a reasonable consumer would have been harmed by Defendants' conduct. ECF No. 181 at 24. Plaintiffs rely on *Bowe v. Pub. Storage*, 318 F.R.D. 160, 182 (S.D. Fla. 2015) to support

---

[9] Defendants also aver that individual issues will predominate as to "actual damages." Plaintiffs' damages models are the same for both the RICO and the FDUTPA classes, and the Court will thus consider damages collectively below.

their position that this inquiry lends itself to class resolution where a defendant's conduct was "the same as to all class members."  *Id*. at 182 ("The correct inquiry here based on Eleventh Circuit precedent, is whether Public Storage's misrepresentations were 'likely to deceive a consumer acting reasonably in the same circumstances,' an inquiry that does not require a showing of each class members' individualized reliance.").  Plaintiffs argue that such is exactly the case here, where Defendants "uniformly failed to disclose the HVAC Defect to Florida consumers prior to their purchase of the class vehicles."  *Id*.

Defendants note that the class members must nevertheless demonstrate "actual exposure," or else there is no causal link.  ECF No. 205 at 30; 203 at 12.  Defendants rely on *Justice v. Rheem Manufacturing Co*., 318 F.R.D. 687, 697 (S.D. Fla. 2016), in which the court denied certification of a FDUTPA class alleging a failure to disclose a defect in household HVAC systems, because individualized inquiries would predominate regarding exposure to and materiality of the statements and omissions.  The court in *Justice* observed that despite FDUTPA's "reasonable consumer" standard, there must be some nexus between the deceptive act and the damages suffered.  *Id*.  (noting that an omission theory would require a showing that the class members would have received any purported disclosure that the plaintiffs alleged should have been made but was not).  Accordingly, individualized inquiries would have been necessary in *Justice* to reveal which marketing materials or information the class members were exposed to prior to purchasing their HVAC systems and whether information about the defect, if provided, "would have been material to purchasing decisions.  *Id*.

So too here, Defendants contend that the individual circumstances surrounding each class member's purchase of a Class Vehicle would be relevant to the causation analysis and would overrun any common issues of proof.  For example, Toyota cites to Plaintiff Baker's testimony

that Toyota should have disclosed the HVAC defect in trade magazines and at an authorized dealership, ECF No. 205-6 at 197:3-16, and Toyota contrasts this with the testimony of Plaintiff Monge, who testified that she did not review any trade magazines prior to making her purchase, which she made from a third-party seller, ECF No. 205-15.  Consistent with Monge's testimony, Toyota argues that many class members would not have seen disclosures made in trade magazines, offering evidence that manufacturer brochures and websites are "not at all" important to approximately 30 percent of Camry purchasers, and consumer reports are similarly "not at all" important to 20 percent of Camry purchasers.  ECF No. 205 at 31 (citing ECF Nos. 205-12 at Ex. A, ¶ 23; 205-2 at Ex. A).

Defendant SET more directly challenges Plaintiffs' failure to "point to common evidence showing any uniform misrepresentation/omission that *all* class members were exposed to— particularly when the proposed class includes purchasers who bought their vehicles from third-parties."  ECF 203 at 12.  SET attacks the Plaintiffs' ability to advance class-wide proof of causation "when the class includes purchases that took place outside of authorized Toyota dealerships and with absolutely no involvement whatsoever by SET."  *Id*. at 203.  SET's criticism is well placed.

It must be acknowledged here that this is the third putative class action arising from this alleged defect, for which purchasers of the vehicles seek to recover from Toyota the allegedly diminished value of their vehicles.  The first class was certified; the second was not. *Compare Salas*, 2019 WL 1940619 *with Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, No. 217CV00035VAPKSX, 2020 WL 1289549, at *9 (C.D. Cal. Mar. 3, 2020).  While neither decision is controlling on this Court, and each has been (and will be) decided on its own unique record, comparison of the respective proposed class definitions is instructive here.  The court in *Salas*

certified a class of "persons in California who purchased or leased a 2012-2015 Toyota Camry XV 50 model vehicle *from an authorized Toyota dealer*"; limited as such, the court rejected Toyota's argument that there was no common evidence of exposure (or materiality). *Salas,* 2019 WL 1940619, at *14. Relying on Ninth Circuit precedent,[10] the court concluded that because the class members all purchased or leased their vehicles from an authorized dealer, there was sufficient evidence "to show that a class member would have been aware of a disclosure had it been made by the defendant's authorized dealer." *Id.* at *9. A year later, and applying the same Ninth Circuit law, the court in *Stockinger* denied a motion to certify a class that encompassed purchasers of thirteen different car models from a multitude of different sellers, including private sellers. "Because the inference of exposure and reliance is not available in sales outside an authorized dealership, individual inquiries would be required here to determine whether putative class members purchased their Class Vehicles from Toyota or a third party." *Stockinger*, 2020 WL 1289549, at *9.

Plaintiffs' proposed class is likewise not limited to those who purchased their class vehicles from authorized Toyota dealerships. Plaintiffs attempt to distinguish *Stockinger* on the basis that the proposed class there included purchasers of many different model vehicles but fail to address the deficiency in common proof of exposure. Rather, in a single footnote, Plaintiffs characterize SET's argument as a "red herring," responding only that a "FDUPTA class including *all* purchasers is acceptable as has been recognized by this District." Plaintiffs rely on *Sanchez-Knutson* for this proposition, which is an odd choice considering that the court in *Sanchez-Knutson* did *not* certify a class of all purchasers; the proposed class was certified "subject to the stipulated modification that the class is limited to those persons who bought or leased their 2011–15

---

[10] *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015).

Explorers during the class period *from authorized Ford dealers*." *Sanchez-Knutson*, 310 F.R.D. at 535–36 (emphasis added).

Plaintiffs' reliance on *Bowe*, *Carriuolo* and *Fitzpatrick* is misplaced in this regard, as the class members in each of those cases were uniformly exposed to affirmative misstatements made by the defendants.  In *Carriuolo*, each class vehicle came with a Moroney sticker on the windshield that stated inaccurate safety information. 823 F.3d at 981.  Similarly, in *Fitzpatrick*, each class member was exposed to the allegedly misleading health information because it was displayed on every single yogurt cup.  635 F.3d at 1282. And in *Bowe*, each class member was presented with a misleading form required for all tenants.  *Bowe*, 318 F.R.D. at 167.

Plaintiffs here proffer evidence of internal statements made by Toyota and SET suggesting that customers should be told the odor was "normal," but the statements are just that—internal. They neither demonstrate what the Defendants told customers in practice, nor do they offer classwide proof that all class members received this information.  And Plaintiffs further advance no evidence or argument demonstrating that if the disclosure was made why it would be reasonably calculated to reach all class members, which is necessary for classwide resolution.

Plaintiffs Baker and Cardenas, however, allege common purchasing experiences in that they both purchased their Camrys from an authorized Toyota dealership in the SET region. Moreover, in limiting their proposed class definition to purchasers *in the SET region*, Plaintiffs tacitly recognize in their Motion that Defendants' fraudulent conduct, if not capable of even reaching a purchaser, is too attenuated to cause their alleged injury.

If Plaintiffs' class definition is revised to limit class members to those who purchased a class vehicle from an authorized Toyota dealership, a permissible inference of common exposure may be drawn.  *Stockinger* observed it would be fair to infer that class member who purchased

25

their vehicle from an authorized dealership would have interacted with representatives of the automaker and viewed materials the automaker provided prior to purchase, including stickers on the vehicle or brochures about the vehicle.  2020 WL 1289549, at *9 (citing *Butler*, 2017 WL 1398316, at *1); *see also Salas*, 2019 WL 1940619, at *9 (certifying a class made up of individuals who purchased or leased their vehicles from an authorized dealer).

Revising the class to include those who purchased or leased their vehicle from an authorized Toyota dealership would be sufficient to support a finding that all class members would have been aware of the disclosure if it had been made through the authorized dealer.  Accordingly, I recommend that the FDUTPA class definition be revised as such, and upon such revision, find that common evidence of causation may support the inference that class members would have been aware of a disclosure, if made, regarding the alleged HVAC defect.

### iii.   RICO Claims[11]

Section 1962(c) establishes that cognizable RICO claims require a plaintiff to show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *William*, 465 F.3d at 1282.  A prevailing plaintiff must therefore show a pattern of predicate acts of the alleged criminal racketeering activity, *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010), which here Plaintiffs allege are criminal mail and wire fraud, ECF No. 49 at ¶¶ 129-38. Going a step further, the participation in the scheme to defraud must necessarily have been intentional, and a defendant must have used interstate mails or wires in furtherance of the scheme. *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). Additionally, § 1962(c) requires

---

[11] In addition to the substantive RICO claim brought against Toyota, discussed here, Plaintiffs bring a RICO conspiracy claim against both SET and Toyota.  The Parties argue—with SET joining and adopting Toyota's opinion—that because the substantive RICO claim cannot be certified, so too must the conspiracy claim fail with regard to certification.  SET adds, however, that Plaintiffs have presented no evidence establishing any nexus between SET and any purchaser, further defeating the predominance claim.  ECF No. 203 at 13.  The Court will consider both the substantive and conspiracy RICO claims together for the purposes of class certification.

a plaintiff to show injury and causation; as applied here, the Plaintiffs must show the criminal mail

and wire fraud caused injury to either their business or property. *Williams*, 465 F.3d at 1283. The

scheme to defraud may be proven by offering evidence of either a material misrepresentation or

the omission or concealment of a material fact calculated to deceive the plaintiff out of money.

*Maxwell*, 579 F.3d at 1299.

To satisfy the commonality and predominance inquiries with regard to the RICO claims,

the Plaintiffs here must demonstrate that the following give rise to common questions that would

permit a fact finder to determine, on a classwide basis without highly individualized legal and

factual determinations: (1) whether Defendants engaged in a pattern of material

misrepresentations or omission/concealment of material facts regarding the HVAC odor present

in Camrys during the applicable time frame; (2) whether this deceit was calculated to deceive the

Plaintiffs and the putative class out of money via interstate mail or wires; and (3) whether Plaintiffs

were harmed directly by the Defendants actions.

The Parties do not contest that evidence common to all class members would be used to

prove a RICO agreement between Toyota and SET, and I agree this aspect of the claim is

susceptible to classwide proof. Defendants here do argue, as they have elsewhere in their

opposition, that Plaintiffs lack common evidence of material misrepresentations or omissions and

any common evidence of causation.

### 1. Common Evidence of Fraudulent Statements or Omissions

Defendants raise a number of the same arguments raised with respect to the FDUTPA class,

namely that (1) Plaintiffs have failed to identify any uniform, classwide misrepresentations or

omissions, the disclosure of which would have reached consumers, and (2) that class members

purchased their vehicles in a variety of different ways and potentially relying on disparate sources

27

of information prior to purchase.  ECF No. 205 at 20-21.  Defendants rely on *Stockinger* to support their argument that the Court should find these facts fatal to class certification.  ECF No. 205 at 21 (citing *Stockinger*, 2020 WL 1289549, at *9).  Plaintiffs observe that no RICO claims were asserted in *Stockinger* and it thus has no applicability here.

Although articulating these challenges in the context of a different legal standard—RICO rather than FDUTPA—they all arise from the same basic factual predicate; namely, that in a class comprised of individuals who may or may not have purchased their class vehicle from an authorized Toyota dealership, Plaintiffs have not identified at what point any disclosure made would have reached all class members.  As was true of the FDUTPA class definition as pled, the fact that the RICO class members could have purchased their vehicle one of any number of ways would undermine the ability to proceed as a class.  Individual inquiries would be necessary not only to determine *how* each class member purchased their vehicle, but also how any potential disclosure might have reached them.  For the same reasons, then, I likewise recommend narrowing the class here to only those who purchased their class vehicle from an authorized Toyota dealership; this limit provides uniformity in the manner of purchase and permits identification a point at which the disclosure could have feasibly reached class members at the time of purchase.

RICO also contains a materiality component, with courts holding that material omissions may rise to the level of fraudulent "if they are "intended to create a false impression."  *See Langford v. Rite Aid of Ala., Inc*., 231 F.3d 1308, 1312 (11th Cir. 2000).  Material misstatements or omissions are those with a natural tendency to influence, or are capable of influencing, the decision maker to whom they are addressed.  *See Maxwell*, 579 F.3d at 1299.  Defendants argue that individual considerations will predominate in determining materiality because HVAC disclosure would not have mattered to most purchasers; even those who knew about the potential for HVAC odor prior

to purchase.  ECF No. 205 at 21.  In support, Defendants refer to a survey conducted by their expert Sarah Butler and an opinion disclosed by their expert Ron Wilcox; the survey considered how an individual's perception of a vehicle and their willingness to pay a certain price for it might be impacted by the disclosure that the HVAC system might produce odor, and Wilcox opines that disclosure would not have mattered to most class members, including those aware of the "HVAC odor problem" prior to purchase.  ECF No. 205 at 21.  Toyota again argues that it is entitled to defend itself by showing that individual class members would have purchased their class vehicle at the price they did even if the alleged HVAC defect was disclosed.  *Id*.

Parsing out the materiality analysis for class certification in the manner put forth by Toyota here would effectively impute and individual reliance requirement where there is none (as discussed in further detail below).  This is best seen through Toyota's argument that it is entitled to show whether each individual class member would have made a different purchasing decision were the defect disclosed.  As a matter of course, the answer to this inquiry would prove whether or not the purchasing decision was *dependent* on the disclosure.  To save everyone a trip to the thesaurus—the words reliance and dependence are indeed synonyms.  The Court declines to impose an individualized reliance requirement by another name, and accordingly, I do not find that any individualized inquiry would be required as to materiality.  To the extent Defendants' experts offer to opine that objectively, HVAC odor would not have mattered to most purchasers, this opinion would be offered as to the entire class and would not, accordingly, defeat predominance.

### 2.   *Causation and Reliance*

The Supreme Court's holding in *Bridge v. Phoenix Bond & Indemnity*, 553 U.S. 639, 649 (2008), makes clear that "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity

consisting of acts of mail fraud." Further, an individual can be injured "by reason of" a pattern of mail fraud even if he has not relied on any misrepresentations." *Id*. To establish causation, however, a plaintiff will often be required to show that *someone* relied on the defendant's misrepresentations, whether that be the plaintiff themselves or a third party. *Id.* at 658-59 (noting that "[i]n most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation"); *see also Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1351 (11th Cir. 2016) (observing that without such a showing, the plaintiffs would not be able to demonstrate that they were injured by the alleged racketeering activity).

Causation under RICO may be determined on a classwide basis where the plaintiff claims that the defendant made a standard misrepresentation, and the plaintiff can establish a reasonable inference of reliance or causation based how the class members behaved. *Bowe*, 318 F.R.D. at 179. Typically, this inference will arise in scenarios where the defendant is accused of making misrepresentations connected to financial transactions, and the plaintiff can prove reliance based on their payment. *Id.*; *see also CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1090–93 (10th Cir. 2014) ("Cases involving financial transactions, such as this one, are the paradigmatic examples of how the inference operates as an evidentiary matter.").

In *Klay v. Humana, Inc.*, 382 F.3d 1241, 1246 (11th Cir. 2004), a case relied upon by Plaintiffs, the court considered RICO claims that were appropriate for class resolution based on common evidence of reliance and causation. In *Klay*, a group of physicians brought suit against certain health maintenance organizations (HMOs), claiming the HMOs represented that payment for medically necessary services and procedures would be based on the codes submitted by the physicians, when in fact the HMOs designed claims systems that would systematically pay the physicians less than the amount calculated by the codes. *Id*. at 1247-48. The HMOs sent the

physicians forms explaining the reimbursement amounts, but they omitted any explanation as to how the physician's submissions were manipulated, resulting in the underpayment. *Id.* The physicians then relied on the proffered forms and accepted payment. *Id.* In affirming certification of the RICO class, the Eleventh Circuit found that, in light of the uniform nature of the misrepresentations at issue, the circumstantial evidence that could be used to demonstrate reliance would be common to the class as a whole. *Id.* (holding that "the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations").

Defendants' argument here arises from the same factual basis as their other objections; they claim that Plaintiffs have proffered no evidence that either they or a third party relied on misstatements by Defendants and that, relatedly, Plaintiffs have no evidence that the HVAC defect would have influenced the purchasing decisions of class members. ECF No. 205 at 23 (citing *Sergeants*, 806 F.3d at 87). I find that with a class definition limited to purchases made at an authorized Toyota dealership, establishing RICO causation will be susceptible to classwide proof. This limitation on the class is, however, necessary to establishing classwide evidence of RICO causation. The RICO class as compared to the FDUTPA class has one key factual point of differentiation in that it applies to purchases made not just in Florida, but in the SET region as a whole. The theory behind extending the class to all such purchasers is that SET conspired with Toyota to defraud purchasers within its own region, as SET distributes parts and vehicles to authorized Toyota dealers.

It simply does not fit with the theory of the RICO claims that SET engaged in a scheme to defraud purchasers outside of authorized dealerships, when it only distributes parts and vehicles to those authorized Toyota dealerships. To the extent Plaintiffs argue that the fraudulent scheme

31

extended beyond authorized sales because Toyota and SET would collectively benefit from improved positioning and value in the eyes of the market as a *whole*, I find that link too attenuated to support inferring causation on a classwide level.  This would proceed only by applying a fraud on the market theory, which is unrecognized as to the automobile market, and for this reason too the class must be limited to those who purchased their vehicle from an authorized Toyota dealership.

Under the narrowed class definition, each class member entered into an agreement to purchase a vehicle that did not disclose what Plaintiffs allege is a design defect of the HVAC system, and as a result of that non-disclosure, class members paid an inflated price for their vehicles.  Causation can therefore be inferred from establishing that class members in fact paid the inflated price for the vehicles and may be proven on a classwide basis without individualized proof.  *See Bowe*, 318 F.R.D.at 180; *see also CGC Holding C*o., 773 F.3d at 1090–91 ("[N]umerous district court decisions, in the process of certifying classes, have accentuated facts similar to those in this case—primarily ... the fact that all plaintiffs paid fees in exchange for a promise—as proper grounds to infer reliance on a classwide basis.").

iv.   <u>Damages</u>

*1. Individualized Issues*

SET avers that individualized damages assessments will be required classwide, noting that many class members may have already sold their class vehicle for a value not reflecting the alleged HVAC defect, meaning there are no "actual damages" as required under FDUTPA.  ECF No. 203 at 17.  Even for those class members who resold their vehicle but *not* for value, the resale value will nevertheless impact the individual damages suffered, as would—even for those who have not resold their vehicles at all—whether any countermeasures were implemented for no cost.  *Id.*

(citing *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, No. 18-CIV-63130, 2020 WL 5667766, at *4 (S.D. Fla. Aug. 24, 2020), which denied certification, noting that the defect in a defective product could manifest at any point in the life of the product; for example, a defective vest that functions for 18 months has a higher market value than one that functions for just 30 days).

As a preliminary matter, under *Carriuolo*, whether or not a class member resold their vehicle is immaterial because each class member was injured by paying a price premium at the time of sale.  823 F.3d at 990.  As to SET's other cited concerns, even if they ultimately prove true, "the potential for individualized damages is not sufficient to defeat class certification under Florida law." *Id*.; 4 Newberg on Class Actions, § 11:6, at 21 (5th ed. 2014).  If necessary, the Court has the discretion to bifurcate the trial into separate liability and damages phases to mitigate potential damages concerns. *Salas*, 2019 WL 1940619, at *13.  Alternatively, the Court could employ issue certification and certify only the question of liability for class treatment, which would still effectuate the goal of a collective action. *Id*.  Accordingly, I do not find that individualized damages issues, to the extent they exist, would defeat either the commonality or predominance inquiries.

## 2.  *Methodology*

Defendants challenge the opinions of Plaintiffs' damages experts Steven Gaskin and Colin Weir, arguing that they should either be excluded entirely or given no weight because neither model—the cost to repair or overpayment damages shown through the conjoint analysis—accurately measures a decrease in market value and thus cannot reliably calculate individual damages for all class members.  ECF No. 205 at 25.  Because the opinions of Gaskin and Weir are the sole evidence Plaintiffs advance for proving classwide damages, the reports are critical to class

certification and accordingly, the Court must conclusively rule on any challenge to their qualifications or submissions prior to ruling on a class certification motion. *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011) (where an expert opinion necessary to class certification is challenged, the court cannot merely accept the expert opinions advanced without conducting a *Daubert* analysis).

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under Rule 702, an expert witness may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d).

The Eleventh Circuit has required the trial court to conduct a "rigorous three-part inquiry" under Rule 702, considering whether: (1) the expert is qualified to testify competently regarding the matter he intends to address ("qualification"); (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert ("reliability"); and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue ("helpfulness"). *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The proponent of the expert bears the burden of showing, by a preponderance of the evidence, that each of these requirements is met. *Id.*

The Rule compels courts to act as "gatekeepers to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329 1335 (11th Cir. 2010)

(citing *Daubert*, 509 U.S. at 597 n.13).  However, in so doing, the Court makes no determinations on credibility or persuasiveness of the proffered evidence; "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

Defendants raise no challenge to the qualification of either Gaskin or Weir, and having reviewed their curriculum vitae, the reports issued in this case, and a number of opinions recognizing their expertise specifically in the application of conjoint analyses, they are more than minimally qualified as *Daubert* requires.  Defendants' challenges particularly attack the methodologies applied by the experts, as well as the fit to the case.

### a.   Conjoint Survey

Defendants argue that no conjoint analysis model, by virtue of its very nature, would be capable of measuring classwide damages in this action.  They claim that this is so because a conjoint analysis measures only a consumer's willingness to pay for a hypothetical vehicle, which does not measure the actual market value of a class vehicle with the disclosed HVAC defect; in other words, the analysis considers demand but not supply.  ECF No. 205 at 13 (arguing that a decrease in willingness to pay only measures the change in demand, which is not the direct equivalent of a reduction in market price); *see also* ECF No. 196 at 9-10.  The conjoint analysis does not offer a true "but-for" market simulation that reflects competitor vehicles and pricing along with Toyota's willingness to sell; it only reflects, as relevant here the consumer's willingness to choose between two otherwise Toyota vehicles in all respects identical except for HVAC odor. ECF No. 196 at 10.  Additionally, conjoint analyses do not consider other factors that would impact supply conditions, including the historical cost of goods sold and what price sellers might be

willing to accept for their good if buyers were only willing to pay less in the hypothetical "but-for" world. *Id*. Defendants characterize the caselaw as trending toward empirical rejection of conjoint analyses on this basis, dismissing those cases in which courts permitted the use of a conjoint analysis as, essentially, outdated. ECF No. 196 at 9-10. Defendants also note that other courts have recently rejected Gaskin and Weir's conjoint analysis methodology in automobile cases for this reason. *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig. ("Clean Diesel")*, 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020).

Plaintiffs argue in response that the conjoint analysis indeed accounts for supply side factors, including: (1) actual market prices during the class period; and (2) the actual quantity of vehicles sold during the class period. ECF No. 243 at 17. Plaintiffs cite various cases that have admitted conjoint analyses and found the analyses appropriately accounted for supply-side factors in measuring damages; in particular, a number of these cases noted that the actual market price reflects, among other things, the number of units sold, manufacturing costs, distribution costs, advertising and marketing costs, and margin. *Id.* (citing, for example, *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *2-4 (E.D. Cal. Mar. 29, 2019). Plaintiffs characterize the court's decision in *Clean Diesel* as an outlier, noting too that the case settled shortly after appellate review was sought on the decision to exclude these experts.

Toyota's contention that conjoint analysis is inherently unreliable to measure overpayment rests on arguments that have been rejected by multiple courts. *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 576 (N.D. Cal. 2020) (granting class certification and rejecting defendant's motion to exclude damages methodology advance by Gaskin's survey, finding challenges to the survey methodology go to weight and not admissibility); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018) (denying motion to exclude and finding "unavailing" defendant's

argment that Gaskin's proposed conjoint analysis failed to satisfy Comcast on grounds that it only sought to measure willingness-to-pay).  Comparing Gaskin's opinion advanced in this case against the challenges raised—and rejected—in several cases lead me to the same conclusion that Toyota's attacks on the application of a conjoint analysis to measure the extent to which the class overpaid for the Class Vehicles do not warrant his exclusion.

Defendants further argue that the conjoint survey performed in *this* case suffers from other flaws rendering it unreliable.  They claim the survey offered a false choice between a vehicle with the potential for HVAC odor and one with *no* potential for HVAC odor but did not, for example, address the frequency with which the HVAC odor might occur.  ECF No. 205 at 13 (citing ECF No. 205-30 at Ex. A).  Defendants aver that the survey results themselves suggest unreliability, given that the overpayment percentages ranged from 25 to 67 percent.  ECF No. 205 at 25 (citing ECF No. 205-30 at Ex. A; *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, ---F. Supp. 3d ---, 2020 WL 6688912, at *8 (N.D. Cal. Nov. 12, 2020)).  Both arguments present a skewed description of Gaskin's method and his conclusions.

A summary of the opinion and methodology provides context.  Gaskin explains in his Report that he designed the survey to assess reduction in market value of the Class Vehicles. Gaskin's online survey employed a series of initial questions to narrow the demographic pool of those respondents from whom data would be collected and used. Only respondents over the age of 18, residing in the United States (but not California), who answered among options presented that they had purchased new or used Toyota Camrys from model years 2012-2017 were permitted to participate in the conjoint choice questions.  Respondents received instructions that they would be asked to select among hypothetical vehicles offered for sale which they would purchase.  Each of the choice sets included seven features that were either present or not (i.e., Smart Key System or

No Smart Key System); or were possibly defective (i.e., "The accelerator pedal may become a bit harder to press, requiring slightly more effort to operate it" or "The accelerator pedal works reliably for the lifetime of the vehicle").  The HVAC feature was presented as "A musty, damp, or sour odor may be emitted from the HVAC system" or alternatively "No musty, damp or sour odor emitted from the HVAC system."  ECF 181-60 at 19.

Toyota's contention that the survey presented a false choice of a vehicle that does not exist (one with no HVAC odor) focuses on the verbiage used to present the option in the survey questions. A more fulsome explanation provided to participants accompanied:

> The Toyota Camrys you will choose from vary in Heating Ventilation and Air Conditioning (HVAC) System.
>
> • A musty, damp, or sour odor may be emitted from the HVAC system of some vehicles.
>
> • The HVAC system may have a design that allows condensing water to accumulate and allows naturally present organic contaminants to be trapped and kept moist, and it cultivates organic matter such as microbes, bacteria, mold, and fungus.
>
> • This issue may or may not be able to be repaired and may or may not be covered by the warranty. There will be no advanced warnings prior to the existence of this condition; you will become aware of it if it occurs.

The explanation of the choice participants were asked to make provides a good fit to the theory advanced in this case. Gaskin's survey, like Plaintiffs' theory of injury here, tests whether consumers would value a car that "may have a *design* that allows condensing water to accumulate and allows naturally present organic contaminants to be trapped and kept moist."  The other option is simply one without the defect; the survey did not, as Toyota contends, offer a vehicle that does not exist. Toyota's attack in this regard relies heavily on the evidence that the odor occurred in low prevalence and on criticism that Gaskin failed to quantify the likelihood that odor "may" occur. This criticism goes to weight, not admissibility, and having examined Gaskin's Report and Rossi's Rebuttal thereto, I am not persuaded that failure to include an estimate of the frequency of the

symptom of the defect detracts from the survey results. Survey participants were told that the HVAC odor was uncertain to occur even if the defect was present; affording the survey participants the opportunity to place a value on the car based on the *likelihood* of the occurrence is precisely the opportunity Plaintiffs allege Toyota denied them here, and it forms the basis of their theory of injury.

Toyota assails the wide range of results Gaskin's survey returned; Rossi opines that if the survey had been reliable, the results would be close. Having examined the survey and disclosed methodology employed by Gaskin, I conclude that it was sound for purposes of determining admissibility and decline to accept Rossi's assertion that the disparity among results proves otherwise. As Gaskin explains in his report, each hypothetical vehicle presented randomized choices for the seven identified features in different order, except for price: each vehicle the participant was asked to consider listed a price at the bottom; options ranged from $20,000 to $38,000. Thus, for each set of three hypothetical vehicles, the survey participant not only had a choice of buying a vehicle at three very different prices, but she had to evaluate what she would get for that purchase price. After making her selection, the participant was next asked if, given her knowledge of the market, she would be willing to buy or lease the Toyota Camry that she chose at the MSRP indicated, thereby affording the participant the option to *not* buy any of the vehicles that had been offered. In short, the survey does *not* assume that participants would be willing to pay the amounts reflected in the survey questions but rather tested that precise assumption.

Moreover, Gaskin's opinion that the results reveal a 25 percent reduction in the value of the vehicle with the defective defect results from applying the quantified amount in dollars to a range of MSRPs, again, ranging from 20,000 to 38,000. The lower the MSRP, the greater the percentage of difference, and by contrast, the higher the MSRP, the lower the percentage of

reduction. Defendants may argue to the jury the incongruence in Gaskin's results, but I find he has disclosed a methodology that is reliable, testable, tethered to the facts and evidence in this case, and ultimately, admissible.

SET separately moved to exclude the reports, opinion and testimony of both Gaskin and Weir on the basis that their opinions rest on an unreliable survey and based on an unrepresentative sample of the putative class. ECF No 249. Toyota raises a similar attack.

A court assessing whether a survey employs a reliable methodology examines whether "(1) the 'universe' was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured. *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *28 (N.D. Ill. Mar. 31, 2017). Defendants cite *In re Fluidmaster* for the proposition that a survey's reliability may consider whether the expert chose a representative sample. Interestingly, the court there concluded that the expert had not done so, because her proposed survey for this conjoint analysis was directed to putative class members—ordinary purchasers of the contested plumbing goods—despite the evidence that the overwhelming majority of purchasers were *not* the ordinary consumer but rather were plumbing professionals, none of whom were included in the survey sample. In finding the proposed survey unreliable, the court observed that an expert could not examine the consumer preferences among different features of a product unless she surveys a representative sample "of those who buy Defendant's products." *Id.* at 29.  Despite inclusion of class members, the sample

was flawed because it excluded actual purchasers. Gaskin's sample does not suffer from this error, as he tested actual purchasers of class vehicles.

To SET's challenge that Gaskin's survey included too few respondents to be admissible, the Eleventh Circuit has held that "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003); *Sanchez-Knutson*, 181 F. Supp. at 995 (rejecting challenge to Gaskin's methodology on basis that it used a national sample to be applied to class alleging FDUPTA claim).

Finally, Defendants contend that the conjoint analysis fails to fit the proposed class definition because it fails to consider purchasers from third party sellers. This concern is negated by the limitation, set forth above, that the class certified include only those who purchased from authorized Toyota dealers.

### b. Cost to Abate HVAC Odor

As an alternative measure of damages, Plaintiffs argue that each class member is entitled to recover the cost they would incur to abate the odor over the course of ten years. ECF No. 181 at 33. One of two methodologies would be employed for this measurement: either the cost to install an Afterblow device multiplied by the number of class vehicles, or the cost to install charcoal filters and provide routine evaporator cleanings and filter replacements, also multiplied by the number of class vehicles. ECF No. 181-62 para 50. Plaintiffs' economist Colin Weir relies on Don Wright, another retained expert, for the assumption that the first repair has an estimated cost of $1,176.05 per vehicle; the filter fix has an estimated cost of $1,973.50. ECF No. 181-62 at ¶ 50. "Either of these costs to remediate the Defect can serve as a proxy for the amount that

Plaintiffs and Class members overpaid for the Vehicles at the time of purchase or lease as a result of the Defect." *Id.*

Defendants argue that no sound economic principle supports using repair costs as a stand-in for a market value decrease.  ECF No. 205 at 27 (citing ECF No. 205-30 at Ex. A).   As noted by Defendants' expert Peter Rossi, the cost to repair model measures neither supply nor demand and does not quantify the decrease in market value due to the non-disclosure; from an economic perspective, Rossi states that it would be irrational to repair a vehicle performing acceptably that could not be distinguished from any other vehicle.  ECF No. 196 at 18.  Defendants note that Plaintiffs' own expert stated that the most rational process is to wait until after a customer complains about HVAC odor to install Afterblow, ECF No. 205-11 at 188:17-20; the cost to abate damages model would thus potentially award the cost of installing Afterblow to individuals who experienced no odor at all.  ECF No. 205 at 27.

Plaintiffs rely on *Nguyen* for the proposition that the cost of repair can serve as a proxy for overpayment, and they note that *Nguyen* found *Carriuolo* was consistent with this theory.  *See* 932 F.3d at 821-22.  Plaintiffs also cite *Salas*, which permitted a cost of repair damages model that considered the average costs of the parts, labor, and sublet required to repair the HVAC defect over the average life of the vehicle.  ECF No. 181 at 29.

Defendants reject the Plaintiffs' comparison to *Nguyen*, noting that the expert there calculated the value of a replacement part for safety reasons rather than simply for use and performance, and the Ninth Circuit expressly recognized a difference between the two scenarios. ECF No. 205 at 26-27.  As to Plaintiffs' causes of action here, Defendants observe that Plaintiffs have not cited any RICO class actions employing a cost to repair model for damages and claim that FDUTPA precludes using the cost to repair as a proxy for a decrease in market value.  ECF

No. 196 at 18 (citing *Harris*, 2016 WL 4543108, at *15).   FDUTPA limits recovery to *actual* damages, and courts have rejected a cost to repair damages model in part because the remediation costs "do not reflect a diminution of market value, and are not recoverable as actual damages." *Id.* (citing *Thermoset Corp.*, 2014 WL 11775929, at *5).

Weir's opinion that costs to repair may be a "proxy for overpayment" in this case should not be admitted. First, Weir offers no explanation for his conclusion beyond the single statement, quoted above, that it simply *is*. While that *ipse dixit* statement would under any circumstances make his opinion vulnerable to exclusion, it is particularly difficult to overlook in the absence of recognition of this principle in the case law. Beginning with *Sanchez-Knutson*, the court expressly rejected the theory that vehicle repair costs could serve as a proxy for overpayment. 310 F.R.D. at 538. Turning to the cases that Plaintiffs contend support application of this model, *Nguyen* is distinguishable on the basis that the cost of repair was capable of returning the purchaser to the position she would have enjoyed but for the defective clutch; by contrast, the cost of repair here, inexplicably over a period of ten years, never restores the purchaser to that position.  Weir makes no effort to explain why then it serves as a proxy for overpayment.

Nor does *Salas* support this theory. The expert there made no effort—at least none described in the court's order—to couch her opinion on the cost of repair *as a proxy of overpayment*. Indeed, the expert's damages model additionally proposed an out-of-pocket method for calculating loses incurred in repairs made by individual class members. *Salas* 2019 WL 1940619, at *11 & n.16.

Plaintiffs, as proponents of this expert opinion, have not satisfied their burden to show that this method of calculating damages for this class is reliable or an appropriate fit to the theory of injury here. Accordingly, I recommend that it be excluded.

v.   Individualized Defenses

Affirmative defenses may undermine the economy of proceeding as a class action and may defeat certification, even standing alone in severe cases, if the defenses are such that in-depth analysis and mini-trials would be necessary at the individual level. *See Brown v. Electrolux Home Prod.*, Inc., 817 F.3d 1225, 1241 (11th Cir. 2016). Where a common course of conduct is shown, however, unique defenses will rarely predominate sufficient to defeat class certification of their own accord. *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 656, 674 (S.D. Fla. 2015). Defendants aver that individualized determinations will need to be made as to each claim to analyze whether a unique defense precludes the individual from being a class member or whether the claim might be barred entirely. For the reasons set forth below, I do not find that it would be warranted to deny certification on the basis of Defendants' affirmative defenses.

*1.   Arbitration Agreements*

Defendants argue that individual legal and factual determinations will be required to determine whether consumers within the class are required to arbitrate their claims. ECF No. 205 at 36. Defendants proffer evidence that many of the class members entered into financing agreements for their class vehicles through the SET affiliate Southeast Toyota Finance. ECF No. 203-12 (Pollock Declaration) ¶¶ 2-5. Those financing agreements contain not only mandatory arbitration provisions, but also a waiver regarding all class proceedings; thus, Defendants argue that analysis at the individual level will be required to determine whether potential class members are bound by those arbitration provisions. Plaintiffs aver in response that Defendants have not offered any evidence as to how many class members might have arbitration agreements but, regardless, the arbitration agreements should not defeat certification given that either subclasses could be created to address the agreements or those with such agreements could be excluded from

the class entirely.  ECF No. 243 at 21 (citing *Espinoza v. Galardi S. Enters., Inc.*, 2016 WL 127586, at *13 (S.D. Fla. Jan. 11, 2016)).

The potential for arbitration agreements does not defeat predominance, in part because Defendants have not offered actual evidence of how many potential class members would be impacted.  *Compare Salas*, 2019 WL 1940619, at *13 *with Guzman v. Bridgepoint Educ.*, 305 F.R.D. 594, 612 (S.D. Cal. 2015) (noting that up to 96 percent of the proposed class may have signed an enforceable arbitration agreement).  But even if the arbitration is ultimately problematic for claims administration purposes, I concur that those with arbitration agreements could either be broken into a subclass or excluded.  *Espinoza*, 2016 WL 127586, at *13.  Defendants have presented no evidence or argument that it would require much, if any, individual analysis to determine whether a class member signed such an arbitration agreement; based on the Defendants' own proffered evidence, the only determination necessary would be whether a potential class member entered into a financing agreement with the SET affiliate, which could likely be accomplished in aggregate using Defendants' own records.

### 2. Statute of Limitations

Defendants next argue that the merits of the statute of limitations defense they plan to raise in response to class members' claims will necessitate individual determinations.  Both RICO and FDUTPA carry a four-year statute of limitations period.  For RICO claims, time begins to accrue "when the injury was or should have been discovered," regardless when it is discovered that the injury arose from a pattern of racketeering.  *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).  For FDUTPA, the clock begins to run on the four-year statutory period from the date of purchase.  *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017).  Here, Plaintiffs' proposed class is limited to purchasers of 2012-2014 model year vehicles, and the litigation was

filed in July of 2018.  Notably, the class includes purchasers of both new and *used* class vehicles, and thus purchases could have been made anytime between late 2011 and July 2018.  Defendants argue this fact implicates statute of limitations concerns, and proffers Baker as an example— Defendants argue Baker's RICO and FDUTPA claims are time barred given that both of his purchasers were made in excess of four years prior from the date of filing the instant lawsuit. ECF No. 205 at 35.

In response to Plaintiffs' claim that the fraudulent concealment tolling doctrine should apply, thus negating potential timeliness issues, Defendants aver that the determination as to whether the doctrine will apply must be made at the individual level; class members will need to demonstrate that the alleged HVAC defect was concealed from them and that they exercised reasonable care and diligence in attempting to discovery the facts forming the basis of the RICO and/or FDUTPA claims.  ECF No. 205 at 36 (citing *Licul v. Volkswagen Grp. of Am., Inc*., 2013 WL 6328734, at \*6 (S.D. Fla. Dec. 5, 2013), for the general legal standard of the fraudulent concealment tolling doctrine).  To this, Plaintiffs assert that they intend to use common proof to show on a classwide basis that Defendants concealed the defect, but also argue that as a matter of law a statute of limitations affirmative defense will not bar class certification even in the fact of inevitable individual issues.  ECF No. 243 at 21 (citing *In re Checking Account Overdraft Litigation*, 307 F.R.D. 656, 680 (S.D. Fla. 2015)).

I find Plaintiffs' reliance on *In re Checking Account Overdraft Litigation* well placed.  The court there observed that courts have been nearly unanimous in finding that differentiating application of a statute of limitations defense to various class members will not preclude certification.  307 F.R.D. at 680.  Indeed, the court also offered the doctrine of fraudulent concealment as an example as to why the statute of limitations does not defeat predominance,

noting that proof of fraudulent concealment could itself be proven with evidence common to all class members.  Even were this not the case, Defendants present no evidence as to how many class members would potentially be subject to the statute of limitations.  While the class encompasses model years 2012-2014, that does not necessarily mean the *sale* occurred during those years, as the class would also include the purchase of used cars so long as they were purchased at an authorized Toyota dealership.  Regardless of the prevalence, however, the Court has the ability to further divide the class into subclasses or further revise the class definition as needed to manage the litigation.  I find no basis upon which a statute of limitations affirmative defense would defeat class certification.

### b.  Typicality and Adequacy

Although distinct requirements under Rule 23(a), an insufficient nexus between the named plaintiffs and the proposed class members will necessarily impact both the typicality and adequacy analyses, and thus the Court will consider them together here.   Rule 23(a)(3)'s typicality prerequisite requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The claims of the class members do not need to be identical to those of the class representative; rather, there must exist "a sufficient nexus ... between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (citing *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1278–79 (11th Cir. 2000)). This nexus exists if the claims of the class representative and the class members "arise from the same event or pattern or practice and are based on the same legal theory." *Id.* at 1217 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

Rule 23(a)(4) also requires adequacy of representation, stating that "the representative

parties will fairly and adequately protect the interests of the class." In order to adequately represent a class, the named plaintiff must show that he possesses the "integrity and personal characteristics necessary to act in a fiduciary role representing the interests of the class, and has no interests antagonistic to the interests of the class." *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 540 (S.D. Fla. 2015). The adequacy of the class counsel is presumed, absent specific proof to the contrary. *Id.*

Defendants do not contest the appointment of Kessler Topaz and Podhurst as class counsel. Kessler Topaz has significant experience with consumer class action litigation generally and automotive defect case specifically, and they have committed significant time and resources to representing the classes here. Podhurst is similarly composed of highly qualified counsel with significant experience litigating automotive defect cases both in the Southern District and elsewhere. Both Kessler and Podhurst have vigorously pursued this litigation thus far, and I find that they would adequately represent the interests of the class members as Class Counsel.

Defendants' main challenge on the typicality and adequacy front is that each named Plaintiff here asserts claims that will be overrun by unique defenses or present such unique factual circumstances that they are either not typical of most class members, inadequate to fairly represent and protect the interests of the class at large, or both. ECF Nos. 203 at 19-20; 205 at 36.

### i. Monge

Defendants proffer that Monge purchased the Camry from a non-authorized Toyota dealer in "as-is" condition, did not rely on any statements from Toyota, and only offered financing when her former partner's application was unexpectedly denied. ECF No. 205 at 36-37 (citing ECF No. 205-15). Defendants argue that all of these facts render her unable to fairly represent the class.

Here, I find the critical and ultimately determinative fact is that Monge did not purchase

her Camry from an authorized Toyota dealership.  As articulated by the Supreme Court, the typicality analysis requires a class representative to fall within the class definition and "possess the same interest and suffer the same injury as the class members." *Prado-Steiman ex rel. Prado*, 221 F.3d at 1279 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)). This ensures that the class representative's incentives align with those of absent class members so as to fairly represent their interests.  *Id.* (citation omitted).  The revised class narrows the definition to *only* those individuals who purchased their class vehicle from an authorized Toyota dealership. This definition would thus exclude Monge and prohibit her from serving as a class representative.

ii.  <u>Cardenas</u>

Defendants note that Cardenas did not make the purchasing decision and does not know exactly how much money he paid toward the car as compared to his mother. ECF No. 205 at 37 (citing ECF No. 205-16). Defendants also argue that because Cardenas resides in Missouri and made payments from there, he may not assert a FDUTPA claim.  ECF Nos. 203 at 20; 205 at 37. This latter argument is no impediment to Cardenas' claim, as FDUTPA considers where the *sale* took place—as this is where the injury occurred—and Cardenas purchased the vehicle in Miami.

As asserted by Plaintiffs, Cardenas' claims arise from the same basis of fact as the class as a whole; he asserts that he was deceived by Defendants' common efforts to conceal the HVAC defect just like every other member of the class, and he suffered the same alleged economic injury by overpaying for a vehicle with a hidden design defect.  ECF No. 181 at 17.  I find there is a sufficient nexus between Cardenas' claims and those of the class, satisfying the typicality inquiry. *See Salas*, 2019 WL 1940619, at *5.  I also find that Cardenas has no conflict of interest with the other members of the class and, to the contrary, find that they share a common interest in the outcome of this litigation such that Cardenas would be an adequate class representative.  *Id*.

iii.   Baker

In addition to arguing that Baker is subject to a statute of limitations defense, Defendants argue in relevant part that Baker is not a fair representative of the class given that he has already sold both of his class vehicles for what he considered a fair value.  ECF No. 205-6 at 15:15-16.[12] Defendants also proffer Baker's testimony demonstrating that he was familiar with very few of the filings in this case, had "virtually no knowledge" of the case as a whole, and "did not know the names of his Florida counsel."  ECF No. 205 at 37 (citing ECF No. 205-6).

The fact that Baker sold his vehicles without regard to the defect, and argument that he has no damages thus to recover, does not create a conflict with the class.  "[T]he fact of resale is immaterial because the injury occurred when class members paid a price premium at the time of lease or purchase." *Carriuolo,* 823 F.3d at 990.  Baker is, in many ways, the prototypical named plaintiff:  he purchased not one but two class vehicles with the alleged defect from authorized Toyota dealerships.  In fact, he complained about the HVAC odor in the first vehicle, but the odor was never fixed and, believing it was unavoidable, Baker purchased *another* class vehicle.

To the extent Baker's claims are not time barred, they are typical of the class, and he has clear incentives to protect the interests of the class members and pursue this litigation on their behalf.  As discussed, the question of whether Plaintiffs' theory of tolling based on fraudulent concealment will rise and fall for all class members in unison, and I find it is closely linked with the merits inquiry at the heart of this case.  If the Court were to find, however, that the class should proceed but that the statute of limitations for each class member would not be tolled, the Court

---

[12] Defendants also argue that Baker "never experienced HVAC odor" thus making him an improper named plaintiff, but this argument is irrelevant to Plaintiffs' theory of the case for the reasons discussed above.  Plaintiffs theorize that Baker's injury occurred at the point of sale when he purchased a class vehicle with a defective HVAC system.  Being aware of the potential for HVAC odor is not equivalent to being aware that a defect in the design of the HVAC system was responsible for the odor.

would need to consider whether Baker's claim is time barred, but to do so now would be premature.

### c.   Superiority

Superiority refers to whether the class action lawsuit is the best method for fairly and efficiently adjudicating the controversy.  Rule 23(b)(3) lists matters pertinent to this finding: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

In addition to citing the individualized issues that would render class treatment inferior for resolving the class members' claims, Defendants argue that there is no *need* for a class action here.  ECF No. 205 at 40.  Putative class members gave multiple incentives to bring and control the litigation of their individual claims, in part because the potential damages are not *di minimis*, with both RICO and FDUTPA permitting recovery for attorney's fees, and in part because state lemon law claims or other alternative dispute resolution processes ending in repurchase of the class vehicle would permit more immediate and broader relief.  ECF No. 205 at 40 (citing ECF Nos. 205-40 at 5; 204-41 (Geiger Deposition)).

Plaintiffs argue that it would be superior to manage this litigation as a class action, citing an absence of evidence that class members have an individual interest in controlling the action, the fact that the Court is exceedingly familiar with the facts and issues raised in this case given the lengthy procedural history, and because the central legal and factual issues to be adjudicated as a class depend on a common set of documents, fact witness testimony, and expert testimony.  ECF No. 181 at 30.  Plaintiffs rely on *Carriuolo*, which stated that because common factual and legal issues predominated, "class-wide adjudication appropriately conserves judicial resources and

advances society's interests in judicial efficiency."  As is the case here; not only is it the most efficient option to resolve the core legal and factual issues in one proceeding as opposed to thousands, it avoids the possibility that inconsistent rulings might result.  I therefore recommend class treatment of these claims as a superior method of resolution.

### a.  Ascertainability

An implicit requirement of class certification is that the Plaintiffs have identified classes that exists and that can be precisely defined. "An identifiable class is essential so that the Court can determine whether a particular claimant is a class member." *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 266 (S.D. Fla. 2003) (internal citations omitted).  And the class must be defined in such a way that every member of the putative class would have standing to assert the relevant claims.  *Sanchez-Knutson*, 310 F.R.D. at 535.  Further, each class member must be possible of being ascertained using objective criteria.  *Bussey*, 562 F. App'x at 787.  Going a step further, many courts within the Eleventh Circuit require the process of applying objective criteria to find the class members be administratively feasible, meaning that the process to identify class members is "manageable process that does not require much, if any, individual inquiry." *Id*.; *Karhu v. Vital Pharm., Inc*., 621 F. App'x 945, 946 (11th Cir. 2015).

Plaintiffs originally defined the two classes as being comprised of persons who have purchased a model year 2012-2014 non-hybrid Toyota Camry vehicle either in Florida or in the SET region, arising under either FDUTPA or RICO.  ECF No. 181 at 19.  Applying the revisions as recommended by the undersigned, that class should be modified to include only those who made purchases from an authorized Toyota dealership.

Defendants lob a series of objections, claiming that the class definition is (1) vague, given that the term "purchasers" is not clearly defined; (2) overbroad insofar as it includes individuals

who did not experience HVAC odor; and (3) unascertainable.  None of these arguments prevail, however.  The term "purchaser" has been used by a number of courts to define membership to a class of consumers injured in relation to the purchase of an automobile.  *See, e.g.*, *Carriuolo*, 823 F.3d 977; *Sala*s, 2019 WL 1940619; *In re: Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2015 WL 9987659 (S.D. Fla. Dec. 2, 2015) (Moreno, J.).  Defendants' claim that the class is overbroad misses the point that, as stated many times over at this juncture, Plaintiffs do not bring a warranty claim, and thus the subjective experience around HVAC odor is not relevant.  Finally, the revision of the class definition mitigates any potential concerns as to locating actual class members, though while I imagine it will likely not be necessary to conduct a public records search using a reverse VIN lookup, Plaintiffs could engage in that process if ultimately required.

I find, therefore, that the class is defined using objective criteria and is sufficiently ascertainable.

## II.     CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Class Certification, ECF No. 181, be **GRANTED**, **in part**.  The Court should certify the following classes under Rule 23(b)(3):

- Florida FDUTPA Class: All persons who purchased a 2012-2014 model year non-hybrid Toyota Camry in the state of Florida from an authorized Toyota dealership; and

- SET Region RICO Class: All persons who purchased a 2012-2014 model year non-hybrid Toyota Camry from an authorized Toyota dealership in the SET Region.

I recommend that the Court appoint Plaintiffs Javier Cardenas and Rodney Baker as Class Representatives, and appoint Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Podhurst Orseck, P.A. ("Podhurst") as Class Counsel.

The undersigned additionally **RECOMMENDS** that SET's Motion to Exclude the

Opinions, Reports, and Testimony of Plaintiffs' Experts Steven Gaskin and Colin Weir, ECF No. 249, be **DENIED** for the reasons set forth in this Report.

Also for the reasons set forth here, I **RECOMMEND** that Toyota's Motion to Exclude the Opinions, Reports, and Testimony of Plaintiffs' Experts Steven Gaskin and Colin Weir be **GRANTED** as to the "cost to repair" damages model offered by Weir and **DENIED** in all other respects. The Court **RECOMMENDS** that Plaintiffs be precluded from relying on the opinions and information relating to the "cost to repair" damages methodology in their substantive pre-trial briefing, and likewise **RECOMMENDS** they be precluded from eliciting testimony thereon at trial.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Federico A. Moreno, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida, this 12th day of August, 2021.

LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE

cc: All Counsel of Record