## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 18-cv-22798-CIV-FAM

JAVIER CARDENAS, RODNEY BAKER,
and MICHELLE MONGE, individually and
on behalf of all others similarly situated,

      Plaintiffs,

      v.

TOYOTA MOTOR CORPORATION,
TOYOTA MOTOR SALES, U.S.A., INC.,
TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA,
INC., and SOUTHEAST TOYOTA
DISTRIBUTORS, LLC,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON MOTIONS
## FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon Defendant Toyota Motor Corporation, Toyota

Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc.'s

("Toyota") Motion for Summary Judgment, ECF No. 175, and Defendant Southeast Toyota

Distributors, LLC's ("SET") Motion for Summary Judgment, ECF No. 179.  Plaintiffs Javier

Cardenas, Rodney Baker, and Michelle Monge filed Responses to each, ECF Nos. 211, 212, and

Toyota filed a Reply, ECF No. 242, as did SET, ECF No. 238.  Oral argument was conducted on

July 13, 2021 and July 14, 2021.  Upon consideration of the Motions, Responses, Replies, the

docket as a whole, and being otherwise duly apprised in the matter, the undersigned hereby

**RECOMMENDS** that Toyota's Motion for Summary Judgment be **GRANTED, in part**, and

**DENIED, in part**, and further **RECOMMENDS** that SET's Motion for Summary Judgment be

**GRANTED, in part**, and **DENIED, in part**.

## I.      INTRODUCTION

This litigation arises from the alleged concealment of a defect in the Heating Ventilation and Air Conditioning ("HVAC") systems in non-hybrid Toyota Camrys, from model years 2012 through 2014.  The Plaintiffs here are current and former owners of these vehicles in the SET region[1] and claim the HVAC systems are defective because they contain the potential to emit foul odors in the passenger compartment caused by the accumulation of moisture and microbial growth within the HVAC system itself.  Plaintiffs allege that the defective design of the HVAC systems "allows condensing water to accumulate and allows naturally present organic contaminants to be trapped, kept moist and cultivate organic matter such as microbes, bacteria, mold and fungus." ECF No. 213-1, Expert Report of Murat Okçuoğlu at 24 (Oct. 20, 2020) ("Initial Okçuoğlu Report").

Plaintiffs brought suit against the three Toyota entities responsible for designing, manufacturing, and testing the vehicles, along with SET, which is a distributor of Toyota parts and vehicles to authorized Toyota dealers who then sell them to the public.  Plaintiffs claim that Toyota and SET conspired and engaged in a plot to conceal the defect in order to protect the Toyota brand, overcharge consumers for the Class Vehicles, and avoid repairs and buybacks under the Florida Lemon Laws, all in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Plaintiffs allege that Defendants executed this plot by engaging in deceptive trade practices, noting that, for example, Defendants disseminated a misleading Technical Service Bulletin used by SET dealerships to inform complaining owners of the Class Vehicles that the HVAC odor was naturally

---

[1] The SET region includes Alabama, Florida, Georgia, North Carolina, and South Carolina.

occurring and could not be repaired, under warranty or otherwise.

Plaintiffs allege that this deception by Toyota and SET defrauded more than 200,000 individuals who purchased a 2012-2014 model year non-hybrid Toyota Camry within the SET region, which includes Florida, and sought to certify two classes of such purchasers: one under RICO comprised of purchasers in the SET region, and another under FDUTPA comprised of purchasers in Florida. ECF No. 181. Under Plaintiffs' theory of the case, they and all class members paid more for their vehicles than they would have if the HVAC defect had been disclosed. By earlier Report and Recommendation, the undersigned recommended that Plaintiffs' classes be certified, as limited to those individuals who purchased their vehicle from an authorized Toyota dealership; I further recommended that Defendants' motions to exclude the opinions and testimony of Plaintiffs' damages experts be granted in part to exclude the opinion that "cost to repair" damages are a suitable proxy for estimating overpayment, but otherwise recommended that the motions to exclude the damages experts be denied. ECF No. 334.

## II.    FACTUAL BACKGROUND

The potential for HVAC odor has long been a known issue to Toyota even outside the context of the Camrys at issue here. As early as 1997, Toyota issued an internal service bulletin (a "TSB") that explicitly acknowledged the presence of microbial growth in the HVAC evaporator caused by dampness in the housing, describing the result as a "musty odor ... emitted from the air conditioning system of some vehicles which are usually operated in areas with high temperature and humidity." ECF No. 213 ¶ 113. This TSB noted that the odor could result from "[b]lockage of the evaporator housing drainpipe, resulting in the buildup of condensate" or "[m]icrobial growth in the evaporator, arising from dampness in the evaporator housing where the cooling air flow is dehumidified." *Id*. New TSBs issued in 2009 and 2011 stated that a "newly designed evaporator

sub-assembly [had] been made available to decrease the potential for HVAC odor" and that this repair was "covered under the Toyota Comprehensive Warranty ... in effect for 36 months or 36,000 miles, whichever occurs first." ECF No. 213, Ex. 98. The 2009 Bulletin also stated that certain "Camry, Camry HV, and Prius models may exhibit an intermittent HVAC system odor." *Id.*

By 2013, Toyota's messaging had evolved, and in a TSB issued that year, Toyota explicitly informed dealers that HVAC odors were normal, "naturally occurring" and/or "related to environmental factors," ECF No. 213 ¶¶ 11, 134; "Tech Tips" documents distributed to dealerships stated that odors emitted from the HVAC system were "a normal characteristic of automotive A/C systems." ECF No. 213 ¶ 134. Even in Owner's Manuals for the Camry, Toyota affirmatively stated that HVAC odors were caused by "various odors from inside and outside the vehicle," which may, during use, "enter into and accumulate in the air conditioning system." ECF No. 213 ¶ 135. A subsequent 2015 TSB revised the 2013 Bulletin to include 2007-2015 Camry and Camry Hybrid vehicles. ECF No. 213 ¶ 12.

The 2013 TSB provided procedures to "minimize" the odors but noted the procedures would "NOT eliminate the odors experienced, but [were] provided to help reduce the intensity of [the] odors." ECF No. 213 ¶ 134. The TSB even provided dealers with language that could be used to this effect with customers. ECF No. 213 ¶ 134. Despite this messaging to its dealers, intended for its customers, Toyota knew that redesigning the HVAC system, changing the evaporator coating, or implementing either charcoal filters or Afterblow as original equipment were all steps they could have taken to remediate the odor. ECF No. 213 ¶¶ 125, 139-142.

SET likewise knew about HVAC odor, as it received many customer complaints throughout its region. *See, e.g.*, ECF No. 210, Exs. 4, 15, 26, 56, 121, 127. It was a significant

and persistent problem: SET recognized that it "represented 69.2% of the total [HVAC odor] claims (2013) and was 4.2 times the national average" and that "SET continues to receive customer complaints over this concern, an issue which has resulted in 43 buybacks over the last 10 years." ECF No. 210, Ex. 127.

In its position as a distributor, SET communicated directly with the dealerships about consumer complaints and would also flag to Toyota those that they felt were particularly in need of attention (Toyota had independent access to a database that housed customer complaints entered by the dealers). *Id.* SET participated in odor investigations alongside Toyota, attended some HVAC conferences, and some SET employees shared a physical building with a Toyota Product Quality Field Office, so that, according to one Toyota employee, Toyota could work with SET on HVAC odor issues. *See, e.g.*, ECF No. 213, Exs. 16, 20-23.

In addition to passing along to the customer the cost for abating the odor rather than covering it under warranty, informing the customers the odor was "normal" avoided potential problems that arose if the customer sought a repair; both SET and Toyota understood that attempted repairs made to the HVAC systems would trigger required buybacks of the vehicles and/or the Lemon Law. *See, e.g.*, ECF No. 213, Exs. 16, 38-39, 109-11. SET represented Toyota in Lemon Law, buyback, and other arbitration proceedings, and were consistently focused on how contextualizing the issue at the consumer level would impact SET and Toyota's position going into those proceedings. Florida has a particularly consumer-friendly Lemon Law that triggers a buyback proceeding after three repair attempts are made to a vehicle on the same issue. In these proceedings, SET took the position at Toyota's direction that the HVAC odor was not a repairable defect; even stating at one point moving forward with a particular defense because the issue was "a/c odor, and Toyota is trying not to set a precedence [sic]" but that regardless of the source of

the odor, "it doesn't negate the fact we are aware of it, and until we find a fix, we're going to maintain the position that it's 'normal.'" ECF No. 213, Ex. 17. Indeed, in 2012, TMC's Overseas Service Field Operations Division conducted a field visit in South Florida in conjunction with TMS and SET, the purpose of which was to investigate dissatisfaction with Komori Odor Logic.[2] ECF No. 211 at 15. The report following the field visit reflects the observation that dealerships were explaining HVAC odor to customers as normal and telling them that no repairs were available to avoid Lemon Law liability. *Id.*

SET monitored how technicians at Toyota's Customer Excellence Centers spoke with customers about the HVAC odor based on how it could impact the arbitration proceedings, even down to individual word choice. For example, after an SET Customer Loyalty Specialist reported that the customer was told no repairs could be done at that time and that the condition was "under investigation" by Toyota, SET Customer Retention Specialist Jennifer Geiger stated that "[w]ords like under investigation sound suspect and should also be removed from the vocabulary. :)." ECF No. 210, Ex. 113. Other recommendations to the Customer Excellence Centers were more generic, with SET advising that customers should be told the odor was possible and based on environmental conditions, but they did not need to be told that "we've seen this a lot" or "we know about this problem but have no solution." ECF No. 213, Ex. 74. Internally, SET discussed how to advise the dealers and technicians, noting in one communication that "in the 'legal' world saying there is no repair infers that the vehicle is broken" and ultimately asking about the preferred method for documenting these cases "that would look better when we go to arbitration and buyback?" ECF No. 213, Ex. 59.

Technicians who deviated from the position that the odor was normal were met with sharp

---

[2] Komori Odor Logic was a countermeasure that redirected air from the HVAC system away from the face and toward the feet of the vehicle occupants upon starting the car.

rebuke.  In a 2013 communication, a Toyota case manager stated that they advise customers to take several steps to remediate any HVAC odor but that if the odor is not alleviated, "we encourage you to contact your local Toyota dealership for a thorough evaluation of the condition"; a SET customer loyalty specialist forwarded the message to Geiger, letting Geiger know that she explained "our problem with unnecessary repairs attempts" to the Toyota employee, who said she understood and would share with the rest of her colleagues.  Geiger stated that the explanation was "not okay" and described it as "damaging, burying to us!!."  ECF No. 213, Ex. 77.

SET at times made suggestions or considered making suggestions to Toyota regarding remediation of the odor.  For example, in 2015, SET reached out to Toyota "regarding Camry HVAC odor," prompting Toyota executives to request a study into how to improve consumer issues with HVAC odor in Camrys in the SET and the "GST" regions.  *See* ECF No. 210, Ex. 90; *see also* ECF No. 210, Ex. 97 (in which one Toyota employee shares with another that SET requested that charcoal filters be introduced as original equipment with the vehicles and/or that their initial installation should be covered by warranty).  SET contemplated asking Toyota for solutions on the HVAC odor in light of customer complaints; they internally composed a letter to that effect that they later determined could put Toyota in an awkward legal position but nevertheless agreed to continue direct discussions with Toyota about potential solutions.  ECF No. 210, Exs. 126, 129.

Rodney Baker, a Florida resident, purchased a 2012 Toyota Camry in December of 2011 from the Central Florida Toyota dealership in Orlando, Florida, an authorized Toyota dealership. ECF No. 49 (Amended Class Complaint).  Baker first experienced HVAC odor in the Camry in late Spring after he bought the car, about five months later. ECF No. 180-18 at 82:19-83:9. In February 2014, Baker traded the 2012 Camry in for a 2014 Camry at the AutoNation Toyota Scion

7

dealership in Winter Park, Florida.  *Id*.  Again, several months after his purchase, he began experiencing the HVAC odor in May, when the weather turned hot and humid. *Id.* at 136:2-7.  Had Baker known of the defective HVAC system, he would have either not purchased the Class Vehicles or would have paid significantly less for them.  ECF No. 213-36 (Baker Supplemental Response to Toyota Interrogatory No. 13).

Michelle Monge, a Florida resident, purchased a used 2013 Toyota Camry around July 2016 from the Modern Auto Sales dealership in Hollywood, Florida for approximately $16,873.00, and owned it still at the time the Complaint was filed.  ECF No. 49 at 11.  Modern Auto Sales is not an authorized Toyota dealership.  Monge contends that if she had known of the defective HVAC system, she would have either not purchased the class vehicle or would have paid significantly less for it.  ECF No. 243-7 (Monge Supplemental Answer to Toyota Interrogatory No. 13).

Javier Cardenas is a Missouri resident who purchased a new 2014 Camry in August of 2014 from Kendall Toyota in Miami, an authorized Toyota dealership.  ECF No. 49 at 8. Cardenas' "driving force" behind his decision to purchase the Camry was that his family had previously owned Toyota vehicles and found them reliable.  ECF No. 180-17 at 169:5-14.  Cardenas began to experience HVAC odor several months after buying his Camry.  *Id.* at 89:18-22.  Had Cardenas known of the defective HVAC system, however, he would have either not purchased the class vehicle or would have paid significantly less for it.  ECF No. 213-41 (Cardenas Answer to Toyota Interrogatory No. 13).

### III.    LEGAL STANDARD

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To discharge this burden, the movant must identify an absence of evidence to support the nonmoving party's case. *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must support its assertion that a genuine material fact remains in dispute by citing to specific parts of the record. *Sutton v. Royal Caribbean Cruises Ltd.*, 285 F. Supp. 3d 1349, 1351 (S.D. Fla. 2018) ("In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, answers to interrogatories, and admissions that a specific fact exist demonstrating a genuine issue for trial."), *aff'd*, 774 F. App'x 508 (11th Cir. 2019). A fact or issue is material for purposes of summary judgment only if it might affect the outcome of the suit under the governing law.  *Webb v. Carnival Corp.*, No. 15-CV-24230, 2017 WL 10795681, at *2 (S.D. Fla. Jan. 13, 2017).  Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."  *Id.*  (citing *Celotex Corp.*, 477 U.S. at 323).

In considering a motion for summary judgment, a court must evaluate the evidence and make all inferences in the light most favorable to the nonmoving party.  *Sutton*, 285 F. Supp. at 135 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586).  However, the nonmoving party may not merely point to a scintilla of evidence that creates a metaphysical doubt about an issue; instead,

the evidence must be sufficient to allow a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87.   Evidence is required; conclusory and unsubstantiated averments will not do, *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000), and citations to specific record evidence are necessary, *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116-17 (11th Cir. 1993).

## IV.     ANALYSIS

### a.   Evidence of an Odor-Causing Defect

As a fundamental issue affecting all claims, Plaintiffs allege the existence of a defect in the HVAC system that depreciated the value of their vehicles.   Defendants argue that Plaintiffs have failed to advance any admissible evidence of a defect in the HVAC systems, levying a two-pronged attack: the first is that the testimony and opinions offered by Plaintiffs' experts Murat Okçuoğlu, Don Wright, and Steven Parkhurst should be excluded for purposes of summary judgment; alternatively, even if admissible, the testimony of these three experts cannot support the inference that an HVAC defect exists.   ECF No. 175 at 20-21.   Because Plaintiffs rely on the testimony of these experts to establish the HVAC design is a defect, Defendants argue that in the absence of their critical testimony and opinions, Plaintiffs cannot survive summary judgment.   ECF No. 175 at 21.   As explained below, the evidence advanced, which is not limited to the expert opinions, is sufficient to support the inference and reach a jury on the question of whether the HVAC had a defect.   Moreover, the opinions on which Plaintiffs rely in opposing summary judgment are admissible under Federal Rule of Evidence 702.[3]

### i.  *Potential for Odor and Microbial Growth in Camry HVAC Systems*

In support of the claim that the HVAC systems were designed in such a way as to give rise

---

[3] Defendants' challenges to the admissibility of the expert opinions (ECF No. 195) are more fully considered and resolved in the undersigned's separately filed Order denying the Motion *in Limine*.

to the potential for odor, Plaintiffs advance the opinion of Murat Okçuoğlu, an expert in engineering and automotive design, in which he states that the defective design of the HVAC systems "allows condensing water to accumulate and allows naturally present organic contaminants to be trapped, kept moist and cultivate organic matter such as microbes, bacteria, mold and fungus." ECF No. 213-1 (Murat Okçuoğlu Expert Report (Oct. 20, 2020)) at 24 ("Initial Okçuoğlu Report"). Okçuoğlu offers the initial opinion that all class vehicles are equipped with identical or substantially similar HVAC systems. Okçuoğlu further opines that there are eight defective design features of the HVAC system that contribute to the microbial growth that leads to the malodor. *Id.* at 23.[4] For example, Okçuoğlu describes the restrictive design features that create uneven air flow through the HVAC housing, which may have some benefit to the cooling system, but create or result in "neglected regions of the evaporator where the absence of abundant fresh airflow allows moisture and contaminants to accumulate." *Id.* at 24-25. Okçuoğlu further opines that the bottom of the evaporator has crevices, sharp edges and other nooks that create an ideal environment to harbor organic matter, which the design permits to congregate there in the absence of flushing or strong air flow to dry the condensation there. *Id.* at 27.

Plaintiffs additionally advance the opinion of industrial hygienist Steven Parkhurst, who opines that the environment described by Okçuoğlu contains the "three sentinel criteria" for microbial growth: food, temperature and moisture. ECF No. 213-4 at 2. Parkhurst explains that in any vehicle, dust and moisture may be drawn into the HVAC system, providing the ideal environment for microbial growth; thus the importance of a design that curbs the opportunity for mold and bacteria to feed and thrive in the HVAC system. *Id.* at 4. Parkhurst tested Cardenas'

---

[4] Plaintiffs note that their industry-standard expert, Don Wright, "agrees" as an engineering matter that these design features cause HVAC odor. Wright may agree with Okçuoğlu's opinion, but he does not offer this opinion himself. ECF No. 213-2 at 10. Wright's opinion, that Toyota's response to the HVAC odor complaints and failure to remediate the defect, is not determinative of any material fact at issue in the present motions for summary judgment.

and Monge's vehicles and found the presence of mold and bacteria.

Defendants argue in response that despite these claims made by Plaintiffs' experts, none of the three actually identified evidence of the ill effects that they claim will arise from the HVAC design in the Plaintiffs' vehicles.  ECF No. 175 at 21.  Defendants state that while Okçuoğlu claimed the certain features of the HVAC system as designed have the *potential* to permit moisture accumulation, Okçuoğlu himself did not offer evidence of *actual* excess moisture accumulation or microbial growth in the HVAC systems of Plaintiffs' vehicles.  *Id.* at 21-22.  Similarly, noting that microbial growth only generates odor if it releases a sufficient amount of MVOCs above an odor threshold, ECF No. 176 ¶¶ 94-95, Defendants proffer that Parkhurst's testing of Monge, Kirton,[5] and Cardenas' vehicles found no MVOCs rising above the odor threshold, and in fact found no detectable level of MVOCs at all.  *Id.* at ¶¶ 99-100 (noting that turning the HVAC system on in Monge's vehicle had no impact on the MVOCs).

Defendants additionally cite testing conducted by an undisclosed expert of Plaintiffs' during the summer months showing that the HVAC system at that time *improved* air quality inside the same vehicles.  ECF No. 176 ¶ 106.  Defendants also offer the opinion of their own expert Jeffrey Hicks[6] as affirmative support of their claims that no HVAC defect exists.  Hicks oversaw an inspection of the same three vehicles that found no musty, damp, or sour odor, nor did it find any MVOCs above an odor threshold when the HVAC system was in operation in the vehicle. ECF No. 176 ¶ 101.  In fact, Hicks found improved air quality inside the vehicle as compared to outdoor air—airborne organic material decreased with operation of the HVAC system, and the MVOC levels inside the car were lower than the outside air.  ECF No. 176 ¶ 102.

Defendants essentially urge the Court to accept their experts as having the stronger opinion

---

[5] Kirton has since moved for voluntary dismissal of his claims and is no longer a plaintiff in this litigation.
[6] Whose opinion and testimony Plaintiffs have moved to exclude.  ECF No. 237.

on the existence (or non-existence) of a defect, but the Court will not accept the invitation to weigh competing disputed evidence on summary judgment.  It is the province of the jury, not the court on summary judgment, to render credibility determinations, weigh the evidence, and draw legitimate inferences from the facts.  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

The question for this Court to determine is, when considering all evidence and inferences in the light most favorable to Plaintiffs as the nonmoving party, whether Plaintiffs have raised a *triable* issue of fact.  *See Sutton*, 285 F. Supp. at 135.  Although not dispositive, I find it persuasive that other courts in highly similar positions have found the same.  In *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-8629 FMO (EX), 2017 WL 11247885, at *5 (C.D. Cal. Sept. 29, 2017), a class action in which the plaintiffs alleged that the defectively designed HVAC systems in their Camrys caused them to overpay for the vehicles, the court denied the defendants' summary judgment motion largely on the basis of Okçuoğlu's opinion and deposition testimony that the HVAC systems in the subject vehicles were designed in such a way to give rise to "strong unpleasant fumes and odor."  *Id.* (citing Okçuoğlu's experience in automotive engineering and with the design of HVAC systems).

Similarly, the court in *Stockinger v. Toyota Motor Sales U.S.A., Inc.*, No. 217CV00035VAPKSX, 2019 WL 1452908, at *6 (C.D. Cal. Mar. 8, 2019), also a class action alleging defective HVAC design in certain Camry vehicles, found that Okçuoğlu's opinion gave rise to sufficient triable issues of fact as to the existence of a design defect.  *Id.* (noting that "once an expert opinion is admitted, the district court is then 'required to view it in the light most favorable to [the nonmoving party]'" (quoting *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 816 (9th Cir. 2014)).  The court found even though Okçuoğlu's opinions were germane

to the class as a whole and were not delivered at the individual level, Okçuoğlu's opinion as to the class vehicles generally raised triable issues of fact regarding the plaintiffs' individual vehicles. *Id.* [7]

The same is true here—the evidence offered by Plaintiffs expert witnesses here is sufficient for Plaintiffs, as the non-moving party, to demonstrate that there is a triable issue of fact as to the existence of a defect in the HVAC system in Plaintiffs' vehicles. Defendants urge this Court to distinguish the opinions reached by *Salas* and *Stockinger* on the basis that the evidentiary record here is different, relying on Okçuoğlu's deposition testimony in this case that in the absence of HVAC odor, the design is not inherently defective.  Plaintiffs argue that the testimony on which Defendants here rely is taken out of context, as the witness was answering questions advanced about vehicles other than the class vehicles. Having reviewed the testimony, it does not, as Defendants urge, defeat or negate his opinion regarding the existence of a defect in the class vehicles; a jury may weigh the testimony at a later date and decide its impact on the overall opinion.

Finally, Plaintiffs' evidence does not depend entirely on the experts' opinions but draws from documents produced by Toyota for proof of the existence of a defect, of HVAC odor, and that the source of the odor was microbial growth. For example, while Toyota contends that Plaintiffs have adduced no evidence that the HVAC odor was caused by microbial growth, Plaintiffs advance a 2014 Technician Handbook as evidence that Toyota recognized the HVAC odor about which it was receiving customer complaints was caused by microbes growing on the evaporator surfaces.  ECF No. 213-53.  Similarly, though Toyota challenges the experts' inability

---

[7] The court there also found Toyota's reliance on the individual deposition testimony of the plaintiffs, as contrary evidence that undermines affirmative evidence of the defect, to be misplaced, as the plaintiffs were laypersons and thus their inability to identify the cause of the defects of their vehicles was not fatal to the claims; the court also observed that Okçuoğlu's expert evidence was sufficient to carry the plaintiff's burden.  *Stockinger*, 2019 WL 1452908, at *6.

to offer an opinion that the tested HVACs revealed too much moisture in the system, Plaintiffs

advance internal correspondence among TMS managers contemplating a request to install charcoal

air filters to all vehicles destined to SET; one member explains the inadequacy of the fix:

> The root of the issue is in the design of the condenser system and the way that it drains the condensation. Which should be considered an Engineering issue. To really improve the issue Engineering would need to redesign the condenser cover to reduce the amount of water that gets caught and the particles that get into the water that promote mold growth.

ECF No. 213, Ex. 10. Plaintiffs have adduced sufficient competent evidence on the existence of

the alleged defect to reach the jury.

### b.  RICO Claims

Section 1962(c) establishes that cognizable RICO claims require a plaintiff to show "(1)

conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk*

*Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006).  A prevailing plaintiff must therefore show a

pattern of predicate acts of the alleged criminal racketeering activity, *Am. Dental Ass'n v. Cigna*

*Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010), which here Plaintiffs allege is criminal mail and wire

fraud, ECF No. 49 at ¶¶ 129-38.  Going a step further, the participation in the scheme to defraud

must necessarily have been intentional, and a defendant must have used interstate mails or wires

in furtherance of the scheme.  *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).

Additionally, § 1962(c) requires a plaintiff to show injury and causation; as applied here, the

Plaintiffs must show the criminal mail and wire fraud caused injury to either their business or

property. *Williams*, 465 F.3d at 1283.  The scheme to defraud may be proven by offering evidence

of either a material misrepresentation or the omission or concealment of a material fact calculated

to deceive the plaintiff out of money.  *Maxwell*, 579 F.3d at 1299.

Plaintiffs allege two violations of RICO occurred:  Count I asserts a RICO claim against

Toyota, while Count II asserts a conspiracy claim against Toyota and SET collectively regarding the RICO violation asserted in Count I.  Although two separate allegations, the analysis for the two claims will necessarily overlap because the two claims are largely predicated on the same conduct.  A RICO conspiracy offense, however, "reaches a wider range of conduct [than a substantive RICO violation].  A defendant may be guilty of conspiracy even if he did not commit the substantive acts that could constitute violations of an underlying RICO count." *Roche Diagnostics Corp. v. Priority Healthcare Corp*., 407 F. Supp. 3d 1216, 1243 (N.D. Ala. 2019) (quoting *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007)) (internal quotations omitted).  Where the conspiracy count does not contain additional allegations, without a cognizable substantive RICO claim, the conspiracy count cannot proceed.  *Carden v. Town of Harpersville*, 2017 WL 4180858, at *12 (N.D. Ala. 2017) ("When Plaintiff fails to state a substantive RICO claim 'and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails.'" (quoting *Rogers v. Nacchio*, 241 F. Appx. 602, 609 (11th Cir. 2007)).

*i.  Count II: RICO Conspiracy*

Resolving the issue of whether Defendants have met their burden on summary judgment to prove that there is no issue of material fact as to whether Toyota and SET conspired to conceal the defect and defraud customers will necessarily implicate factual questions relevant to the substantive RICO claim, and thus the Court addresses the evidence of a conspiracy first.

At the heart of every successful RICO *conspiracy* claim is proof of an agreement between the defendants "to participate in the conduct of an enterprise's illegal activities."  *In re Takata Airbag Products Liability Litigation*, 396 F. Supp. 3d 1101, 1164 (S.D. Fla. 2019).  A plaintiff may evidence this agreement in one of two ways:  (1) showing that each defendant agreed to the overall objective of the conspiracy; or (2) demonstrating that each defendant agreed to commit two

predicate acts.  *See, e.g.*, *Beck v. Prupis*, 162 F. 3d 1090, 1098 (11th Cir. 1998); *United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992).  A lack of direct evidence is not fatal, as an agreement may be inferred "from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Silvestri*, 409 F.3d 1311, 1323 (11th Cir. 2005); *see also Cardenas*, 418 F. Supp. 3d at 1103 ("An agreement under RICO need not be established by direct evidence, however; it may be inferred from the conduct of the participants."); *Spadaro v. City of Miramar*, No. 11-61607-CIV, 2013 WL 495780, at *28 (S.D. Fla. Feb. 7, 2013) (noting that an agreement may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct (citations omitted)), *aff'd*, 591 F. App'x 906 (11th Cir. 2015).

In Count II, Plaintiffs allege that SET conspired with Toyota and other unnamed co-conspirators to both misrepresent the alleged HVAC defect and to conceal it from the public. Plaintiffs claim the purpose of this conspiracy was to sell more of the Camrys at issue and to sell them at a higher price for a higher profit, and to avoid incurring expenses related to repurchasing allegedly defective vehicles.  ECF No. 49 ¶¶ 93, 130.

### 1.  SET

SET categorically denies that it agreed with Toyota, or anyone, to conceal the alleged defect in the HVAC system. ECF No. 180 ¶ 33. The evidence that SET offers in support of this denial is the deposition testimony of Craig Pollock, but review of the entire deposition excerpt attached to SET's statement of facts in no way supports this fact.  ECF No. 180-1.  The portion cited in SET's statement of facts relates to a spreadsheet the witness was asked to identify. Plaintiffs dispute this fact, moreover, advancing evidence that is further discussed below. SET has not evidenced the absence of disputed fact by this denial.

SET additionally attempts to demonstrate the absence of evidence that it conspired as

alleged through evidence that it *could not* have conspired with Toyota to defraud customers because it did not know there was an HVAC design defect and is not equipped to make such a determination on its own.  In support of this argument, SET emphasizes its "specific and defined role" as a distributer in the chain of commerce here, which contains no engineering expertise or function.  ECF No. 179 at 5 (citing ECF No. 180 ¶¶ 8-9).  SET, whose only contact with Toyota is through TMS, argues that it relies entirely on Toyota to analyze consumer issues and determine how, if at all, they should be addressed.  SET contends that its role in relaying information to Toyota from the dealerships and vice versa is minimal—it conveys information from the dealers to TMS regarding certain customer complaints, but SET proffers evidence that TMS already possesses and has access to this information independent of SET through TMS owned and maintained data management systems used by dealers to communicate customer issues to Toyota directly.  ECF No. 180 at ¶ 5.  Similarly, TMS distributes the technical service updates published by TMC directly to dealers, and any actions by SET to transmit information are either executed "as a courtesy" or to highlight certain issues being communicated.  *Id.*  (Citing ECF No. 180 ¶¶ 3-7).

SET argues that any role it has in Toyota's investigations is merely logistical and often "menial" in nature, with Toyota handling the substantive work.  For example, SET may coordinate inspections by facilitating communications between dealerships and TMS, secure inspection locations, or obtain vehicles or parts for inspections, but the inspections themselves SET avers are handled entirely by Toyota.  Similarly, while SET concedes that its employees have represented Toyota during Lemon Law or arbitration proceedings initiated by complaining customers, it claims the extent of its involvement is to advise the tribunal of the facts regarding the vehicle or part and issue and relay Toyota's position.  *Id.* (citing ECF No. 180 ¶ 15).  At oral argument, SET argued

there was no record evidence of what SET's motivation would be to agree to a scheme that would defraud customers, citing, as an example, a lack of evidence as to what, if any, impact buybacks and arbitration proceedings had on SET financially.

Plaintiffs dispute SET's statement of facts, claiming that their proffered evidence shows the following:  SET knew the HVAC design was defective; SET received and shared customer complaints about HVAC odor with Toyota; SET jointly investigated HVAC odor issues with Toyota; SET strategized with Toyota on how dealerships and technicians should respond to customer complaints in a misleading way that allowed the defect to remain hidden and increased the likelihood of SET's success in arbitration and Lemon Law proceedings.

Having examined the exhibits advanced by Plaintiffs in opposition, not all 60 of them indeed support the fact for which they are cited.[8]   However, there is evidence from which a reasonable fact finder could infer that SET *knew* about the odor, had some level of involvement in investigating the odor, and even understood the implications that odor complaints could have on buybacks.  This is not *direct* evidence of a conspiracy between SET and Toyota, but provides circumstantial evidence or inferences drawn from the conduct of the parties.  *See Silvestri*, 409 F.3d at 1323.  To this point, Plaintiffs have advanced evidence that meaningfully disputes SET's characterization of itself as a limited player in this game with no engineering expertise who provides coordination and logistical assistance to Toyota on various issues but offers no substantive input.

For example, Plaintiffs offer evidence that SET had internal conversations regarding what should be communicated to customers regarding the HVAC odor and what language should be

---

[8] Plaintiffs contend these 60 exhibits all constitute direct evidence of SET's knowledge of the defect and agreement with Toyota to conceal same. ECF No. 212 at 9 (citing ECF No. 210 at ¶¶ 2, 3, 5, 7, 8, 50-65, which collectively cite to over sixty individual exhibits).

used; in one 2013 conversation, an SET Field Technical Specialist stated that customers should be told the odor was possible and based on environmental conditions, but they did not need to be told that "we've seen this a lot" or "we know about this problem but have no solution."  An SET Customer Loyalty Specialist reported that the customer was told no repairs could be done at that time and that the condition was "under investigation" by Toyota, to which Jennifer Geiger, an SET Customer Retention Specialist, stated that "[w]ords like under investigation sound suspect and should also be removed from the vocabulary. :)."  ECF No. 213, Ex. 74; *see also* ECF No. 210, Ex. 123 (an SET customer loyalty specialist tells Geiger that he heard TMS was working on a replacement evaporator core to address HVAC odor but it would be available to customers only in a buy-back situation; Geiger confirms, adding that this should be kept "on the DL and no not repeat to customers").

Plaintiffs additionally advance evidence that Geiger created a "best practices" document on HVAC odor in 2013 that was created for distribution to the dealers in order to "create consistency and hopefully weed out true cases vs. customer induced cases."  The document includes an inspection checklist, a customer education component explaining why the odor arises (directing customers to the Tech Tip and Owner's Manual), and a model for documentation.  *See* ECF No. 213, Ex. 72.  Geiger sent the document to other SET employees noting that it was designed to "appropriately document the customer's concern and further help distinguish 'true AC odor' with 'sweaty gym bag I forgot about in my trunk' cases."  *See* ECF No 210, Ex. 131 (noting that they are "itching to get this out" but are waiting for the document to be approved).  It is unknown whether the document was ultimately distributed to dealers, but this evidence meaningfully refutes SET's claim that it could not have conspired with Toyota because it lacked even the ability to participate in the determination of how to address customer's recurrent

complaints about HVAC odor.

SET's active role in managing a cohesive response to customer complaints is evidenced in an email communication internal to SET, in which Geiger emphasizes the importance of SET and TMS being "on the same page" about HVAC odor.  Geiger there observes that while it is "not her call," she felt the Customer Excellence Center should not be suggesting HVAC repairs to the customers, concluding that it "makes it harder to defend in arbitration."  *See* ECF No. 213, Ex. 75. Geiger forwarded the communication on, again noting that SET, TMC, and the Customer Excellence Center need to "land on the same page" and asking "do we all still agree no repairs on AC Odor?"  *Id.*  At deposition, Geiger explained that her desire to "be on the same page" and her frustrations here arose from a desire to not confuse the customer and create false expectations based on Toyota's direction in the owner's manual that the HVAC odor was a "nonwarrantable condition and no repairs should be made," ECF No. 213, Ex. 76, Geiger Deposition Excerpt; notwithstanding, a jury may infer a different meaning from the contemporaneous emails.

Another 2013 communication on the same subject supports an inference that SET knew the HVAC odor problem was incapable of repair—thus a defect—and that because attempts to repair would be futile, a message to customers that instructed them to present the vehicles for evaluation at the dealership was "damaging, burying us!!"  ECF No. 213, Ex. 77.

In refute of SET's claim that its role in any arbitration proceedings was limited, Plaintiffs offer a series of communications in which SET either internally discusses what language the dealers and technicians should use when advising customers with complaints about HVAC odors in light of its impact on arbitration or discusses arbitration concerns generally.  *See* ECF No. 213, Ex. 59 (noting that "in the 'legal' world saying there is no repair infers that the vehicle is broken" and ultimately asking about the preferred method for documenting these cases "that would look

better when we go to arbitration and buyback?"); ECF No. 213, Ex. 73 (SET sharing "a well documented [sic] RO [repair order] as it relate[d] to A/C Odor," which would "stand[] up very well in arbitration!"); ECF No. 210, Ex. 113 (SET reminding dealers to "remember the RO is a LEGAL document" and that "[i]nternal phrases such as 'under investigation' should not end up on RO's"); ECF No. 210, Ex. 115 (SET advising that ROs should "mention the TSB, that the odor is environmental or that the service was a goodwill offer and not covered by warranty" or it "makes it much more difficult to defend in an arbitration scenario");  ECF No. 213, Ex. 17 (discussing in the context of a repurchasing hearing based on HVAC odor that SET moved forward with a defense because the issue was "a/c odor, and Toyota is trying not to set a precedence [sic]" but that regardless of the source of the odor, "it doesn't negate the fact we are aware of it, and until we find a fix, we're going to maintain the position that it's "normal."); ECF No. 210, Ex. 122 (in which an SET employee circulates information regarding "a recent case we won," but noting that it was not a unanimous decision; one of the three board members voted that there was a defect because "the customer felt so strongly regarding the smell (they were crying) that there must be something substantially wrong with the vehicle. Very scary.").

While SET claims that it did not know and lacked the expertise to determine whether the HVAC design rendered the system defective, Plaintiffs proffer evidence that SET not only knew the HVAC system was defective but engaged in efforts to conceal it from the public.  Plaintiffs advance multiple examples of internal discussions around SET's position on the HVAC odor that characterize it as "normal," but do so in quotations, as though straining to use a word that does not intuitively describe the situation in fact.  For example, in discussing the terminology that the dealers and technicians should use in explaining the HVAC issue to consumers, one SET employee stated that he tries not to describe the issue as "'normal' because when they tell the customer that,

it makes us look silly.  How can we say a brand new [sic] car that stinks is 'normal'?" ECF No. 213, Ex. 59; *see also* ECF No. 213, Ex. 17 (in which an SET repurchase coordinator discussing an upcoming repurchasing hearing notes that SET is "going to maintain the position that [the HVAC odor] is 'normal.'"). In some communications, the messaging that the odor was "normal" was tied to concerns about Lemon Laws.  ECF No. 213, Ex. 15 (in "AC Odor Issue Summary," TMS Product Engineer explains "SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida. SET started to tell customers the condition was normal.").

Relatedly, in response to SET's claim that it was up to Toyota to make all decisions regarding HVAC design and remediation, Plaintiffs advance evidence that SET at times made suggestions or considered making suggestions to Toyota regarding remediation of the odor.  For example, in 2015, SET reached out to Toyota "regarding Camry HVAC odor," prompting Toyota executives to request a study into how to improve consumer issues with HVAC odor in Camrys in the SET and the "GST" regions.  *See* ECF No. 210, Ex. 90; *see also* ECF No. 210, Ex. 97 (in which one Toyota employee shares with another that SET requested that charcoal filters be introduced as original equipment with the vehicles and/or that their initial installation should be covered by warranty).  At one point, SET internally even drafted a letter to Toyota that identified customer complaints about the HVAC odor and asked for solutions.  ECF No. 210, Ex. 126.  After some discussion, SET ultimately decided not to send the letter to Toyota, acknowledging that it might put TMS in an awkward legal position; they instead elected to pursue further offline discussions with TMS on the matter.  ECF No. 210, Ex. 129.

Plaintiffs have presented sufficient circumstantial evidence from which a jury could find that SET committed a RICO conspiracy violation by engaging in at least two predicate acts of

fraud.  For example, Plaintiffs' evidence indicates that SET was aware of an odor issue, took the position that customers should be told the issue was unavoidable and/or not a repair issue to avoid triggering the Lemon Laws, but internally recognized that it felt "silly" to tell customers the issue was "normal."  Even in the absence of information that would demonstrate SET's motivation for doing so apart from the generic desire to sell more vehicles, Plaintiffs have adduced sufficient evidence that there are triable issues of fact regarding the conspiracy claim.

### 2.  Toyota

Toyota primarily claims that the conspiracy claim should fail because the substantive RICO claim should fail.  ECF No. 175 at 19-20.  For the seasons set forth in the section below, the substantive RICO claim survives summary judgment, and thus this argument does not carry the day for Toyota.  Toyota next argues that there is no evidence that any of the RICO participants were aware of any alleged design defect and sought to conceal it from customers at all, much less any evidence that this was done at Toyota's direction.  *Id.* at 20.  Plaintiffs, however, adduce significant evidence that SET and Toyota were aware of the HVAC odor and that consumers were complaining about it—in some cases arguing to the point of tears during buyback hearings, as described above.  Toyota and SET consistently also took the position that the odor was not repairable, attributable to environmental conditions, and was "normal"; Toyota explicitly states this in the Owner's Manual.  SET, in taking the position that the odor is not repairable, repeatedly expressed that they did so because this is Toyota's position.  Resolving all inferences in favor of the Plaintiffs here, Toyota has not carried its burden to show that there is no issue of disputed material fact as to the conspiracy claim.

### ii.  *Substantive RICO Claim*

For Plaintiffs to prevail on their substantive RICO claim against Toyota at trial, they will

24

need to establish evidence of a pattern of material misrepresentations or omission/concealment of material facts by Toyota regarding the HVAC odor present in Camrys during the applicable time frame.  Plaintiffs must then prove that these actions by Toyota were calculated to deceive the Plaintiffs and the putative class out of money via interstate mail or wires, and, step three, the Plaintiffs must demonstrate that they were harmed directly by Toyota's intentional deceit.  For Toyota to prove that it is entitled to summary judgment here, it must establish that there is no issue of material fact as to any one of these elements.

### 1.   Evidence of Predicate Acts of Racketeering Activity

The first element of a successful RICO claim requires a plaintiff to establish the defendant's participation in a so-called scheme to defraud.  As articulated by the Eleventh Circuit in *Maxwell*, a plaintiff must thus offer proof that the defendant made either a material misrepresentation, or that he omitted or concealed a material fact "calculated to deceive another out of money." *Maxwell*, at 1299.

### a.   Material Misrepresentations

Plaintiffs claim that Defendants affirmatively told customers HVAC odor was normal and a natural phenomenon that could not be fully remedied.  ECF No. 211 at 13.  Plaintiffs first proffer in support the statements made by Toyota in the Camry's Owner's Manuals, which affirmatively claimed that HVAC odors were caused by "various odors from inside and outside the vehicle," which during use, "may enter into and accumulate in the air conditioning system."  ECF No. 213 ¶ 135.  Such statements were misleading because they did not directly inform customers that the source of the odor was in fact microbial growth occurring in the damp environment of the evaporator housing.  ECF No. 201 at 13.  Further, Plaintiffs aver that the recommendation in the manual to reduce potential odor by setting the HVAC system to "outside air mode" prior to turning

off the vehicle was also misleading because Defendants *knew* these passive features would not eradicate enough moisture to eliminate odor entirely. *Id*. As evidence of Toyota's knowledge at the time regarding the HVAC odors, Plaintiffs proffer that Toyota issued a TSB that explicitly acknowledged the presence of microbial growth in the HVAC evaporator caused by dampness in the housing. ECF No. 213 ¶ 113. Further, Toyota distributed training materials to its technicians saying the same. ECF No. 213 ¶ 114.

Plaintiffs additionally claim that the 2013 service bulletin and a "tech tips" document issued by Toyota created a "script" that dealerships would use to mislead customers. ECF No. 211 at 14. The TSB stated that HVAC odors were normal, "naturally occurring" and/or "related to environmental factors." ECF No. 213 ¶¶ 11, 134. The bulletin contained language that the dealerships could use to inform customers that the odor could not be eliminated but that certain out-of-pocket procedures could minimize them. *Id*. Likewise, the "tech tips" documents distributed to dealerships stated that odors emitted from the HVAC system were "a normal characteristic of automotive A/C systems." ECF No. 213 ¶ 134.

Plaintiffs claim that the expectation here was that the dealerships would repeat this information to—and thus mislead—consumers, which would reduce warranty claims and buybacks under the state Lemon Laws. ECF No. 211 at 14. In support of this claim, Plaintiffs proffer an internal email from Toyota, citing a line from a Quarterly Technical Field Visit report focused on HVAC odor; in the report, Technical Supervisor Shaun Austin relays comments from various service managers at dealerships, one of which came from the "JM Lexus." ECF No. 213-70. In the report, the service manager reports that "[w]arranty has gone down as no other effective repairs are available and customers are being told this condition is 'normal.'" *Id*. In support of their claim regarding SET's contribution here, Plaintiffs proffer the email in which Geiger shared

with other SET employees the "best practices" document she created for dealing with HVAC odor complaints; the document was created for distribution to the dealerships, and it directed customers to the language discussed above in the Owner's Manual and the Tech Tips documents.  ECF No. 213, Ex. 72.

Plaintiffs, though their experts, have advanced evidence that the HVAC systems in the Camry vehicles were defectively designed.  *See supra*.  Here, Plaintiffs proffer evidence of affirmative statements made to consumers, or to dealers who would then relay them to consumers, that the odor was normal, due to environmental factors, and not coverable by warranty.  Further, Defendants argued *against* consumers in buyback hearings who claimed the vehicles were defective, claiming that this was not the case.  Plaintiffs have therefore raised a triable issue of fact as to whether Defendants made material misrepresentations to consumers.

### b.  Omissions

Even if there were not disputed issues of material fact as to whether Defendants' actions rose to the level of affirmative misstatements, Plaintiffs aver that they proffered evidence of actionable omissions by Defendants.  ECF No. 211 at 16.  Defendants claim that Plaintiffs cannot base their RICO claim on a theory of omission because they owed Plaintiffs no "duty to disclose." ECF No. 175 at 12 (noting that, under RICO, a duty to disclose arises only "by statute," *Am. United Life Ins. Co*., 480 F.3d at 1065, or by "a special relationship between the parties" involving trust, citing *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1368 n.33 (11th Cir. 2011)).  Defendants aver that, as a matter of law, there can be no such special relationship between an automobile manufacturer and a purchaser.  ECF No. 175 at 13 (citing *Ayres v. Gen. Motors Corp*., 234 F.3d 514, 525 (11th Cir. 2000)).

Plaintiffs rely on *In re Managed Care Litig*., 298 F. Supp. 2d 1259, 1278 (S.D. Fla. 2003),

for the proposition that in transactional relationships, the concealment of "critical data, even without a formalized duty to disclose, may also constitute mail and/or wire fraud in certain situations."  As further stated by the Eleventh Circuit in *Langford*, 231 F.3d at 1313, a determination as to whether a party has a duty to disclose information requires a case-by-case analysis of the nature of the transaction and the relationship between the parties; to find that such a duty exists only where dictated by statute or contractual relationship would be "unduly constrictive."  Under Plaintiffs' theory, Defendants were legally obligated to correct the misleading impression they fostered that the HVAC odor was normal and naturally occurring. ECF No. 211 at 17 (citing *Kemp v. Am. Tel. & Tel. Co*., 393 F.3d 1354, 1360 (11th Cir. 2004) (noting that a duty to disclose exists "to correct the mistaken impression [defendant] fostered"); *In re Managed Care*, 298 F. Supp. 2d at 1278 (finding a duty to disclose exists where "disclosure was necessary to prevent the [plaintiffs] from being misled by [d]efendants' apparent actions and statements")).

The duty to disclose does not exclusively arise out of a special relationship or statutory obligation but can also arise in a situation where the defendant has made partial or ambiguous statements that require further disclosure to avoid being misleading.  *Kemp,* 393 F.3d at 1360 (finding that such a duty "can be judicially created where there is a special relationship of trust between the parties, or may be based on other circumstances.").  Such "other circumstances" may include, as observed in *In re Managed Care*, instances in which disclosure is necessary to prevent a party from being misled.  298 F. Supp. 2d at 1278.

The question then becomes whether Plaintiffs have offered sufficient evidence to raise a triable issue of fact as to whether Toyota was obligated to make disclosures to the Plaintiffs in order to avoid misleading them.  Defendants claim that Plaintiffs have failed to advance evidence

showing that they specifically were exposed to the alleged misrepresentation in connection with their purchases.  ECF No. 242 at 5.  The Supreme Court has rejected the notion that a RICO plaintiff must demonstrate that *he* relied on the fraudulent statements.  *Bridge v. Phoenix Bond & Indemnity*, 553 U.S. 639, 649 (2008), makes clear that "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud."

Defendants next argue that, under *Ayres*, they owed Plaintiffs no duty to disclose because Plaintiffs proffered no evidence of a safety hazard and "the potential for odor is low."  ECF No. 242 at 6 (citing *Ayres*, 234 F.3d at 525 (finding no duty to disclose)).  In *Ayres*, purchasers of used cars sued under the Georgia RICO statute, claiming that the defendant car manufacturer violated the statute by failing to report a defect with a component part as required by Safety Act.  234 F.3d at 525.  Plaintiffs argue that *Ayres* is distinguishable on the basis that it considered whether the Safety Act imposed a duty to disclose, but Defendants argue that this is not so, noting that the Court also contemplated whether a duty could arise from "nondisclosure of material facts intending to create a false and fraudulent representation," finding it did not.  *Id.*

Importantly, however, the Court in *Ayres* found that a duty to disclose did not arise, not that it *could not* arise.  The plaintiffs in *Ayres* argued at the district court level that the Safety Act imposed a duty to disclose, and only raised in their brief on appeal legal arguments that material facts intending to create a false and fraudulent representation might constitute mail fraud. *Id.* The Eleventh Circuit found that, despite this articulation of a legal argument, Plaintiffs were "extremely vague with respect to the application of such a theory to the facts of the instant case. They point merely to the facts that the Defendants never notified the Plaintiffs or other similar owners and that such a notification would have been costly."  *Id*.  *Ayres* thus does not preclude a finding that

Defendants owed Plaintiffs a duty to disclose.

The application of *Kemp* is compelling here.  In *Kemp*, AT&T included on the plaintiff's long-distance telephone bill charges for calling the "Let's Make a Deal" telephone game's 900 line.  *Kemp*, 393 F.3d at 1357.  The charges for playing the game were, in fact, owed to the parent company of the telephone game and were *not* owed to AT&T for long-distance services, even though they appeared on the long-distance bill.  *Id*.  AT&T argued that there was nothing technically untruthful about the bill, as it contained no affirmative representation that the charges were for long-distance services, but the Court nevertheless found that upon inclusion of the game charges on the long-distance bill, AT&T was duty bound to "correct the mistaken impression it had fostered that the [debts incurred by playing the game] were for long distance charges." *Id.* (citing *United States v. Autuori*, 212 F.3d 105, 119 (2nd Cir. 2000) ("A duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading.")).

 Defendants do not explain why a telephone carrier would owe this duty to a customer but a car manufacturer would not; in both scenarios, the claim is that the defendants fostered a mistaken impression through what they did and did not say to the customer.  Should a fact finder conclude that the HVAC design is indeed a defect, a jury could likewise find that Defendants were under a duty make this disclosure to Plaintiffs to correct any false impression.  Accordingly, summary judgment is not warranted on this basis.

### c.   Calculated to Deceive

As evidence of the claim that the purpose of these statements was for SET and Toyota to avoid liability under the Lemon Laws, Plaintiffs offer evidence of a 2012 field visit conducted in South Florida by TMC's Overseas Service Field Operations Division in conjunction with TMS

and SET, the purpose of which was to investigate dissatisfaction with Komori Odor Logic.  ECF No. 211 at 15.  The report following the field visit reflects the observation that dealerships were explaining HVAC odor to customers as normal and telling them that no repairs were available, to avoid Lemon Law liability.  *Id*.  Further, Plaintiffs proffer a 2012 internal Toyota email from TMS Product Engineer, Christopher Hitt to Bill Bergen, Toyota's National Manager for Field Technical Operations, in which Hitt states that HVAC odor "has been one the top issues for SET for the last few years," but "because of the severity of the Lemon Law in the state of Florida . . . SET started to tell customers the condition was normal."  ECF No. 213 ¶¶ 116, 133.  Plaintiffs argue that Defendants told customers these issues were normal and unavoidable so that they could avoid liability, even though they knew all the while that solutions were available.  In support of this claim, Plaintiffs proffer evidence that Toyota knew redesigning the HVAC system, changing the evaporator coating, or implementing either charcoal filters or Afterblow were all steps they could have taken to remediate the odor.  ECF No. 213 ¶¶125, 139-142 & Ex. 9.

Considering the evidence of what Toyota knew about the defect in conjunction with the evidence offered above as to Plaintiffs' conspiracy claim regarding Toyota's efforts to conceal that defect from customers, I find that Defendants have not met their burden to show that there is no issue of triable fact as to whether the Defendants' actions were calculated to deceive.

### iii.   Evidence of RICO Enterprise

Establishing a RICO enterprise requires proof of association of "individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity."  *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).  As observed by the Supreme Court, this showing necessitates proof of *two distinct* entities:  "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person'

referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). While the "enterprise" requirement is a distinct element of a RICO claim, the proof establishing the enterprise and the racketeering pattern may overlap. *In re Managed Care Litig.*, 298 F. Supp. 2d at 1274.

Defendants rely on *Cisneros v. Petland, Inc*., 972 F.3d 1204, 1212 (11th Cir. 2020), in arguing that Plaintiffs lack evidence that Toyota shared with the other members of the alleged enterprise any *improper* common purpose, as opposed to merely sharing the common business purpose of selling the proposed class vehicles. In *Cisneros*, a case alleging fraudulent pet sales, the Eleventh Circuit found that the "abstract common purpose" of a "generally shared interest in making money" was insufficient to find an association-in-fact enterprise. *Id.* at 1211 (citing *Ray*, 836 F.3d at 1352–53, 1352 n.3). Instead, where the alleged enterprise participants' purpose is to make money for themselves, the plaintiff must demonstrate that "the participants shared the purpose of enriching themselves through a particular criminal course of conduct." *See id.* at 1212. The Court in *Cisneros* thus found no enterprise existed where there the plaintiff alleged no facts that the defendants were "collectively trying to make money in pet sales <u>by fraud</u>." *Id.* (emphasis in original).

Plaintiffs' Complaint alleges that the RICO enterprise includes Toyota as an entity, including all subsidiaries and Toyota employees; SET and other distributors, along with their employees; DENSO, the HVAC manufacturer, and its employees; and certain Toyota dealerships and their employees. ECF No. 49 ¶ 124. Plaintiffs describe Toyota and SET as two separate and distinct entities that worked in concert to keep the alleged HVAC design defect hidden and portray any HVAC odor as normal, all done for the purpose of their own enrichment. ECF No. 211 at 19. Relying on this Court's language on its Order on the Motion to Dismiss, Plaintiffs aver that SET

and Toyota constitute a RICO enterprise with a "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  ECF No. 211 at 19 (citing *Cardenas*, 418 F. Supp. 3d at 1101-02).  Plaintiffs note that the Order on the Motion to Dismiss additionally found, when taking the Plaintiffs' allegations in the Complaint as true, that SET and Toyota "served a common purpose: to sell as many Defective HVAC Systems and Class Vehicles containing the Defective HVAC Systems, as possible, and thereby maximize the revenue and profitability of the Toyota RICO Enterprise's members." *Cardenas*, 418 F. Supp. 3d at 1102.

At this posture, in resisting summary judgment, Plaintiffs proffer evidence that SET and Toyota jointly participated in HVAC odor-related investigations, ECF No. 213 at ¶ 13, and that SET and Toyota worked jointly to inform customers that odor is naturally occurring and cannot be remedied, ECF No. 213 ¶ 120.  As further evidence of the enterprise, Plaintiffs also proffer SET's efforts to ensure that SET, Toyota, and the customer excellence centers were "in lockstep" and were consistent in their messaging that HVAC odor was natural in response to environmental conditions and could not be eliminated.  ECF No. 210 ¶ 7.  This position ultimately came from Toyota's determination that service related to HVAC odor was not covered by warranty.  *Id*. Finally, Plaintiffs advance evidence that SET and Toyota discussed what terminology to use in documenting HVAC odor to improve their position going into arbitration and buyback proceedings.  ECF No. 210 at 56.

Plaintiffs additionally advance evidence that TMS distributed the allegedly misleading TSBs and Tech Tips documents, claiming that this demonstrates TMS' coordination with the other Defendants to falsely portray the HVAC odor to consumers and constituted a "uniform script" for SET dealerships.  ECF No. 213 ¶ 134.  This proffered evidence, however, implicates only the

Toyota entities; as noted by Defendants, the distinctiveness requirement precludes finding an enterprise exists amongst TMS and the other Toyota entities because they are all subsidiaries of TMC.  ECF No. 175 at 13 (citing *Berber v. Wells Fargo Bank, N.A.*, No. 16-24918-CIV, 2018 WL 10436236, at *4 (S.D. Fla. May 24, 2018) ("[A] parent company and its subsidiaries cannot form an 'enterprise' for RICO purposes unless there is some suggestion that the vehicle of corporate separateness was deliberately used to facilitate unlawful activity.")).

What Plaintiffs have demonstrated here is more than an association for the purpose of selling vehicles and making money; rather, Plaintiffs have adduced competent evidence to show that Toyota and SET engaged in steps to refuse to cover the cost of repairs and took a number of steps to resist and avoid the cost that would be incurred in buying back the vehicles.  The means of accomplishing this goal, Plaintiffs allege, was by maintaining the position that the HVAC odor was normal.  Plaintiffs have advanced evidence in support of these claims, thus raising a triable issue of a fact as to whether Toyota and SET met the association in fact enterprise requirement.

### iv.  RICO Causation

RICO additionally requires that a plaintiff show she was injured "by reason of" a violation of the statute.  *See* 18 U.S.C. § 1964(c).  The Supreme Court's holding in *Bridge*, 553 U.S. at 649, makes clear that "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud."  Further, an individual can be injured "by reason of" a pattern of mail fraud even if he has not relied on any misrepresentations." *Id*.  As a practical matter, a plaintiff will often—but not *always*—need to demonstrate that *someone* relied on the defendant's misrepresentations, whether that be the plaintiff themselves or a third-party.  *Id.* at 658-59.  This is so because if the individual allegedly deceived by the misrepresentation would have taken the

same action regardless, then the misrepresentation cannot be a proximate cause of the plaintiff's injury. Nevertheless, reliance is not itself an element of a successful RICO claim; while it may be sufficient to show causation, it is not necessary.

Defendants argue that Plaintiffs have not advanced evidence that they relied upon any of the cited misrepresentations or omissions in connection with the purchase of their vehicles. ECF No. 241 at 4. Defendants advance evidence of the following: Monge did not make the purchasing decision, and ultimately, she purchased a used car from an unauthorized Toyota dealer, ECF No. 176 ¶¶ 67-69; Baker knew about the potential for odor before purchasing both of his Camry vehicles, remembered no statements made by Toyota when he purchased his first Camry, and relied upon third-party industry reports in making that purchase, *id*. ¶ 40; and, like Monge, Cardenas did not make the purchasing decision, his mother did, and there is no evidence she relied on any of the asserted misrepresentations or omissions in making that decision, *id.* ¶ 54.

At oral argument, Defendants cited *Ironworkers Loc. Union 68,* 634 F.3d at 1359, in support of their claim that Plaintiffs failed to establish the requisite causal link under RICO. In *Ironworkers*, the district court found that the plaintiffs failed to establish a direct relationship between the alleged misrepresentations by the defendant pharmaceutical company regarding the safety and efficacy of the drug and the economic injury plaintiffs claimed they suffered in overpaying. Rather, the court found that by the terms of the plaintiffs' own allegations those losses could have been caused by "other independent factors." And this concern was not hypothetical-- physicians prescribed the drug in question through the exercise of their independent professional judgment, which could be informed by more than simply the defendant's representations about the drug. *Id.* On appeal, however, the Eleventh Circuit took a slightly different view, finding that to establish causation in the context of prescription drug purchases, the plaintiffs needed to allege not

just overpayment, but also that the purchased drugs were either *un*safe or *in*effective for their prescribed use. *Id*. at 1360. The unique context of prescription drug claims, and the factual circumstances including the professional judgment employed by the physician in prescribing the drug, make *Ironworkers* an ill fit for comparison to this case for causation purposes.

Defendants additionally rely on *Ray v. Spirit Airlines, Inc*., 836 F.3d 1340, 1350 (11th Cir. 2016), in which the plaintiffs claimed that the defendant airline violated RICO by portraying on its website that a passenger user fee charged along with every airline base fare was a government-imposed tax, when in fact it was part of the base fare charged by the airline. The Eleventh Circuit affirmed dismissal of the case, finding no direct link between the defendant airline's presentation of its allegedly deceptive passenger user fee and a plaintiff's decision to purchase their airline ticket on the defendant's website. The court observed that the plaintiffs' causation argument was "at the highest order of abstraction and supports the claim only with conclusory assertions," in part because the complaint did not "even allege that the plaintiffs would not have purchased their tickets from the Spirit website had they known that the Passenger Usage Fee was not authorized or collected by the government." *Ray*, 836 F.3d at 1350. But even if they had, the court found it would be implausible to claim that a passenger purchasing an airline ticket accompanied by a passenger user fee of $8.99 would refuse to purchase the ticket upon learning that the airline rather than the government was charging the fee. *Id*.

Unlike the plaintiffs in *Ray*, however, in support of their causation argument, Plaintiffs offer evidence for each Plaintiff that, had he or she known about the defect, the Plaintiff "would not have purchased or would have paid less for the Class Vehicle." ECF No. 211 (citing ECF No. 213 ¶¶ 40, 57, 72). Each of these paragraphs in Plaintiffs' Statement of Facts cites to the respective Plaintiffs' supplemental interrogatory responses; for example, Plaintiffs state in the Statement of

Facts at paragraph 40 that "[i]f Defendants had disclosed the Defect, Baker would not have purchased or would have paid less for his Camry Vehicles and, when he purchased his Camry Vehicles, Baker relied on the reasonable expectation that the vehicles would be equipped with defect-free HVAC systems that would not pose a threat to his health or safety."  ECF No. 213 ¶ 40 (citing ECF No. 213-36, Baker's Supplemental Response to Interrogatory No. 13).

Plaintiffs additionally argue that their damages experts Colin Weir and Steven Gaskin established causation through their determination that each class member was damaged by overpaying for their vehicle, but this argument suffers from two flaws, the first of which is that, as Defendants note, both Gaskin and Weir testified at deposition that their assumed liability was established for the sake of their calculations.  ECF No. 242 at 8-9 (citing Ex. 15, Gaskin Dep. at 106:14–15 ("I'm assuming liability has been proven"); Ex. 16, Weir Dep. at 21:11–12 ("I accept their theory of liability as it is."); *id.* at 43:9–11 ("I did make at least one central assumption; namely that plaintiffs will be able to establish their theory of liability.")).  The second flaw in this argument is that it attempts to circumvent the causation inquiry through offering proof of a RICO injury, but these are two distinct elements of a meritorious RICO claim.

The Plaintiffs' causation argument thus hinges on three individual interrogatory responses. It is inappropriate at the summary judgment phase for the Court to weigh the sufficiency of the evidence and make determinations as to its persuasiveness; that is a task for the jury.  The relevant inquiry here is whether the evidence would permit the inference that these Plaintiffs, Monge, Baker, and Cardenas, would have made a different purchasing choice had Defendants made some disclosure about the defect.  This is a permissible inference for Baker and Cardenas, but not for Monge.

In the context of class certification, the undersigned found that causation could be inferred

on a classwide basis only based on a narrowed class definition that limited the class to those who purchased their vehicle at an authorized Toyota dealership. This is key here because implicit in the Plaintiffs' statements that they would have acted differently in the face of disclosure is an assumption *that they would have received* the disclosure. A reasonable fact finder could conclude that Baker and Cardenas, who purchased their Camry vehicles at authorized Toyota dealerships, would have received such a disclosure had it been made.[9]

Monge, however, did *not* purchase her vehicle at an authorized Toyota dealership, and Plaintiffs offer no explanation or evidence as to how she might have received a disclosure about the HVAC system if one had been made. The record reveals no opportunity for her to have been exposed to the disclosure she avers would have affected her decision to buy at the price she did, or to buy the vehicle at all. All of Plaintiffs' relevant cited cases on this point considered determinations at the motion to dismiss phase in which the allegations are taken as true, but the bare allegations themselves are insufficient at the summary judgment juncture. Accordingly, I recommend that summary judgment be entered in favor of Defendant Toyota on Monge's RICO claim.

### v.   RICO Injury

Successful RICO claims require proof of direct economic injury to either their business or property. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985); accord 18 U.S.C. § 1964(c). To survive summary judgment, the plaintiff must proffer "evidence from which a jury could calculate any alleged loss with reasonable certainty." *London v. Fieldale Farms Corp.*, 410

---

[9] Defendants do not offer support for their claim that the lack of disclosure could not have caused injury to Cardenas because he did not make the down payment for the vehicle, and thus summary judgment is not warranted on this basis. Defendants also claim that Baker knew about the potential for HVAC odor, but knowledge about the potential for odor is not the same as knowledge about an HVAC design defect that causes odor. Defendants also note that Baker relied on third-party industry reports—and not any statements from Toyota—in making his purchasing decision, but this does not negate the theory that the *lack* of disclosure caused the harm.

F.3d 1295, 1306 (11th Cir. 2005).

Plaintiffs argue that proof of overpayment is sufficient to establish a RICO injury, as this is consistent with what courts have found in the context of motions to dismiss.  ECF No. 211 at 24 (citing *In re Takata Airbag Prod. Liab. Litig*., 396 F. Supp. 3d at  1121 (sustaining RICO claim and finding plaintiffs alleged the requisite economic injury where "[p]laintiffs . . . assert they suffered economic injuries and are entitled to damages comprising the value they overpaid for their vehicles[.]"); *Dolan v. JetBlue Airways Corp*., 385 F. Supp. 3d 1338, 1354 (S.D. Fla. 2019) (holding that plaintiff adequately alleged requisite injury to business or property pursuant to RICO "by paying more for a service than its actual value")).  As evidence, Plaintiffs proffer the testimony of their damages experts, Steven Gaskin and Colin Weir, who utilized a conjoint analysis to determine classwide overpayment damages in aggregate.[10]  *Id*. (citing ECF No. 213 ¶¶ 108-111).

Defendants criticize this approach, first claiming that it is insufficient evidence at summary judgment because neither expert evaluated harm at the individual plaintiff level.  Defendants do not, however, offer support that would explain *why* calculating the damages in aggregate is insufficient.  Plaintiffs use Gaskin and Weir's testimony here to establish classwide damages, from which each class member's—including Plaintiffs'—damages may be calculated.

Defendants next aver that because the model calculates damages at the point of the first purchase, it is an ill fit for those who purchased used vehicles or for those, like Baker, who purchased and resold a vehicle.  In response, Plaintiffs advance Weir's deposition testimony, in which he states that the point of purchase overpayment damages can be applied to both purchasers of used vehicles and those who resold their vehicles.  ECF No. 213 at ¶ 111 (citing Ex. 52, Weir

---

[10] Gaskin and Weir additionally offered cost of repair calculations as a proxy for overpayment damages.  Because I have, by separately filed Report and Recommendation on Class Certification, recommended that this analysis be excluded as inadmissible, I have not considered it here.

Dep. 114:9-20). According to Weir, the "point of first purchase" measurement calculates the total harm caused by Toyota and thus the total amount of overpayment; that total amount of harm can then be allocated and apportioned as appropriate for those who purchased their car used or for those who resold the vehicle.

Defendants claim that this method will not permit a jury to calculate any alleged loss with reasonable certainty, citing a case from the District of Arizona for the proposition that aggregate damages are insufficient to survive summary judgment and that individualized damages must be shown. ECF No. 242 at 12 (citing *Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089, 1104-05, 1107 (D. Ariz. 2006)). *Lemon*, which was not a RICO case, found that scrutiny of the plaintiffs' damages evidence was appropriate at the summary judgment phase because the plaintiff would bear the burden of showing individualized damages at trial and thus must show that there is a triable issue with respect to the damages suffered by each individual plaintiff. 437 F. Supp. 2d at 1104.

The comparison to *Lemon* is inapposite to this analysis; the question of whether the damages methodology is sufficiently concrete to survive summary judgment is an entirely separate inquiry from whether it can be used to establish a RICO injury. One considers the quantifiable degree to which the plaintiff was harmed, while the other considers whether the plaintiff was injured at all. In any event, the facts of *Lemon* also differ from those at issue here in key respects—the expert in *Lemon* offered only damages in aggregate because she was *unable* to provide individual damages due to the defendant's "refusal" to reliably quantify certain sales data. *Id.* at 1104 (noting that the plaintiffs claimed the expert estimated individual damages "as much as possible"). While Gaskin and Weir calculated damages in aggregate, their figures do not reflect missing foundational data necessary to determine individual damages figures, as was the case in

40

*Lemon*.  As Weir testified, the total damages for an individual simply need to be allocated according to the ownership interest purchased or sold by the individual Plaintiff.  This is an activity typical of the claims administration process that need not be determined at the summary judgment phase.

Through the conjoint analysis, Plaintiffs offer evidence that individuals who purchased a Camry with a defectively designed HVAC system were injured because they overpaid for their vehicles.  The analysis applies to *all* those within the scope of the study who overpaid for their vehicles; Plaintiffs are necessarily included in the results.  There is a triable issue of fact as to whether Plaintiffs suffered a RICO injury.

### vi.   Whether Baker's RICO Claim is Barred by the Statute of Limitations

RICO contains a four-year statute of limitations for civil actions that "begins to run when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering." *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013) (citation omitted).  Defendants aver that because Baker observed odor in his 2012 Camry in May 2012, and smelled odor in his 2014 Camry in May 2014, the statute of limitations expired for any RICO claim prior to the filing of the Complaint in this action.  ECF No. 175 at 20.

Plaintiffs argue in response the Defendants are improperly conflating the date(s) Baker first observed odor with the date Baker should have been aware of the alleged injury.  ECF No. 211 at 28 (citing *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc*., 782 F.3d 922, 928 (7th Cir. 2015) (finding that the RICO statute of limitations runs when the plaintiff becomes aware that it paid more because of illegal conduct)).  Plaintiffs aver that Defendants offer no evidence to suggest that that the date Baker first observed the odor is one and the same with the date that he knew or should have known that he overpaid for his vehicles because their HVAC systems defects

undisclosed at the time of purchase.

And even if Baker's statutory time period has expired, Plaintiffs argue that the doctrine of fraudulent concealment justifies tolling Baker's claim.  The doctrine of fraudulent concealment tolls the statute of limitations upon a showing that "fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury."  *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d at 1344; *Padilla v. Porsche Cars N. Am., Inc*., 391 F. Supp. 3d 1108, 1113 (S.D. Fla. 2019).  In support of their claim, Plaintiffs proffer the evidence offered above as to Defendants' concealment of their misconduct.  *Id*. at 29 (citing ECF No. 213 ¶¶ 41, 133, 135, 137-138).  Plaintiffs' theory here is that in concealing the defect, Defendants also sought to conceal their motivation for doing so.

Defendants have not offered evidence that would demonstrate with any degree of certainty what date Baker's statute of limitations began to run, nor have they offered a meaningful rebuttal to Plaintiffs' defense that the limitations period was tolled.  Defendants have thus not carried their burden to demonstrate that they are entitled to judgment on this affirmative defense as to Baker's RICO claims.

### c.   FDUTPA Claim

FDUTPA, Florida's consumer protection statute, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  The purpose of this law is: (1) "[t]o simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices;" (2) "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade

or commerce;" and (3) "[t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202.

A successful FDUTPA claim requires a showing of:  (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.  *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 167 (Fla. Dist. Ct. App. 2015).  While the Florida legislature has not specifically defined what a "deceptive act or unfair practice" is, it has mandated that FDUTPA "shall be construed liberally."  Fla. Stat. § 501.202.  Courts in this district have held that a "deceptive act" is one where a "representation, omission, or practice occurred that was likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment;" an "unfair practice" is one that "offends established public policy and…is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal citations omitted); *see also Horton v. Hoosier Racing Tire Corp.*, 2015 WL 12859316, at *3 (M.D. Fla. Dec. 15, 2015) ("FDUTPA claim is stated where the defendant knowingly fails to disclose a material defect that diminishes a product's value.").

### i.  Deceptive Act or Unfair Practice and Causation

Under FDUTPA, courts must employ a reasonable consumer test, which asks whether a reasonable consumer standing in the plaintiff's shoes would have been likely misled by the defendant's actions.  *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *State, Office of Attorney Gen., Dept. of Legal Affairs v. Commerce Commercial Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. 1st DCA 2007)).  This test is an objective one, and thus the plaintiff need not show actual reliance on the representation or omission at issue.  *Id.* (citing *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000)).  To reiterate:  the question here is whether the

Plaintiffs paid a price premium and *not* whether they relied on the alleged illegal misrepresentation. *Id.* at 986. To survive summary judgment, Plaintiffs must advance evidence that a reasonable consumer in their circumstances would have been likely to be misled by Defendants' failure to disclose the HVAC design defect. This inquiry is a separate one from whether the Defendants *caused* the Plaintiffs' injury. To satisfy the causation element on summary judgment, a plaintiff must allege and advance evidence that the deceptive act or unfair practice caused them to act as they did. As applied here, to meet the causation requirement, the Plaintiffs must show that if Defendants had disclosed the alleged HVAC design defect, the Plaintiffs would not have paid a price premium for their vehicle.

Despite the distinction, Defendants each argue the two elements together, claiming that they overlap. The Court will thus dispose of the arguments here in kind but parse apart the two analyses as necessary.

### 1. SET

SET argues that it is entitled to summary judgment as to the FDUTPA claims because it "had no knowledge that the class vehicles were defective in any way," claiming that this is supported by "undisputed evidence." ECF No. 179 at 18. Plaintiffs, however, advanced evidence that SET was aware of the HVAC odor, knew that related customer complaints in its region were significant, and in at least some instances relayed information about complaints to Toyota. *See, e.g.*, ECF No. 210, Exs. 4, 15, 26, 56, 121, 127. Further, Plaintiffs have advanced evidence that SET defended buyback and Lemon Law proceedings, arguing affirmatively that there was *not* a defect despite the fact that, in at least one instance, one member of the three-member panel concluded that the HVAC system was defective. ECF No. 210, Ex. 122 (in which an SET employee circulates information regarding "a recent case we won," but noting that it was not a

unanimous decision; one of the three board members voted that there was a defect because "the customer felt so strongly regarding the smell (they were crying) that there must be something substantially wrong with the vehicle. Very scary."). Finally, Plaintiffs have also adduced evidence that in internal conversations, at least some SET employees exhibited skepticism at characterizing the odor as "normal." *See, e.g.*, ECF No. 213, Ex. 59 (discussing proper terminology in describing the HVAC issue to customers but noting that this employee "tries not to describe the issue as "'normal' because when they tell the customer that, it makes us look silly. How can we say a brand new [sic] car that stinks is 'normal'?"). There is, therefore, an issue of triable fact as to whether SET was aware that the HVAC systems in the vehicles were defective.

SET next argues that there is no evidentiary connection between any allegedly deceptive or unfair conduct by SET and Plaintiffs' alleged injury in purchasing the vehicle at a premium, because no information from SET would have been available to a reasonable consumer in the same circumstances. ECF No. 179 at 20. SET first advances as evidence the Plaintiffs' testimony that they were neither exposed to nor relied on any information from SET in purchasing their vehicles. ECF No. 179 at 20. Baker, proffers SET, relied on third party resources when purchasing his first class vehicle and then relied on his own experience in purchasing the second, while Monge and Cardenas relied on no information at all, given that they did not make the purchasing decisions. *Id*. SET additionally notes that it does not sell vehicles to consumers directly and has no interaction with them at the point of sale. *Id*.

What Plaintiffs subjectively relied on or did not rely on, as the case may be, is not relevant to this objective inquiry. SET's broader argument here is that it could not have caused injury because SET's role in the distribution process is too far removed from what takes place with consumers at the point of sale. It is correct that FDUTPA requires the purported deception to be

available to a reasonably objective consumer at the time he/she entered into the transaction. *Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *6 (S.D. Fla. Sept. 30, 2018). It is also accurate that SET is a distributor that does not interact with consumers at the point of sale. Notwithstanding, Plaintiffs' evidence that they paid a higher price than they would have, but for Defendants' deception, satisfies the causation element. *"*Ostensibly, a deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice. Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have. Consequently, the consumer suffers damages." *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 (S.D. Fla. 2010).

Plaintiffs advanced evidence, as described above, of SET's role in the perpetuation of misleading messages to customers that contributed to causing Plaintiffs' injuries, that is, the overpayment of class vehicles *that were sold by dealerships in SET's region*. Absent this connection between the consumer and the dealership, Plaintiffs cannot establish that the purported deception *by SET and Toyota* was available to a reasonably objective consumer in those circumstances. This is why courts are willing to recognize the inference of exposure in the context of sales at an authorized dealership, *Stockinger*, 2020 WL 1289549, at *9, to go beyond that requires too big an inferential leap. This limitation on the inference is in part why the undersigned recommended that the FDUTPA class be likewise limited to only those who purchased their vehicle at an authorized dealership—absent the inference, the Court would be required to conduct individualized inquiries to determine whether or not the inference of exposure was available.

It is undisputed that Baker and Cardenas both purchased their vehicles at authorized Toyota dealerships, and further, Plaintiffs advanced evidence that had Baker and Cardenas known about

the defect, they would have either paid less for the vehicle purchased or they would have purchased a different vehicle entirely. Summary judgment is not warranted to Baker and Cardenas on this basis.

It is also undisputed that Monge did not purchase her vehicle at an authorized Toyota dealership. There can thus be no inference that a reasonable consumer in her circumstances would have been exposed to the deception and thus misled, and Plaintiffs have not otherwise adduced evidence that would address how a reasonable consumer in Monge's circumstances would have been so exposed. Accordingly, I recommend that summary judgment be granted as to Monge's FDUTPA claim against SET.

## 2. Toyota

Toyota does not here explicitly argue that it is entitled to summary judgment on the basis that it did not engage in deceptive acts or unfair practices, outside of its global argument that that Plaintiffs have failed to adduce admissible evidence of a defect fundamentally. To the extent Toyota takes the position that this argument is implicit or incorporated by reference into a challenge as to the FDUTPA claim, the Court observes here that Plaintiffs have (1) advanced evidence through their experts that the HVAC system was defectively designed and that (2) Toyota was aware of the odor and its root cause, and (3) nevertheless repeatedly took the position that the odor was "normal," thus not entitling customers to repairs under warranty or a buyback under the Lemon Law.

Toyota argues that Monge and Baker cannot establish causation because they cannot demonstrate that they were exposed to the alleged deceptive activity. In support, Toyota cites *Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 627 (11th Cir. 2015), for the proposition that a plaintiff must allege that, but for the deceptive act, she would not have undertaken the action

she did, and *Maor*, 2018 WL 4698512, at *8, for the proposition that a plaintiff must demonstrate that the misrepresentation must have "been available to be relied on by a reasonably objective consumer when entering into the transaction." ECF No. 175 at 25.

As to the latter point, for the reasons articulated above, summary judgment is appropriate with respect to Monge's FDUTPA claim against Toyota as well. Monge did not purchase her vehicle from an authorized dealer, thus precluding any inference that a reasonable consumer in her circumstances would have been exposed to the deceptive activity, and Plaintiffs offer no additional facts or evidence on which such an inference could rest. In purchasing his vehicles from authorized Toyota dealerships, it may be inferred that a reasonable consumer in Baker's circumstances would have been exposed to the allegedly deceptive activity. Plaintiffs further advance evidence that had the HVAC defect been disclosed to Baker, he would have made a different purchasing decision.[11] Summary judgment is therefore not warranted as to Baker's FDUTPA claim against Toyota.

*ii.   Actual Damages*

Under FDUTPA, consumers may recover actual damages, which are measured by "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *ADT LLC v. Vivint, Inc.*, No. 17-CV-80432, 2017 WL 5640725, at *5 (S.D. Fla. Aug. 3, 2017) (internal citation omitted); Fla. Stat. § 501.211. The rationale for this calculation is that FDUTPA is "intended to protect a consumer from unfair or deceptive acts or practices which diminish the value or worth of the goods or services purchased by the consumer." *Id.* This metric permits a plaintiff to proceed on the theory that she did not get what she bargained

---

[11] As noted earlier, to the extent Defendants argue that Baker was aware of the odor and purchased both cars regardless, this conflates knowledge of the odor with knowledge that the HVAC system was defectively designed. The two are not analogous.

for. *See, e.g.*, *Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 991 (Fla. 5th DCA 2004) ("This case turns on a relatively simple question, at least as to damages—Is a car with defective seatbelt buckles worth less than a car with operational seatbelt buckles?  Common sense indicates that it is[.]").

As they did for RICO, Plaintiffs claim they incurred actual damages by overpaying for their Camry vehicles with the undisclosed HVAC defect.  ECF Nos. 211 at 36; 212 at 19.  Plaintiffs again offer as evidence the opinions of their experts and the conjoint analysis performed.  And here too, Defendants raise many of the same challenges to Plaintiffs' proffered evidence:  namely, that the analysis cannot be used to determine the quantity of damages with any degree of reasonable certainty.  The Court rejects this argument for the same reasons as it did with respect to RICO— the actual damages requirement under FDUTPA as applied here requires that Plaintiffs suffered some economic loss in the form of overpaying for their vehicles with the hidden defect, not that that loss be precisely quantified at the summary judgment phase.

The conjoint analysis measured the total overpayment at the time of the initial sale of the Camry from Toyota to the consumer.  Consistent with Weir's testimony, for a plaintiff like Cardenas who did not make 100 percent of the payments for the vehicle, or for a plaintiff like Baker who resold both of his vehicles, the total amount of overpayment damages simply need be properly apportioned to confirm with the ownership interest.  ECF No. 213-111 (citing ECF No. 213 at Ex. 52, Weir Dep. 114:9-20); *see also Carriuolo*, 823 F.3d at 990 (noting that the "fact of resale is immaterial because the injury occurred when class members paid a price premium at the time of lease or purchase.").

Plaintiffs have thus established a triable issue of fact that both Cardenas and Baker suffered actual damages.

> iii. *Whether Baker's FDUTPA Claim is Barred by the Statute of Limitations*

Like RICO, FDUTPA has a four-year statute of limitations, but time begins to accrue from the date of purchase. *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017). Defendant proffers the same facts here as above, to which Plaintiffs again argue that the statute of limitations period for Baker's FDUTPA claim was tolled under the doctrine of fraudulent concealment. The statute of limitations is tolled upon a showing that the injured party was fraudulently precluded from discovering his injury and right to a cause of action. *See In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d at 1344. Plaintiffs here argue that Defendants concealed both the defect and the fraud they were allegedly perpetrating upon consumers, which prevented Baker from realizing that he overpaid for his vehicle and had a right to sue under FDUTPA, advancing as evidence Toyota and SET's knowledge of the HVAC odor. ECF No. 211 at 39 (citing ECF No. 213 ¶ 13).

Defendants in response attack this evidence as insufficient and claim that in *Padilla*, a case relied upon by Plaintiffs for their claim of fraudulent concealment, the court found nondisclosure insufficient to toll the statute of limitations. ECF No. 242 at 23. In *Padilla*, the court found that while the plaintiff claimed the defendant affirmative concealed the alleged defect from the public in a FDUTPA claim, plaintiff did not allege with particularity that the concealment was *fraudulent*. *Padilla*, 391 F. Supp. 3d at 1113 (noting that claims of fraudulent concealment must meet the heightened pleading standard set forth regarding scienter under Rule 9(b)). Plaintiffs here *do* allege fraud—indeed, it is an element of their claim that Defendants are liable under RICO in that they acted with the intent to defraud—and in the context of arguing their claim under RICO, Plaintiffs advance evidence sufficient to support their theory of intent to defraud to survive summary judgment.

Accordingly, Defendants have not carried their burden to show that there is no issue of triable fact as to whether Plaintiff Baker's statute of limitations under FDUTPA was tolled by the doctrine of fraudulent concealment.

          iv. *Whether Cardenas has Standing to Pursue his FDUTPA Claim*

While it is not disputed that Cardenas purchased his vehicle at West Kendall Toyota in Miami, Florida, Defendants claim that Cardenas does not have standing to bring a claim under FDUTPA because he is a Missouri resident and made payments from Missouri, citing Florida choice of law principles. ECF Nos. 175 at 27; 179 at 23. Defendants' arguments on this point complicate the analysis; as alleged, Plaintiffs claim that Cardenas was injured *at the time of purchase*, which occurred in Florida. The plain language of the statute contains no "language which purports to confine the provisions of FDUTPA or limit the Department's enforcement authority to commercial transactions involving only Florida residents." *Millennium Communications & Fulfillment, Inc. v. Office of Attorney Gen., Dept. of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1261 (Fla. 3d DCA 2000).

Accordingly, the fact that Cardenas made payments while residing in Missouri does not undermine his standing to bring a claim under FDUTPA.

        d. <u>Evidence of Standing to Pursue Injunctive Relief</u>

Plaintiffs seek "an order enjoining Defendants' unfair, unlawful, and deceptive practices." CAC ¶ 180. FDUTPA permits that "anyone aggrieved by a violation [of FDUTPA] may bring action . . . to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." Fla. Stat. § 501.211(1). As stated by the court *Galstadi v. Sunvest Cmty. USA, LLC*, 637 F. Supp. 2d 1045, 1057 (S.D. Fla. 2009) (Altonaga, J.), the statute is "broadly worded to authorize declaratory and injunctive relief even if those remedies might not benefit the individual consumers

who filed the suit," because its purpose is to protect the rights of both litigants and "the public at large." *Id*. (citing *Davis v. Powertel, Inc*., 776 So.2d 971, 975 (Fla. 1st DCA 2000)) (internal quotations omitted); *see also Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1186 (S.D. Fla. 2019).  Because Plaintiffs have stated a claim of a FDUTPA violation, they are entitled to seek injunctive relief under FDUTPA.

Plaintiffs must also satisfy the requirements for standing under Article III, as district courts are courts of limited jurisdiction, and thus standing is a "threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." *Galstaldi*, 637 F. Supp. 2d at 1058 (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir.2005)) (internal quotations omitted).  "To have standing, a plaintiff must establish (1) an injury in fact, which is concrete and particularized and actual or imminent; (2) a causal connection between the injury and the causal conduct; and (3) a substantial likelihood that a favorable decision will redress the injury." *Amnesty Intern., USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009) (citing *Granite State Outdoor Adver. v. City of Clearwater, Fla*., 351 F.3d 1112, 1116 (11th Cir. 2003)).

Defendants argue that Plaintiffs do not have standing to bring a claim for injunctive relief because they do not intend to purchase a Class Vehicle in the future and thus there is no threat of future harm.  ECF No. 175 at 28.  While Defendants advance evidence that Cardenas and Baker claimed they would not purchase a Class Vehicle in the future, Plaintiffs claim this does not negate all threat of future injury given that Defendants claim the defect does not exist and refuse to make repairs under warranty.  ECF No. 211 at 40.

Plaintiffs have established the requisite elements for Article III standing; they proffer a sufficient threat of future harm, they allege a concrete injury in fact in the overpayment for their vehicles and have demonstrated the causal connection between Defendants' alleged

misrepresentations about the vehicles and the loss suffered.

## V.     CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that:

Toyota's Motion for Summary Judgment, ECF No. 175, be **GRANTED, in part, and DENIED, in part**; and SET's Motion for Summary Judgment, ECF No. 179, be **GRANTED, in part, and DENIED, in part**.  The undersigned recommends that the Motions be **GRANTED** with respect to Plaintiff Monge. In all other respects, the Motions should be **DENIED**.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Federico A. Moreno, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in chambers this 2nd day of September, 2021.

_____
LAUREN F. LOUIS
**UNITED STATES MAGISTRATE JUDGE**

cc: All Counsel of Record