UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 18-22798-CIV-MORENO**

JAVIER CARDENAS, KURT KIRTON,
PAMELA BAKER, and MICHELLE MONGE,
individually and on behalf of all others simiarly
situated,

        Plaintiffs,

vs.

TOYOTA MOTOR CORPORATION;
TOYOTA MOTOR SALES, U.S.A., INC.;
TOYOTA MOTOR ENGINEERING &
MANUFACTURING, INC.; and
SOUTHEAST TOYOTA DISTRIBUTORS,
LLC,

        Defendants.

_____/

## ORDER CERTIFYING A REVISED CLASS

This case is about an alleged defect in non-hybrid Toyota Camrys for the model years

2012 to 2014. Car owners Javier Cardenas, Rodney Baker, and Michelle Monge bring this

putative class action against a variety of Toyota entities, in particular Toyota Motor Corporation,

which designed and manufactured the vehicles, and Southeast Toyota Distributors, which

distributed the vehicles to authorized dealers in the southeast United States. Plaintiffs allege that

Toyota and Southeast Toyota Distributors conspired to and actually concealed a defect in the

Heating, Ventilation and Air Conditioning ("HVAC") systems of the vehicles, in order to protect

the Toyota brand, overcharge consumers, and avoid buybacks under the Florida Lemon Laws.

The Court certifies one class under the Florida Deceptive and Unfair Trade Practices Act of all persons who purchased a 2012-2014 model year non-hybrid Toyota Camry from an authorized Toyota dealer in the state of Florida.  But the Court declines to certify a class under the Racketeer Influenced and Corrupt Organizations Act for purchasers of the same vehicles from authorized dealers in all of the southeast United States.

## I.    Background

Plaintiff car owners bring claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). Plaintiffs seek to certify two classes under Federal Rule of Civil Procedure 23(b)(3):

1.    All persons who purchased a 2012-2014 model year non-hybrid Toyota Camry in the state of Florida, called the FDUTPA Class.

2.    All persons who purchased a 2012-2014 model year non-hybrid Toyota Camry in the Southeast region, which includes Alabama, Florida, Georgia, North Carolina, and South Carolina, called the RICO Class.

Plaintiffs claim that the HVAC systems in the Class Vehicles are designed such that nutrient particles, organic matter, and dusts become trapped in the nooks and crevices in the evaporator housing.  As a result, Plaintiffs says that this design traps instead of flushing out contaminants with flowing condensation, creating a habitat for organic matter that causes microbial growth and malodor that is then expelled into the cabin.

The three representative plaintiffs have generally the same story.  Named plaintiff Rodney Baker purchased a 2012 Toyota Camry from an authorized Toyota dealership in central Florida.  After the purchase, he noticed a moldy smell coming from the vehicle's vents.  He complained to a Toyota dealership, but no repair was completed.  Two years later, he traded in the 2012 Camry for a 2014 Camry at another Toyota dealership in Florida.  Baker noticed the same odor, and again no repair was completed when he complained of it.  Michelle Monge

purchased her 2013 Camry "as is" from a non-Toyota dealer in 2016 in Florida. She noticed that the vehicle emits a moldy smell but has never had it inspected. Lastly, Javier Cardenas purchased his 2014 Camry from a dealer in south Florida. After, he noticed a bad smell coming from the HVAC system after he started the vehicle. All named Plaintiffs say that had Toyota disclosed the alleged defect to them, they either would not have purchased the vehicle or would have paid less.

This suit, howver, is not so much about the odor as it is about the Defendants' efforts to hide that defect and thereby overcharge for the vehicles. Plaintiffs claim that Defendants have known about this defect and concealed it for some time. Toyota Motor Corporation internally described HVAC odor as a "chronic issue" in 2012 and ranked it as third on Toyota's list of global issues. In response, Toyota Motor Corporation developed technical service bulletins and "Tech Tips" that Southeast Toyota Distributors would distribute to authorized dealers. These documents stated that HVAC odor was a normal characteristic of the systems and that it was naturally occurring—in other words, that Toyota could do nothing to fix it. Toyota and Southeast Toyota Distributors, through these documents and others, directed dealerships to tell customers that HVAC odor was normal. Toyota Motor Corporation and Southeast Toyota Distributors did so, in part, to avoid Florida's Lemon Law that required a buyback after three failed attempts to repair the issue.

Plaintiffs have put forward several expert witnesses in support of their claims. First, Murat Okçuoğlu analyzed the design of the HVAC systems in the class vehicles. He opines that the system is the same in all class vehicles and that the defective design features which permit materials to accumulate and cause odor are therefore present in class vehicles. Next, Steve Gaskin and Colin Weir performed a conjoint analysis, which Plaintiffs say accurately determines

3

the amount of overpayment damages (what class members paid versus what the vehicles were actually worth with the defect). In a conjoint survey, consumers are surveyed and asked to assign values to particular product attributes. In this case, they were essentially surveyed about their willingness to pay for two different vehicles: one with an HVAC system that might emit odor versus one with an HVAC system that did not emit odor. Gaskin and Weir found that the defect's disclosure resulted in a 25 percent reduction in value per class vehicle. In addition to this measure of overpayment, Weir offers another: he estimated the cost to abate HVAC odor over a ten-year period. These different damages theories are referred to as the "conjoint analysis" and the "cost to repair model."

First, Plaintiffs moved for class certification. Both Southeast Toyota Distributors and Toyota Motor Corporation separately filed briefs arguing against certification. Defendants have also moved for summary judgment. The Court referred both class certification and summary judgment to Magistrate Judge Lauren F. Louis. In addition to class certification and summary judgment, the Court referred several of the parties' evidentiary motions to Magistrate Judge Louis—specifically, Defendants' motions to exclude the opinions of Okçuoğlu as well as the conjoint analysis and cost to repair model. Magistrate Judge Louis entered a well-reasoned reports recommending denying summary judgment. She also recommended granting class certification, but only after amending the class definition to include only those individuals who purchased their Class Vehicle from an authorized Toyota dealer. She therefore recommended excluding Michelle Monge as a class representative. Plaintiffs chose not to object to this suggested revision of the class definition. Magistrate Judge Louis recommended admitting Okçuoğlu's opinions and the conjoint analysis but excluding the cost to repair model as an inappropriate proxy for overpayment damages.

4

The Court then held a hearing on all pending motions that spanned four hours. Counsel for all parties as they wished presented argument and the Court inquired accordingly. The Court then adopted the Magistrate's recommendation on summary judgment and explained that ruling in a written order. The Court also adopted Judge Louis's recommendation on Defendants' motions to exclude Plaintiffs' experts, without a concurrent written explanation, and noted that it would further elaborate on that decision in its forthcoming class certification ruling. Thus, in the present order the Court will rule on class certification and explain its ruling on Defendants' motions to exclude Plaintiffs' experts as required for class certification.

## II.    DEFENDANTS' MOTIONS TO EXCLUDE

"[A] district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification." *Sher v. Raytheon Co.*, 419 F. App'x 887, 891 (11th Cir. 2011). The Court in this section is ruling only on those evidentiary matters that must be decided before it can rule on class certification. Thus, the Court first considers Defendants' Motions to Exclude the conjoint analysis and the cost to repair model as well as the opinions of Okçuoğlu.

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. That rule permits admission if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), instructs trial courts to act as "gatekeepers," ensuring that "speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter*

5

*Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).   A district court has satisfied its *Daubert* obligations only after it has considered whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

Defendants' arguments here go to the second prong, often called "reliability."   In ascertaining reliability under the second prong, the Eleventh Circuit has "identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Id.* at 1292.

Defendants argue, with help from their expert Peter Rossi, that the conjoint analysis did not reliably calculate a proper market value because it did not account for supply-side factors. Defendants explain that an accurate measurement of true market price requires considering both demand by consumers and supply from sellers.  Here, they say, Gaskin and Weir considered only what consumers would be willing to pay.  This was to the neglect of important factors such as competitor pricing decisions and Toyota's willingness to sell, which directly impact market value.   To support their position, Defendants principally rely on *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), which generally adopted Defendants' arguments to exclude a conjoint analysis by Gaskin, *see id.* ("Mr. Gaskin does not actually calculate a market price premium; he examines only what

6

consumers say they would be willing to pay for certain vehicles. As Defendants point out, this ignores the 'supply' part of the supply/demand curve.").

Plaintiffs respond to the contrary. They say that Gaskin and Weir expressly describe in their reports which supply side factors they incorporated into their conjoint analysis to calculate the reduction in market value caused by the alleged Defect. (D.E. 223 at 9-13). Defendants only quarrel with the factors that were chosen, which goes to weight but not admissibility, according to Plaintiffs. The supply side factors that Gaskin and Weir considered are (1) the actual market prices that prevailed during the Class Period and (2) the actual quantity of Class Vehicles sold during that period. This makes sense, Plaintiffs explain, because their damages calculation is supposed to reflect a "but-for world" in which all else is equal except the Defendants' challenged conduct. In this case, that means that all should be the same except that Defendants did not make any material misrepresentations or omissions regarding the defect. Plaintiffs describe the court's decision in *Clean Diesel* as an outlier and instead cite several cases that have accepted Gaskin and Weir's conjoint analysis as offered in this case. *See, e.g.*, *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at \*4 (E.D. Cal. Mar. 29, 2019); *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, at \*6 (C.D. Cal. Sept. 23, 2020); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018).

In some respects, Plaintiffs and Defendants are both right. District courts around the country have accepted both arguments—some have excluded the proffered conjoint analysis and some have admitted it. For instance, the court in *Hadley* found that Gaskin's conjoint analysis sufficiently accounted for supply-side factors because it considered actual market prices and actual sales during the class period. *See Hadley*, 324 F. Supp. 3d at 1106. Judge Koh explained that courts have found conjoint analyses to have adequately considered supply-side factors when

7

they consider these metrics, and she thus held consistent with that trend. *See id.* at 1105. The court in *Clean Diesel*, however, felt differently; there, Judge Breyer explained that "presuming that Defendants would have sold the same number of cars, at the exact price that consumers would have been willing to pay, is not a way to reliably incorporate supply-side considerations." 500 F. Supp. 3d at 949.

In light of these conflicting views, Judge Crawford in the Western District of New York recently explained, "[t]his debate is common in the caselaw of conjoint analysis" and "[c]ourts have followed [both] directions." *In re Fisher-Price Rock 'N Play Sleeper Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2021 WL 4988186, at *6 (W.D.N.Y. Oct. 19, 2021). He elaborated:

> What these two lines of cases indicate is that there is a legitimate difference of opinion, both among judges and experts, about the significance of supply side information in calculating loss of value. Mr. Weir's methodology is not wrong or "fake"—it is simply different in a principled way from Dr. Rossi's analysis. A difference in opinion is not a basis for exclusion of an expert opinion under *Daubert* standards.

*Id.* at *7.

This Court agrees with Judge Crawford and other district courts which have observed that "critiques about Gaskin's failure to include certain attributes in his conjoint survey may be valid," yet "it is well-established that these types of critiques merely go to the weight, [] not to the admissibility, of survey-based analyses." *Hadley*, 324 F. Supp. 3d at 1108; *Beaty v. Ford Motor Co.*, 2021 WL 3109661, at *5 (W.D. Wash. July 22, 2021) (noting this disagreement among district courts, concluding that the defendant "simply disagrees with Gaskin and Weir about whether Plaintiffs' proposed conjoint model . . . should incorporate certain supply-side information," and reasoning that "[s]uch disputes go to the weight that should be afforded to the experts' model, not its admissibility"); *Earl v. Boeing Co.*, 2021 WL 4034514, at *38 (E.D. Tex. Sept. 3, 2021) (concluding that "the various threads of argumentation Defendants urge on this

point relate more readily to the task of the factfinder at trial"); *Milan v. Clif Bar & Co.*, 2021 WL 4427427, at *7 (N.D. Cal. Sept. 27, 2021) ("This may be grist for cross-examination at trial, but it is not a good reason to exclude Gaskin altogether from the case.").

This resolution is consistent with how this district has handled the matter before. *See Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 996 (S.D. Fla. 2016). And it is consistent with the principle, recognized in this district, that arguments about a consumer survey's methodology generally go to weight, not admissibility. *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, 2020 WL 1666763, at *13 (S.D. Fla. Apr. 3, 2020); *Taylor v. Trapeze Mgmt., LLC*, 2019 WL 1977514, at *2 (S.D. Fla. Feb. 28, 2019).

Defendants add a bevy of additional arguments for why Gaskin's conjoint analysis is unreliable. First, they argue that the conjoint analysis contained innumerable flaws: it provided respondents with a false choice between a vehicle that may emit HVAC odor and one that never will emit HVAC odor (which Defendants say does not exist), it omitted vehicle features that respondents actually care about and thus artificially increased apparent value of the HVAC system, it lacked a sufficient sample size, and it was unrepresentative because it included purchasers of hybrid vehicles and old people. Defendants also argue that the variability of Gaskin's result show that his method was unreliable; this, in addition to results showing that respondents would have unreasonably overpaid for certain vehicle features.

Notwithstanding the potential merit of these objections, the Eleventh Circuit, as well as district courts from sea to shining sea, have recognized that they go to weight, not admissibility. *See FCOA, LLC v. Foremost Title & Escrow Servs., LLC*, 2019 WL 416817, at *4 (S.D. Fla. Feb. 1, 2019) (noting that objections like poor sampling, poorly designed questions, and other errors in execution are "technical deficiencies that affect the survey's weight" but "not its

admissibility" (quoting *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844-45 (11th Cir. 1983))); *Sanchez-Knutson*, 181 F. Supp. 3d at 995 (same); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 370 (N.D. Cal. 2018); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 698 (E.D. Mich. 2019); *Hadley*, 324 F. Supp. 3d at 1110. As a result, Defendants' objections do not provide reason to exclude the conjoint analysis— especially because it is sufficiently tied to Plaintiff's legal theory that they overpaid for their vehicles and because it satisfies the predominance requirement under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), a conclusion that is elaborated upon later in this order. *Cf. Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015).

Defendants also object to Weir's cost-to-repair model on the grounds that under both FDUTPA and RICO, the proper measure of damages is the difference in market value of the product as delivered and the condition in which it should have been delivered, a value that is completely separate from the cost to repair. Defendants are correct, *see Sanchez-Knutson*, 310 F.R.D. at 538, as explained in greater detail by Magistrate Judge Louis in her recommendation to exclude the cost to repair model. (D.E. 334 at 41-43). Accordingly, the cost to repair model is excluded.

Finally, Defendants move to exclude Okçuoğlu's opinions because he did not himself test the class vehicles for odor. As Magistrate Judge Louis explains, however, this is not sufficient reason to exclude his opinions. Okçuoğlu's objective was not to deteremine whether there was odor in the vehicles—Toyota's own documents show that. Instead, his mission was to determine the cause of the odors generated in the HVAC system and see if a defect common to the class vehicles was the cause. For this reason and those explained in greater detail by Magistrate Judge Louis, (D.E. 355), the motion to exclude Okçuoğlu is denied.

10

Having resolved the parties' evidentiary skirmishes as necessary, the Court moves on to class certification.

## III.   CLASS CERTIFICATION

In a class action, representative litigants may bring claims on behalf of absent persons called class members.   Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979), and as a result, the presumption is against class certification, *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).   Although district courts have traditionally enjoyed broad discretion in deciding whether to certify a class, *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992), that discretion must be carefully exercised according to the dictates of Federal Rule of Civil Procedure 23, *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004) .

To proceed as a class, the named representatives must complete a burdensome checklist. Specifically, they "must satisfy an implicit ascertainability requirement, the four requirements listed in Rule 23(a), and at least one of the requirements listed in Rule 23(b)." *Ohio State Troopers Ass'n, Inc.*, 481 F. Supp. 3d at 1270.   Rule 23(a) requires that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   These requirements are generally referred to as "numerosity, commonality, typicality, and adequacy of representation." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009).

11

If the plaintiffs have affirmatively demonstrated ascertainability and that the requirements of Rule 23(a) are satisfied, the district court moves on to Rule 23(b). Here, since Plaintiffs proceed under Rule 23(b)(3), they must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Finally, Plaintiffs must also establish that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp.*, 569 U.S. at 35.

Since it is the plaintiffs' burden to establish that Rule 23 is satisfied, and that rule does not set forth a mere pleading standard, "the merits of the underlying claim may be considered to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Ohio State Troopers Ass'n, Inc.*, 481 F. Supp. 3d at 1271 (simplified). Doubts are resolved against class certification. *Brown*, 817 F.3d at 1234.

Because Magistrate Judge Louis recommended revising the class definition to only those purchasers that acquired their Class Vehicle from an authorized Toyota dealer, and Plaintiffs did not object, the forgoing discussion is based on that revised definition.

### A. Ascertainability

The first step for a plaintiff seeking class certification is to establish that the proposed class is adequately defined and clearly ascertainable. *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). In other words, the plaintiff must show that class members can be identified by reference to objective criteria. *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014). And such objective criteria must enable an identification process that is administratively feasible, requiring little, if any, individual inquiry. *Id.*

Plaintiffs maintain that this requirement is satisfied here because the class is defined by reference to objective criteria: persons that purchased the Class Vehicles from authorized dealers in Florida and in the Southeast region. Such persons could be identified, Plaintiffs maintain, through Defendants' records and through public records, like Vehicle Identification Numbers, which are maintained by various public and private entities. Plaintiffs are correct that use of this data is sufficient to render a class ascertainable. *See, e.g.*, *Berman v. Gen. Motors LLC*, 2019 WL 6163798, at *11 (S.D. Fla. Nov. 18, 2019).

In opposition, Defendants also argue that the class definition is overbroad. Specifically, Defendants argue that the class includes class members that never experienced HVAC odor and therefore never experienced any harm. But this is based on a fundamental misunderstanding of the nature of Plaintiffs' claims.

At bottom, this is a fraud case. It is not a products liability case. Plaintiffs allege that Defendants conspired to and succeeded at concealing a defect in their vehicles in order to defraud purchasers of the class vehicles. Their claims in general, under RICO and FDUTPA, require a showing that Defendants engaged in a scheme to defraud and acted deceptively. *See Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1098, 1105 (S.D. Fla. 2019). These legal wrongs, if committed, were complete at the time of purchase of the class vehicles, irrespective of which class members experienced HVAC odor. *See, e.g.*, *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019).

Defendants cited authorities do not compel a different conclusion. All that Defendants have established is that a class is overbroad when it includes uninjured individuals. *See, e.g.*, *Ohio State Troopers Association, Inc.*, 481 F. Supp. 3d at 1269; *Breakstone v. Caterpillar, Inc.*, 2010 WL 2164440, at *6 (S.D. Fla. May 26, 2010). And they have further demonstrated that

such might be the case where plaintiffs seek to certify a class of all purchasers, yet there is no evidence to show that a uniform defect existed at the time of sale. *See Ohio State Troopers Ass'n, Inc.*, 481 F. Supp. 3d at 1276 n.9.

But we do not have such a case here. Rather, the plaintiffs have created a triable issue that the HVAC systems in the Class Vehicles were defectively designed and that Defendants failed to disclose that defect. A jury, if it believes Plaintiffs' evidence, could thus find that the Class Vehicles were defective at the moment of sale, and that at the same moment Defendants failed to disclose that defect. *See, e.g.*, *Sanchez-Knutson*, 310 F.R.D. at 535. Thus, the proposed class definitions are sufficiently ascertainable and do not include class members that sustained no injury.

In its objections, Southeast Toyota Distributors ascribes error to Magistrate Judge Louis's report and recommendation for accepting "Plaintiffs' theory that the harm in this case is 'not the odor' but is instead the mere existence of an alleged undisclosed design problem at the time of purchase." Southeast Toyota Distributors then cites many cases, all of which the Court has considered, which simply restate the undisputed proposition that the presence of uninjured class members in a class often defeats certification. *Breakstone*, *Harris*, *Melton*, and *Ohio State Troopers* do nothing to establish that uninjured class members are included in the class definition here. If Plaintiffs' claims were for products liability-design defect, and therefore their alleged damages were odor in the cars, Southeast Toyota Distributors would be correct. But Plaintiffs' claims are brought under consumer protection-fraud statutes, and therefore the alleged harm is the overpayment as a result of the concealment of the alleged defect, not the defect itself. Any qualms about the existence of such a cause of action should be lodged with the legislatures that made the cause of action available, not the Court.

14

This misunderstanding of the cause of action also undermines Southeast Toyota Distributors's contention that Baker suffered no harm because he sold his class vehicle without respect to any diminution in value as a result of the alleged defect. Unlike in the case cited by Southeast Toyota Distributors, *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *5 (S.D. Fla. Dec. 5, 2013), where the alleged defect had not manifested prior to resale, both the injury and damage in this case accrued to Baker at the point of his initial purchase and was not ameliorated by his resale of the vehicle.

**B.      Numerosity**

The first requirement of Rule 23(a) is that the class be so numerous that joinder of all members is impracticable. Plaintiffs argue that this is satisfied here because the class vehicles number over 205,000 in the Southeast region and 91,000 class vehicles in Florida. It is clear that joinder of all purchasers from an authorized dealership would be impracticable, *see Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986), and Defendants do not argue otherwise.

**C.      Commonality and Predominance[1]**

Next, under Rule 23(a)(2), there must be questions of law or fact common to the class. This means that more than one common issue of law or fact must exist. *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 325 (S.D. Fla. 1996). Such issues, furthermore, must be susceptible to class-wide proof. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009). The focus is on the "capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Though not always the case, the commonality inquiry is generally satisfied where the defendants have

---

[1] "Because there is considerable overlap between Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement, courts often address them together." *Ohio State Troopers Ass'n, Inc.*, 481 F. Supp. 3d at 1282.

engaged in a standardized course of conduct that affects all class members. *See Sanchez-Knutson*, 310 F.R.D. at 536.

Predominance, on the other hand, presents a more difficult hurdle for plaintiffs. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997). Predominance demands, under Rule 23(b)(3), that "questions of law or fact common to class members predominate over any questions affecting only individual members." As described by the Eleventh Circuit, this means that the common issues of law and fact must have a direct impact on every class member's effort to establish liability and on every class member's entitlement to relief. *Williams*, 568 F.3d at 1357. Judge Tjoflat, writing for the panel, has provided the following particularly helpful illustration:

> [I]f the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Vega*, 564 F.3d at 1270 (simplified).

To begin, Plaintiffs argue that there are both common questions of law and fact; for example, whether Defendants engaged in a scheme to defraud Class members by knowingly selling defective Class Vehicles (RICO) and whether Defendants engaged in a deceptive or unfair business practice by concealing the HVAC Defect (FDUTPA). (D.E. 181 at 15-16). Those are examples of the biggest questions. Plaintiffs offer more discrete questions of fact and law as well, like whether the Class Vehicles contained an HVAC Defect, whether Defendants knew or should have known about that defect, and whether Defendants intentionally misrepresented or concealed facts concerning the defect. (D.E. 181 at 16).

As to predominance, Plaintiffs advance three main arguments.  First, Plaintiffs argue that their RICO claims will be established on a class wide basis using common evidence.  They will have to show an omission of material fact that was calculated to deceive.  And given Defendants' uniform conduct, the claims of each Class member will rise and fall together.  Second, Plaintiffs argue that common questions predominate on their FDUTPA claim because Florida courts apply an objective standard to such claims.  According to Plaintiffs, that means they only need to show that a reasonable consumer would have been harmed by the omission—an inquiry perfectly suited to class wide resolution.  Finally, Plaintiffs argue that their damages methodologies can be applied class wide because the conjoint analysis offered by their experts establishes the difference in market value of the Class Vehicles based on whether they had the alleged defect. In sum, on both their RICO and FDUTPA claims, Plaintiffs maintain that both the elements of such claims and the damages that follow are susceptible to class wide proof: answering the question as to one class member will answer it as to all of them.

In response, Defendants argue that individualized inquires will necessarily be required on all fronts, and that they will predominate over the common questions.  Defendants' collective response can broadly be divided into five main arguments, each of which is explained and considered in view of Plaintiffs' arguments in turn.

### 1. Design defect

Defendants argue that all claims require a common design defect causing odor, but that no evidence of such a common defect exists.  The Court does not agree.  Plaintiffs' expert Okçuoğlu has opined that the Class Vehicles "share identical or substantially similar HVAC designs" and that each has the same "design defects that allow moisture to accumulate in the HVAC systems."  Okçuoğlu Report at 31.  Defense expert Robert Kuhn purports to identify

"key" differences across Class Vehicles, but none of these purported differences go to the physical design of the HVAC systems.  To the extent that Mr. Kuhn disagrees with Okçuoğlu's conclusions, that is an issue if fact for the jury.  Either way, Plaintiffs have presented evidence that, if a jury believes, will show a design defect common to the Class Vehicles.  Resolving whether there is in fact a defect, then, will answer the question for all Class members.[2]

### 2. Common evidence of RICO Liability

Defendants provide three reasons for why individual issues predominate on Plaintiffs' substantive and conspiracy RICO claims.

First, Defendants say that there is a lack of common evidence showing a uniform, material misrepresentation or omission.  They argue that the only alleged misrepresentations to which Plaintiffs point are the "Tech Tips" and technical service bulletins which aren't good enough because they only go to dealers, not consumers, and owner's manuals, which may or may not have been read by consumers before purchase.  Defendants' position essentially breaks down to unless Plaintiffs point to a single, uniform misrepresentation made to all class members, there are no common questions on RICO liability.

Defendants also argue that Plaintiffs have offered no class-wide theory of RICO causation.  The way they tell it, Plaintiffs must show that someone relied on the alleged misrepresentation.  For this reason, they say, predominance is doomed: there's no evidence of any uniform misrepresentation or omission, much less reliance thereon.  They add that according

---

[2] Defendants make much of Okçuoğlu's statement in his deposition that "[i]f you drive a vehicle under different conditions on a large number of occasions, then in the absence of any malodors, one can conclude that a defect does not exist which causes odors."  (D.E. 340 at 14).  This, of course, does not alter the conclusions set forth in Okçuoğlu's report or suggest that he will not testify consistent with that report at trial.  Furthermore, seconds before that statement in his deposition, Okçuoğlu was asked "[i]f a vehicle does not exhibit HVAC odor, does that lead you to conclude that there's no defect with respect to the HVAC system" and he responded "[t]hat wouldn't be an accurate statement."  If Defendants believe that Okçuoğlu's testimony is self-contradictory, they are free to pursue that theory on cross examination.

to their expert, most class members still would have purchased the vehicle at the same price in the face of a disclosure—and there can't be reliance where a plaintiff would have acted the same regardless.

Defendants' arguments on the nature of the RICO statute and of Rule 23 are incomplete. They are correct that to succeed on their substantive RICO claim, Plaintiffs must show that Defendants engaged in a pattern of racketeering activity. *Williams*, 465 F.3d at 1282. And they are also correct that racketeering activity predicated on mail and wire fraud requires showing a scheme to defraud, which requires showing a material misrepresentation or omission. *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). Finally, Defendants are correct that for predominance to exist, there must be common evidence, capable of resolving in one swipe issues that are common to every single class member. *Williams*, 568 F.3d at 1357. However, it does not follow from these statements that in a RICO class action predicated upon mail and wire fraud, predominance rises and falls on the existence of a material misrepresentation or omission made by the defendant to every single class member, on which they in fact relied.

To begin, the Supreme Court has held that a plaintiff asserting a RICO claim predicated on mail fraud need not show that it relied on the defendant's alleged misrepresentation. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008). So that Plaintiffs personally relied on the owner's manual, or any other alleged misrepresentations by Toyota and Southeast Toyota Distributors, is not a requirement of their claim. *See id.* at 660 ("RICO's text provides no basis for imposing a first-party reliance requirement."). Rather, under RICO, a plaintiff needs to show a "pattern" of racketeering activity by the defendant, meaning two such acts. 18 U.S.C. § 1961(5). And once a RICO plaintiff has proved the predicate acts, they will still need to show causation, which is often done by showing that *someone else* relied on the misrepresentation or

19

omission. *Bowe v. Pub. Storage*, 318 F.R.D. 160, 179 (S.D. Fla. 2015). But plaintiffs need not establish individual, actual reliance on the predicate acts once proved; as the Supreme Court has explained, quoting the RICO statute, "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Bridge*, 553 U.S. at 649. Consider the following example that it provided:

> [S]uppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves. If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud, even though they never received, and therefore never relied on, the fraudulent mailings.

*Id.* at 649-50.

In short, if the plaintiff in an individual RICO action based on wire and mail fraud needn't be exposed to the predicate act-misrepresentation, then surely in a RICO class based on wire and mail fraud, not every class member need be actually exposed to the same misrepresentation. Instead, Plaintiffs need to present at least two predicate acts that are susceptible to class-wide proof that ultimately caused them to overpay for their vehicles. But they need not show by class-wide proof that every class member was in fact exposed to and relied on those predicate acts.

But even so, Plaintiffs' misrepresentation theory fails. Even if Plaintiffs' are correct that Toyota and Southeast Toyota Distributors made misrepresentations to authorized Toyota dealers about the source of the odor and the efficacy of the HVAC system, it does not follow that these misrepresentations caused every purchaser from an authorized dealership to overpay for their vehicle. Based on the evidence Plaintiffs offer, it was only those people who already owned a Class Vehicle and brought it to a dealership complaining of odor who were the potential victims

of a misrepresentation—i.e., they were the only people told that the odor was normal.[3]  But it is too attenuated an inferential chain to conclude that a purchaser from an authorized dealer, that had no meaningful communication with the dealer or Defendants about the HVAC defect, was harmed "by reason of" Defendants directing dealerships to convey to complaining customers that the odor was normal.  Magistrate Judge Louis came to a similar conclusion in her report and recommendation, (D.E. 334 at 25), and the Court agress with her.

Plaintiffs are correct, as a general principle, that causation can be achieved by an inference that a person who pays the amount specified for a product would not have done so absent reliance on the representation that the product was not defective.  *Bowe* 318 F.R.D. at 179 (collecting cases); *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1089–90 (10th Cir. 2014) ("In the RICO context, class certification is proper when 'causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct.'" (citation omitted)).  But for the reasons explained in this section, that observation does not connect the misrepresentations by Toyota and Southeast Toyota Distributors regarding the source of the odor to authorized dealerships with all persons that purchased a Class Vehicle.

Plaintiffs argument that a duty to disclose arose under RICO fails for similar reasons.  Plaintiffs are correct that the "nondisclosure of material information, even in the absence of any patently false statements, can also constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359–60 (11th Cir. 2004).  The Eleventh Circuit has explained that determinations "as to whether a duty to

---

[3] Even on this front, there is no class wide evidence to suggest that invididuals who already owned a Class Vehicle and brought it in for odor issues were actually told that the odor was due to natural causes.   There is only evidence making it plausible that they were so informed.   To reach that conclusion, the jury would have to assume that authorized dealers followed Defendants' instructions in all cases.

disclose information exists must be made on a case by case basis, with appropriate attention given to the nature of the transaction and the relationship between the parties." *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000).

The court in *Kemp* elaborated that a duty to disclose can arise "in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading" and that under RICO it is unlawful to omit certain facts that are necessary to make statements already made not misleading. 393 F.3d at 1360. The problem for Plaintiffs is that they have not offered any class wide evidence that Defendants, or even dealerships, told half truths to Class members *before* they purchased their vehicles. Plaintiffs have only submitted evidence that would permit a jury to infer that class members who complained of odor to an authorized dealership were mislead.

Neither have Plaintiffs provided a persuasive reason to find a duty to disclose on account of the relationship between themselves, Toyota, and Southeast Toyota Distributors. For RICO purposes, a vehicle manufacturer and a vehicle distributor are not in a fiduciary relationship or other relationship of trust with a vehicle purchaser such that a duty to disclose arises—or at least Plaintiffs here have not sufficiently explained why they are. Plaintiffs cite this Court's statement that the "concealment of critical data, even without a formalized duty to disclose, may also constitute mail and/or wire fraud in certain situations." *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1278 (S.D. Fla. 2003). But they have not explained why this case is one such certain situation. Furthermore, even if a "formalized" duty to disclose may not be required (i.e., a duty imposed by statute or regulation), an "informal" duty still is, as explained in *Langford*, which was cited by this this Court in *Managed Care*. So Plaintiffs still must explain why a duty to disclose has arisen, which they have not done. And this Court declines to hold, without any hint

from the Eleventh Circuit or Supreme Court, that manufacturers and distributors are under an omnipresent duty to disclose, for RICO purposes, all that may conceivablely be labeled a defect.

To conclude, the Court finds that Plaintiffs have not offered class wide evidence of a material misrepresentation or omission that caused injury to Plaintiffs, and as a result, individual issues of RICO liability predominate over the common RICO questions. The Court thus declines the certify a RICO class. Because no class can be certified on Plaintiffs' substantive RICO claim, a class likewise cannot be certified on their conspiracy RICO claim. *Cf. Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152-53 (11th Cir. 2011). For the sake of completeness, the Court still reaches conclusions in this order on Plaintiffs' and Defendants' arguments on the other RICO-related class certification issues.

### 3. Common evidence of the FDUTPA claim

Florida courts hold that "a consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006).

Plaintiffs assert, of course, that this claim will be established on a class wide basis through common evidence. (D.E. 181 at 23). First, Plaintiffs argue that under Florida law, an omission (such as a failure to disclose a defect) is a deceptive act for the purposes of FDUTPA (they are correct, *see Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 167 (Fla. Dist. Ct. App. 2015)), which can be established through common evidence. Second, Plaintiffs argue that their FDUTPA claim is well-suited for class treatment because Florida courts apply an objective standard of causation—whether a reasonable person would have been deceived. Because of this, Plaintiffs assert, whether a reasonable person would have been deceived is capable of common resolution for all class members.

Defendants attack FDUTPA predominance on two grounds. (D.E. 205 at 29-33). First, they argue that there is no common evidence of exposure to any alleged false statement or omission. Second, they argue that there is no class wide evidence that could show their conduct would have deceived all reasonable consumers in the same circumstances.

### a. Common evidence of a deceptive act and causation

Defendants concede that a FDUTPA plaintiff need not show reliance but say they must nevertheless show causation. To Defendants this means that the plaintiff must demonstrate actual exposure to the deceptive act, or else there is no causal link. They maintain that Plaintiffs cannot achieve this here; first, because there is no evidence of an omission that all consumers were exposed to and therefore could have relied upon, and second, because there's no evidence that Plaintiffs would have received a disclosure had Defendants made one.

Defendants' first argument is inconsistent Florida law as well as the proffered evidence in this case. With respect to FDUTPA, the Eleventh Circuit has explained that "plaintiffs do not need to present evidence that each potential class member was actually harmed by a defendant's conduct," and rather, that "plaintiffs need only show that a reasonable consumer would have been harmed by defendant's conduct." *Bowe v. Pub. Storage*, 318 F.R.D. 160, 182 (S.D. Fla. 2015) (citing *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007)); *see also Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) ("Because a plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue, the mental state of each class member is irrelevant." (simplified)). This understanding has been confirmed by Florida courts: "For the purposes of FDUTPA, we think the inquiry is how a reasonable consumer would" have responded to the alleged deceptive act. *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. Dist. Ct. App. 2000). The *Latman* court explained

24

that plaintiffs "need not individually prove reliance," only that "a reasonable person would have relied on the representations." *Id.* (simplified).   And the court added that reliance (which Defendants dispute here) can be sufficiently shown by the fact that the consumer parted with their money as a result of the deceptive act. *Id.*

Furthermore, in view of the revision of the class definition to only those who purchased a class vehicle from an authorized dealer, "a permissible inference of common exposure may be drawn." (D.E. 334 at 25).  Thus, whether Plaintiffs were exposed to the same omission is indeed susceptible to class wide proof.  As other district courts have aptly put it: "all class members received the same information from defendant regarding the purported defect – which is to say, no information." *Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2019 WL 1940619, at *9 (C.D. Cal. Mar. 27, 2019) (citing *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 531 (C.D. Cal. 2012)).

Defendants rely on the decision in *Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, 2020 WL 1289549, at *9 (C.D. Cal. Mar. 3, 2020).  In that case, they say, the district judge "denied certification of a FDUTPA class on the very theory advanced" by Plaintiffs.  But the California district court in that case appears to have concluded that FDUTPA has an individual reliance requirement—a concession that Defendants have already made here.

Defendants also seek refuge under the predominance analysis in *Justice v. Rheem Manufacturing Company*, 318 F.R.D. 687, 696 (S.D. Fla. 2016).  There, the district court concluded that the defendant's evidence suggested that consumers were unlikely to view and attach significance to any disclosure of the alleged defect. *Id.* at 697.  This is not persuasive: the district court in that case was careful to note that the plaintiffs offered no rebuttal evidence suggesting that consumers would have received and cared about a disclosure. *See id.* at n.5.  But here, there is a permissible inference that purchasers from an authorized dealer would have been

exposed to a disclosure, and Plaintiffs' expert reports constitute evidence that purchasers indeed would have attached significance to such a disclosure.

### b. Common evidence of reasonable consumers in the same circumstances

Defendants next argue on Plaintiffs FDUTPA claim that there is no common evidence that Defendants conduct was likely to deceive all reasonable consumers in their particular circumstances. They maintain that the evidence in this case reveals that not all class members had the same purchasing circumstances. Therefore, the circumstances of each class member's purchase cannot be proven class wide. The Court does not agree. The Court has explained the consequences for this case of FDUTPA's objectively reasonable consumer standard. In addition, Magistrate Judge Louis's suggested revision to the class definition ensures that all class members did purchase their vehicle under the same circumstances: from an authorized Toyota dealer. *See* (D.E. 334 at 25-26).

### 4. Common evidence of damages

On damages, Defendants raise several arguments against the conjoint survey. Only one of these arguments,[4] though, goes to the survey's capability of generating class wide answers— Defendants argue that the conjoint survey does not measure damages for any class member but instead merely aggregates damages to the class as a whole. This is insufficient, Defendants argue, because Plaintiffs must prove the actual injury to each class member.

The Court does not agree. First, Defendants do not dispute Plaintiffs' observation that "individualized damages calculations are insufficient to foreclose the possibility of class certification." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016). Indeed,

---

[4] That is, only one of those arguments *after* bracketing arguments that go to admissibility, the cost-to-repair model, and damages for class members that did not purchase their class vehicle from an authorized Toyota dealer, all of which the Court addressed above.

nothing in Rule 23 "requires plaintiffs to prove predominance separately as to both liability and damages." *Id.* Second, Defendants appear mistaken that the conjoint analysis cannot estimate the damages per class member. Gaskin explains how, having calculated the amount of overpayment damages per vehicle,[5] the damages per class member and to the class as a whole can easily be calculated. (D.E. 223-2 ¶¶ 55-59). Defendants do not suggest that the Gaskin Report here is mistaken or otherwise incorrect. The most they offer is an excerpt of Wier's deposition in which he explains that allocating damages to class members takes place during claims administration and that therefore he was not at that moment offering an opinion on the way to allocate between one class member or another. (D.E. 205-33 at 114-15). For that, he explains, he will need the class definition. Yet this does not rebut the methodology that the Gaskin report offered for calculating damages per class member; it just highlights the obvious fact that to make such a calculation, one would need to know who is a class member and who is not, which will be most prescient during claims administration after the Court has officially defined the class.

### 5. Individualized defenses

Defendants finally argue that they will raise two affirmative defenses in particular that are sufficient to defeat class certification. First, Defendants argue that many of the class members claims, because they regard Camrys from 2012-2014, are likely barred by the statute of limitations, because both RICO and FDUTPA have 4-year limitations periods and this action was filed in July 2018. Second, Defendants argue that many class members likely signed contracts agreeing to arbitrate and waiving any class action claims.

---

[5] And the parties agree that under RICO and FDUTPA, overpayment is the proper measure of damages.

The general rule, as acknowledged by the Eleventh Circuit, is that individual affirmative defenses ordinarily do not defeat predominance. *Brown*, 817 F.3d at 1240. Still, a district court confronted with the prospect of affirmative defenses should not simply recite this general rule and move along. *See id.* at 1240-41. Affirmative defenses are relevant to the predominance inquiry, particularly where they raise individual questions and could apply to the vast majority of class members. *Id.* at 1241.

The putative statute of limitations bar in this case does not defeat predominance because Plaintiffs raise fraudulent concealment as a tolling doctrine, which can be proven on a class-wide basis. This would require showing successful concealment of the cause of action and fraudulent means to achieve that concealment. *Fedance v. Harris*, 1 F.4th 1278, 1287 (11th Cir. 2021). Plaintiffs must also show that they have "pursued [their] rights diligently;" in other words, "the tolling ceases when those facts are, or should have been, discovered by the plaintiff." *Id.* (simplified). Whether Defendants succeeded at concealing the alleged defect and did so fraudulently is consistent with Plaintiffs' theory and capable of proof class wide. *See In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 656, 680 (S.D. Fla. 2015) ("Predominance is not defeated because the doctrines used by plaintiffs for tolling the statute of limitations, such as the doctrine of fraudulent concealment, involve proof common to the defendants, namely, the act of concealing defendant's wrong.") (simplified). Indeed, much of the evidence on which Plaintiffs will rely for the merits of their claims will also support their burden on fraudulent concealment.

Defendants also argue that many class members are subject to binding arbitration agreements and class waivers that they signed with Southeast Toyota Distributors, and that Toyota would be entitled to invoke these clauses under an equitable estoppel theory. The Court acknowledges that arbitration may bar the litigation of some class members' claims. But

Defendants do not say how many class members have signed such agreements or why they are definitely applicable here. Until they do so, the Court declines to find that this possibility cuts against predominance. The Court is mindful that if evidence later shows that an affirmative defense is likely to bar claims against some class members, there are adequate procedural mechanisms at its disposal. *Brown*, 817 F.3d at 1241 (citing *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39–40 (1st Cir. 2003)). For example, the Court could appoint a special master to preside over individual damages proceedings, decertify the class after the liability trial and provide notice to class members about how they may proceed to prove damages, amend the class definition, and more. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001).

### D.     Typicality

Under Rule 23(a)(3), the "claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." This requires that a "sufficient nexus exist[] between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001). Such a nexus is present if "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Williams*, 568 F.3d at 1357 (citation omitted). At bottom, if proof of the representative's claims would prove the proposed class's claims, the representative's claims are typical of the proposed class. *Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 698 (S.D. Fla. 2015).

Plaintiffs argue that this requirement is satisfied because their claims arise from the same defect and common effort to conceal that defect as the rest of the class. They add that they and

the rest of the class were injured in the same way, by overpaying for their vehicles, and that to support their claims they will advance the same arguments of law and fact as individual class members would.

Defendants raise several arguments against the typicality of each named plaintiff. With respect to Cardenas, Defendants argue that his class vehicle was purchased by his mother on his behalf who decided which car to buy and made the down payment for him. Further, Cardenas has had no interactions with Southeast Toyota Distributors. And he cannot represent the FDUTPA class, they say, because he paid for and operates his car in Missouri. These objections are unpersuasive. Cardenas made monthly payments on the vehicle even though his mother made the down payment and was therefore still injured by overpayment in the same way as other class members. Further, since there is no subjective reliance requirement in either statute, that Cardenas himself did not interact with Southeast Toyota Distributors is irrelevant. And while it is true that he lives in Missouri, it is undisputed that he purchased the vehicle from a Toyota dealer in Miami, Florida and thus was injured in Florida. (D.E. 181-73 at 26).

Defendants next argue that Baker is an inappropriate class representative because he never experienced any odor and because he only reviewed third-party materials before making his purchase. These facts are irrelevant, since the alleged injury is overpaying for the vehicle—not experiencing odor—and since there is no subjective reliance requirement (as explained above, a plaintiff needn't have been exposed to the alleged misrepresentation to have been harmed by it). Defendants add that Baker's claim is tolled by the statute of limitations, but they make this same argument as to other class members, so it does not interfere with typicality. Further, the statute of limitations in this case is disputed; Plaintiffs invoke the doctrine of fraudulent concealment, which is subject to class wide proof.

Finally, Defendants argue that Monge did not purchase her vehicle from an authorized Toyota dealer. Consistent with the revised class definition as recommended by Magistrate Judge Louis, and adopted by this Court, Monge is excluded from being a class representative for this reason.

### E.     Adequacy

Under Rule 23(a)(4), a class action cannot proceed unless "the representative parties will fairly and adequately protect the interests of the class." Adequacy is satisified where a named plaintiff shows they possess "the integrity and personal characteristics necessary to act in a fiduciary role representing the interests of the class, and has no interests antagonistic to the interests of the class." *Sanchez-Knutson*, 310 F.R.D. at 540. "In addition, plaintiff's counsel must be qualified, experienced, and generally able to conduct the proposed litigation." *Ohio State Troopers Ass'n, Inc.*, 481 F. Supp. 3d at 1279. "[A]bsent specific proof to the contrary, the adequacy of class counsel is presumed." *Sanchez-Knutson*, 310 F.R.D. at 540 (simplified).

Plaintiffs argue that adequacy is satisfied here because the named plaintiffs have been actively involved with the litigation and will continue to do so. According to Plaintiffs, they have responded to written discovery requests, sat for depositions, allowed Defendants to inspect their vehicles, selected competent counsel, and otherwise participated in the litigation.

Defendants offer very little in the way of rebuttal other than a smattering of claims without citation to pertinent legal authority. For instance, Defendants say that "Baker was never looking to sue Toyota until he surfed the internet while bored, reviewed only a few filings about the case until his deposition, and, even at this deposition, did not know the names of his Florida counsel." (D.E. 205 at 37). But Defendants do not explain why these facts would render Baker an inadequate representative.

Without any serious challenge from Defendants on this front, Plaintiffs have established that they will serve as adequate class representatives. Further, class counsel are experienced class litigators that are competent to conduct this litigation—Defendants do not challenge this point.

**F.      Superiority**

The second requirement of Rule 23(b)(3) is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Four criteria for consideration are offered in a non-exhaustive list: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Generally, this inquiry requires the Court to "consider the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. The outcome of the Court's predominance analysis "has a tremendous impact on the superiority analysis" because "the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Id.*

Plaintiffs argue that superiority is satisfied because there is "no evidence that any class member has shown an interest in individually controlling this cation and there is no overlapping litigation involving these claims on behalf of these members of the Classes." (D.E. 181 at 30). They add that the Court is so familiar with this case that its desirable to litigate all claims in this forum, and that the legal and factual issues of the class will be resolved on a core set of

32

documents, fact witness testimony, and expert testimony. This, they describe, is to be preferred to thousands of repetitive proceedings that will probe the same questions.

Defendants respond that individual issues predominate, so superiority is not established. Defendants are correct as to the RICO claims but incorrect as to the FDUTPA claim. Defendants add that a "more expedient dispute resolution program" is available "for the few class members who experience HVAC odor." This contention is again predicated on Defendants' misunderstanding of the causes of action, and Defendants do not say why the mere availability of an alternative dispute resolution program defeats superiority. Defendants also argue that class members are incentivized to bring their own actions because potential damages are not *de minimis* and both causes of action provide for attorney's fees. The Court acknowledges that in cases like the one cited by Defendants, where very few class members have been identified, the availability of damages and attorney's fees weighs against superiority. *See Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 669 (N.D. Ala. 2010). But this case does not concern a small amount of class members that have not been identified. In light of the many potential class members, the straightforward identification mechanism offered by Plaintiffs, and the predominating issues of law and fact, the availability of damages and attorney's fees is not enough to defeat superiority on the FDUTPA claim.

## IV.    Appointment of Class Counsel

Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel," the court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to

representing the class." Fed. R. Civ. P. 23(g)(1).  The Court appoints Peter Prieto of Podhurst

Orseck and  Joseph H. Meltzer of Kessler Topaz Meltzer & Check as class counsel.

**V.      Conclusion**

Based upon the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.      Plaintiff's Motion for Class Certification is **GRANTED in part and DENIED in part**.

2.      Pursuant to Federal Rule of Civil Procedure 23(b)(3), the Court hereby certifies the following class:

All persons who purchased a 2012-2014 model year non-hybrid Toyota Camry in the state of Florida from an authorized Toyota dealer, ("the FDUTPA Class").

3.      Rodney Baker and Javier Cardenas are designated as class representatives.

4.      Peter Prieto and Joseph H. Meltzer are designated as class counsel.

DONE  AND  ORDERED  in Chambers at Miami, Florida, this   6   of December
2021.

_____

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Magistrate Judge Lauren Fleischer Louis

Counsel of Record